UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

* * * * * * * * * * * * * * * * * * * * *
                                        *
KIRSTIE TRAHAN,                         *
                                        *
        Plaintiff,                      *
                                        *
   vs.                                  *
                                        *
WAYFAIR MAINE, LLC.,                    *
                                        *
        Defendants.                     *
                                        *
* * * * * * * * * * * * * * * * * * * * *


**DEPOSITION OF:  JONIE DUNIVAN**


        BEFORE:  Angella D. Clukey, Notary Public, at the

    offices of Lanham Blackwell & Baber, 133 Broadway,

    Bangor, Maine, on Friday, March 1, 2019, beginning

    at 10:04 a.m.



                    APPEARANCES:


Brett D. Baber, Esq.                    For the Plaintiff

Katharine I. Rand, Esq.                 For the Defendant



            DON THOMPSON & ASSOCIATES, INC.
              PO Box 2236, Bangor, Maine
    (Phone) 207-394-3900 (E-mail) dtreport@myottmail.com
            www.donthompsonandassociates.com

DEPONENT:  JONIE DUNIVAN

EXAMINATION                                          PAGE

By Mr. Baber:                                          3

By Ms. Rand:                                          112

                    *   *   *   *   *

EXHIBIT INDEX

No.                 Description              Marked

1              Deposition Notice               3

2       Human Rights Commission Response       3

3     Working at Wayfair; An Employee Guide    3

4     Recruiter Report: Service Consultant     3

5              Handwritten Notes               3

6              Handwritten Notes               3

7              Handwritten Notes               3

8               9/12/17 E-mail                 3

9            Manager Orientation               3

10              Handwritten Notes              3

11              10/21/17 E-mail                3

                    *   *   *   *   *

OBJECTIONS

                                                    PAGE

By Ms. Rand:                 11, 35, 63, 99, 101, 104

3

(This deposition was taken before Angella D. Clukey, Notary Public, at the offices of Lanham Blackwell & Baber, 133 Broadway, Bangor, Maine, on Friday, March 1, 2019, beginning at 10:04 a.m.)

* * * * *

(Deposition Exhibit Nos. 1-10 were marked prior to the deposition by Mr. Baber.)

* * * * *

(The deponent was administered the oath by the Notary Public.)

* * * * *

JONIE DUNIVAN, called, after having been duly sworn, on her oath deposes and says as follows:

EXAMINATION

BY MR. BABER:

Q    Would you state your name for the record, please?

A    **Jonie Dunivan.**

Q    That's D-u-n-i-v-a-n?

A    **Yes, sir.**

Q    Thank you.  And so we're here today to take your deposition in a -- sort of a dual capacity.  You're here, I understand, as a designated representative on behalf of Wayfair, Maine, LLC.  Do you understand that?

A    **Yes, sir.**

4

Q    And I will be showing you the deposition notice in a moment.  We are also here -- to the extent that for some reason you might have factual information or insight that's not contained in the deposition notice, I've also noticed your individual deposition just as sort of a catchall in the event that for some reason I didn't cover it in the deposition notice.

And so for the purposes of the corporate deposition, I'm going to proceed on the assumption that you are authorized to speak to the topics in the deposition notice to the extent -- you know, we're going to go over those in a moment just to make sure you are authorized.

Have you ever had your deposition taken before?

A    **Yes, I believe so.**

Q    Under what circumstances?

A    **Personal motor vehicle.**

Q    So you were involved in a personal motor vehicle litigation?

A    **Yes.**

Q    Were you the plaintiff or the defendant?  Did you have injuries and you were seeking recovery for somebody, or were you --

A    **No.**

Q    -- the -- the person that was being sued?

5

A    **I was the person being sued.**

Q    In any event, we have some ground rules.  You were present for Ms. Trahan's deposition.  I think my ground rules are the same as Ms. Rand's.  And -- but just for -- so we're all on the same page, it's very important that you allow me to finish asking my question before you start to answer.  And then I will, hopefully, allow you to finish answering my question before we move on to the next question.

That will also do another thing and, that is, if for some reason you don't understand my question, please let me know.  Sometimes my questions can be long and unwieldy and incomprehensible and --.  Just let me know and I will try to rephrase my question.

And if for -- it's important to use words.  Gestures are okay, but I might have to try to, you know, capture in words what the gesture was if it's important, or uh-huhs or mm-hums are sort of incomprehensible on the record.  We may understand it in the room.  And if you use an uh-huh or an mm-hum -- and I almost assure you that you will at some point during the day -- I'll just ask you to, you know, please say yes or no or verbalize it in some manner that we can record for the record.

And should you need a break, please let me know

6

and we'll take a break.  I would just ask that if I've asked you a question, that you would attempt to answer that question before we go on the break.

Are those ground rules acceptable to you?

A    **Yes, sir.**

Q    All right.  How long have you been with Wayfair, Maine, LLC?

A    **Since August 8th, 2016.**

Q    What is your -- and this is where your personal deposition notice might come in handy.  But what is your educational background?

A    **I have a bachelors of science and a juris doctorate.**

Q    So you're an attorney?

A    **I have the degree, I have not sat for the bar.**

Q    Where did you go to law school?

A    **Western New England.**

Q    What year did you graduate?

A    **'04.**

Q    And between law school and working for Wayfair what did you do for employment?

A    **Compliance.**

Q    A corporate compliance job?

A    **I worked for a couple of behavioral health companies as their compliance manager, auditing, making sure they're following regulations, accreditations.**

Deposition taken of: Jolie Dunivan

**7**

Q And what was your bachelor of science in?

A **Environmental science. I think at the time they called it natural resources.**

Q Where did you get your BS from?

A **University of Maine.**

Q What is your current position at Wayfair?

A **I'm a manager within our Talent Management Department.**

Q And is talent management a different terminology for HR?

A **It is synonymous with HR.**

Q And what do you -- what do folks within Wayfair call the people that are actually interfacing with customers on the telephone calls, are they employees, associates or talent or some other name?

A **Typically we would reference them by their title and it would be SSCs.**

Q And what does SSC stand for?

A **Sales and service consultant.**

Q Well, I might be a little pejorative and refer to them as employees during the course of the day, but --

A **I would understand that term.**

Q All right. Other than law school, have you received any training in -- you know, outside the company --.

**8**

So outside of law school, outside the company, have you received any training in human resources practices?

A **Outside of --? No.**

Q And when you were serving in your compliance role did you also serve as a compliance officer with respect to HR issues?

A **Yes.**

Q And inside Wayfair have you received any additional training or instruction on human resources practices?

A **Formalized trainings, no. But, you know, I meet regularly with my management team.**

Q Did you -- and I understand with new SSC personnel that they go through an orientation and a nesting process. And we'll talk a bit about that in a little while here.
    Did you go through a similar corporate orientation process?

A **I went through an on-boarding process very unlike the SSCs.**

Q And your on-boarding process, did it focus on human resources issues?

A **Yes.**

Q Were there any formal -- no, let's not use the word formal.

**9**

Q Did you do any computerized training as part of your on-boarding process?

A **No. Yes. There's trainings that are issued through Wayfair; you know, sexual harassment, interventions, confidentiality, those types of learning opportunities are online.**

Q And those learning opportunities on sexual harassment and so forth, would those be the same types of learning opportunities that an SSC or a lower-level employee would undertake?

A **Yes.**

Q So those would be sort of standard throughout the company?

A **Yes.**

Q Do you know if there was a training -- a computerized training segment or interactions with persons with disabilities?

A **There was not.**

Q Where is your office physically located?

A **Bangor.**

Q And what's the street address for Wayfair in Bangor?

A **690 Maine Ave. Maine like the state.**

Q So it's out near the University of Maine Augusta and off --

A **Right as you're going into the airport.**

**10**

Q Oh, okay.

A **The rotary prior to being at the airport.**

Q Who is your supervisor?

A **Shawn Spanier.**

Q Last name?

A **I would have to verify the spelling -- S-p-a-n-i-e-r.**

Q So Mr. Spanier, how long has he been your supervisor?

A **A year.**

Q I noticed in some of the materials in this case that you had some interaction with a Candice Smith. Is she with -- still with the company?

A **She is.**

Q Was she your supervisor back in -- at the time, you know, say summer and fall of 2017?

A **She was.**

Q When was the changeover from Ms. Smith and Mr. Spanier, approximately?

A **It's been almost one year, so --.**

Q Sometime in 2018?

A **Yeah. February or March 2018. I don't have the exact dates.**

Q That's fine. And is Mr. Spanier now the director of talent management?

A **No.**

Q All right. Is Candice Smith still in that role of

Deposition taken of: Jonie Dunivan

11

director of talent management?

A  Yes.

Q  And where is her office physically located?

A  I believe Washington state.

Q  And in the summer and fall of 2017 was Ms. Smith located in Washington state?

A  I am not sure.

Q  If you were to happen to need her assistance or want to discuss a matter with her, would you have in your mind that there was some sort of time -- time zone difference?

A  No.

Q  Okay.  And where is the Wayfair corporate headquarters home office?

A  Boston, Massachusetts.

Q  And why would the director of talent management be out in Washington state as opposed to Boston --

MS. RAND:  Objection; foundation.

BY MR. BABER:

Q  -- if you know.

MS. RAND:  You can answer when I do that.

BY MR. BABER:

Q  If you know.  Yeah, she's telling me that my question might suggest that you might not have the requisite knowledge to --

12

A  Candice is the director of talent management in the field and so her office would be outside of our corporate office.

Q  So are there so-called field offices out in Washington?

A  I don't believe there's -- I don't believe there's an outside office currently in Washington state.

Q  Does she work out of her home?

A  Her job is primarily travel.

Q  Okay.

A  My last understanding was at least three weeks a month she's physically at a site.

Q  And in 2017 how often would Ms. Smith be -- might she visit the Bangor site?

A  Once a quarter.

Q  And if Ms. Smith is on site, does she do any training while she's on site?

A  Not necessarily.

Q  Okay.  When you say not necessarily, that suggests to me that she might be doing some training.  Does she ever do training when she's on site, to your knowledge?

A  When I was initially hired, she -- she came out and she taught the first class, she did our first orientation or sent somebody to do the first

13

orientation.  And the training that we provided for our managers regarding discrimination, she would have done that first one.

Q  And this training on discrimination, when did you go through that training?

A  To the best of my recollection, it would have been sometime within my first 30 days.  I'm not sure what particular date or which office I was in.

Q  That's fine.  So part of the on-boarding process?

A  I would have done that, yes.

Q  Did you, to your knowledge, receive any written materials as part of that training?

A  All the trainings would have been, like, in a power point that I would have been able to access.

Q  So I'm going to show you what I've marked as Plaintiff's Exhibit 1.  And you might have seen these before.  And this is the deposition notice for today.

And, I guess, initially I'd ask you, have you seen Plaintiff's Exhibit 1 before today?

A  Yes, sir.

Q  So there are 18 topics on here.  And my question to you is, to your -- the best of your knowledge, are you authorized by the company to address each of these topics?  And if there are any topics you're not authorized to address on behalf of the company, just

14

let me know.

A  Yes, sir.

Q  So you are authorized to address all 18 topics?

A  Yes, sir.

Q  Would there be anybody within Wayfair -- well, let me back up.

Is Wayfair Maine, LLC part of a larger Wayfair corporation?

A  Yes, sir.

Q  Does each state have a separate entity such as Wayfair Maine, LLC, to your knowledge?

A  No, sir.

Q  What is the name of the corporate parent?

A  Wayfair, LLC.

Q  And are there any corporate layers between Wayfair, LLC and Wayfair Maine, LLC?

A  Not to my knowledge.

Q  Is Wayfair, LLC a publicly-owned company?  Do you know whether they sell stock on a stock exchange?

A  They do.

Q  I think I'll ask my next question in both corporate levels.  Would there be anybody within Wayfair Maine, LLC that would have greater knowledge than you on any of the topics in the deposition notice?

A  No, sir.

Deposition taken of: Jolie Dunlivan

15

Q And would there be anybody within Wayfair, LLC that would have greater knowledge on any of the topics?

A I don't believe so.

Q What, if anything, other than meeting with corporate counsel, did you do to prepare for the corporate deposition today?

A I reviewed the documents that we provided and our interrogatories.

Q Were you involved in preparation of the answers to interrogatories?

A I was.

Q And did you assist in the production of documents --

A I did.

Q -- previously?

Did you have any personal involvement in the preparation of the Maine Human Rights Commission response?

A Can you repeat the question, please?

Q Sure. Do you recall a response on behalf of Wayfair Maine, LLC -- actually, or Wayfair to the Maine Human Rights Commission?

A I do.

Q And did you assist in the preparation of that response?

A I did.

16

Q I'll be referring to that later, but we can get it out of the way. So did you assist in providing the factual background in -- on page -- starting on Page 2, it says: Events leading to termination?

A I did.

Q Then down at the bottom of Page 3 it seems to shift to sort of a legal analysis in the last paragraph. Were you the person that assembled the information that's factually set forth in the events leading to termination?

A I did.

Q All right. We'll come back to that. In preparation for the deposition did you speak with anybody else within the company?

A I didn't.

Q I believe there's one audio recording of a message left by Ms. Trahan on your phone. Did you listen to that in preparation for the deposition?

A I did.

Q And I understand from counsel that your personal phone line at -- I say personal -- your line at Wayfair Maine is not a line that's routinely recorded; is that accurate?

A That is correct.

Q Do you have the ability to actually record a call

17

that's coming in or out of your line?

A I don't.

Q So, for example, my phone system here in my office, if I press a button -- and I don't remember what the button is, but I've been told there's a button that I can record a phone call on my phone and actually save it to a server. Do you know if you -- your phone has that capability?

A My phone does not.

MS. RAND: I wish mine did.

MR. BABER: Off the record.

(A discussion was held off the record.)

BY MR. BABER:

Q So as the -- as a manager within talent management -- first off, other than yourself, are there other management -- managers within talent management in the talent management office at Wayfair Maine?

A I'm the only manager in talent management in Bangor.

Q Is there another Wayfair Maine, LLC location other than Bangor?

A Yes, sir.

Q Where is that?

A Brunswick, Maine.

Q How many employees are there in Brunswick?

A Approximately 500.

18

Q And how many employees are there in Bangor?

A A little over 300.

Q I think you told me you're located in Bangor. Do you have a counterpart at the Brunswick office?

A I do.

Q And are you at the same level on the corporate hierarchy?

A Outside of tenure, yes.

Q Okay. Who's been there longer, you or the Brunswick person?

A I have.

Q So you would be familiar with the hiring process at Wayfair in Bangor?

A I would.

Q What involvement, if any, do you have in the -- you know, the hiring of sales and service consultants?

A I have no involvement in the hiring of SSCs.

Q And who would do the hiring and make the hiring decisions involving SSCs?

A The -- a recruiter.

Q And the recruiter, is that person or persons internal or external to the company?

A Internal.

Q Other than recruiting candidates for employment at Wayfair, do the recruiters have any other job

Deposition taken of: Jorie Dunivan

19

responsibilities, to your knowledge?

A All their job responsibilities are in line with the function of bringing employees in.

Q Have you provided -- who was the recruiter at Wayfair -- I'm going to start saying Wayfair Bangor; Brunswick is interesting, but we'll try to stick to Bangor -- the recruiter in the summer of 2017, if you recall?

A I don't recall. It would have been a team of individuals. And I'm not sure who comprised that team during that specific time frame.

Q How many recruiters, approximately, were there on the team in 2017?

A I'm not aware.

Q More than five, less than five?

A I honestly wouldn't be able to -- to say. I could find that out and bring that back, but I don't have that information today.

Q I'm just curious. Do you in your capacity in HR provide any training to recruiters regarding disability policies -- I'm sorry, regarding discrimination policies?

A I personally do not.

Q Do you know if anybody within the corporation -- I'm talking the Wayfair parent corporation or Wayfair

20

Maine -- provide such training to the recruiters?

A I can't imagine that they weren't provided some sort of training, but I don't have their on-boarding process.

Q Do you have any role within HR of monitoring compliance with antidiscrimination laws and policies within the recruiting process?

A In my role, no.

Q Do you know who would provide that insight or supervision?

A I do not.

Q Let me show you Plaintiff's Exhibit 3. And I'll represent this is just an excerpt from a document that was produced by Wayfair Maine in its document production in this case. And I've attached what is numbered Bates number -- and by Bates numbers, as I'm sure your attorney has explained, are these little numbers with the Ws down at the bottom of each page.
    And so I've provided the cover page for Working at Wayfair; An Employee Guide. To your knowledge, is this the -- would be the cover page for the Wayfair Employee Guide that went out to all employees that came through after June of 2017?

A Yes, sir.

Q And with respect to the Employee Guide, would SSCs

21

receive a copy of this during their on-boarding process?

A Are you asking if they received a physical copy?

Q Yes. Or a digital version.

A They would have been shown where the digital version was saved as part of their orientation package and accessed it that way.

Q Are they expected to read through the entire document as part of their on-boarding?

A Yes, sir.

Q And they sign off on it somewhere?

A Yes, sir.

Q And on Page 8, Bates No. 8, there's the -- company's equal employment opportunity policy is set forth?

A Yes, sir.

Q Within the equal employment opportunity policy it says -- and I quote -- Wayfair also makes reasonable accommodations for qualified applicants and employees with disabilities unless doing so creates an undue hardship, comma, in accordance with all legal requirements.
    Do you see that sentence?

A I do not.

Q Okay. It would be --

A Yes, sir.

22

Q The third paragraph on Page 8. And your attorney has pointed that out to you now.

A Yes.

Q Have you, during your tenure as the manager within the talent management in Bangor, worked with any other Wayfair personnel in developing reasonable accommodations to a person with disabilities?

A Yes, sir.

Q And without naming names, can you tell me the circumstances of that?

A Of all of them?

Q Well, let's start with that. How many times do you think you've developed -- worked on developing reasonable accommodations to qualified applicants or employees with disabilities?

A More than 20, but that's a guess. For an exact number I would need to reference material and come back.

Q Approximate numbers are fine. That's one of the reasons we call this process discovery, we're learning about how your company does things. So precise numbers aren't necessary unless I so indicate.
    Of those 20 do you recall any instances that involved persons with intellectual challenges or

23

mental health issues?

A   I do.

Q   And so we have a subset of 20 people with disabilities.  Of those, approximately, 20 people, how many of those involved intellectual or mental health disabilities?

A   A majority.  That number might be low.

Q   That's fine.  Okay.  So the 20 might be -- you're thinking that might be higher than 20?

A   Yes.

Q   Within a range of how many, like, an additional 10 or --?  What do you think the best estimate would be?

A   There's -- I don't have an exact number.

Q   That's fine.  But you were thinking there was more than 20 for the total number of people with disabilities you've worked with since 2016?

A   Yes.  I'm trying to think of how many active cases I have right now and how many have already closed.  And it probably exceeds 30.  My apologies, I don't have that exact --.

Q   And along the way if you recall something later that you think changes an answer, feel free to just tell me that, I've recalled something differently and I'd like to amend my answer and the deposition transcript will so reflect that.

24

A   Thank you.

Q   Have you ever -- other than Ms. Trahan, have you worked with anybody that has informed you that they have posttraumatic stress disorder?

A   Yes, sir.

Q   Any approximation of how many other PTSD cases you've worked -- or employees with PTSD that you've worked with?

A   I don't have an approximation.  They don't have to disclose what the underlying condition is when they ask for an accommodation.

Q   As part of the on-boarding process do employees receive general information as to how they should bring concerns they may have about disabilities to the attention of the company?

A   Yes, sir.

Q   And what do you recall the training is in that regard?

A   It's the portion of the orientation that is actually presented by talent management.  It's discussed a couple of times.  One of which is when we're reviewing the attendance policy and the different leave options, we notify people that should they have a need outside of what we've already talked about, to talk to talent management so that we can come up with

25

the best plan moving forward.

Q   After an employee is hired, does the company do any sort of evaluation of whether the employees have any disabilities that may affect their ability to perform the essential functions of their jobs?

A   Are you asking me if we perform an assessment --

Q   Yes.

A   -- with folks with disabilities?

Q   Yes.

A   We do not perform any sort of assessment on folks that have identified as disability.  Of course, there are, I'm assuming, a plethora of employees who have not disclosed and are working without an accommodation.

Q   Sure.  What I was getting at -- so let's say --.  And I'm not suggesting that there's any -- at least not yet, anyway -- that there's any assessment before an employment offer is made.
I'm talking about the time period after an offer of employment is made whether there's any effort to evaluate whether the employees are capable of performing the essential functions of their job?

A   There is no postemployment test, per se.  At the end of their two-week training period, they take an assessment regardless of any identified or not

26

identified disability.  Everybody completing the SSC training takes an assessment at the end of that class.

Q   And what is the purpose of that assessment?

A   To identify any sort of knowledge gaps, make sure that everybody has a comprehensive understanding of how to use the tools and functions of their job.

Q   Are there any documents that set forth the essential functions of the sales and service consultant position?

A   A job description.

Q   And sitting here today do you recall what the essential functions of the position sales and service consultant are?

A   Not all of them.  Some reference ability to use computer and computer systems, telephone, telephone systems, provide customer service in a way that promotes Wayfair.

Q   And so there would be a job description for the sales and service consultants?

A   Yes, sir.

Q   And are those provided to each person that's hired into that position?

A   They are not.

Q   Where are those job descriptions kept?

Deposition taken of: Jolie Dunivan

**27**

A They're part of the application process.

Q So would an applicant receive the job description for the sales and service consultant?

A As you are -- if you are applying for a position as an SSC, you would see the job description as part of the ad for the job and then you would apply.

Q Do you know if there are any documents that inform a -- a hired employee that if they have a need for some form of accommodation due to a disability to contact any specific personnel within Wayfair Maine?

A Only in the -- my understanding would be only in the form of throughout the different presentations that are given through training, including the one that HR provides.
    We say multiple times, you know, if you need something outside of what we're offering, please, you know, make an appointment with talent management. Let's not discuss it in the classroom setting, make an appointment with us privately; put in a ticket, don't put your personal information in that ticket, just say that you want to talk to us and we'll set up a time to do so.

Q So what do you recall -- well, have you personally done the presentations on the orientation piece on disabilities with new employees?

**28**

A Yes.

Q And how often each year would you provide that training?

A My first year with the company we were providing orientation, approximately, every other week. I got help -- an associate joined the department summer/fall of 2017 and they would have started doing the orientations.

Q So in 2017 would you have personally done any of the orientations?

A Yes.

Q I'm just guessing, but you probably don't recall having Ms. Trahan in an orientation class?

A I do not.

Q Was there just one other associate that would do the orientations for new employees at Wayfair Bangor in 2017?

A Yes.

Q And what's -- who is that person?

A Her name was Sue Torrey.

Q Is she still with the company?

A She is.

Q Do you recall what new employees would be told about bringing concerns regarding, you know, disabilities that might affect the work performance to the

**29**

attention of management?

A We would have told them to contact talent management. We would have done this numerous times throughout the presentation.

Q Would you offer new employees some generalized descriptions of what disabilities might be worthwhile to bring to the attention of management?

A Typically it would be when we were talking about our leaves and attendance policy we would let folks know, if there's something outside of this, if you have a medical need, if you need something different than one of these leaves, please talk to talent management.
    And then in another point in the presentation we would have shown them how to enter a ticket. And when we entered the ticket, we would have used, you know, an example that would have been relevant to seeking an accommodation.

Q Other than bringing up an issue related to leave policy, is there any discussion within the, you know, orientation process that you're familiar with about seeking accommodations for actual workplace issues?

A I'm not sure of the other -- what the other departments' presentations -- if they touch upon it. I know that it's something that we talk about in

**30**

talent, like, if you need something different, you know, please make an appointment to talk to us. I'm not sure if facilities has a -- the facilities department has something similar as, you know, there's always requests, of course, for a sit-and-stand station or an ergonomic evaluation. They probably touch upon it at some point in their presentation that that's something that needs to be through talent management.

Q And do you recall sort of what your presentation involves in the orientation about requests for nonleave accommodations?

A Just because we're talking to a group, we just make -- we leave it very general; if you need anything outside of what we've talked about here, please make an appointment so that we can talk about it.

Q Are you personally able to authorize the development of reasonable accommodations for somebody with intellectual or mental health disabilities?

A I am.

Q And without -- without disclosing any names, can you describe for me sort of any of the types of accommodations that you've developed working with people with intellectual or mental health

**31**

disabilities?

A   I can.

Q   And what are those that you recall?

A   **Intermittent time off, maybe an extended period of time off, maybe a sit/stand station, extended break times, additional break times.**

Q   Do you recall ever discussing a request for an accommodation to work off-site, like, work from home?

A   **In general or in Ms. Trahan's case?**

Q   Generally.

A   **More recently we have.**

Q   And is that with somebody that requested an accommodation or is this part of a -- some type of actual work-from-home program for the company?

A   **I would only manage it if it was through an accommodation.**

Q   To your knowledge, any time between, say, August of 2017 and now has Wayfair offered any employees in the Bangor facility the opportunity to work from home?

A   **Via an accommodation or --?**

Q   Just generally.

A   **Yes.**

Q   When did that -- I'm not sure program is the right word, but when did that capacity first come into being?

**32**

A   **Late fall of 2017.**

Q   And what's your understanding of when work from home might be an opportunity for an associate to avail himself or herself of?

A   **During what time period?  That process --**

Q   Again, after --

A   **-- has evolved.**

Q   Yeah.  Since its inception in the late fall of 2017.

A   **When it started, there was a tenure requirement and also you had to pass a speed test.**

Q   Pass a what test?

A   **A speed, an internet speed test.  So our IT department would provide you with the necessary information, you would run this test at home to make sure that your Internet was fast enough to operate all the systems.**

Q   Gotcha.  So the person to work from home had to have sufficiently fast internet speed?

A   **To run all the systems, correct.**

Q   Okay.

A   **Then you had a tenure requirement.  That process has changed.  We have launched a virtual network now.  So there's no more employees that are Bangor work at home.  Now we have a virtual site and everybody in the virtual site reports up through the virtual**

**33**

network.  Does that make sense?

Q   Sort of.  I'm not going to explore it in too much detail.  But when did the virtual network come into existence?

A   **To the best of my recollection, approximately, six months ago.**

Q   So third or fourth quarter of 2018?

A   **That makes sense.  Again, I would have to double check.  I'm just basing it on the tenure of the manager in talent management of that department, how long he's been with the company.**

Q   And when the work-from-home capacity first existed you mentioned there was a tenure requirement.  What was the tenure requirement?

A   **Either three months or six months.**

Q   With the company before you could go work -- work from home?

A   **Correct.**

Q   From, let's say, inception, late fall of 2017, through, say, fall of 2018, do you know, roughly, how many Bangor employees actually worked from home?

A   **My -- an approximation would be around 170.**

Q   And I guess I can put this on the record.  I'm not intending to share this with anybody, but if there are any proprietary issues here, I'll certainly

**34**

protect those to the best of our ability.  I don't intend to share this information with other --.

    Now, before this -- back up for a moment.  Who would have been in charge of the development of the work-from-home program before its inception in the fall of 2017?

A   **To the best of my recollection, there was a team of folks working on it; the directors of each of the sites.  And I'm not sure of what her position was formerly, but she's now the director of the virtual network -- Erin Dewey is her name -- she was in charge of developing what that work structure looked like, how some of the nuances would work for the virtual world.**

Q   You mentioned the site director or manager might have been involved in the development of the work-from-home program in whole or in part.  Was the site director in the fall of 2017 Pete Boudreaux?

A   **Yes, sir.**

Q   And is Mr. Boudreaux still the site manager?

A   **No, sir.**

Q   When did Mr. Boudreaux cease serving as the site manager for Bangor?

A   **January of 2018.**

Q   Do you know if Mr. Boudreaux is still with the

**35**

Q company?

A He is.

Q Is he still in Bangor?

A Physically his address is still Bangor.

Q It sounds like he might have some duties that he travels a bit?

A Yes, sir.

Q Before the development of the work-from-home opportunity in the fall of 2017, do you recall through HR ever utilizing work from home as an accommodation to an employee?

A No, sir.

Q To your knowledge, did anybody, other than Ms. Trahan, ever suggest working from home as a potential accommodation?

MS. RAND: Objection.

BY MR. BABER:

Q And she's objecting because the evidence might not establish that Ms. Trahan ever objected for that -- or ever requested that type of accommodation.

MS. RAND: You can always answer when I object unless I tell you not to. So you can always -- you can always ignore me.

A Ms. Trahan never sought an accommodation to work from home.

**36**

BY MR. BABER:

Q Okay. Other than Ms. Trahan, did anybody else ever seek an accommodation to work from home?

A No. In that -- you're saying during the fall of 2017?

Q I'm -- up to the fall of 2017.

A Up to the fall of 2017 Ms. Trahan or -- no other employee requested an accommodation to work from home.

Q Do you recall -- you're familiar with the concept of interactive process when somebody seeks an accommodation?

A I am.

Q Do you recall any discussion whatsoever with any employees about the possibility of working from home as part of the interactive process?

A During the fall of 2017 I do not recall any conversations about -- through an interactive process about an accommodation to work from home.

Q So from your start date with the company through the fall of 2017, did you -- do you recall any discussion with any employees about the possibility of work from home as a possible accommodation during the interactive process?

A I do not recall -- I do not recall having those

**37**

conversations.

Q To your knowledge, did you ever have a directive, order or some other type of corporate understanding that work from home was not a possible accommodation before the fall of 2017?

A Can you please repeat your question?

Q Sure. So before the fall of 2017 during your tenure with the company do you recall whether there was any sort of corporate instruction, message, policy, directive, written or oral, indicating that work from home was not a possible accommodation to a person with a disability?

A I do not recall the company saying that that was not an accommodation.

Q Other than the training that is provided to all employees during the on-boarding process, are there any other programs in place at Wayfair that might affirmatively assist employees with disabilities?

A I'm not aware of any.

Q Okay. Is there an EAP program at Wayfair?

A There is.

Q And are new employees informed of the EAP program?

A They are.

Q Does the company have any policies in place regarding civility amongst employees?

**38**

A Yes.

Q And what are those?

A They're -- they're in the Wayfair Employee Guide, they are addressed under Code of Conduct.

Q Do you know whether the code of conduct expressly addresses the use of foul language in the workplace?

A It does not explicitly state foul language, it references treating each other professionally and courteously. I could get the exact language if you wanted.

Q Other -- well, let me back up foundationally. Are you involved to some degree or another with the termination of every employee at Wayfair Bangor?

A I am.

Q And do you have personal authority to terminate employees?

A I do.

Q Other than yourself, who within the Bangor site has personal authority to terminate employees?

A Nobody.

Q Would I be correct then that you are the only person that has authority to affirmatively terminate an employee at the Bangor location?

A The process is supposed to be that talent management is signing off on the terms, that all terminations

39

are reviewed with talent management. Certainly a site director can make that sort of decision. And in my tenure with Wayfair, there's only been one termination that was made prior to consulting me.

Q  During your tenure with the company do you know, approximately, how many terminations you've been involved with?

A  Voluntary and involuntary?

Q  Involuntary. So the company terminating the employee's employment as opposed to an employee resigning, quitting.

A  I wouldn't -- I wouldn't have a number.

Q  Less than 100, more than 100?

A  Probably more than 100.

Q  And of the more than 100 -- and, again, that's -- the record will reflect you gave us an estimate. Of the, approximately, more than 100 employee involuntary terminations that you've been involved with, do you recall any instance, other than Ms. Trahan, where the employee had an intellectual or mental health disability?

A  I only know of the folks that have disclosed it. Certainly there are, I'm assuming, a large group of folks who aren't disclosing an intellectual or mental health --.

40

Q  Sure. With respect to those that have disclosed an intellectual or mental health disability, how many, to your knowledge, of the more than 100 involuntary terminations had raised an issue regarding such a disability?

A  In fairness, I couldn't give you an estimate.

Q  Other than Ms. Trahan, do you recall other cases of termination -- involuntary termination involving somebody with a mental or intellectual disability?

A  Yes.

Q  Do you have a sense of how many discrete cases you're talking about?

A  I am sorry -- I can get that information and provide it to counsel, but I would not have that off the top of my head today.

Q  Is there any way, as you sit here today, you have an ability to provide a rough estimate?

A  In fairness, I wouldn't feel comfortable doing that without being able to reference records.

Q  Other than Ms. Trahan -- and I pronounce it both ways, my apologies; fortunately, it comes out on the record the same way -- can you think of any other instance in which employees have been involuntarily terminated for their interactions with coworkers?

A  Yes.

41

Q  To what extent do you spend any time out on the actual call center floor?

A  When I'm in Bangor, nearly 100 percent of my day. It's an open floor concept, so my desk is actually in the middle of the entire call center.

Q  And do you have the opportunity to hear the interchanges from time to time between call center employees?

A  I do.

Q  Have you overheard call center employees use foul language from time to time?

A  I've heard cursing.

Q  And when you hear cursing, is it always dealt with in some manner or is some amount of cursing tolerated within the workplace?

A  It's situational. Certainly there's some amount that is tolerated in the break room, bathrooms, not on the phone. But there's no tolerance for it with customers or directed at peers in any type of aggressive manner.

    MR. BABER: Let's take five minutes and we'll sort of shift topics here.

    (Whereupon a recess was held at 11:04 a.m., and the deposition was resumed at 11:09 a.m. this date.)

42

BY MR. BABER:

Q  Given your involvement in involuntary terminations of employment in Bangor, are you aware of other instances involving other employees -- again, without getting into names or whatever, but where an employee has been disciplined for some sort of emotional outburst or a fit of anger in the work -- work area?

A  Outside of a termination?

Q  Yes.

A  No.

Q  Would any employee that engaged in some sort of emotional outburst or fit of anger involving coworkers, not involving customers, would that be automatic grounds for termination?

A  Each situation is reviewed. So I would be cautious to say every single case. It has been my experience that situations where there are outbursts at others in a manner similar to the one we're talking about today, have all resulted in a termination.

Q  Can you think of any instance in which there was a fit of anger or an emotional outburst between one employee and another that resulted in some lesser form of discipline?

A  No.

Q  Can you think of any instance, other than the one

43

involving Ms. Trahan, where the person that was terminated for an outburst or a fit of anger had some sort of underlying mental health disability?

A   I only --

MS. RAND:  That she knew about?

BY MR. BABER:

Q   That you knew about.

A   **That I knew about, no.**

Q   So to your knowledge, there have been no other employees that were in the process of being terminated for a fit of anger or an emotional outburst that told you or somebody else within the company that they had an underlying mental health disability?

A   **That is correct.**

Q   I'm going to show you Plaintiff's Exhibit 4.  Sort of a lead up, what us lawyers call foundation, to Plaintiff's Exhibit 4.  We talked earlier about recruiters who seek new candidates for employment at Wayfair.  You recall that discussion?

A   **I do.**

Q   And I've shown you what I've marked as Plaintiff's Exhibit 4, which is a Recruiter Report: Service Consultant.

Do you know what recruiter reports for service

44

consultants are?

A   **Are you asking me if I know what the report that is identified as Exhibit 4 is?**

Q   Not specific to Ms. Trahan, but what they -- what these are generally.

A   **Yes.**

Q   And what are recruiter reports for service consultants designed to do generally?

A   **They're designed to be an initial assessment of a potential applicant's skill level.**

Q   That was going to be my question -- next question, which is, when are these assessments undertaken, before or after employment?

A   **Prior to employment.**

Q   And do you have an understanding of the design of the assessment tool that is being reported in this particular report?

A   **I do not have an understanding of the design of the tool.**

Q   Okay.  Do you have an understanding what the assessment tool is seeking to evaluate?

A   **I have a base understanding of -- of that.**

Q   To your knowledge, why does Wayfair use this particular assessment?

A   **I know that the assessment is used to gauge an**

45

**overall competency.  Why they use this particular assessment, I'm not sure.**

Q   Now, we have what I'd call the end product of the assessment tool.  What does the employee -- or the future perspective employee do that results in the issuance of the report?

A   **It is an online assessment that is provided to them.**

Q   Is it like a series of questions they answer?

A   **My understanding is there's a series of questions that they answer, some are based on scenarios that are presented to them.**

Q   Do you know if this particular assessment -- online assessment tool is utilized throughout the company?

A   **My understanding is it's utilized for all sales and service consultants.**

Q   Do you know whether or not hiring decisions are made based at least in part on the information gathered through the online assessment tool?

A   **Yes.**

Q   Do you know whether there is any effort within the assessment tool to evaluate a potential employee's behavioral tendencies?

A   **Not outside of the categories provided.**

Q   So, for example, on Ms. Trahan's assessment, Plaintiff's Exhibit 4, there's a category talking

46

about professional potential.  Do you see that?

A   **I do.**

Q   That's on Bates No. W000119.  And there's a general block that sort of describes what the measure is about.  Do you see that?

A   **I do.**

Q   And then it has a -- in this instance, a highlighted block about the particular candidate and her -- the information she's provided through the assessment tool, correct?

A   **Correct.**

Q   There's, I guess, what I'd call an interpretive assessment for Ms. Trahan?

A   **I see that.**

Q   Okay.  We know from the employment file that Ms. Trahan was actually hired, but would there be anybody that would have looked at her recruiting report or recruiter report to decide whether these -- some of the categories she's in the low range, whether they could still hire the employee despite the low rankings?

A   **My understanding is the recruiter looks at the overall score; based on the overall score, decides whether to proceed with the process with the candidate.**

Deposition taken of: Jorie Dunivan

47

Q So for Ms. Trahan's instance, her score was in the medium range, correct?

A Yes, sir.

Q Do you know whether the recruiters would have looked through the -- at least the low score areas to see whether there were any indicators of future issues with the potential candidate?

A It is my understanding that they do not go into that sort of depth in reviewing the assessments.

Q At the time of Ms. Trahan's -- the process leading up to her termination, would you have had access to Plaintiff's Exhibit 4?

A If I'd asked for it, I'm sure that's something that the recruiters would have provided to me. But it is not our routine business that I look at these ever.

Q Do you recall looking at Ms. Trahan's exhibit -- Service Consultant: Recruiter Report in conjunction with the process that led up to her termination?

A I recall I did not look at it. It was only through the process of discovery.

Q Did you speak with the recruiter as part of the termination process?

A No.

Q I'm going to go through a list of people that, based on the Human Rights Commission Response, Exhibit 2,

48

were involved in some manner in either the incident involving Ms. Trahan and/or the investigation that led to her termination. The questions will be rather similar for each with a couple of exceptions.

Is Ashley MacDonald still employed at Wayfair?

A I believe so.

Q And Joseline Belanger?

A She is.

Q Kirstie Foster?

A She is.

Q Haley Mannion?

A She is.

Q I don't know if I'm pronouncing it correctly, Thoma or Thoma Noddin?

A She is.

Q We talked about Pete Boudreaux. And to your knowledge, is Brianna Ireland still with the company?

A I believe she is not.

Q Do you know when she separated from the company?

A I do not.

Q Do you know whether she was -- voluntarily resigned or whether she was terminated?

A I do not recall.

Q To your knowledge, was Brianna Ireland subject to any corrective action or discipline for the issues on the

49

floor on September 20, 2017?

A She was not.

Q Would it be appropriate for any employee at Wayfair Bangor to harass somebody because of a disability?

A No.

Q Was there any conduct that you became aware of involving Ms. Ireland's behavior that might have violated the code of conduct policy with respect to the events of September 20th?

A No.

Q Did Ms. Trahan provide you any information that suggested that Ms. Ireland was not acting in a professional and civil manner toward Ms. Trahan?

A Ms. Trahan provided us with comments that were made to her by Ms. Ireland, none of which we deemed to be in violation of any code of conduct.

Q Are you familiar with the concept of clique behavior?

A In general or --?

Q Generally.

A Yes.

Q Okay. Everybody that went to high school knows what a clique is, right?

A Yes.

Q Would clique behavior be in violation of the code of conduct?

50

A Only to an extent that behavior began to exhibit rude, disrespectful behavior to peers. But sitting together at lunch, taking breaks together would not be any sort of behavior that we would deem inappropriate.

Q Would clique behavior that involved sort of exclusivity or a standoffish nature be a problem within the code of conduct? So if one group was cold-shouldering another employee?

A If it was brought to somebody's attention that this was happening, certainly it would be addressed. Whether it would be disciplined or not isn't -- without additional details --. We need quantifiable examples to determine whether if it was discipline -- it should be disciplined or not.

Q And, to your knowledge, was Ms. Ireland -- did she have any type of mental health or intellectual disability?

A Not to my knowledge.

Q To the best of your recollection, when did Ms. Ireland's employment with the company come to an end?

A I don't know.

Q Do you recall whether she was --?

After the nesting process, what's the next step

51

in the progression of a -- of a SSC?

A  **After nesting they join a team, they're assigned a team.**

Q  In your preparation for this deposition, did you see that Ms. Trahan and Ms. MacDonald did not join their teams at the same time that their fellow nesters went off to their teams?

A  **I'm not aware of that.**

Q  So I'm showing you Plaintiff's Exhibit 8, which is a -- it might be a couple of e-mails, but it looks like one e-mail in particular from Ms. Noddin to Darren Plante dated September 12, 2017.  That's what you have in front of you, correct?

A  **Yes, sir.**

Q  And it appears to suggest that all of the SSCs that were showing that were assigned to Ms. Noddin had gone off to their teams with the exception of two people, correct?

A  **Yes, sir.**

Q  And those two people were Ms. McDonald and Ms. Trahan, correct?

A  **Yes, sir.**

Q  Do you know what reasons there may have been as to why Ms. McDonald and Ms. Trahan were not moved out to their teams along with their -- the people -- the

52

other people that were in their nest?

A  **I can speculate.**

Q  Noting for the record that it's entirely speculation, what are the possible reasons why these two might not have been moved out to their teams?

A  **Sure.  So to move an individual from nesting where they're assigned the nesting coach is their -- you know, how they report through the work structure, those are all done through tickets.  So I could speculate that these tickets just hadn't been processed.  They're done in batches.**

**So any given -- when a team is done nesting, that group of 15, 20 people are then each assigned a manager.  And it's a manual process of going in, getting the ticket, going through all of our systems and reassigning them, and then working with that manager to make sure that, you know, their desk is ready, the new spot on the floor.  So I would guess it was just a matter of their tickets being processed.**

**And then the other thing that I would have to look into is there was a period of time that Darren joined the manager team and was acting as an intern manager.  And sometimes when that happens, the reporting would be glitched in the system so he**

53

wouldn't have access to the people that were reporting to him because he was in the acting capacity.  So in some of our systems it would take longer for -- for that -- right permissions to be assigned so he could see them.

**But as far as the teams moving, they have a day that nesting is done, it's the graduation, they're done nesting.  And then as far as just not showing up, it would have been possibly the tickets being processed or something to do with Darren's ability to access them if during this time he was still in that acting role, which he may have been.**

Q  Would there ever be a reason why, you know, employees in the SSC role would not be moved out to their team and be held in sort of nesting limbo, for lack of a better word, because of behavioral reasons?

A  **No.**

Q  Would they be held back because they needed additional training?

A  **No.**

Q  Do you have any personal knowledge as to why Ms. Trahan and Ms. McDonald had not been moved out to their teams between September 12th, as reflected in the e-mail, and the day of the events that led to Ms. Trahan's termination on September 20th?

54

A  **No, outside of Darren may have been in an acting role, which just required more steps in the process for him to be able to see folks.  But there would have been no reason -- all of our teams are moved at the end of the nesting period.**

Q  So when I was in the Army and basic training there would be -- and we all feared this -- there would be trainees that would get held back and they'd have to go through another basic training cycle.

Did that process ever occur in a similar manner with respect to people in the nesting process?

A  **Not for those reasons.  I can think of one example.  An employee had a family emergency and missed an extended period of time in nesting.  And we were able to offer them an opportunity to sit in the next group's nesting -- because these classes are coming through, every two weeks there's always a group in nesting -- that we afforded one person an opportunity to stay in nesting because they had missed a large portion of their nesting opportunity.  But outside of that, no.**

Q  So if the person shows potential to become a successful SSC employee, but they're just not quite getting it, they're never run back through the nesting program?

Deposition taken of: Jorie Dunivan

55

A   No.

Q   Other than during the events of September 20, 21st, 2017 since then have you spoken with Ms. Noddin regarding any interactions she had with Ms. Trahan leading up to that day?

A   You're asking me if I talked to Ms. Noddin at any point?

Q   Since these events.  Just sort of retroactively to see what she might have heard or learned about on certain issues?

A   Well, during the process of discovery I had another conversation just to ensure that she had provided all the documentation.

Q   So you were present during Ms. Trahan's deposition, correct?

A   I was.

Q   And you heard -- I believe you heard that she testified that she had some issues with her coworkers leading up to the -- the events of September 20th, you heard that, correct?

A   Yes, sir.

Q   And I believe she also mentioned that she had -- might have reached out to Ms. Noddin about that, correct?

A   Yes, sir.

56

Q   And have you gone back to Ms. Noddin to say, you know, Ms. Trahan said this, do you have -- does that refresh your recollection or do you have any further insight on those issues or --?

A   No, because during the deposition Ms. Trahan didn't say anything that -- she had already provided that during the initial investigation, she had said that she had talked to Thoma about her -- the clique behavior, not wanting to be working with the other women in her class.  And so certainly I talked to Thoma as part of this investigation.

Q   And Thoma at the time denied having heard those concerns?

A   That is correct.

Q   So other than going through the ticket review process, to your knowledge, was Ms. Trahan eligible to be placed into an assignment out on the floor?

A   Yes.  Everybody moves, when they're done nesting, to a team.

Q   So as of September 20th it was not -- there wasn't anything inherent in the company structure that would have required Ms. Trahan and Ms. McDonald to be colocated, correct?

A   Correct.

Q   During the orientation process or the nesting process

57

do you know if any new employees receive training regarding behavioral issues that might involve coworkers other than just be nice and civil and professional, that sort of thing?

A   Outside of that, I'm not aware of any.

Q   Before Wayfair -- let me back up.

Were you the person within Wayfair that officially communicated to Ms. Trahan that she was being terminated?

A   Yes.

Q   And before you informed Ms. Trahan that she was being terminated, were you aware of her contention that she acted out toward Ashley McDonald because Ms. McDonald had triggered her PTSD condition?

A   Before I communicated it or before the decision was made to terminate?

Q   Before you communicated it.

A   Yes.

Q   And before you communicated the decision to Ms. Trahan, to what extent did Wayfair, you and others within the company, consider whether or not Ms. McDonald was treating a person with a disability improperly?

A   Can you repeat that, please?

Q   Sure.  Let me get my emphasis on the right words, it

58

might help.

So before you communicated the decision to Ms. Trahan terminating her employment, did you and others within Wayfair give any consideration to whether or not Ms. McDonald had been treating a person with a disability improperly?

A   We investigated the entire situation that led up to the termination, all aspects of it.

Q   But as part of that investigation, did you consider whether or not Ms. McDonald may have intentionally or inadvertently triggered a reaction from a person with a disability?

A   I'm not -- I'm not sure what you're asking.  We did an investigation where we talked to all the parties involved.  We took into account comments made by all of the parties and then proceeded with the necessary course of action.

Q   So what I'm getting at -- and I understand, sort of, the idea of what an investigation is and we're going to get into that in some detail.  But what I'm getting at is, was there any consideration given before the termination decision was communicated to the fact that Ms. Trahan had communicated to you that she had this disability and the conduct of Ms. McDonald had triggered manifestations of that

59

disability?

A   I think Ms. Trahan actually said that her disability is why she wanted to move her desk and not sit near them, not that what they were doing was triggering an episode for her.

Q   So are you suggesting that Ms. Trahan never informed you that the conduct of her coworker is what triggered her emotional reaction?

A   The message that she left me said that she had failed to mention that she had PTSD and that is why she didn't want to sit near -- I think she called out Ashley specifically on that message.

Q   Did you ever hear -- again, up to the point where you communicated the termination decision -- that Ms. Trahan had some sort of flashback?  Does the word flashback sound like a term that she used with you?

A   I don't remember at what point she would -- she used that or if -- I just recall that from reading her complaint to the Human Rights Commission.

Q   If you could refer to Page 3 of Exhibit 2, the response through corporate counsel, Ms. Rand, to the Maine Human Rights Commission.  It says that when -- and I'm just going to read it -- when Ms. Dunivan returned Ms. Trahan's call on September 21st, Ms. Trahan stated she had PTSD and that is why she

60

swore at her peers.

Is that statement accurate?

A   I don't -- can you repeat that, please, where you are?

Q   Sure.  Third full paragraph on Page 3 of Exhibit 2.  And I quote:  When Ms. Dunivan -- that's you, correct --

A   Yes, sir.

Q   -- returned Ms. Trahan's call on September 21st, Ms. Trahan stated she had PTSD and that is why she swore at her peers, correct?

A   Correct.

Q   It goes on -- well, she -- it says that:  Ms. Dunivan did not suggest that Wayfair wanted or would need to review any medical records, though, Ms. Trahan noted that she could produce medical records if Wayfair required proof of her disability, correct?

A   Correct.

Q   So Ms. Trahan was willing to document her claim of having a disability, correct?

A   Correct.

Q   Now, the next sentence says:  Nor did Ms. Dunivan state that she did not believe Ms. Trahan had experienced a flashback.

So putting aside the double negative, did you

61

have a conversation at some point in time with Ms. Trahan about a flashback experience?

A   Yes.  Based on this, this is what -- these were the notes closer to the event.  We're now another year out from that, it's hard to remember the very specific dates and times, especially, being involved in numerous conversations about this since.  But I would believe this to be true.

Q   This being Exhibit 2?

A   Yes, sir.

Q   And Exhibit 2 is based on information that you were factually aware of --

A   Yes.

Q   -- from these events?

Other than Exhibit 2 and some notes I'm going to show you now, do you believe there are any other documents out there in the corporate world at Wayfair that would refresh your memory to make it any stronger than it is today.

A   No.

Q   I'm going to show you Exhibits 5, 6, 7 and 10.  I've given you Exhibits 5, 6, 7 and 10.  And do you recognize those as notes of various conversations in conjunction with Ms. Trahan's employment?

A   I do.

62

Q   Are any of those notes your own personal notes?

A   They are not.

Q   Did you keep any notes regarding your investigation?

A   Not that I'm aware of.

Q   Okay.  Would you have made any contemporaneous notes during the course of the events on September 20, 21?

A   I wasn't there for the part of the investigation that these notes reflect.

Q   Okay.  But you were the person that sort of brought the investigation to a head, correct?

A   In what sense?

Q   Well, you -- you were the person involved in -- in with others in making the decision to terminate Ms. Trahan's employment, right?

A   Correct.

Q   And before this situation with Ms. Trahan, had you ever -- putting aside law school, but had you been involved in any other employment situations that had involved a litigated claim of employment discrimination?

A   No.

Q   Had you ever received training about the importance of taking contemporaneous notes?

A   Through Wayfair?

Q   Anywhere.

63

A   I can't think of any formal training.

Q   Okay. So other than the factual description in Exhibit 2 and the notes in Exhibits 5, 6, 7 -- I've some questions about 10 in a moment, but other than those documents, can you think of any other documents that would refresh your recollection as to what transpired vis-à-vis Ms. Trahan?

A   I cannot.

Q   Looking at Exhibits 5, 6 and 7, are any of those -- do any of those appear to pertain to an interview with Ms. Ireland?

A   Yes.

Q   Okay. Which one involves Ms. Ireland?

A   I believe Exhibit 7.

Q   Would you agree that Ms. Ireland does not describe any use of foul language by Ms. Trahan?

      MS. RAND: Objection.

BY MR. BABER:

Q   If you see some mention of foul language in there, just let me know what you see in Exhibit 7. Oh, I see a reference to swearing, correct?

A   Correct.

Q   Ms. McDonald does not describe in detail what the actual swearing language consisted of, correct?

      MS. RAND: Objection.

64

A   Correct.

      MR. BABER: Now I'm curious as to the basis of your objection.

      MS. RAND: Oh, the basis is that this document -- Brianna didn't author this document, right?

      MR. BABER: Oh, okay.

      MS. RAND: That was the basis. You were talking about what Brianna --.

BY MR. BABER:

Q   So Exhibit 7 is somebody else's record of what Brianna Ireland said to the person that was taking the notes, correct?

A   Correct.

Q   And there's no description in Plaintiff's Exhibit 7 of what the actual swearing language was in Exhibit 7, correct?

A   Correct.

Q   Do you have any independent recollection of speaking to Brianna Ireland?

A   I do not.

Q   Do you know, back during the course of the investigation, did you have a sense of whether the swearing was directed at Ms. Ireland or whether it was Kirstie muttering some foul language under her breath as she was leaving the situation?

65

A   I have a recollection of it being directed directly at her peers.

Q   And that's based on one of the documents that you have in front of you?

A   It's based on Kirstie's account of the events.

Q   So she was forthcoming with you about her language, correct?

A   Correct.

Q   And Kirstie's description is in Plaintiff's Exhibit 5, correct?

A   Correct.

Q   And Kirstie said that she didn't use any, quote, F-bombs on the floor, correct?

A   Correct.

Q   She did describe her coworkers as a bunch of bitches, correct?

A   Correct.

Q   Did you ever ask her what -- why she felt so strongly about her coworkers?

A   She vocalized her concerns about her -- her coworkers.

Q   And what do you recall her description or her concerns about her coworkers was?

A   That they didn't mind their own business, they were cliquey, they talked about her.

66

Q   And just taking those comments at face value, would those comments be a violation of the code of conduct policy?

A   It's certainly not treating people with respect.

Q   And did Ms. Trahan, either in this initial interview -- I've to get some more foundation on that in a moment, but in this initial interview and conversations with you, describe the impact on her mental health of the conduct of her coworkers?

A   She did not.

Q   Do you have an understanding of who the person that wrote the actual notes in Plaintiff's 5 and 6 was?

A   I do.

Q   Who wrote those notes?

A   There were two managers that worked with Kirstie, Joseline and Haley. Haley --

Q   One of the two of those?

A   Yes.

Q   All right. And Plaintiff's Exhibit 7 seems to have been handwritten by somebody other than the one that authored 5 and 6?

A   Correct.

Q   Do you think that's the other person?

A   One is Joseline and one is Haley.

Q   All right. At the bottom of Plaintiff's 5 there's

67

some -- again, some handwriting that looks different than the top half, you know, where all the bullet points are on Plaintiff's 5. Does it appear that somebody else wrote some additional notes after the first person wrote in all the bullet points?

A Yes, sir.

Q And do you know who the person was that wrote in the subsequent information at the bottom of the page?

A Yes, sir.

Q Who is that?

A Christy Foster.

MS. RAND: As to the other answers to the questions, there are documents that can refresh her memory and --

MR. BABER: Link it up.

MS. RAND: We can -- yeah. That's information, if you want it, it's not a secret. I'm not interested in hiding that information. I can tell you don't remember, but --.

BY MR. BABER:

Q So do you know what the reference is on the bottom of Plaintiff's 5 where it says -- it looks like WOM, dash, never witnessed?

A Not for sure.

Q What's your best understanding?

68

A The women's bathroom.

Q So did somebody bring to the attention of the investigator some issue in the women's bathroom?

A Yes.

Q And who brought that issue to the attention of the investigator?

A My understanding is that came from a conversation with Matt Pulley.

Q And that's in Exhibit 10, correct?

A Yes, sir.

Q Somehow I've lost my copy of Exhibit 10.

MS. RAND: Do you want mine?

MR. BABER: Thanks. It's around here somewhere.

BY MR. BABER:

Q So Exhibit 10 is some investigation notes. And it appears to be in handwriting that's closer to Exhibit 7 than the handwriting in Exhibits 5 and 6.

Do you know if Mr. Pulley is still with the company?

A He is.

Q And is -- do you know whether or not the information that Mr. Pulley is describing pertains to events on September 20th or some other date?

A They pertain to some other date.

Q Some -- a date before September 20th?

69

A Yes, sir.

Q How did -- do you know how it came to be that somebody went to talk to Mr. Pulley about some situation that occurred before September 20th?

A I do.

Q How did that arise?

A At some point there was a comment made about how Kirstie had yelled at Matt Pulley. And then Christy Foster, after doing this initial investigation, went to talk to Matt to see what that situation that was referenced was about.

Q So one of Ms. Trahan's coworkers mentioned to one of the investigators some situation involving Mr. Pulley, correct?

A Correct.

Q And Mr. Pulley describes some interactions he had with Ms. Trahan, correct?

A Correct.

Q And it appears he's suggesting that Ms. Trahan told him on this occasion that she was starting to lose her patience with him; is that how you attribute that phrase?

A That's correct.

Q And it says: I can't be near you, correct?

A Correct.

70

Q That's a comment Mr. Pulley was attributing to Ms. Trahan?

A Correct.

Q And she walked off, correct?

A Correct.

Q And it appears that Matt Pulley told this investigator that he went to Thoma about that situation, correct?

A Correct.

Q And, in fact, Mr. Pulley mentions that Ms. Trahan had been crying in the bathroom after this interchange with him, correct?

A Correct.

Q And Mr. Pulley mentions that Thoma went to get her, meaning Ms. Trahan, correct?

A Correct.

Q So did you ask Ms. Trahan if she had any recollection about the situation between Mr. Pulley and Ms. -- Ms. Trahan?

A I did.

Q Did she recall that situation?

A She did.

Q She did or didn't?

A She did.

Q Did. What did she tell you about that situation?

71

A That there had -- Matt had attempted to help Kirstie, Kirstie got really upset and left. In doing so, it was noticed by all of her peers. And then the peers actually got Matt a card to just say, thank you, we think you're doing a great job, because they felt so bad about how he had been treated.

Q Do you have an understanding of when the situation with Mr. Pulley arose?

A It would have been during the nesting period. So it would have been in the time frame of the -- you know, from the two weeks after she got out of class, it would have been in that three-week period that she was nesting.

Q Sometime before September 12 if we use the date of Plaintiff's Exhibit 8 for a reference?

A Yes.

Q And, to your knowledge, did Ms. Noddin bring the situation involving Mr. Pulley and Ms. Trahan to anybody's attention?

A No.

Q Do you know if Ms. Noddin spoke with Ms. Trahan about the situation with Mr. Pulley?

A I don't know.

Q So the situation with Ms. Trahan first came to the attention of Wayfair management when Ashley McDonald

72

informed manager Joseline Belanger; is that your understanding?

A Yes.

Q And Ms. Belanger brought it to the attention of Kirstie Foster?

A Correct.

Q And is Ms. Foster the person that, basically, coordinated the investigation going forward?

A Correct.

Q And what was it within her job duties that would have led her to undertake the investigation?

A So her role is a manager 2, so Joseline was reporting to her. And in my absence, Pete Boudreaux asked her to conduct the investigation.

Q Would somebody have gone to Mr. Boudreaux before Ms. Foster was asked to undertake the investigation?

A I don't believe anybody went to Mr. Boudreaux prior to that.

Q How would -- how would Mr. Boudreaux make the appointment then?

A My understanding is Christy let him know, we have a situation on the floor, somebody just reached out to Joseline, said that there's a situation, and he told her find out what was going on and investigate.

Q And how do you recall that piece of information?

73

A Because it -- I would have typically been the one that initiated the investigation and I was off-site that day.

Q Do you recall where you were that day?

A I do.

Q Where were you?

A I was at -- I was at my home doing an online training.

Q Had you come in that day because of the situation that was evolving?

A No, not because of. My training ended and I came into work after.

Q Okay. What time do you recall coming in?

A Around 2:30.

Q And then Ms. Foster met with Haley Mannion who was Ms. Ireland's manager?

A Yes.

Q And Ms. Foster and Ms. Belanger met with Kirstie Trahan, correct?

A Correct.

Q Do you know whether Ms. Trahan expressed any concerns about her mental health or well-being during her meeting with Ms. Foster or Ms. Belanger?

A She did not express any concerns.

Q How do you know that?

74

A Because I've talked to both of them about their interactions and the notes.

Q Did Ms. Trahan make any requests about how these issues might be avoided in the future?

A No.

Q Do you know whether or not she asked either Ms. Foster or Ms. Belanger if it was possible for her to move to her permanent assignment?

A I do not.

Q Do you know whether or not Ms. Trahan raised concerns with Ms. Foster and Ms. Belanger about her interactions with Ms. Ireland?

A Yes.

Q And what, if any, investigation was done to assess the voracity of Ms. Trahan's concerns about working with Ms. Ireland?

A Well, certainly Ms. Ireland was questioned.

Q Do you know if any coworkers were questioned about interactions between Ms. Ireland and Ms. Trahan before the events of September 20th?

A Can you repeat that, please?

Q Yeah. Do you know whether anybody looked into -- or asked other coworkers or other employees about previous interactions between Ms. Trahan and Ms. Ireland?

Deposition taken of: Jorie Dunivan

75

A    Prior to this event, I'm not aware.

Q    Would it be appropriate for a coworker to abruptly snap at another coworker?

A    Would it be -- no.  We foster an environment where we treat each other with respect.

Q    And do you agree that the notes reflect that Ms. Trahan informed Ms. Foster and Ms. Belanger that Ms. McDonald had snapped at her that sort of precipitated this whole thing?

A    I'm aware that is her perception of the events.

Q    Are there any audio files or videotapes that would confirm objectively whose version was correct?

A    There are not.

Q    Ms. Foster and Ms. Belanger then met with Ashley McDonald, correct?

A    Yes.

Q    And then Ms. Foster met with Thoma Noddin, correct?

A    I would have to review the records to speak to the sequence of --.

Q    Sure.  And I've based my sequence largely on the information provided in Plaintiff's Exhibit 2.  So if you would like to look at Plaintiff's Exhibit 2, feel free to do so.

MS. RAND:  Will you be using, like, the actual investigation report as well, like, the --

76

MR. BABER:  No.

MS. RAND:  Okay.

MR. BABER:  When you say investigation, are you talking Maine Human Rights Commission investigation report?

MS. RAND:  No.  Let's go off the record for a second.

(Whereupon a recess was held at 12:02 p.m. and the deposition was resumed at 12:12 p.m. this date.)

(Deposition Exhibit No. 11, 10/21/17 E-mail, was marked by the reporter.)

BY MR. BABER:

Q    So Wayfair's counsel reminded me that there were some -- a comprehensive memo prepared by Christy Foster to yourself dated September 21, 2017.  And we've marked those as Plaintiff's -- or Exhibit 11.

And you have that in front of you now, correct?

A    Yes.

Q    And you received this memo at roughly 6:54 in the morning of September 21st, correct?

A    Yes.

Q    So this memo would have been the -- done the day after the events at issue, correct?

A    Correct.

Q    So you would not have had this memorandum at the time

77

you met with Mr. Boudreaux, the site manager, on the afternoon of the 20th, correct?

A    Correct.

Q    And you didn't believe it was necessary to document your own discussions in a manner similar to that provided by Ms. Foster, correct?

A    I do not believe I have notes.

Q    So after the various conversations that Ms. Foster has described -- and I don't think I'm going to ask you anything in particular about Plaintiff's Exhibit 11 from here on out, but feel free to refresh your memory with it.

At some point you're brought into the investigation, correct?

A    Correct.

Q    Who first brought the situation to your attention?

A    It would have been either Christy or Pete.

Q    And you met with Ms. Foster and Mr. Boudreaux, correct?

A    Yes.

Q    Where did the three of you meet?

A    We were -- it would have likely have been -- when I walk in, I sit right next to Mr. Boudreaux.  So it would have probably been at his desk, or Christy would have come directly to mine and let me know that

78

there was a situation and then we would have got the conference room.

Q    Does Mr. Boudreaux -- is his desk out on the floor with everybody else's?

A    Yes, sir.

Q    All right.  And the three of you decided to send Ms. Dawson home pending next steps, correct?

A    Pete and I would have made that decision.

Q    So Ms. Foster would have stepped out of the room at that point?

A    Or --

Q    I'm sorry?

A    I'm not sure at what point we were talking at Pete's desk and when we went into a conference room.  But either way, Pete and I would have made the decision to send somebody home pending an investigation.

Q    You and Pete had not decided to terminate Ms. Trahan at that point in time?

A    Not at -- well, not at that point.  I still needed to hear everybody, make sure that everything had been -- all the right parties had been talked to.

Q    After you met with Mr. Boudreaux, it's my understanding that you, Ms. Foster and Ms. Belanger met with Ms. Trahan, correct?

A    Correct.

Deposition taken of: Jorie Dunivan

79

Q  And why was it the three of you met with her?

A  So it would have been customary for me to meet with them and then their initial manager.  And Christy was Joseline's manager as Joseline was still learning her role.  So that's why there were -- there were so many people.

Q  Where did you meet with Ms. Trahan?

A  In a conference room.

Q  Where is the conference room in relation to the door to the exterior of the property?

A  We would have met with her in a conference room in the front lobby off the floor, if that makes sense.

Q  Is the front lobby separated from the --

A  Yes.

Q  -- other employees?

A  Yes.

Q  What was Ms. Trahan's emotional condition at that time?

A  I can only speak to my observations.

Q  And what did you observe?

A  She was defensive --

Q  I'm sorry?

A  She was defensive, she was abrupt with us, she lacked any sort of accountability of what had transpired. Even when I talked to her, she was referencing the

80

other women as bitches; she rolled her eyes when I talked to her.

Q  When Ms. Trahan would reference the other women as bitches, did you ask her why she was using such severe language?

A  I didn't ask her why she was cursing.

Q  Was she tearful during your meeting?

A  Not at all.

Q  Did she look you in the eye?

A  To an extent, but she would look you in the eye and roll her eyes at you.

Q  Do you recall any other behavioral mannerisms during that meeting?

A  She was -- she just seemed really annoyed.

Q  Did anybody ask her, you know, her perspective as to what was going on?

A  During that meeting or the initial one?

Q  This meeting.

A  I don't know if we asked her what her perception was.

Q  Did anybody ask her why she was acting in the manner she was during the -- the meeting?

A  She disclosed that she was upset about, you know, one of the women answering a question that she didn't believe was directed towards her and she was -- she appeared upset because I wouldn't disclose what sort

81

of action we were taking with the other women involved.

Q  And there was no other action involving the other women involved, correct?

A  Correct.

Q  Was there any mention of any mental health issues during the course of that meeting?

A  There was not.

Q  After that meeting, what did you do?

A  I -- I would have went back -- I believe it was after that meeting I had another follow-up conversation with Thoma.  I had questions for Christy.

Q  Christy Foster?

A  Yes, sir.  I would have also talked to Haley and Joseline.

Q  Do you recall what your discussion with Ms. Noddin entailed?

A  I do.

Q  What was that conversation?

A  I wanted to follow up to see if she recalled any sort of allegations, complaints, concerns that were brought to her from Kirstie.

Q  Ms. Trahan?

A  Yes, sir.

Q  And we have a Kirstie and a Christy, so I'm trying to

82

use last names like Trahan versus Foster.

And what did Ms. Noddin tell you, nothing, she hadn't heard anything?

A  She could recall one situation.

Q  And that was the one involving Matt Pulley?

A  No, sir.

Q  Some other situation?

A  Yes, sir.

Q  What was that situation?

A  That one day when they were leaving the classroom Kirstie had made -- Ms. Trahan had made a comment about it being so high school.  She might have referenced the word cliques.  And Ms. Noddin responded back, you know, we're all here to get a -- something to the effect of, we're all here to get a job done, you know --.  And that was the extent of it.

She didn't -- Ms. Trahan didn't make any, you know, formal complaints, alleged that she needed to talk to her or that any particular comments that were made to her were inappropriate, just that she was sick of it being so high school or something to that effect.

Q  And she mentioned the word clique?

A  She may have.  Ms. Noddin's account of it was, you

83

know, you didn't share this with anyone at the time. She's, like, I didn't see it as a big deal. She said that she didn't like, you know, this high school feeling. And she said, well, you know, we're all here to just get a job done and let's focus on, you know, our task at hand. And that was the end of it.

Q  So Ms. Noddin didn't suggest to Kirstie a willingness to explore those issues in any further detail?

A  She did not, nor did Ms. Trahan elaborate on any type of situation or particular grievance.

Q  Ms. Noddin made some comments that were setting some corporate behavioral expectations, correct, we're all here to get a job done?

A  Sure.

Q  Yep. Those comments wouldn't encourage further discussion, would they?

A  In the format that they were being presented, it didn't seem to warrant it. It was a comment made in passing as she was walking by leaving her classroom. She didn't ask to speak to Thoma off the floor, she didn't ask to speak to a manager, she didn't say, like, hey, I have some concerns here. She just said, I don't -- you know, I'm sick of this high school.

Q  So you're telling us about stuff Ms. Trahan didn't do, but Ms. Noddin didn't seek to explore the source

84

of the depth of Ms. Trahan's concerns about this being a high school cliquey environment, correct?

A  Correct.

Q  On the day after the issues on the floor -- that would have been Friday, September 21st -- do you recall roughly what time you would have come into work that day?

A  8:30.

MS. RAND:  Just to be clear Thursday, September 21st, isn't it?  Yeah.

MR. BABER:  Okay.  Thank you.

MS. RAND:  I only know that because I'm looking at Exhibit 11.

BY MR. BABER:

Q  So if you came in at 8:30, do you have a sense of -- and I'm looking for relative time periods -- when you would have looked at the e-mail versus checked your phone messages?

A  I don't have -- I don't have a reference to that.

Q  So I have an understanding -- and it's been produced in discovery -- that at some point that morning you listened to a voicemail message from Ms. Trahan, correct?

A  Correct.

Q  And do you recall whether or not you read

85

Ms. Foster's e-mail before you had listened to Ms. Trahan's voicemail?

A  I don't -- I don't recall.

Q  How would you describe the tone of voice Ms. Trahan used in leaving that message?

A  It was rather matter of fact.

Q  Not emotional like she had been the day before?

A  My -- she'd left the message the day before.

Q  Oh, okay.

A  She -- she had left the message after I had left for the day.

Q  But the tone of her voicemail message was a different tone of voice than she had displayed during your meeting with you, Ms. Foster and Ms. Belanger, correct?

A  I would agree with that characteristic.

Q  And in the voicemail -- and we can listen to it if you'd like, but you recall that Ms. Trahan told you that she'd forgotten to mention the reason that she was requesting a transfer?

A  Correct.

Q  Do you recall at some point the day before that Ms. Trahan had requested a transfer?

A  I recall that there was some conversation that Kirstie wanted to sit next to a friend of hers that

86

also worked for Wayfair.

Q  All right. And she went on to say in the voicemail that the reason was that she was a veteran with severe PTSD, correct?

A  Correct.

Q  And she told you in the voicemail that she'd been raped in the past and her coworkers treated -- and the way her coworkers treated her caused her to have a flashback, correct?

A  Correct.

Q  And did you have any reason not to accept the truthfulness of Ms. Trahan's voicemail comments?

A  No.

Q  Did you understand that Ms. Trahan was requesting a transfer as a means to address her PTSD and how it might manifest itself in the workplace?

A  I did not.

Q  Did you, based on your training and experience, believe that Ms. Trahan was requesting -- perhaps, informally, using her language, but requesting what those in the profession would regard as an accommodation to the Americans with Disabilities Act?

A  Not -- I was not under any sort of impression that her seat move was in -- her request to move her seat was any sort of accommodation based on accommodations

87

under the Americans with Disabilities Act.

Q Would you agree that Ms. Trahan linked the request to transfer to her PTSD in her voicemail message with you?

A I guess so.

Q And, again, without using the legal nomenclature of an accommodation under the ADA, would that be a request to take some action to address her disability in the -- in the workplace environment?

A That is not how I interpreted it, based on the previous conversations that she had already asked to sit by a friend of hers because she knew that person and they were just friends outside of work.

Q When did Ms. Trahan mention that she wanted to sit next to somebody that she was friendly with outside work, when did that happen, the day before?

A I'm not sure on the sequence of events of when it was that she had shared that. And I can't recall the woman's name. But there was a conversation that she had initiated about wanting to sit near somebody and it was explained that -- that that -- she's not being moved to that team, that the classes that are coming out of nesting are already assigned a manager and they're moving over in groups and there's reasons based on managers' schedules why people are assigned

88

to different teams. And so we couldn't just accommodate her deciding what team that she wanted to go on to sit next to a friend of hers.

Q You would agree that at least in the voicemail message Ms. Trahan didn't mention wanting to sit next to a coworker, correct?

A Yes, she didn't -- she just said a seat move.

Q You would recall that she explained that she was requesting a transfer and then went on to tell you about her PTSD from her military experience, correct?

A She left that in the voicemail.

Q Do you have a general understanding of what posttraumatic stress disorder is?

A I do.

Q What is your understanding?

A My understanding is it's classified under, you know, mental health, that it's a particular condition where people can exhibit symptoms from an event in the past, sometimes there are known triggers, other times there are unknown triggers to those feelings.

Q Based on your training and experience both from law school and your -- in your capacity as a talent manager with Wayfair, do you have an understanding of the concept of a disability under the Americans with Disabilities Act?

89

A I do.

Q Do you believe that Ms. Trahan was putting Wayfair on notice that she had a disability when she told you about her PTSD?

A Yes.

Q When you heard the mention of PTSD by Ms. Trahan, did you analyze to any extent how that reference might implicate her rights under the Americans with Disabilities Act?

A I did.

Q What was your thinking in that regard?

A My thinking in that regard was, does her admission of a disability after we had made the decision to terminate her affect our ability to terminate her?

Q You would agree that you had not communicated the decision to terminate her when she mentioned the disability, correct?

A Correct. She left the message after I had left for the day.

Q And Ms. Trahan -- you called Ms. Trahan back at some point, correct?

A I did.

Q And did you have a -- have a recollection of what time you might have called her back?

A I do not.

90

Q Before you called Ms. Trahan back, had you spoken with anybody else within Wayfair about Ms. Trahan's invocation of -- or her reference to having a disability?

A I did.

Q And who did you speak with?

A I would have spoken to Pete Boudreaux.

Q What was your discussion in that regard?

A I just informed him that she had left me a message, she had disclosed that she has PTSD in that message. I don't believe I would have shared any other details with him regarding the events that led up to the PTSD.

Q The source of her PTSD?

A I don't believe I would have mentioned that to Pete. And then I would have had a conversation with my manager to let her know just to kind of put her on notice. Any type of event outside of the ordinary, you know, I would just as a courtesy let my supervisor know. And that particular day I had talked to another individual in talent management and let him know just this -- you know, this situation that I had on site.

Q And who was that individual in talent management?

A His name was William Quick.

91

Q Where is Mr. Quick located?

A **His physical site was in Texas, but in his role he was predominantly traveling.**

Q Do you know why you would have reached out to Mr. Quick?

A **I was talking to him for -- I don't know what initiated the call, it wasn't about the -- I can't remember what particular reason, if we had already had something scheduled for that time. It's fairly common any given day that I'm talking to my peers throughout our network.**

Q And your manager, again, was Candice Smith?

A **Correct.**

Q Do you recall whether you spoke with Ms. Smith before your follow-up call to Ms. Trahan or after or both?

A **I don't recall.**

Q And do you recall whether you spoke with Mr. Quick before or after your follow-up call to Ms. Trahan or both?

A **It would have been before.**

Q Do you have any recollection of your discussions with Mr. Quick?

A **I would have just told him that we had the, you know, situation on the floor where there was the outburst, we sent her home so that I could talk to folks, we**

92

**were going to terminate, but then she left me this message on my phone and I just wanted to make sure I was doing all my due diligence after receiving that.**

Q Did you have any discussion at any time before you communicated to Ms. Trahan that she was being terminated -- any discussion with anybody within the company about possible accommodations to Ms. Trahan that might allow her to successfully perform her job going forward?

A **There would have -- I would have questioned what type of accommodation would be provided for somebody not to have an emotional outburst on the floor. That's certainly not an actual accommodation, nor is it one that she asked for.**

Q Okay. Well, my question was, do you recall talking to anybody within the company about, is there anything we can do short of -- short of termination that would, you know, in recognition of Ms. Trahan's disability, assist her in performing her job functions going forward in a professional and civil manner?

A **I'm not sure I understand. Like, we had made the decision to terminate based on the outburst.**

Q But that decision was made before you were aware that Ms. Trahan was claiming that she had a disability?

93

A **Correct.**

Q And Ms. Trahan, to your knowledge, didn't know that she was being terminated at the time she told you about her disability, correct?

A **I'm sure she was fairly confident that she would not be returning. She took all of her things with her, she said that she -- and we're, like, is there anything back at your desk? She said, no, I have everything, there's nothing here.**

Q When you called her back, what was the purpose of that call?

A **When somebody leaves you a message, certainly to the extent that Ms. Trahan did, I think it's a professional courtesy, even if the decision has already been made, to hear them out. I mean, knowing that we were going to terminate her, not calling her back felt like the wrong thing.**

Q When you called her back, was it even conceivable that she might say something that might change your managerial decision to terminate her?

A **No.**

Q What was her tone of voice when you called her back?

A **It started similar to how she had left a voicemail, but then transitioned a little bit into how she was in the meeting with her.**

94

Q Did Ms. Trahan at least in her discussion with you -- I realize you couldn't see her nonverbal communication, but did she suggest to you that she was recognizing the seriousness of the situation?

A **Yes. I think that's why she was calling. I think she understood we were moving forward with a termination and she wanted to prevent that from happening.**

Q Did you tell her during that conversation that management was contemplating her termination?

A **I told her it was a very serious offense.**

Q But did you tell her that management was contemplating termination?

A **I probably wouldn't -- would not have used that exact language.**

Q Did you ask questions of Ms. Trahan as to her ability to provide appropriate customer service?

A **I believe I said something to the effect, you know, what would stop this from happening while you were on the phone with a customer?**

Q And what did she -- what was her response?

A **I just know I won't.**

Q So she exuded some confidence that she could provide appropriate customer service?

A **Yes.**

Deposition taken of: Jorie Dunivan

95

**Q** Did you discuss with her any potential workplace modifications that might allow her to successfully continue in the workplace?

**A** We discussed the ADA process in which -- you know, it's an interactive process, we provide documentation to her, she would fill out a portion, her doctor would fill out a portion and then they would need to very specifically tell us what type of accommodation would be needed for the disability. But it would have been in general terms, not specific to her instance. It would have been exactly how I explain it to all employees when they want to meet for an accommodation.

**Q** So is it your testimony that you then did, in fact, have a conversation with Ms. Trahan about how she might invoke the ADA process for seeking accommodations?

**A** I wouldn't classify it like that.

**Q** What would you classify it as?

**A** She was saying that, you know, she had PTSD and, you know, that's why she behaved like that and that, you know, she knew it wouldn't happen again and she could provide -- she made a reference to being able to provide her doctor's records. And that's likely why I brought up, well, I wouldn't request your doctor's

96

records. Even in our process where somebody seeks an accommodation, their doctor fills out a portion of our paperwork, but at no point ever do we request medical records from employees.

**Q** Did you suggest to Ms. Trahan that she could avail herself of an interactive process following this telephone conversation?

**A** Not at this point, no.

**Q** Did you -- other than legal counsel, did you discuss with anybody within the company about Ms. Trahan's invocation of a disability as an explanation for the behavior that was leading to her consideration for termination?

**A** Can you repeat what you're asking, please?

**Q** Yeah. So after the phone call with Ms. Trahan, did you discuss with anybody within the company, other than legal counsel, perhaps, what, if anything, it meant because Ms. Trahan had said she had a disability and that's what was explaining her behavior on the floor?

**A** Well, that would have been part of my conversation with William Quick, that this employee had disclosed after the fact that they had had a disability.

**Q** And he said it was just fine to go ahead and terminate her regardless of whether or not she had a

97

disability?

**A** No. I believe it was more of an interactive process where he was saying, okay, so did she notify you before that she need an accommodation? So what type of an accommodation could we offer somebody so that they didn't curse at their peers? What sort of accommodation could we have that would ensure us that she didn't have an outburst like this on the phone when talking to a customer?

**Q** Is it the policy of your company that it will not employ people with mental health disabilities that might have a propensity to have some sort of behavioral reaction to a phone conversation with a customer?

**A** We do not have any policy that outlines people with a particular mental health condition or disability are not employable.

**Q** Are you familiar with a syndrome known as Tourette's syndrome?

**A** I am.

**Q** What's your understanding of Tourette's?

**A** This is a layman's knowledge, I am not a mental health professional, nor do I work in the mental health field. But my understanding of Tourette's could be it's classified under autism, it's part of

98

the autism spectrum, that it is involuntary, it could be physical, like, reactions or it could be a verbalizations.

**Q** You've heard of people with Tourette's that might involuntarily use what otherwise might be considered foul language?

**A** I've heard of it, yes.

**Q** Or they might have some sort of emotional reaction?

**A** I've heard of that, yes.

**Q** Have you ever personally met anybody with Tourette's?

**A** I'm sure I have along the course of my life. It's not -- people with Tourette's aren't broadcasting that they have Tourette's. You can make an assumption if you hear something or assume, but --.

**Q** Do you know whether or not it would be -- whether or not Wayfair would employ somebody with Tourette's with or without reasonable accommodations?

**A** Wayfair has a nondiscrimination policy. So in none of our employment practices do we advocate that we do not employ people with Tourette's.

**Q** And likewise for PTSD?

**A** Likewise for PTSD.

**Q** My question then is, knowing that Kirstie Dawson had a plausible psychological reason for her interactions with her coworker on September 20th, why it would not

Deposition taken of: Jonie Dunivan

**99**

consider working with her to try to address that in a manner that would enable her to perform the essential functions of her job?

A Just for clarification of the record, when you say Kirstie Dawson you're talking about --

Q Kirstie Trahan.

A Trahan. That process needs to be initiated by the employee. And it needs -- and it can't be to rectify a behavior that they've exhibited and then after the fact say, I need you to excuse this because --. The process works by the employee bringing their concerns forward, us initiating an interactive process for them, but it's not meant to excuse past behavior.

Q But is that in and of itself a form of discrimination because aren't you asking the employee with a disability to forgo the chance of working successfully without telling the employer of his or her disability?

MS. RAND: I'm just going to object to form. You can answer.

A I'm not sure how an employer is supposed to assess folks coming in whether they have a disability or not, approach them to seek an accommodation without the employee disclosing that they need something. I can't make an assumption about everybody walking in

**100**

and -- and offer them an accommodation for something I don't know they have or need.

BY MR. BABER:

Q Okay. That's not really my question. My question is, so let's suppose we have an employee like Kirstie Trahan that has a diagnosed mental health disability. Is it -- is it inappropriate not to allow that disabled employee at least an opportunity to try to work in the environment without telling the employer they have a disability?

A Sure, they can work in the environment and try to work without an accommodation. But that still wouldn't allow them to curse at their peers and treat them disrespectfully on the floor.

Q So if the employee can successfully conceal their disability and get along with everybody, that's acceptable to the company, correct?

A We certainly employ people with disabilities that don't seek accommodations.

Q And who are not known to the company as having a disability?

A That would be my assumption.

Q You can understand why employees might not want to tell their employer that they have a disability, correct?

**101**

A I can.

Q But if the -- if the employee is not able to follow all the rules and procedures because of their disability, they're not -- the company's policy isn't to allow them to retroactively raise the issue of disability; is that your testimony?

MS. RAND: Objection; form. You can answer.

A I'm not sure exactly what you're asking. If you're asking if somebody can curse at their peers and then come back and say, I need you to excuse that, I have a disability, that would not be an accepted practice.

BY MR. BABER:

Q Okay. Well, let's put aside the concept of excuse like you're getting a free pass on the whole situation, but why the employer, in this instance Wayfair, knowing now that a person has a disability might stress, hey, this is a really, you know, bad situation, what can we do to address your disability so that you don't do these things in the future? Is it your company's policy not to engage in that type of discussion?

A No, we engage in that type of discussion and certainly make numerous accommodations for folks that are presenting that situation.

Q But only if they raise it on their own before --

**102**

before any behavioral issue arises?

A If I'm not on notice of the disability, I don't know how I can provide the accommodation.

Q So getting back to my situation then with an employee that is doing their best not to reveal to the employer -- and I'm not suggesting there's any onus on the employer to do anything when the employee is intentionally not telling the employer of their disability.

But when a situation arises where because of their disability they're not able to fully conform to the behavioral expectations of the employer, why the company -- again, without giving them a free pass, wouldn't have a -- have a discussion with the person about their ability to, in the future, with or without accommodations, to adhere to the company's standards?

A I would say in most situations we do do exactly that. For example, an employee has severe anxiety or depression, they have a mental health condition that prevents them from coming to work on all their scheduled shifts. So maybe what has happened is their manager has met with them, maybe they've put them on some sort of progressive discipline based on their attendance.

Deposition taken of: Jorie Dunivan

103

Then the employee says, well, you know, I miss all this work because I -- my depression doesn't allow me to come in every day. The manager would then direct them to talent management where we would start this interactive process and we would seek to come up with, you know, a plan and they would provide us with what their accommodation needed to be for, say, time off in the future to attend appointments or maybe just a day that they need to call out of work, they don't have any appointments, but they just need that mental health day. And we would -- provided we get all the paperwork, we would provide that going forward, but we wouldn't excuse the past behavior before we were on notice of that.

Q  I understand your example and I'm wondering why you wouldn't do the same thing -- you mentioned your example with respect to attendance. Why you wouldn't attempt to do the same thing under certain circumstances with an employee that had a behavioral issue that arose out of a disability?

A  **We weren't on notice of the disability and it's not unreasonable to have a no tolerance policy for causing distractions at work and swearing at your peers.**

Q  So do you tell all of the employees as they're coming

104

through the orientation process that we have a no tolerance policy for behavioral issues even if you have a disability and so if you have a disability that might affect your behavior, you should talk to management?

A  **Of course not.**

Q  So what's to put a disabled employee on notice that they need to be forthcoming, upfront about their disability if it might affect their behavior in the workplace?

MS. RAND: I'm just going to object to the extent that the word behavior is extraordinarily broad.

A  **To what extent? Do I tell people, you can't swear at your peers? No. Do I tell people, you can't throw around your Wayfair equipment? No. It would be impossible during a time we're giving an orientation to go over every possible situation that could violate our code of conduct.**

BY MR. BABER:

Q  But just generally with respect to the code of conduct -- and I can certainly appreciate that because life is short and time is of the essence and so forth. But during your discussion either in the disability training piece or in the code of conduct piece emphasize to employees that, if you think you

105

have a concern --?

So my question is, during the orientation process do you communicate to your trainees that if they have a disability that might affect their behavior in the workplace, the time is now to raise your behavioral concern with management as opposed to later on? Do you think you give employees fair notice in that regard.

A  **I think there are enough conversations throughout the orientation process, the number of interactions with HR and other managers that employees know that it's an open-door policy and should they need anything, they just need to talk to somebody and if that's not the right person, they will be directed to who they need to talk to.**

Q  You can understand based on your background in HR that employees with disabilities might be -- feel some stigma in coming forward in that manner, correct?

A  **I certainly do.**

Q  Did anybody consider the possibility of having Ms. Trahan work from home in response to this situation?

A  **No. But at the time the request wasn't being made and, two, we weren't completely set up to deploy**

106

**people from home. So while that is something that we would have been talking about, we -- you know, decisions and how that would work were being worked on. The equipment, the training, the organizational reporting, that wasn't worked out.**

Q  Were you aware as of, you know, the third week of September 2017 that there was a program in development within Wayfair to allow employees to work from home?

A  **Yes.**

Q  And in coming back to my question, do you recall any discussion with anybody within Wayfair in response to the Trahan situation that maybe we can suspend her for a few weeks until this work-from-home program comes into place and then we can try her through that program?

A  **No. But through the entire interactive process for ADA, we typically aren't the ones recommending what accommodation; we're not medical providers. So we -- we look at what the medical provider is saying the accommodation needs to be and then base that -- is that reasonable based on our business need? So we're typically not in the position of offering up what the accommodations need to be.**

Q  Except, perhaps, in response to an interactive

107

Q dialogue with the employee and his or her medical providers, correct, the interactive process?

A Are you saying do we talk to the doctors?

Q No. I'm saying, as part of the interactive process might Wayfair offer suggestions that are different than the employer's preferred solution?

A Maybe if the -- I don't know. Like, if the -- if the employee suggested something that we couldn't do, we would try to find something that we could.

Q Yeah, that's sort of what I'm getting at. So in this instance Ms. Trahan did suggest being moved somewhere else on the -- on the -- I don't want to call it the sales floor -- on the work floor, correct?

A She -- she requested to be moved, yes.

Q To your knowledge, once an employee comes out of nesting and goes on to their initial assignment, do they receive any wage increases?

A Not at that point.

Q Okay. What's the next point in time where an employee might be eligible for a wage increase?

A There's a -- when they come in, they can -- there is Skill 1, they can progress to a Skill 2. I'm not sure if it's three months or six months.

Q And is there a standard increase when somebody goes from Skill 1 to Skill 2?

108

A Yes.

Q And do you know what that increase is?

A 50 cents an hour.

Q And what's the Skill 1 wage rate?

A $14 an hour.

Q And do Skill 1 employees receive any benefits?

A Yes.

Q What benefits do they receive?

A Health, dental, vision, short-term, long-term disability, life insurance. These are all -- some of them are elected and some are just base. I'm sorry, should I distinguish with each?

They have the option of selecting health insurance, the option of purchasing -- purchasing vision, they have the option to purchase supplemental insurances, they have -- the supplemental insurances are accidental, hospital indemnity, life insurance, additional life insurance. And then Wayfair pays for short-term disability, long-term disability, they also pay a $50,000 life insurance policy. You have the option of signing up for pet insurance, legalese. It's a thing. You have the benefits and -- you know, those are all optional. And then there's a 401(k) and there's equity.

Q Equity?

109

A Stock.

Q Stock purchases, stock options. Do you know what the value is of the corporate benefits for a Skill 1 person on an annual basis?

A I don't. Based on -- there's a lot of factors in those numbers. So whether single coverage, single plus one or family insurance, you know, all those would make a difference.

Q Let's say just on health insurance if an employee is Skill Level 1, elects company health insurance, do you know what the ratio is of employee payment to corporate payment, like, is it 20 to 80 or 0 to 100?

A There's three separate plans.

Q Okay.

A So it would have been dependent on the plan.

Q The last document I'm going to talk about is Plaintiff's Exhibit 9. And do you recognize the content of Plaintiff's Exhibit 9?

A I do.

Q What is it?

A It's the deck that they use for the on boarding of new managers, it's the deck that HR presents.

Q Basically, the slide presentation that's shown during the orientation of new managers?

A Part of their on boarding.

110

Q Okay. The power point slides that's shown?

A Yes.

Q Do you -- do you personally provide any part of the manager orientation?

A I do.

Q And do you utilize the slide deck in Exhibit 9?

A I did.

Q If you could turn to Bates 132. Do you recall that it's company policy that if managers are made aware of a disability or condition they are obligated to refer them to TM, correct?

A Correct.

Q And TM being talent management?

A Correct.

Q Do you know if there's any instruction to new managers as to what they are to do if they suspect that an employee might have a disability that's affecting their work, what they're supposed to do?

A If they suspected that the employee has a disability --

Q Correct.

A -- that is affecting their work?

Q The employee hasn't told them, but let's say they observe absenteeism or alcohol on the breath or something else that comes to their attention that

111

might suggest the employee might have some sort of impairment or disability?

A   I would just say that we foster an open-door policy. So managers are always free to talk to talent management and should they have any sort of -- with any concern regarding their employees.

As far as your example, there's -- that can be parsed out a couple of different ways. So if they suspected that they could smell alcohol on their breath, then that's covered under our fit for duty, which they have to report to talent management immediately.

Q   And on Page 136 of Exhibit 9 there's slide -- a slide on employee relations. Do you see that?

A   Mm-hum.

Q   That's a yes?

A   Yes, I see that.

Q   That's the first time and we're almost finished. I think that's a record.

And the slide directs managers to document that if you didn't write it down, it didn't happen, correct?

A   Correct.

Q   Did you -- and I think we've established this, but you didn't document any of your interactions with

112

Ms. Trahan, correct?

A   I do not believe I have any documentation regarding my interactions with Ms. Trahan.

Q   Page 136 also mentions that managers should seek to understand context, correct?

A   Correct.

Q   And in the context of the issues involving Ms. Trahan, you were aware that there was a context of -- of an underlying disability, correct?

A   She had left me the message, yes. So I was made aware via the message.

Q   And you spoke to her further about her disability, correct?

A   The following day, yes.

MR. BABER:  I have nothing further at this time.

MS. RAND:  Just give me, like, maybe three minutes and I might -- I may not have anything either, but I just want to look back.

MR. BABER:  Yeah.

(Whereupon a recess was held at 1:10 p.m., and the deposition was resumed at 1:14 p.m. this date.)

EXAMINATION

BY MS. RAND:

Q   Exhibit 11, which is this e-mail that Christy Foster sent you early in the morning on Thursday, September

113

21st.

A   Yes.

Q   You testified that you weren't sure whether you received -- whether you read this e-mail before or after you listened to Ms. Trahan's voicemail message?

A   Correct.

Q   The information that's contained in this Exhibit 11, is that information that you had before you left work on the 20th?

A   Yes.

MS. RAND:  That's all I have.

MR. BABER:  Nothing further.

(A discussion was held off the record.)

(It was indicated that the deponent would read and sign a copy of her deposition transcript.)

(Concluded this deposition at 1:15 p.m. this date.)

114

CERTIFICATE

I, Angella D. Clukey, a Notary Public in and for the State of Maine, hereby certify that on March 1, 2019, personally appeared before me Jonie Dunivan, the within-named deponent, who was sworn to testify to the truth, the whole truth and nothing but the truth, in the cause of action Kirstie Trahan vs. Wayfair Maine, LLC now pending in the United States District Court, District of Maine, and that this deposition was stenographically reported by me and later reduced to typewritten form with the aid of Computer-Aided Transcription, and the foregoing is a full and true record of the testimony given by the witness.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

I further certify that the adverse party was duly notified according to law to attend at the taking of said deposition and did attend.

IN WITNESS WHEREOF, I subscribe my hand and affix my seal this 31st day of March 2019.

_____
ANGELLA D. CLUKEY, NOTARY PUBLIC
Court Reporter

My commission expires March 17, 2024

**115**

DON THOMPSON & ASSOCIATES
PO BOX 2236
BANGOR ME 04402-2236
PHONE: (207) 394-3900
E-MAIL dtreport@myottmail.com

March 31, 2019

Katharine I. Rand, Esq.
Pierce Atwood
Merrill's Wharf
254 Commercial Street
Portland ME 04101

Re: Kirstie Trahan vs. Wayfair Maine, LLC

Dear Katharine,

Attached is your copy of the transcript of Jonie Dunivan, which was taken in this matter on March 1, 2019, along with a separate signature page and errata sheet for the deponent to execute.

Please provide these items, along with appropriate instructions to Ms. Dunivan for her review and signature. Once the deponent has completed reviewing the transcript and has returned the executed sheet to you, please retain a copy of those documents for your file and forward the original documents directly to Attorney Brett Baber for inclusion in his copy of the transcript as well as the original deposition transcript.

Sincerely,

Angella D. Clukey

Enclosure
cc: Brett D. Baber, Esq.

---

**117**

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

I, **Jonie Dunivan,** have read or had read to me the foregoing pages of my deposition and have noted any errors in form or substance of my testimony, together with their respective corrections and the reasons therefore on the following errata page.

(Signature)_____
(Date)_____

Name of person reading transcript to deponent if deponent cannot read:
_____
* * * * *
TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

I, _____, a Notary Public/Attorney, hereby acknowledge that the above-named deponent personally appeared before me and affixed his/her signature above as his/her own true act and deed.

_____
DATED_____

My Commission Expires:_____

Title: Kirstie Trahan vs. Wayfair Maine, LLC
Jurisdiction: United States District Court, District of Maine
Date of Deposition: March 1, 2019
Transcript Mailing Date: March 316, 2019
**Noticing Party**
**Thad B. Zmistowski, Esq.**
Eaton Peabody
80 Exchange Street  PO Box 1210
Bangor ME 04402-1210
**Copy Sent To:**
**Katharine I. Rand, Esq.**
Pierce Atwood
Merrill's Wharf
254 Commercial Street
Portland ME 04101
        **Reporter:** Angella D. Clukey
        DON THOMPSON & ASSOCIATES
        COURT REPORTING

---

**116**

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Reason for change:_____

Page No._____Line No._____Change to:_____
_____
Reason for change:_____

Page No._____Line No._____Change to:_____
_____
Reason for change:_____

Page No._____Line No._____Change to:_____
_____
Reason for change:_____

Page No._____Line No._____Change to:_____
_____
Reason for change:_____

**$**

$14 [1] - 108:5
$50,000 [1] - 108:20

**'**

'04 [1] - 6:18

**0**

0 [1] - 109:12
04101 [2] - 115:9, 117:24
04402-1210 [1] - 117:21
04402-2236 [1] - 115:2

**1**

1 [14] - 1:16, 2:9, 3:3, 13:16, 13:19, 107:22, 107:25, 108:4, 108:6, 109:3, 109:10, 114:3, 115:14, 117:18
1-10 [1] - 3:6
10 [8] - 2:18, 23:11, 61:21, 61:22, 63:4, 68:9, 68:11, 68:15
10/21/17 [2] - 2:19, 76:10
100 [8] - 39:13, 39:14, 39:15, 39:17, 40:3, 41:3, 109:12
101 [1] - 2:24
104 [1] - 2:24
10:04 [2] - 1:17, 3:4
11 [8] - 2:19, 2:24, 76:10, 76:16, 77:11, 84:13, 112:24, 113:7
112 [1] - 2:4
11:04 [1] - 41:23
11:09 [1] - 41:24
12 [2] - 51:12, 71:14
1210 [1] - 117:20
12:02 [1] - 76:8
12:12 [1] - 76:9
12th [1] - 53:23
132 [1] - 110:8
133 [2] - 1:15, 3:3
136 [2] - 111:13, 112:4
15 [1] - 52:13
17 [1] - 114:25
170 [1] - 33:22
18 [2] - 13:21, 14:3

1:10 [1] - 112:20
1:14 [1] - 112:21
1:15 [1] - 113:16

**2**

2 [14] - 2:10, 16:4, 47:25, 59:20, 60:5, 61:9, 61:11, 61:15, 63:3, 72:12, 75:21, 75:22, 107:22, 107:25
20 [12] - 22:16, 22:24, 23:3, 23:4, 23:8, 23:9, 23:15, 49:1, 52:13, 55:2, 62:6, 109:12
2016 [2] - 6:8, 23:16
2017 [28] - 10:14, 11:5, 12:13, 19:7, 19:13, 20:23, 28:7, 28:9, 28:17, 31:18, 32:1, 32:8, 33:19, 34:6, 34:18, 35:9, 36:5, 36:6, 36:7, 36:17, 36:21, 37:5, 37:7, 49:1, 51:12, 55:3, 76:15, 106:7
2018 [5] - 10:19, 10:20, 33:7, 33:20, 34:24
2019 [8] - 1:16, 3:3, 114:3, 114:20, 115:5, 115:14, 117:18, 117:18
2024 [1] - 114:25
207 [1] - 115:2
207-394-3900 [1] - 1:25
20th [11] - 49:9, 53:25, 55:19, 56:20, 68:23, 68:25, 69:4, 74:20, 77:2, 98:25, 113:9
21 [2] - 62:6, 76:15
21st [7] - 55:2, 59:24, 60:9, 76:20, 84:5, 84:10, 113:1
2236 [2] - 1:24, 115:1
254 [2] - 115:8, 117:23
2:30 [1] - 73:14

**3**

3 [17] - 2:3, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 16:6, 20:12, 59:20, 60:5

30 [2] - 13:7, 23:19
300 [1] - 18:2
31 [1] - 115:5
316 [1] - 117:18
31st [1] - 114:20
35 [1] - 2:24
394-3900 [1] - 115:2

**4**

4 [7] - 2:12, 43:16, 43:18, 43:23, 44:3, 45:25, 47:12
401(k [1] - 108:23

**5**

5 [12] - 2:13, 61:21, 61:22, 63:3, 63:9, 65:10, 66:12, 66:21, 66:25, 67:3, 67:22, 68:17
50 [1] - 108:3
500 [1] - 17:25

**6**

6 [8] - 2:14, 61:21, 61:22, 63:3, 63:9, 66:12, 66:21, 68:17
63 [1] - 2:24
690 [1] - 9:22
6:54 [1] - 76:19

**7**

7 [12] - 2:15, 61:21, 61:22, 63:3, 63:9, 63:14, 63:20, 64:10, 64:14, 64:16, 66:19, 68:17

**8**

8 [6] - 2:16, 21:13, 22:1, 51:9, 71:15
80 [2] - 109:12, 117:20
8:30 [2] - 84:8, 84:15
8th [1] - 6:8

**9**

9 [5] - 2:17, 109:17, 109:18, 110:6, 111:13
9/12/17 [1] - 2:16

99 [1] - 2:24

**A**

a.m [4] - 1:17, 3:4, 41:23, 41:24
ability [9] - 16:25, 25:4, 26:15, 34:1, 40:17, 53:10, 89:14, 94:16, 102:15
able [9] - 13:14, 19:16, 30:18, 40:19, 54:3, 54:14, 95:23, 101:2, 102:11
above-named [2] - 114:15, 117:11
abrupt [1] - 79:23
abruptly [1] - 75:2
absence [1] - 72:13
absenteeism [1] - 110:24
accept [1] - 86:11
acceptable [2] - 6:4, 100:17
accepted [1] - 101:11
access [4] - 13:14, 47:11, 53:1, 53:11
accessed [1] - 21:7
accidental [1] - 108:17
accommodate [1] - 88:2
accommodation [38] - 24:11, 25:14, 27:9, 29:18, 31:8, 31:13, 31:16, 31:20, 35:11, 35:15, 35:20, 35:24, 36:3, 36:8, 36:12, 36:19, 36:23, 37:4, 37:11, 37:14, 86:22, 86:25, 87:7, 92:11, 92:13, 95:8, 95:13, 96:2, 97:4, 97:5, 97:7, 99:23, 100:1, 100:12, 102:3, 103:7, 106:19, 106:21
accommodations [15] - 21:18, 22:7, 22:14, 29:22, 30:12, 30:19, 30:24, 86:25, 92:7, 95:17, 98:17, 100:19, 101:23, 102:16, 106:24
accordance [1] - 21:20
according [1] - 114:17
account [3] - 58:15, 65:5, 82:25
accountability [1] - 79:24
accreditations [1] - 6:25
accurate [2] - 16:23, 60:2
acknowledge [1] - 117:11
Act [3] - 86:22, 87:1, 89:9
act [2] - 88:25, 117:12
acted [1] - 57:13
acting [6] - 49:12, 52:23, 53:2, 53:12, 54:1, 80:20
action [7] - 48:25, 58:17, 81:1, 81:3, 87:8, 114:7, 114:15
active [1] - 23:17
actual [8] - 29:22, 31:14, 41:2, 63:24, 64:15, 66:12, 75:24, 92:13
ad [1] - 27:6
ADA [4] - 87:7, 95:4, 95:16, 106:18
additional [7] - 8:9, 23:11, 31:6, 50:13, 53:19, 67:4, 108:18
address [9] - 9:21, 13:23, 13:25, 14:3, 35:4, 86:15, 87:8, 99:1, 101:18
addressed [2] - 38:4, 50:11
addresses [1] - 38:6
adhere [1] - 102:16
administered [1] - 3:9
admission [1] - 89:12
adverse [1] - 114:16
advocate [1] - 98:19
affect [6] - 25:4, 28:25, 89:14, 104:4, 104:9, 105:4
affecting [2] - 110:18, 110:22
affirmatively [2] - 37:18, 38:22
affix [1] - 114:19
affixed [1] - 117:12
afforded [1] - 54:18
afternoon [1] - 77:2
aggressive [1] - 41:20
ago [1] - 33:6
agree [6] - 63:15,

2

75:6, 85:16, 87:2, 88:4, 89:15

**ahead** [1] - 96:24

**aid** [1] - 114:11

**Aided** [1] - 114:11

**airport** [2] - 9:25, 10:2

**alcohol** [2] - 110:24, 111:9

**allegations** [1] - 81:21

**alleged** [1] - 82:19

**allow** [9] - 5:6, 5:8, 92:8, 95:2, 100:7, 100:13, 101:5, 103:3, 106:8

**almost** [3] - 5:21, 10:18, 111:18

**amend** [1] - 23:24

**Americans** [4] - 86:22, 87:1, 88:24, 89:8

**amount** [2] - 41:14, 41:16

**analysis** [1] - 16:7

**analyze** [1] - 89:7

**Angella** [5] - 1:14, 3:1, 114:2, 115:22, 117:24

**ANGELLA** [1] - 114:23

**anger** [5] - 42:7, 42:12, 42:21, 43:2, 43:11

**annoyed** [1] - 80:14

**annual** [1] - 109:4

**answer** [10] - 5:7, 6:3, 11:21, 23:22, 23:24, 35:21, 45:8, 45:10, 99:20, 101:7

**answering** [2] - 5:8, 80:23

**answers** [2] - 15:9, 67:12

**antidiscrimination** [1] - 20:6

**anxiety** [1] - 102:19

**anyway** [1] - 25:17

**apologies** [2] - 23:19, 40:21

**appear** [2] - 63:10, 67:3

**APPEARANCES** [1] - 1:19

**appeared** [3] - 80:25, 114:4, 117:11

**applicant** [1] - 27:2

**applicant's** [1] - 44:10

**applicants** [2] -

21:18, 22:14

**application** [1] - 27:1

**apply** [1] - 27:6

**applying** [1] - 27:4

**appointment** [5] - 27:17, 27:19, 30:2, 30:16, 72:20

**appointments** [2] - 103:8, 103:10

**appreciate** [1] - 104:21

**approach** [1] - 99:23

**appropriate** [5] - 49:3, 75:2, 94:17, 94:24, 115:16

**approximate** [1] - 22:19

**approximation** [3] - 24:6, 24:9, 33:22

**area** [1] - 42:7

**areas** [1] - 47:5

**arise** [1] - 69:6

**arises** [2] - 102:1, 102:10

**army** [1] - 54:6

**arose** [2] - 71:8, 103:20

**Ashley** [5] - 48:5, 57:13, 59:12, 71:25, 75:14

**aside** [3] - 60:25, 62:17, 101:13

**aspects** [1] - 58:8

**assembled** [1] - 16:8

**assess** [2] - 74:14, 99:21

**assessment** [21] - 25:6, 25:10, 25:17, 25:25, 26:2, 26:4, 44:9, 44:16, 44:21, 44:24, 44:25, 45:2, 45:4, 45:7, 45:12, 45:13, 45:18, 45:21, 45:24, 46:9, 46:13

**assessments** [2] - 44:12, 47:9

**assigned** [7] - 51:2, 51:16, 52:7, 52:13, 53:5, 87:23, 87:25

**assignment** [3] - 56:17, 74:8, 107:16

**assist** [5] - 15:12, 15:23, 16:2, 37:18, 92:19

**assistance** [1] - 11:8

**associate** [3] - 28:6, 28:15, 32:3

**ASSOCIATES** [3] - 1:24, 115:1, 117:25

**associates** [1] - 7:15

**assume** [1] - 98:14

**assuming** [2] - 25:12, 39:23

**assumption** [4] - 4:9, 98:14, 99:25, 100:22

**assure** [1] - 5:21

**Attached** [1] - 115:13

**attached** [1] - 20:15

**attempt** [2] - 6:2, 103:18

**attempted** [1] - 71:1

**attend** [3] - 103:8, 114:17, 114:18

**attendance** [4] - 24:22, 29:9, 102:25, 103:17

**attention** [11] - 24:15, 29:1, 29:7, 50:10, 68:2, 68:5, 71:19, 71:25, 72:4, 77:16, 110:25

**attorney** [3] - 6:13, 20:17, 22:1

**ATTORNEY** [1] - 117:9

**Attorney** [1] - 115:18

**attribute** [1] - 69:21

**attributing** [1] - 70:1

**Atwood** [2] - 115:7, 117:22

**audio** [2] - 16:16, 75:11

**auditing** [1] - 6:24

**August** [2] - 6:8, 31:17

**Augusta** [1] - 9:23

**author** [1] - 64:5

**authored** [1] - 66:21

**authority** [3] - 38:15, 38:19, 38:22

**authorize** [1] - 30:18

**authorized** [5] - 4:10, 4:13, 13:23, 13:25, 14:3

**autism** [2] - 97:25, 98:1

**automatic** [1] - 42:14

**avail** [2] - 32:3, 96:5

**ave** [1] - 9:22

**avoided** [1] - 74:4

**aware** [16] - 19:14, 37:19, 42:3, 49:6, 51:8, 57:5, 57:12, 61:12, 62:4, 75:1, 75:10, 92:24, 106:6, 110:9, 112:8, 112:11

**B**

**BABER** [29] - 3:15, 11:19, 11:22, 17:11, 17:13, 35:17, 36:1, 41:21, 42:1, 43:6, 63:18, 64:2, 64:6, 64:9, 67:15, 67:20, 68:13, 68:14, 76:1, 76:3, 76:12, 84:11, 84:14, 100:3, 101:12, 104:19, 112:15, 112:19, 113:12

**Baber** [7] - 1:15, 1:20, 2:3, 3:2, 3:7, 115:18, 115:24

**bachelor** [1] - 7:1

**bachelors** [1] - 6:12

**background** [3] - 6:11, 16:3, 105:16

**bad** [2] - 71:6, 101:17

**Bangor** [28] - 1:16, 1:24, 3:3, 9:20, 9:21, 12:14, 17:18, 17:20, 18:1, 18:3, 18:13, 19:5, 19:7, 22:5, 28:16, 31:19, 32:23, 33:21, 34:23, 35:3, 35:4, 38:13, 38:18, 38:23, 41:3, 42:3, 49:4, 117:21

**BANGOR** [1] - 115:2

**bar** [1] - 6:14

**base** [3] - 44:22, 106:21, 108:11

**based** [19] - 45:10, 45:17, 46:23, 47:24, 61:3, 61:11, 65:3, 65:5, 75:20, 86:18, 86:25, 87:10, 87:25, 88:21, 92:23, 102:24, 105:16, 106:22, 109:5

**basic** [2] - 54:6, 54:9

**basing** [1] - 33:9

**basis** [4] - 64:2, 64:4, 64:7, 109:4

**batches** [1] - 52:11

**Bates** [4] - 20:16, 21:13, 46:3

**bates** [1] - 110:8

**bathroom** [3] - 68:1, 68:3, 70:11

**bathrooms** [1] - 41:17

**BE** [2] - 117:2, 117:9

**became** [1] - 49:6

**become** [1] - 54:22

**BEFORE** [1] - 1:14

**began** [1] - 50:1

**beginning** [2] - 1:16, 3:4

**behalf** [3] - 3:23, 13:25, 15:19

**behaved** [1] - 95:21

**behavior** [17] - 49:7, 49:17, 49:24, 50:1, 50:2, 50:4, 50:6, 56:9, 96:12, 96:20, 99:9, 99:13, 103:13, 104:4, 104:9, 104:12, 105:4

**behavioral** [12] - 6:23, 45:22, 53:16, 57:2, 80:12, 83:12, 97:13, 102:1, 102:12, 103:19, 104:2, 105:5

**Belanger** [11] - 48:7, 72:1, 72:4, 73:18, 73:23, 74:7, 74:11, 75:7, 75:14, 78:23, 85:14

**benefits** [4] - 108:6, 108:8, 108:22, 109:3

**best** [10] - 13:6, 13:22, 23:12, 25:1, 33:5, 34:1, 34:7, 50:20, 67:25, 102:5

**better** [1] - 53:16

**between** [9] - 6:19, 14:15, 31:17, 41:7, 42:21, 53:23, 70:18, 74:19, 74:24

**big** [1] - 83:2

**bit** [3] - 8:15, 35:6, 93:24

**bitches** [3] - 65:15, 80:1, 80:4

**Blackwell** [2] - 1:15, 3:2

**block** [2] - 46:4, 46:8

**boarding** [11] - 8:19, 8:21, 9:2, 13:9, 20:3, 21:1, 21:9, 24:12, 37:16, 109:21, 109:25

**bombs** [1] - 65:13

**Boston** [2] - 11:15, 11:17

**bottom** [5] - 16:6, 20:18, 66:25, 67:8, 67:21

**Boudreaux** [15] - 34:18, 34:20, 34:22, 34:25, 48:16, 72:13, 72:15, 72:17, 72:19, 77:1, 77:18, 77:23, 78:3, 78:22, 90:7

**BOX** [1] - 115:1

**Box** [2] - 1:24, 117:20

break [6] - 5:25, 6:1, 6:3, 31:5, 31:6, 41:17
breaks [1] - 50:3
breath [3] - 64:25, 110:24, 111:10
Brett [3] - 1:20, 115:18, 115:24
Brianna [6] - 48:17, 48:24, 64:5, 64:8, 64:11, 64:19
bring [5] - 19:17, 24:14, 29:7, 68:2, 71:17
bringing [4] - 19:3, 28:24, 29:19, 99:11
broad [1] - 104:12
broadcasting [1] - 98:12
Broadway [2] - 1:15, 3:3
brought [8] - 50:10, 62:9, 68:5, 72:4, 77:13, 77:16, 81:22, 95:25
Brunswick [5] - 17:23, 17:24, 18:4, 18:9, 19:6
BS [1] - 7:4
bullet [2] - 67:2, 67:5
bunch [1] - 65:15
business [3] - 47:15, 65:24, 106:22
button [3] - 17:4, 17:5
BY [20] - 3:15, 11:19, 11:22, 17:13, 35:17, 36:1, 42:1, 43:6, 63:18, 64:9, 67:20, 68:14, 76:12, 84:14, 100:3, 101:12, 104:19, 112:23, 117:2, 117:9

## C

Candice [4] - 10:10, 10:25, 12:1, 91:12
candidate [3] - 46:8, 46:25, 47:7
candidates [2] - 18:24, 43:19
cannot [2] - 63:8, 117:8
capability [1] - 17:8
capable [1] - 25:21
capacity [6] - 3:21, 19:19, 31:24, 33:12, 53:3, 88:22
capture [1] - 5:17

card [1] - 71:4
case [4] - 10:9, 20:15, 31:9, 42:16
cases [4] - 23:17, 24:6, 40:7, 40:11
catchall [1] - 4:6
categories [2] - 45:23, 46:19
category [1] - 45:25
caused [1] - 86:8
causing [1] - 103:23
cautious [1] - 42:15
cc [1] - 115:24
cease [1] - 34:22
center [4] - 41:2, 41:5, 41:7, 41:10
cents [1] - 108:3
certain [2] - 55:10, 103:18
certainly [14] - 33:25, 39:1, 39:23, 41:16, 50:11, 56:10, 66:4, 74:17, 92:13, 93:12, 100:18, 101:23, 104:21, 105:20
CERTIFICATE [1] - 114:1
certify [3] - 114:3, 114:14, 114:16
challenges [1] - 22:25
chance [1] - 99:16
change [7] - 93:19, 116:5, 116:9, 116:13, 116:17, 116:21, 116:25
changed [1] - 32:22
changeover [1] - 10:16
changes [1] - 23:22
characteristic [1] - 85:16
charge [2] - 34:4, 34:12
check [1] - 33:9
checked [1] - 84:17
Christy [11] - 67:11, 69:8, 72:21, 76:14, 77:17, 77:24, 79:3, 81:12, 81:13, 81:25, 112:24
circumstances [3] - 4:16, 22:10, 103:19
civil [3] - 49:13, 57:3, 92:20
civility [1] - 37:25
claim [2] - 60:19, 62:19
claiming [1] - 92:25
clarification [1] -

99:4
class [5] - 12:24, 26:3, 28:13, 56:10, 71:11
classes [2] - 54:16, 87:22
classified [2] - 88:16, 97:25
classify [2] - 95:18, 95:19
classroom [3] - 27:18, 82:10, 83:19
clear [1] - 84:9
clique [6] - 49:17, 49:22, 49:24, 50:6, 56:8, 82:24
cliques [1] - 82:13
cliquey [2] - 65:25, 84:2
closed [1] - 23:18
closer [2] - 61:4, 68:16
CLUKEY [1] - 114:23
Clukey [5] - 1:14, 3:1, 114:2, 115:22, 117:24
coach [1] - 52:7
Code [1] - 38:4
code [9] - 38:5, 49:8, 49:16, 49:24, 50:8, 66:2, 104:18, 104:20, 104:24
cold [1] - 50:9
cold-shouldering [1] - 50:9
colocated [1] - 56:23
comfortable [1] - 40:18
coming [9] - 17:1, 54:16, 73:13, 87:22, 99:22, 102:21, 103:25, 105:18, 106:11
comma [1] - 21:20
comment [4] - 69:7, 70:1, 82:11, 83:18
comments [8] - 49:14, 58:15, 66:1, 66:2, 82:20, 83:11, 83:15, 86:12
Commercial [2] - 115:8, 117:23
Commission [8] - 2:10, 15:16, 15:21, 47:25, 59:19, 59:22, 76:4, 117:15
commission [1] - 114:25
common [1] - 91:10
communicate [1] -

105:3
communicated [10] - 57:8, 57:15, 57:17, 57:19, 58:2, 58:22, 58:23, 59:14, 89:15, 92:5
communication [1] - 94:3
companies [1] - 6:23
company [42] - 7:25, 8:1, 9:13, 10:11, 13:23, 13:25, 14:18, 16:14, 18:22, 22:21, 24:15, 25:2, 28:4, 28:21, 31:14, 33:11, 33:16, 35:1, 36:20, 37:8, 37:13, 37:24, 39:5, 39:9, 43:13, 45:13, 48:17, 48:19, 50:21, 56:21, 57:21, 68:19, 92:7, 92:16, 96:10, 96:16, 97:10, 100:17, 100:20, 102:13, 109:10, 110:9
company's [4] - 21:13, 101:4, 101:20, 102:16
competency [1] - 45:1
complaint [1] - 59:19
complaints [2] - 81:21, 82:19
COMPLETED [2] - 117:2, 117:9
completed [1] - 115:17
completely [1] - 105:25
completing [1] - 26:1
compliance [6] - 6:21, 6:22, 6:24, 8:5, 8:6, 20:6
comprehensive [2] - 26:6, 76:14
comprised [1] - 19:10
Computer [1] - 114:11
computer [2] - 26:16
Computer-Aided [1] - 114:11
computerized [2] - 9:1, 9:15
conceal [1] - 100:15
conceivable [1] - 93:18
concept [5] - 36:10, 41:4, 49:17, 88:24, 101:13
concern [3] - 105:1,

105:6, 111:6
concerns [13] - 24:14, 28:24, 56:13, 65:20, 65:23, 73:21, 73:24, 74:10, 74:15, 81:21, 83:22, 84:1, 99:11
concluded [1] - 113:16
condition [7] - 24:10, 57:14, 79:17, 88:17, 97:16, 102:20, 110:10
Conduct [1] - 38:4
conduct [14] - 38:5, 49:6, 49:8, 49:16, 49:25, 50:8, 58:24, 59:7, 66:2, 66:9, 72:14, 104:18, 104:21, 104:24
conference [5] - 78:2, 78:14, 79:8, 79:9, 79:11
confidence [1] - 94:23
confident [1] - 93:5
confidentiality [1] - 9:5
confirm [1] - 75:12
conform [1] - 102:11
conjunction [2] - 47:17, 61:24
consider [4] - 57:21, 58:9, 99:1, 105:21
consideration [3] - 58:4, 58:21, 96:12
considered [1] - 98:5
consisted [1] - 63:24
Consultant [2] - 2:12, 47:17
consultant [5] - 7:19, 26:9, 26:14, 27:3, 43:24
consultants [5] - 18:16, 26:20, 44:1, 44:8, 45:15
consulting [1] - 39:4
contact [2] - 27:10, 29:2
contained [2] - 4:4, 113:7
contemplating [2] - 94:10, 94:13
contemporaneous [2] - 62:5, 62:23
content [1] - 109:18
contention [1] - 57:12
context [3] - 112:5, 112:7, 112:8
continue [1] - 95:3

4

**conversation** [13] - 55:12, 61:1, 68:7, 81:11, 81:19, 85:24, 87:19, 90:16, 94:9, 95:15, 96:7, 96:21, 97:13

**conversations** [8] - 36:18, 37:1, 61:7, 61:23, 66:8, 77:8, 87:11, 105:9

**coordinated** [1] - 72:8

**copy** [7] - 21:1, 21:3, 68:11, 113:15, 115:13, 115:18, 115:19

**Copy** [1] - 117:21

**corporate** [18] - 4:8, 6:22, 8:17, 11:13, 12:3, 14:13, 14:15, 14:21, 15:4, 15:5, 18:6, 37:3, 37:9, 59:21, 61:17, 83:12, 109:3, 109:12

**corporation** [3] - 14:8, 19:24, 19:25

**correct** [118] - 16:24, 32:19, 33:18, 38:21, 43:15, 46:10, 46:11, 47:2, 51:13, 51:18, 51:21, 55:15, 55:20, 55:24, 56:14, 56:23, 56:24, 60:7, 60:11, 60:12, 60:17, 60:18, 60:20, 60:21, 62:10, 62:15, 63:21, 63:22, 63:24, 64:1, 64:12, 64:13, 64:16, 64:17, 65:7, 65:8, 65:10, 65:11, 65:13, 65:14, 65:16, 65:17, 66:22, 68:9, 69:14, 69:15, 69:17, 69:18, 69:23, 69:24, 69:25, 70:3, 70:4, 70:5, 70:8, 70:9, 70:12, 70:13, 70:15, 70:16, 72:6, 72:9, 73:19, 73:20, 75:12, 75:15, 75:17, 76:17, 76:20, 76:23, 76:24, 77:2, 77:3, 77:6, 77:14, 77:15, 77:19, 78:7, 78:24, 78:25, 81:4, 81:5, 83:12, 84:2, 84:3, 84:23, 84:24, 85:15, 85:21, 86:4, 86:5, 86:9, 86:10, 88:6, 88:10, 89:17, 89:18, 89:21, 91:13, 93:1, 93:4,

100:17, 100:25, 105:19, 107:2, 107:13, 110:11, 110:12, 110:14, 110:21, 111:22, 111:23, 112:1, 112:5, 112:6, 112:9, 112:13, 113:6

**corrections** [1] - 117:4

**corrective** [1] - 48:25

**correctly** [1] - 48:13

**counsel** [7] - 15:5, 16:20, 40:14, 59:21, 76:13, 96:9, 96:17

**counterpart** [1] - 18:4

**couple** [5] - 6:23, 24:21, 48:4, 51:10, 111:8

**course** [9] - 7:21, 25:11, 30:5, 58:17, 62:6, 64:21, 81:7, 98:11, 104:6

**Court** [3] - 114:8, 114:24, 117:17

**COURT** [2] - 1:1, 117:25

**courteously** [1] - 38:9

**courtesy** [2] - 90:19, 93:14

**cover** [3] - 4:7, 20:19, 20:21

**coverage** [1] - 109:6

**covered** [1] - 111:10

**coworker** [5] - 59:7, 75:2, 75:3, 88:6, 98:25

**coworkers** [14] - 40:24, 42:13, 55:18, 57:3, 65:15, 65:19, 65:21, 65:23, 66:9, 69:12, 74:18, 74:23, 86:7, 86:8

**creates** [1] - 21:19

**crying** [1] - 70:11

**curious** [2] - 19:19, 64:2

**current** [1] - 7:6

**curse** [3] - 97:6, 100:13, 101:9

**cursing** [4] - 41:12, 41:13, 41:14, 80:6

**customary** [1] - 79:2

**customer** [6] - 26:17, 94:17, 94:20, 94:24, 97:9, 97:14

**customers** [3] - 7:14, 41:19, 42:13

**cycle** [1] - 54:9

**D**

**Darren** [3] - 51:12, 52:22, 54:1

**Darren's** [1] - 53:10

**dash** [1] - 67:23

**date** [10] - 13:8, 36:20, 41:24, 68:23, 68:24, 68:25, 71:14, 76:9, 112:21, 113:17

**Date** [3] - 117:6, 117:18, 117:18

**dated** [2] - 51:12, 76:15

**DATED** [1] - 117:14

**dates** [2] - 10:21, 61:6

**Dawson** [3] - 78:7, 98:23, 99:5

**days** [1] - 13:7

**deal** [1] - 83:2

**dealt** [1] - 41:13

**Dear** [1] - 115:12

**decide** [1] - 46:18

**decided** [2] - 78:6, 78:17

**decides** [1] - 46:23

**deciding** [1] - 88:2

**decision** [15] - 39:2, 57:15, 57:19, 58:2, 58:22, 59:14, 62:13, 78:8, 78:15, 89:13, 89:16, 92:23, 92:24, 93:14, 93:20

**decisions** [3] - 18:19, 45:16, 106:3

**deck** [3] - 109:21, 109:22, 110:6

**deed** [1] - 117:12

**deem** [1] - 50:4

**deemed** [1] - 49:15

**defendant** [1] - 4:21

**Defendant** [1] - 1:21

**Defendants** [1] - 1:9

**defensive** [2] - 79:21, 79:23

**degree** [2] - 6:14, 38:12

**denied** [1] - 56:12

**dental** [1] - 108:9

**department** [4] - 28:6, 30:4, 32:13, 33:10

**Department** [1] - 7:8

**departments'** [1] - 29:24

**dependent** [1] -

109:15

**deploy** [1] - 105:25

**deponent** [8] - 3:9, 113:14, 114:5, 115:15, 115:17, 117:7, 117:11

**DEPONENT** [2] - 2:1, 117:2

**deposes** [1] - 3:13

**DEPOSITION** [2] - 1:12, 116:1

**Deposition** [4] - 2:9, 3:6, 76:10, 117:18

**deposition** [30] - 3:1, 3:7, 3:21, 4:1, 4:4, 4:5, 4:7, 4:9, 4:11, 4:14, 5:3, 6:10, 13:17, 14:24, 15:6, 16:13, 16:18, 23:24, 41:24, 51:4, 55:14, 56:5, 76:9, 112:21, 113:15, 113:16, 114:9, 114:18, 115:19, 117:3

**depression** [2] - 102:20, 103:2

**depth** [2] - 47:9, 84:1

**describe** [6] - 30:23, 63:15, 63:23, 65:15, 66:8, 85:4

**described** [1] - 77:9

**describes** [2] - 46:4, 69:16

**describing** [1] - 68:22

**Description** [1] - 2:8

**description** [8] - 26:11, 26:19, 27:2, 27:5, 63:2, 64:14, 65:9, 65:22

**descriptions** [2] - 26:25, 29:6

**design** [2] - 44:15, 44:18

**designated** [1] - 3:22

**designed** [2] - 44:8, 44:9

**desk** [7] - 41:4, 52:17, 59:3, 77:24, 78:3, 78:14, 93:8

**despite** [1] - 46:20

**detail** [4] - 33:3, 58:20, 63:23, 83:8

**details** [2] - 50:13, 90:11

**determine** [1] - 50:14

**developed** [2] - 22:13, 30:24

**developing** [3] - 22:6, 22:13, 34:12

**development** [5] -

30:18, 34:4, 34:16, 35:8, 106:8

**Dewey** [1] - 34:11

**diagnosed** [1] - 100:6

**dialogue** [1] - 107:1

**difference** [2] - 11:11, 109:8

**different** [10] - 7:9, 24:22, 27:12, 29:11, 30:1, 67:1, 85:12, 88:1, 107:5, 111:8

**differently** [1] - 23:23

**digital** [2] - 21:4, 21:5

**diligence** [1] - 92:3

**direct** [1] - 103:4

**directed** [5] - 41:19, 64:23, 65:1, 80:24, 105:14

**directive** [2] - 37:2, 37:10

**directly** [3] - 65:1, 77:25, 115:18

**director** [8] - 10:22, 11:1, 11:16, 12:1, 34:10, 34:15, 34:18, 39:2

**directors** [1] - 34:8

**directs** [1] - 111:20

**disabilities** [20] - 9:17, 21:19, 22:7, 22:15, 23:4, 23:6, 23:16, 24:14, 25:4, 25:8, 27:25, 28:24, 29:6, 30:20, 31:1, 37:18, 88:25, 97:11, 100:18, 105:17

**Disabilities** [3] - 86:22, 87:1, 89:9

**disability** [68] - 19:21, 25:11, 26:1, 27:9, 37:12, 39:21, 40:2, 40:5, 40:9, 43:3, 43:14, 49:4, 50:18, 57:22, 58:6, 58:12, 58:24, 59:1, 59:2, 60:17, 60:20, 87:8, 88:24, 89:3, 89:13, 89:17, 90:4, 92:19, 92:25, 93:4, 95:9, 96:11, 96:19, 96:23, 97:1, 97:16, 99:16, 99:18, 99:22, 100:6, 100:10, 100:16, 100:21, 100:24, 101:4, 101:6, 101:11, 101:16, 101:18, 102:2, 102:9, 102:11,

103:20, 103:21, 104:3, 104:9, 104:24, 105:4, 108:10, 108:19, 110:10, 110:17, 110:20, 111:2, 112:9, 112:12
**disabled** [2] - 100:8, 104:7
**discipline** [4] - 42:23, 48:25, 50:14, 102:24
**disciplined** [3] - 42:6, 50:12, 50:15
**disclose** [2] - 24:10, 80:25
**disclosed** [6] - 25:13, 39:22, 40:1, 80:22, 90:10, 96:22
**disclosing** [3] - 30:22, 39:24, 99:24
**discovery** [4] - 22:20, 47:20, 55:11, 84:21
**discrete** [1] - 40:11
**discrimination** [5] - 13:2, 13:4, 19:22, 62:20, 99:14
**discuss** [5] - 11:9, 27:18, 95:1, 96:9, 96:16
**discussed** [2] - 24:20, 95:4
**discussing** [1] - 31:7
**discussion** [17] - 17:12, 29:20, 36:14, 36:21, 43:20, 81:16, 83:16, 90:8, 92:4, 92:6, 94:1, 101:21, 101:22, 102:14, 104:23, 106:12, 113:13
**discussions** [2] - 77:5, 91:21
**disinterested** [1] - 114:14
**disorder** [2] - 24:4, 88:13
**displayed** [1] - 85:13
**disrespectful** [1] - 50:2
**disrespectfully** [1] - 100:14
**distinguish** [1] - 108:12
**distractions** [1] - 103:23
**DISTRICT** [2] - 1:1, 1:2
**District** [4] - 114:8, 117:17

**doctor** [2] - 95:6, 96:2
**doctor's** [2] - 95:24, 95:25
**doctorate** [1] - 6:12
**doctors** [1] - 107:3
**document** [10] - 20:13, 20:14, 21:8, 60:19, 64:4, 64:5, 77:4, 109:16, 111:20, 111:25
**documentation** [3] - 55:13, 95:5, 112:2
**documents** [11] - 15:7, 15:12, 26:8, 27:7, 61:17, 63:5, 65:3, 67:13, 115:18, 115:18
**DON** [3] - 1:24, 115:1, 117:25
**done** [16] - 13:3, 13:10, 27:24, 28:9, 29:3, 52:9, 52:11, 52:12, 53:7, 53:8, 56:18, 74:14, 76:22, 82:16, 83:5, 83:13
**door** [3] - 79:9, 105:12, 111:3
**double** [2] - 33:8, 60:25
**down** [3] - 16:6, 20:18, 111:21
**dtreport@ myottmail.com** [2] - 1:25, 115:3
**dual** [1] - 3:21
**due** [2] - 27:9, 92:3
**duly** [2] - 3:12, 114:16
**DUNIVAN** [4] - 1:12, 2:1, 3:12, 3:18
**Dunivan** [9] - 3:17, 59:23, 60:6, 60:13, 60:22, 114:4, 115:14, 115:16, 117:3
**during** [34] - 5:22, 7:21, 19:11, 21:1, 22:4, 32:5, 36:4, 36:17, 36:23, 37:7, 37:16, 39:5, 53:11, 55:2, 55:11, 55:14, 56:5, 56:7, 56:25, 62:6, 64:21, 71:9, 73:22, 80:7, 80:12, 80:17, 80:21, 81:7, 85:13, 94:9, 104:16, 104:23, 105:2, 109:23
**duties** [2] - 35:5, 72:10
**duty** [1] - 111:10

## E

**E-mail** [4] - 1:25, 2:16, 2:19, 76:10
**E-MAIL** [1] - 115:3
**e-mail** [6] - 51:11, 53:24, 84:17, 85:1, 112:24, 113:4
**e-mails** [1] - 51:10
**EAP** [2] - 37:20, 37:22
**early** [1] - 112:25
**Eaton** [1] - 117:20
**educational** [1] - 6:11
**effect** [3] - 82:15, 82:23, 94:18
**effort** [2] - 25:20, 45:20
**either** [8] - 33:15, 48:1, 66:5, 74:6, 77:17, 78:15, 104:23, 112:18
**elaborate** [1] - 83:9
**elected** [1] - 108:11
**elects** [1] - 109:10
**eligible** [2] - 56:16, 107:20
**emergency** [1] - 54:13
**emotional** [9] - 42:6, 42:12, 42:21, 43:11, 59:8, 79:17, 85:7, 92:12, 98:8
**emphasis** [1] - 57:25
**emphasize** [1] - 104:25
**employ** [4] - 97:11, 98:16, 98:20, 100:18
**employable** [1] - 97:17
**employed** [1] - 48:5
**employee** [47] - 9:10, 20:22, 25:2, 27:8, 35:11, 36:8, 38:13, 38:23, 39:10, 39:17, 39:20, 42:5, 42:11, 42:22, 45:4, 45:5, 46:20, 49:3, 50:9, 54:13, 54:23, 96:22, 99:8, 99:11, 99:15, 99:24, 100:5, 100:8, 100:15, 101:2, 102:4, 102:7, 102:19, 103:1, 103:19, 104:7, 107:1, 107:8, 107:15, 107:20, 109:9, 109:11, 110:17, 110:19, 110:23,

111:1, 111:14
**Employee** [4] - 2:11, 20:20, 20:25, 38:3
**employee's** [2] - 39:10, 45:21
**employees** [48] - 7:14, 7:21, 17:24, 18:1, 19:3, 20:22, 21:18, 22:15, 24:7, 24:12, 25:3, 25:12, 25:21, 27:25, 28:16, 28:23, 29:5, 31:18, 32:23, 33:21, 36:15, 36:22, 37:16, 37:18, 37:22, 37:25, 38:16, 38:19, 40:23, 41:8, 41:10, 42:4, 43:10, 53:13, 57:1, 74:23, 79:15, 95:12, 96:4, 100:23, 103:25, 104:25, 105:7, 105:11, 105:17, 106:8, 108:6, 111:6
**employer** [9] - 99:17, 99:21, 100:9, 100:24, 101:15, 102:6, 102:7, 102:8, 102:12
**employer's** [1] - 107:6
**employment** [19] - 6:20, 18:24, 21:14, 21:16, 25:18, 25:20, 39:10, 42:3, 43:19, 44:13, 44:14, 46:15, 50:21, 58:3, 61:24, 62:14, 62:18, 62:19, 98:19
**enable** [1] - 99:2
**Enclosure** [1] - 115:24
**encourage** [1] - 83:15
**end** [6] - 25:23, 26:2, 45:3, 50:22, 54:5, 83:6
**ended** [1] - 73:11
**engage** [2] - 101:20, 101:22
**engaged** [1] - 42:11
**England** [1] - 6:16
**ensure** [2] - 55:12, 97:7
**entailed** [1] - 81:17
**enter** [1] - 29:15
**entered** [1] - 29:16
**entire** [4] - 21:8, 41:5, 58:7, 106:17
**entirely** [1] - 52:3
**entity** [1] - 14:10
**environment** [5] -

75:4, 84:2, 87:9, 100:9, 100:11
**environmental** [1] - 7:2
**episode** [1] - 59:5
**equal** [2] - 21:14, 21:16
**equipment** [2] - 104:15, 106:4
**equity** [2] - 108:24, 108:25
**ergonomic** [1] - 30:6
**Erin** [1] - 34:11
**errata** [2] - 115:14, 117:5
**ERRATA** [1] - 116:1
**errors** [1] - 117:3
**especially** [1] - 61:6
**Esq** [6] - 1:20, 1:21, 115:7, 115:24, 117:19, 117:22
**essence** [1] - 104:22
**essential** [5] - 25:5, 25:22, 26:8, 26:13, 99:2
**establish** [1] - 35:19
**established** [1] - 111:24
**estimate** [4] - 23:12, 39:16, 40:6, 40:17
**evaluate** [3] - 25:21, 44:21, 45:21
**evaluation** [2] - 25:3, 30:6
**event** [7] - 4:6, 5:2, 61:4, 75:1, 88:18, 90:18, 114:15
**events** [16] - 16:4, 16:9, 49:9, 53:24, 55:2, 55:8, 55:19, 61:14, 62:6, 65:5, 68:22, 74:20, 75:10, 76:23, 87:17, 90:12
**evidence** [1] - 35:18
**evolved** [1] - 32:7
**evolving** [1] - 73:10
**exact** [6] - 10:21, 22:16, 23:13, 23:20, 38:9, 94:14
**exactly** [3] - 95:11, 101:8, 102:18
**EXAMINATION** [3] - 2:2, 3:14, 112:22
**example** [8] - 17:3, 29:17, 45:24, 54:12, 102:19, 103:15, 103:17, 111:7
**examples** [1] - 50:14
**exceeds** [1] - 23:19
**except** [1] - 106:25

**exception** [1] - 51:17
**exceptions** [1] - 48:4
**excerpt** [1] - 20:13
**Exchange** [1] - 117:20
**exchange** [1] - 14:19
**exclusivity** [1] - 50:7
**excuse** [5] - 99:10, 99:13, 101:10, 101:13, 103:13
**execute** [1] - 115:15
**executed** [1] - 115:17
**EXHIBIT** [1] - 2:7
**Exhibit** [42] - 3:6, 13:16, 13:19, 20:12, 43:16, 43:18, 43:23, 44:3, 45:25, 47:12, 47:25, 51:9, 59:20, 60:5, 61:9, 61:11, 61:15, 63:3, 63:14, 63:20, 64:10, 64:14, 64:16, 65:10, 66:19, 68:9, 68:11, 68:15, 68:17, 71:15, 75:21, 75:22, 76:10, 76:16, 77:11, 84:13, 109:17, 109:18, 110:6, 111:13, 112:24, 113:7
**exhibit** [3] - 47:16, 50:1, 88:18
**exhibited** [1] - 99:9
**Exhibits** [1] - 68:17
**exhibits** [4] - 61:21, 61:22, 63:3, 63:9
**existed** [1] - 33:12
**existence** [1] - 33:4
**expectations** [2] - 83:12, 102:12
**expected** [1] - 21:8
**experience** [5] - 42:16, 61:2, 86:18, 88:10, 88:21
**experienced** [1] - 60:24
**expires** [1] - 114:25
**Expires** [1] - 117:15
**explain** [1] - 95:11
**explained** [3] - 20:17, 87:21, 88:8
**explaining** [1] - 96:19
**explanation** [1] - 96:11
**explicitly** [1] - 38:7
**explore** [3] - 33:2, 83:8, 83:25
**express** [1] - 73:24
**expressed** [1] - 73:21

**expressly** [1] - 38:5
**extended** [3] - 31:4, 31:5, 54:14
**extent** [11] - 4:2, 4:11, 41:1, 50:1, 57:20, 80:10, 82:16, 89:7, 93:13, 104:11, 104:13
**exterior** [1] - 79:10
**external** [1] - 18:22
**extraordinarily** [1] - 104:12
**exuded** [1] - 94:23
**eye** [2] - 80:9, 80:10
**eyes** [2] - 80:1, 80:11

## F

**F-bombs** [1] - 65:13
**face** [1] - 66:1
**facilities** [2] - 30:3
**facility** [1] - 31:19
**fact** [6] - 58:23, 70:10, 85:6, 95:14, 96:23, 99:10
**factors** [1] - 109:5
**factual** [3] - 4:3, 16:3, 63:2
**factually** [2] - 16:9, 61:12
**failed** [1] - 59:9
**fair** [1] - 105:7
**fairly** [2] - 91:9, 93:5
**fairness** [2] - 40:6, 40:18
**fall** [16] - 10:14, 11:5, 32:1, 32:8, 33:19, 33:20, 34:6, 34:18, 35:9, 36:4, 36:6, 36:7, 36:17, 36:21, 37:5, 37:7
**familiar** [5] - 18:12, 29:21, 36:10, 49:17, 97:18
**family** [2] - 54:13, 109:7
**far** [3] - 53:6, 53:8, 111:7
**fast** [2] - 32:15, 32:18
**feared** [1] - 54:7
**February** [1] - 10:20
**feelings** [1] - 88:20
**fellow** [1] - 51:6
**felt** [3] - 65:18, 71:5, 93:17
**few** [1] - 106:14
**field** [3] - 12:2, 12:4, 97:24

**file** [2] - 46:15, 115:18
**files** [1] - 75:11
**fill** [2] - 95:6, 95:7
**fills** [1] - 96:2
**fine** [6] - 10:22, 13:9, 22:19, 23:8, 23:14, 96:24
**finish** [2] - 5:6, 5:8
**finished** [1] - 111:18
**first** [13] - 12:24, 12:25, 13:3, 13:7, 17:15, 28:4, 31:24, 33:12, 67:5, 71:24, 77:16, 111:18
**fit** [6] - 42:7, 42:12, 42:21, 43:2, 43:11, 111:10
**five** [3] - 19:15, 41:21
**flashback** [5] - 59:15, 59:16, 60:24, 61:2, 86:9
**floor** [17] - 41:2, 41:4, 49:1, 52:18, 56:17, 65:13, 72:22, 78:3, 79:12, 83:20, 84:4, 91:24, 92:12, 96:20, 100:14, 107:13
**focus** [2] - 8:21, 83:5
**folks** [11] - 7:12, 25:8, 25:10, 29:9, 34:8, 39:22, 39:24, 54:3, 91:25, 99:22, 101:23
**follow** [5] - 81:11, 81:20, 91:15, 91:18, 101:2
**follow-up** [3] - 81:11, 91:15, 91:18
**following** [4] - 6:25, 96:6, 112:14, 117:5
**follows** [1] - 3:13
**foregoing** [2] - 114:11, 117:3
**forgo** [1] - 99:16
**forgotten** [1] - 85:19
**form** [8] - 27:9, 27:12, 42:23, 99:14, 99:19, 101:7, 114:10, 117:4
**formal** [4] - 8:24, 8:25, 63:1, 82:19
**formalized** [1] - 8:11
**format** [1] - 83:17
**formerly** [1] - 34:10
**forth** [5] - 9:8, 16:9, 21:14, 26:8, 104:23
**forthcoming** [2] - 65:6, 104:8
**fortunately** [1] -

40:21
**forward** [9] - 25:1, 72:8, 92:9, 92:20, 94:6, 99:12, 103:13, 105:18, 115:18
**foster** [26] - 48:9, 67:11, 69:9, 72:5, 72:7, 72:16, 73:15, 73:18, 73:23, 74:7, 74:11, 75:4, 75:7, 75:14, 75:17, 76:15, 77:6, 77:8, 77:18, 78:9, 78:23, 81:13, 82:1, 85:14, 111:3, 112:24
**foster's** [1] - 85:1
**foul** [7] - 38:6, 38:7, 41:10, 63:16, 63:19, 64:24, 98:6
**foundation** [3] - 11:18, 43:17, 66:6
**foundationally** [1] - 38:11
**fourth** [1] - 33:7
**frame** [2] - 19:11, 71:10
**free** [6] - 23:22, 75:23, 77:11, 101:14, 102:13, 111:4
**Friday** [3] - 1:16, 3:3, 84:5
**friend** [3] - 85:25, 87:12, 88:3
**friendly** [1] - 87:15
**friends** [1] - 87:13
**front** [5] - 51:13, 65:4, 76:17, 79:12, 79:13
**full** [2] - 60:5, 114:12
**fully** [1] - 102:11
**function** [1] - 19:3
**functions** [7] - 25:5, 25:22, 26:7, 26:9, 26:13, 92:20, 99:3
**future** [6] - 45:5, 47:6, 74:4, 101:19, 102:15, 103:8

## G

**gaps** [1] - 26:5
**gathered** [1] - 45:17
**gauge** [1] - 44:25
**general** [7] - 24:13, 30:14, 31:9, 46:3, 49:18, 88:12, 95:10
**generalized** [1] - 29:5
**generally** [6] - 31:10,

31:21, 44:5, 44:8, 49:19, 104:20
**gesture** [1] - 5:17
**gestures** [1] - 5:16
**given** [7] - 27:13, 42:2, 52:12, 58:21, 61:22, 91:10, 114:12
**glitched** [1] - 52:25
**gotcha** [1] - 32:17
**graduate** [1] - 6:17
**graduation** [1] - 53:7
**great** [1] - 71:5
**greater** [2] - 14:23, 15:2
**grievance** [1] - 83:10
**ground** [3] - 5:2, 5:4, 6:4
**grounds** [1] - 42:14
**group** [5] - 30:13, 39:23, 50:8, 52:13, 54:17
**group's** [1] - 54:16
**groups** [1] - 87:24
**guess** [6] - 13:18, 22:16, 33:23, 46:12, 52:18, 87:5
**guessing** [1] - 28:12
**guide** [1] - 20:22
**Guide** [4] - 2:11, 20:20, 20:25, 38:3

## H

**Haley** [6] - 48:11, 66:16, 66:24, 73:15, 81:14
**half** [1] - 67:2
**hand** [2] - 83:6, 114:19
**handwriting** [3] - 67:1, 68:16, 68:17
**Handwritten** [4] - 2:13, 2:14, 2:15, 2:18
**handwritten** [1] - 66:20
**handy** [1] - 6:10
**harass** [1] - 49:4
**harassment** [2] - 9:4, 9:7
**hard** [1] - 61:5
**hardship** [1] - 21:20
**head** [2] - 40:15, 62:10
**headquarters** [1] - 11:14
**health** [26] - 6:23, 23:1, 23:6, 30:20, 30:25, 39:20, 39:25, 40:2, 43:3, 43:13,

50:17, 66:9, 73:22, 81:6, 88:17, 97:11, 97:16, 97:23, 97:24, 100:6, 102:20, 103:11, 108:9, 108:13, 109:9, 109:10

**hear** [6] - 41:6, 41:13, 59:13, 78:20, 93:15, 98:14

**heard** [11] - 41:12, 55:9, 55:17, 55:20, 56:12, 82:3, 89:6, 98:4, 98:7, 98:9

**held** [8] - 17:12, 41:23, 53:15, 53:18, 54:8, 76:8, 112:20, 113:13

**help** [3] - 28:6, 58:1, 71:1

**hereby** [2] - 114:3, 117:11

**herself** [2] - 32:4, 96:6

**hiding** [1] - 67:18

**hierarchy** [1] - 18:7

**high** [6] - 49:21, 82:12, 82:22, 83:3, 83:23, 84:2

**higher** [1] - 23:9

**highlighted** [1] - 46:7

**himself** [1] - 32:4

**hire** [1] - 46:20

**hired** [5] - 12:23, 25:2, 26:22, 27:8, 46:16

**hiring** [6] - 18:12, 18:16, 18:17, 18:18, 45:16

**his/her** [2] - 117:12

**home** [33] - 11:14, 12:8, 31:8, 31:14, 31:19, 32:2, 32:14, 32:17, 32:24, 33:12, 33:17, 33:21, 34:5, 34:17, 35:8, 35:10, 35:14, 35:25, 36:3, 36:9, 36:15, 36:19, 36:23, 37:4, 37:11, 73:7, 78:7, 78:16, 91:25, 105:22, 106:1, 106:9, 106:14

**honestly** [1] - 19:16

**hopefully** [1] - 5:8

**hospital** [1] - 108:17

**hour** [2] - 108:3, 108:5

**HR** [10] - 7:10, 7:11, 8:7, 19:19, 20:5, 27:13, 35:10, 105:11,

105:16, 109:22

**huhs** [1] - 5:18

**hum** [2] - 5:21, 111:15

**Human** [7] - 2:10, 15:16, 15:20, 47:25, 59:19, 59:22, 76:4

**human** [3] - 8:2, 8:10, 8:21

**hums** [1] - 5:18

## I

**idea** [1] - 58:19

**identified** [4] - 25:11, 25:25, 26:1, 44:3

**identify** [1] - 26:5

**ignore** [1] - 35:23

**imagine** [1] - 20:2

**immediately** [1] - 111:12

**impact** [1] - 66:8

**impairment** [1] - 111:2

**implicate** [1] - 89:8

**importance** [1] - 62:22

**important** [3] - 5:6, 5:15, 5:18

**impossible** [1] - 104:16

**impression** [1] - 86:23

**improperly** [2] - 57:23, 58:6

**IN** [1] - 114:19

**inadvertently** [1] - 58:11

**inappropriate** [3] - 50:5, 82:21, 100:7

**INC** [1] - 1:24

**inception** [3] - 32:8, 33:19, 34:5

**incident** [1] - 48:1

**including** [1] - 27:13

**inclusion** [1] - 115:19

**incomprehensible** [2] - 5:13, 5:19

**increase** [3] - 107:20, 107:24, 108:2

**increases** [1] - 107:17

**indemnity** [1] - 108:17

**independent** [1] - 64:18

**INDEX** [1] - 2:7

**indicate** [1] - 22:23

**indicated** [1] - 113:14

**indicating** [1] - 37:10

**indicators** [1] - 47:6

**individual** [4] - 4:5, 52:6, 90:21, 90:24

**individuals** [1] - 19:10

**inform** [1] - 27:7

**informally** [1] - 86:20

**information** [20] - 4:3, 16:9, 19:18, 24:13, 27:20, 32:14, 34:2, 40:13, 45:17, 46:9, 49:11, 61:11, 67:8, 67:16, 67:18, 68:21, 72:25, 75:21, 113:7, 113:8

**informed** [7] - 24:3, 37:22, 57:11, 59:6, 72:1, 75:7, 90:9

**inherent** [1] - 56:21

**initial** [8] - 44:9, 56:7, 66:5, 66:7, 69:9, 79:3, 80:17, 107:16

**initiated** [4] - 73:2, 87:20, 91:7, 99:7

**initiating** [1] - 99:12

**injuries** [1] - 4:22

**inside** [1] - 8:9

**insight** [3] - 4:4, 20:9, 56:4

**instance** [9] - 39:19, 40:23, 42:20, 42:25, 46:7, 47:1, 95:11, 101:15, 107:11

**instances** [2] - 22:24, 42:4

**instruction** [3] - 8:10, 37:9, 110:15

**instructions** [1] - 115:16

**insurance** [9] - 108:10, 108:14, 108:17, 108:18, 108:20, 108:21, 109:7, 109:9, 109:10

**insurances** [2] - 108:16

**intellectual** [9] - 22:25, 23:5, 30:20, 30:25, 39:20, 39:24, 40:2, 40:9, 50:17

**intend** [1] - 34:2

**intending** [1] - 33:24

**intentionally** [2] - 58:10, 102:8

**interaction** [1] - 10:10

**interactions** [12] -

9:16, 40:24, 55:4, 69:16, 74:2, 74:12, 74:19, 74:24, 98:24, 105:10, 111:25, 112:3

**interactive** [13] - 36:11, 36:16, 36:18, 36:24, 95:5, 96:6, 97:2, 99:12, 103:5, 106:17, 106:25, 107:2, 107:4

**interchange** [1] - 70:11

**interchanges** [1] - 41:7

**interested** [1] - 67:18

**interesting** [1] - 19:6

**interfacing** [1] - 7:13

**intermittent** [1] - 31:4

**intern** [1] - 52:23

**internal** [2] - 18:21, 18:23

**internet** [2] - 32:12, 32:18

**Internet** [1] - 32:15

**interpreted** [1] - 87:10

**interpretive** [1] - 46:12

**interrogatories** [2] - 15:8, 15:10

**interventions** [1] - 9:4

**interview** [3] - 63:10, 66:6, 66:7

**investigate** [1] - 72:24

**investigated** [1] - 58:7

**investigation** [23] - 48:2, 56:7, 56:11, 58:9, 58:14, 58:19, 62:3, 62:7, 62:10, 64:22, 68:15, 69:9, 72:8, 72:11, 72:14, 72:16, 73:2, 74:14, 75:25, 76:3, 76:4, 77:14, 78:16

**investigator** [3] - 68:3, 68:6, 70:7

**investigators** [1] - 69:13

**invocation** [2] - 90:3, 96:11

**invoke** [1] - 95:16

**involuntarily** [2] - 40:23, 98:5

**involuntary** [7] - 39:8, 39:9, 39:17, 40:3, 40:8, 42:2, 98:1

**involve** [1] - 57:2

**involved** [17] - 4:18, 15:9, 22:25, 23:5, 34:16, 38:12, 39:7, 39:18, 48:1, 50:6, 58:15, 61:6, 62:12, 62:18, 62:19, 81:2, 81:4

**involvement** [4] - 15:15, 18:15, 18:17, 42:2

**involves** [2] - 30:11, 63:13

**involving** [13] - 18:19, 40:8, 42:4, 42:12, 42:13, 43:1, 48:2, 49:7, 69:13, 71:18, 81:3, 82:5, 112:7

**Ireland** [16] - 48:17, 48:24, 49:12, 49:15, 50:16, 63:11, 63:13, 63:15, 64:11, 64:19, 64:23, 74:12, 74:16, 74:17, 74:19, 74:25

**Ireland's** [3] - 49:7, 50:21, 73:16

**issuance** [1] - 45:6

**issue** [8] - 29:19, 40:4, 68:3, 68:5, 76:23, 101:5, 102:1, 103:20

**issued** [1] - 9:3

**issues** [17] - 8:7, 8:22, 23:1, 29:22, 33:25, 47:6, 48:25, 55:10, 55:18, 56:4, 57:2, 74:4, 81:6, 83:8, 84:4, 104:2, 112:7

**IT** [1] - 32:12

**items** [1] - 115:16

**itself** [2] - 86:16, 99:14

## J

**January** [1] - 34:24

**job** [20] - 6:22, 12:9, 18:25, 19:2, 25:22, 26:7, 26:11, 26:19, 26:25, 27:2, 27:5, 27:6, 71:5, 72:10, 82:16, 83:5, 83:13, 92:8, 92:19, 99:3

**jobs** [1] - 25:5

**join** [2] - 51:2, 51:5

**joined** [2] - 28:6, 52:23

**Jonie** [4] - 3:17,

114:4, 115:13, 117:3
**JONIE** [3] - 1:12, 2:1, 3:12
**Joseline** [8] - 48:7, 66:16, 66:24, 72:1, 72:12, 72:23, 79:4, 81:15
**Joseline's** [1] - 79:4
**June** [1] - 20:23
**juris** [1] - 6:12
**Jurisdiction** [1] - 117:17

**K**

**Katharine** [4] - 1:21, 115:7, 115:12, 117:22
**keep** [1] - 62:3
**kept** [1] - 26:25
**kind** [1] - 90:17
**kirstie** [1] - 115:11
**KIRSTIE** [1] - 1:5
**Kirstie** [20] - 48:9, 64:24, 65:12, 66:15, 69:8, 71:1, 71:2, 72:5, 73:18, 81:22, 81:25, 82:11, 83:7, 85:25, 98:23, 99:5, 99:6, 100:5, 114:7, 117:16
**Kirstie's** [2] - 65:5, 65:9
**knowing** [3] - 93:15, 98:23, 101:16
**knowledge** [27] - 11:25, 12:22, 13:11, 13:22, 14:11, 14:17, 14:23, 15:2, 19:1, 20:20, 26:5, 31:17, 35:13, 37:2, 40:3, 43:9, 44:23, 48:17, 48:24, 50:16, 50:19, 53:21, 56:16, 71:17, 93:2, 97:22, 107:15
**known** [3] - 88:19, 97:18, 100:20
**knows** [1] - 49:21

**L**

**lack** [1] - 53:15
**lacked** [1] - 79:23
**language** [14] - 38:6, 38:7, 38:9, 41:11, 63:16, 63:19, 63:24, 64:15, 64:24, 65:6, 80:5, 86:20, 94:15, 98:6
**Lanham** [2] - 1:15, 3:2

**large** [2] - 39:23, 54:19
**largely** [1] - 75:20
**larger** [1] - 14:7
**last** [5] - 10:5, 12:11, 16:7, 82:1, 109:16
**late** [3] - 32:1, 32:8, 33:19
**launched** [1] - 32:22
**law** [7] - 6:15, 6:19, 7:24, 8:1, 62:17, 88:21, 114:17
**laws** [1] - 20:6
**lawyers** [1] - 43:17
**layers** [1] - 14:15
**layman's** [1] - 97:22
**lead** [1] - 43:17
**leading** [6] - 16:4, 16:10, 47:10, 55:5, 55:19, 96:12
**learned** [1] - 55:9
**learning** [5] - 9:5, 9:7, 9:9, 22:21, 79:4
**least** [7] - 12:11, 25:16, 45:17, 47:5, 88:4, 94:1, 100:8
**leave** [3] - 24:23, 29:19, 30:14
**leaves** [3] - 29:9, 29:12, 93:12
**leaving** [4] - 64:25, 82:10, 83:19, 85:5
**led** [6] - 47:18, 48:3, 53:24, 58:7, 72:11, 90:12
**left** [14] - 16:17, 59:9, 71:2, 85:8, 85:10, 88:11, 89:18, 90:9, 92:1, 93:23, 112:10, 113:8
**legal** [5] - 16:7, 21:20, 87:6, 96:9, 96:17
**legalese** [1] - 108:21
**less** [2] - 19:15, 39:13
**lesser** [1] - 42:22
**Level** [1] - 109:10
**level** [3] - 9:9, 18:6, 44:10
**levels** [1] - 14:22
**life** [6] - 98:11, 104:22, 108:10, 108:17, 108:18, 108:20
**likely** [2] - 77:22, 95:24
**likewise** [2] - 98:21, 98:22
**limbo** [1] - 53:15

**line** [5] - 16:21, 16:22, 17:1, 19:2
**Link** [1] - 67:15
**linked** [1] - 87:2
**list** [1] - 47:24
**listen** [2] - 16:17, 85:17
**listened** [3] - 84:22, 85:1, 113:5
**litigated** [1] - 62:19
**litigation** [1] - 4:19
**LLC** [16] - 1:8, 3:23, 6:7, 14:7, 14:11, 14:14, 14:16, 14:18, 14:23, 15:1, 15:20, 17:19, 114:7, 115:11, 117:16
**lobby** [2] - 79:12, 79:13
**located** [5] - 9:19, 11:3, 11:6, 18:3, 91:1
**location** [2] - 17:19, 38:23
**long-term** [2] - 108:9, 108:19
**look** [8] - 47:15, 47:19, 52:22, 75:22, 80:9, 80:10, 106:20, 112:18
**looked** [5] - 34:12, 46:17, 47:4, 74:22, 84:17
**looking** [4] - 47:16, 63:9, 84:12, 84:16
**looks** [4] - 46:22, 51:10, 67:1, 67:22
**lose** [1] - 69:20
**lost** [1] - 68:11
**low** [4] - 23:7, 46:19, 46:21, 47:5
**lower** [1] - 9:9
**lower-level** [1] - 9:9
**lunch** [1] - 50:3

**M**

**Macdonald** [2] - 48:5, 51:5
**MAIL** [1] - 115:3
**mail** [10] - 1:25, 2:16, 2:19, 51:11, 53:24, 76:10, 84:17, 85:1, 112:24, 113:4
**Mailing** [1] - 117:18
**mails** [1] - 51:10
**MAINE** [2] - 1:2, 1:8
**Maine** [31] - 1:16, 1:24, 3:3, 3:23, 6:7, 7:5, 9:22, 9:23, 14:7,

14:11, 14:16, 14:22, 15:16, 15:20, 16:22, 17:17, 17:19, 17:23, 20:1, 20:14, 27:10, 59:22, 76:4, 114:3, 114:7, 114:9, 115:11, 117:16, 117:17
**majority** [1] - 23:7
**manage** [1] - 31:15
**Management** [1] - 7:7
**management** [34] - 7:9, 8:12, 10:23, 11:1, 11:16, 12:1, 17:14, 17:16, 17:17, 17:18, 22:5, 24:20, 24:25, 27:17, 29:1, 29:2, 29:7, 29:13, 30:9, 33:10, 38:24, 39:1, 71:25, 90:21, 90:24, 94:10, 94:12, 103:4, 104:5, 105:6, 110:13, 111:5, 111:11
**Manager** [1] - 2:17
**manager** [27] - 6:24, 7:7, 17:14, 17:18, 22:4, 33:10, 34:15, 34:20, 34:23, 52:14, 52:17, 52:23, 52:24, 72:1, 72:12, 73:16, 77:1, 79:3, 79:4, 83:21, 87:23, 88:23, 90:17, 91:12, 102:23, 103:3, 110:4
**managerial** [1] - 93:20
**managers** [11] - 13:2, 17:16, 66:15, 105:11, 109:22, 109:24, 110:9, 110:16, 111:4, 111:20, 112:4
**managers'** [1] - 87:25
**manifest** [1] - 86:16
**manifestations** [1] - 58:25
**manner** [12] - 5:24, 41:14, 41:20, 42:18, 48:1, 49:13, 54:10, 77:5, 80:20, 92:21, 99:2, 105:18
**mannerisms** [1] - 80:12
**mannion** [1] - 48:11
**Mannion** [1] - 73:15
**manual** [1] - 52:14
**March** [10] - 1:16, 3:3, 10:20, 114:3, 114:20, 114:25,

115:5, 115:14, 117:18, 117:18
**marked** [5] - 3:6, 13:15, 43:22, 76:11, 76:16
**Marked** [1] - 2:8
**Massachusetts** [1] - 11:15
**material** [1] - 22:17
**materials** [2] - 10:9, 13:12
**matt** [7] - 68:8, 69:8, 69:10, 70:6, 71:1, 71:4, 82:5
**matter** [4] - 11:9, 52:19, 85:6, 115:14
**McDonald** [14] - 51:20, 51:24, 53:22, 56:22, 57:13, 57:22, 58:5, 58:10, 58:25, 63:23, 71:25, 75:8, 75:15
**ME** [4] - 115:2, 115:9, 117:21, 117:24
**mean** [1] - 93:15
**meaning** [1] - 70:15
**means** [1] - 86:15
**meant** [2] - 96:18, 99:13
**measure** [1] - 46:4
**medical** [7] - 29:11, 60:15, 60:16, 96:4, 106:19, 106:20, 107:1
**medium** [1] - 47:2
**meet** [5] - 8:11, 77:21, 79:2, 79:7, 95:12
**meeting** [12] - 15:4, 73:23, 80:7, 80:13, 80:17, 80:18, 80:21, 81:7, 81:9, 81:11, 85:14, 93:25
**memo** [3] - 76:14, 76:19, 76:22
**memorandum** [1] - 76:25
**memory** [3] - 61:18, 67:14, 77:12
**mental** [22] - 23:1, 23:5, 30:20, 30:25, 39:20, 39:24, 40:2, 40:9, 43:3, 43:13, 50:17, 66:9, 73:22, 81:6, 88:17, 97:11, 97:16, 97:22, 97:23, 100:6, 102:20, 103:11
**mention** [7] - 59:10, 63:19, 81:6, 85:19, 87:14, 88:5, 89:6
**mentioned** [8] -

33:13, 34:15, 55:22, 69:12, 82:24, 89:16, 90:15, 103:16

**mentions** [3] - 70:10, 70:14, 112:4

**Merrill's** [2] - 115:8, 117:23

**message** [19] - 16:16, 37:9, 59:9, 59:12, 84:22, 85:5, 85:8, 85:10, 85:12, 87:3, 88:5, 89:18, 90:9, 90:10, 92:2, 93:12, 112:10, 112:11, 113:5

**messages** [1] - 84:18

**met** [12] - 73:15, 73:18, 75:14, 75:17, 77:1, 77:18, 78:22, 78:24, 79:1, 79:11, 98:10, 102:23

**middle** [1] - 41:5

**might** [52] - 4:3, 5:16, 6:10, 7:20, 11:24, 12:13, 12:20, 13:16, 23:7, 23:8, 23:9, 28:25, 29:6, 32:3, 34:15, 35:5, 35:18, 37:17, 49:7, 51:10, 52:4, 55:9, 55:23, 57:2, 58:1, 74:4, 82:12, 86:16, 89:7, 89:24, 92:8, 93:19, 95:2, 95:16, 97:12, 98:4, 98:5, 98:8, 100:23, 101:17, 104:4, 104:9, 105:4, 105:17, 107:5, 107:20, 110:17, 111:1, 112:17

**military** [1] - 88:10

**mind** [2] - 11:10, 65:24

**mine** [3] - 17:10, 68:12, 77:25

**minutes** [2] - 41:21, 112:17

**miss** [1] - 103:1

**missed** [2] - 54:13, 54:19

**Mm-hum** [1] - 111:15

**mm-hum** [1] - 5:21

**mm-hums** [1] - 5:18

**modifications** [1] - 95:2

**moment** [5] - 4:2, 4:12, 34:3, 63:4, 66:7

**monitoring** [1] - 20:5

**month** [1] - 12:12

**months** [5] - 33:6, 33:15, 107:23

**morning** [3] - 76:20, 84:21, 112:25

**most** [1] - 102:18

**motor** [2] - 4:17, 4:18

**move** [7] - 5:9, 52:6, 59:3, 74:8, 86:24, 88:7

**moved** [8] - 51:24, 52:5, 53:14, 53:22, 54:4, 87:22, 107:11, 107:14

**moves** [1] - 56:18

**moving** [4] - 25:1, 53:6, 87:24, 94:6

**MR** [29] - 3:15, 11:19, 11:22, 17:11, 17:13, 35:17, 36:1, 41:21, 42:1, 43:6, 63:18, 64:2, 64:6, 64:9, 67:15, 67:20, 68:13, 68:14, 76:1, 76:3, 76:12, 84:11, 84:14, 100:3, 101:12, 104:19, 112:15, 112:19, 113:12

**MS** [24] - 11:18, 11:21, 17:10, 35:16, 35:21, 43:5, 63:17, 63:25, 64:4, 64:7, 67:12, 67:16, 68:12, 75:24, 76:2, 76:6, 84:9, 84:12, 99:19, 101:7, 104:11, 112:16, 112:23, 113:11

**multiple** [1] - 27:15

**muttering** [1] - 64:24

# N

**Name** [1] - 117:7

**name** [8] - 3:16, 7:15, 10:5, 14:13, 28:20, 34:11, 87:19, 90:25

**named** [3] - 114:5, 114:15, 117:11

**names** [4] - 22:9, 30:22, 42:5, 82:1

**naming** [1] - 22:9

**natural** [1] - 7:3

**nature** [1] - 50:7

**near** [5] - 9:23, 59:3, 59:11, 69:24, 87:20

**nearly** [1] - 41:3

**necessarily** [2] - 12:18, 12:19

**necessary** [4] - 22:22, 32:13, 58:16, 77:4

**need** [26] - 5:25, 11:8, 22:17, 24:24, 27:8, 27:15, 29:11, 30:1, 30:14, 50:13, 60:14, 95:7, 97:4, 99:10, 99:24, 100:2, 101:10, 103:9, 103:10, 104:8, 105:12, 105:13, 105:15, 106:22, 106:24

**needed** [5] - 53:18, 78:19, 82:19, 95:9, 103:7

**needs** [4] - 30:8, 99:7, 99:8, 106:21

**negative** [1] - 60:25

**nest** [1] - 52:1

**nesters** [1] - 51:6

**nesting** [23] - 8:14, 50:25, 51:2, 52:6, 52:7, 52:12, 53:7, 53:8, 53:15, 54:5, 54:11, 54:14, 54:16, 54:18, 54:19, 54:20, 54:25, 56:18, 56:25, 71:9, 71:13, 87:23, 107:16

**network** [5] - 32:22, 33:1, 33:3, 34:11, 91:11

**never** [4] - 35:24, 54:24, 59:6, 67:23

**New** [1] - 6:16

**new** [12] - 8:13, 27:25, 28:16, 28:23, 29:5, 37:22, 43:19, 52:18, 57:1, 109:22, 109:24, 110:15

**next** [13] - 5:9, 14:21, 44:11, 50:25, 54:15, 60:22, 77:23, 78:7, 85:25, 87:15, 88:3, 88:5, 107:19

**nice** [1] - 57:3

**No.____Change** [6] - 116:3, 116:7, 116:11, 116:15, 116:19, 116:23

**No.____Line** [6] - 116:3, 116:7, 116:11, 116:15, 116:19, 116:23

**nobody** [1] - 38:20

**Noddin** [16] - 48:14, 51:11, 51:16, 55:3, 55:6, 55:23, 56:1,

71:17, 71:21, 75:17, 81:16, 82:2, 82:13, 83:7, 83:11, 83:25

**Noddin's** [1] - 82:25

**nomenclature** [1] - 87:6

**nondiscrimination** [1] - 98:18

**none** [2] - 49:15, 98:18

**nonleave** [1] - 30:12

**nonverbal** [1] - 94:2

**Nos** [1] - 3:6

**NOTARY** [2] - 114:23, 117:9

**Notary** [5] - 1:14, 3:2, 3:9, 114:2, 117:11

**noted** [2] - 60:15, 117:3

**Notes** [4] - 2:13, 2:14, 2:15, 2:18

**notes** [18] - 61:4, 61:15, 61:23, 62:1, 62:3, 62:5, 62:8, 62:23, 63:3, 64:12, 66:12, 66:14, 67:4, 68:15, 74:2, 75:6, 77:7

**nothing** [5] - 82:2, 93:9, 112:15, 113:12, 114:6

**Notice** [1] - 2:9

**notice** [14] - 4:1, 4:5, 4:7, 4:11, 6:10, 13:17, 14:24, 89:3, 90:18, 102:2, 103:14, 103:21, 104:7, 105:7

**noticed** [3] - 4:5, 10:9, 71:3

**Noticing** [1] - 117:19

**notified** [1] - 114:17

**notify** [2] - 24:23, 97:3

**noting** [1] - 52:3

**nuances** [1] - 34:13

**number** [7] - 20:16, 22:17, 23:7, 23:13, 23:15, 39:12, 105:10

**numbered** [1] - 20:16

**numbers** [5] - 20:16, 20:18, 22:19, 22:22, 109:6

**numerous** [3] - 29:3, 61:7, 101:23

# O

**oath** [2] - 3:9, 3:13

**object** [3] - 35:21, 99:19, 104:11

**objected** [1] - 35:19

**objecting** [1] - 35:18

**objection** [6] - 11:18, 35:16, 63:17, 63:25, 64:3, 101:7

**OBJECTIONS** [1] - 2:22

**objectively** [1] - 75:12

**obligated** [1] - 110:10

**observations** [1] - 79:19

**observe** [2] - 79:20, 110:24

**occasion** [1] - 69:20

**occur** [1] - 54:10

**occurred** [1] - 69:4

**OF** [2] - 1:2, 1:12

**off-site** [2] - 31:8, 73:2

**offense** [1] - 94:11

**offer** [7] - 25:18, 25:19, 29:5, 54:15, 97:5, 100:1, 107:5

**offered** [1] - 31:18

**offering** [2] - 27:16, 106:23

**office** [10] - 9:19, 11:3, 11:14, 12:2, 12:3, 12:7, 13:8, 17:3, 17:17, 18:4

**officer** [1] - 8:6

**offices** [3] - 1:15, 3:2, 12:4

**officially** [1] - 57:8

**often** [2] - 12:13, 28:2

**on-boarding** [9] - 8:19, 8:21, 9:2, 13:9, 20:3, 21:1, 21:9, 24:12, 37:16

**Once** [1] - 115:17

**once** [2] - 12:15, 107:15

**one** [32] - 10:18, 13:3, 16:16, 22:19, 24:21, 27:13, 28:15, 29:12, 39:3, 42:18, 42:21, 42:25, 50:8, 51:11, 54:12, 54:18, 63:13, 65:3, 66:17, 66:20, 66:24, 69:12, 73:1, 80:17, 80:22,

82:4, 82:5, 82:10, 92:13, 109:7
ones [1] - 106:18
online [5] - 9:6, 45:7, 45:12, 45:18, 73:7
onus [1] - 102:6
open [3] - 41:4, 105:12, 111:3
open-door [2] - 105:12, 111:3
operate [1] - 32:15
opportunities [3] - 9:6, 9:7, 9:9
opportunity [10] - 21:14, 21:16, 31:19, 32:3, 35:9, 41:6, 54:15, 54:18, 54:20, 100:8
opposed [3] - 11:17, 39:10, 105:6
option [4] - 108:13, 108:14, 108:15, 108:21
optional [1] - 108:23
options [2] - 24:23, 109:2
OR [1] - 117:9
oral [1] - 37:10
order [1] - 37:3
ordinary [1] - 90:18
organizational [1] - 106:4
orientation [18] - 8:14, 8:18, 12:25, 13:1, 21:6, 24:19, 27:24, 28:5, 28:13, 29:21, 30:11, 56:25, 104:1, 104:16, 105:2, 105:10, 109:24, 110:4
Orientation [1] - 2:17
orientations [3] - 28:8, 28:10, 28:16
original [2] - 115:18, 115:19
otherwise [1] - 98:5
outburst [9] - 42:7, 42:12, 42:21, 43:2, 43:12, 91:24, 92:12, 92:23, 97:8
outbursts [1] - 42:17
outcome [1] - 114:15
outlines [1] - 97:15
outside [19] - 7:25, 8:1, 8:4, 12:2, 12:7, 18:8, 24:24, 27:16, 29:10, 30:15, 42:8, 45:23, 54:1, 54:20, 57:5, 87:13, 87:15, 90:18
overall [3] - 45:1,

46:23
overheard [1] - 41:10
own [5] - 62:1, 65:24, 77:5, 101:25, 117:12
owned [1] - 14:18

## P

p.m [5] - 76:8, 76:9, 112:20, 112:21, 113:16
package [1] - 21:6
PAGE [3] - 2:2, 2:23, 117:1
page [19] - 5:5, 16:3, 16:6, 20:18, 20:19, 20:21, 21:13, 22:1, 59:20, 60:5, 67:8, 115:14, 116:3, 116:7, 116:11, 116:15, 116:19, 116:23, 117:5
Page [3] - 16:4, 111:13, 112:4
pages [1] - 117:3
paperwork [2] - 96:3, 103:12
paragraph [3] - 16:7, 22:1, 60:5
parent [2] - 14:13, 19:25
parsed [1] - 111:8
part [22] - 9:1, 13:9, 13:12, 14:7, 21:6, 21:9, 24:12, 27:1, 27:5, 31:13, 34:17, 36:16, 45:17, 47:21, 56:11, 58:9, 62:7, 96:21, 97:25, 107:4, 109:25, 110:3
particular [14] - 13:8, 44:17, 44:24, 45:1, 45:12, 46:8, 51:11, 77:10, 82:20, 83:10, 88:17, 90:20, 91:8, 97:16
parties [3] - 58:14, 58:16, 78:21
party [1] - 114:16
Party [1] - 117:19
pass [4] - 32:10, 32:11, 101:14, 102:13
passing [1] - 83:19
past [4] - 86:7, 88:19, 99:13, 103:13
patience [1] - 69:21
pay [1] - 108:20
payment [2] - 109:11, 109:12
pays [1] - 108:18

Peabody [1] - 117:20
peers [13] - 41:19, 50:2, 60:1, 60:11, 65:2, 71:3, 91:10, 97:6, 100:13, 101:9, 103:24, 104:14
pejorative [1] - 7:20
pending [3] - 78:7, 78:16, 114:8
people [27] - 7:13, 23:3, 23:4, 23:15, 24:23, 30:25, 47:24, 51:18, 51:20, 51:25, 52:1, 52:13, 53:1, 54:11, 66:4, 79:6, 87:25, 88:18, 97:11, 97:15, 98:4, 98:12, 98:20, 100:18, 104:13, 104:14, 106:1
per [1] - 25:23
percent [1] - 41:3
perception [2] - 75:10, 80:19
perform [5] - 25:4, 25:6, 25:10, 92:8, 99:2
performance [1] - 28:25
performing [2] - 25:22, 92:19
perhaps [3] - 86:19, 96:17, 106:25
period [9] - 25:19, 25:24, 31:4, 32:5, 52:22, 54:5, 54:14, 71:9, 71:12
periods [1] - 84:16
permanent [1] - 74:8
permissions [1] - 53:4
person [33] - 4:25, 5:1, 16:8, 18:10, 18:21, 22:7, 26:22, 28:19, 32:17, 37:11, 38:21, 43:1, 54:18, 54:22, 57:7, 57:22, 58:6, 58:11, 62:9, 62:12, 64:11, 66:11, 66:23, 67:5, 67:7, 72:7, 87:12, 101:16, 102:14, 105:14, 109:4, 114:14, 117:7
personal [11] - 4:17, 4:18, 6:9, 15:15, 16:20, 16:21, 27:20, 38:15, 38:19, 53:21, 62:1
personally [8] - 19:23, 27:23, 28:9, 30:18, 98:10, 110:3,

114:4, 117:11
personnel [3] - 8:13, 22:6, 27:10
persons [3] - 9:16, 18:21, 22:25
perspective [2] - 45:5, 80:15
pertain [2] - 63:10, 68:24
pertains [1] - 68:22
pet [1] - 108:21
Pete [9] - 34:18, 48:16, 72:13, 77:17, 78:8, 78:15, 78:17, 90:7, 90:15
Pete's [1] - 78:13
Phone [1] - 1:25
phone [14] - 16:17, 16:21, 17:3, 17:6, 17:7, 17:9, 41:18, 84:18, 92:2, 94:20, 96:15, 97:8, 97:13
PHONE [1] - 115:2
phrase [1] - 69:22
physical [3] - 21:3, 91:2, 98:2
physically [4] - 9:19, 11:3, 12:12, 35:4
piece [4] - 27:24, 72:25, 104:24, 104:25
Pierce [2] - 115:7, 117:22
place [3] - 37:17, 37:24, 106:15
placed [1] - 56:17
plaintiff [1] - 4:21
Plaintiff [2] - 1:6, 1:20
plaintiff's [20] - 13:16, 13:19, 20:12, 43:18, 43:22, 51:9, 64:14, 65:9, 66:12, 66:19, 66:25, 67:3, 67:22, 71:15, 75:21, 75:22, 76:16, 77:10, 109:17, 109:18
Plaintiff's [3] - 43:16, 45:25, 47:12
plan [3] - 25:1, 103:6, 109:15
plans [1] - 109:13
plante [1] - 51:12
plausible [1] - 98:24
plethora [1] - 25:12
plus [1] - 109:7
PO [3] - 1:24, 115:1, 117:20
point [22] - 5:22, 13:14, 29:14, 30:7, 55:7, 59:13, 59:17,

61:1, 69:7, 77:13, 78:10, 78:13, 78:18, 78:19, 84:21, 85:22, 89:21, 96:3, 96:8, 107:18, 107:19, 110:1
pointed [1] - 22:2
points [2] - 67:3, 67:5
policies [4] - 19:21, 19:22, 20:6, 37:24
policy [19] - 21:14, 21:16, 24:22, 29:9, 29:20, 37:9, 49:8, 66:3, 97:10, 97:15, 98:18, 101:4, 101:20, 103:22, 104:2, 105:12, 108:20, 110:9, 111:3
portion [5] - 24:19, 54:20, 95:6, 95:7, 96:2
Portland [2] - 115:9, 117:24
position [7] - 7:6, 26:10, 26:13, 26:23, 27:4, 34:9, 106:23
possibility [3] - 36:15, 36:22, 105:21
possible [7] - 36:23, 37:4, 37:11, 52:4, 74:7, 92:7, 104:17
possibly [1] - 53:9
postemployment [1] - 25:23
posttraumatic [2] - 24:4, 88:13
potential [7] - 35:15, 44:10, 45:21, 46:1, 47:7, 54:22, 95:1
power [2] - 13:13, 110:1
practice [1] - 101:11
practices [3] - 8:3, 8:10, 98:19
precipitated [1] - 75:9
precise [1] - 22:22
predominantly [1] - 91:3
preferred [1] - 107:6
preparation [6] - 15:9, 15:16, 15:23, 16:12, 16:18, 51:4
prepare [1] - 15:5
prepared [1] - 76:14
present [2] - 5:3, 55:14
presentation [5] - 29:4, 29:14, 30:8, 30:10, 109:23

**presentations** [3] - 27:12, 27:24, 29:24
**presented** [3] - 24:20, 45:11, 83:17
**presenting** [1] - 101:24
**presents** [1] - 109:22
**press** [1] - 17:4
**prevent** [1] - 94:7
**prevents** [1] - 102:21
**previous** [2] - 74:24, 87:11
**previously** [1] - 15:14
**primarily** [1] - 12:9
**privately** [1] - 27:19
**problem** [1] - 50:7
**procedures** [1] - 101:3
**proceed** [2] - 4:9, 46:24
**proceeded** [1] - 58:16
**process** [53] - 8:15, 8:18, 8:19, 8:21, 9:2, 13:9, 18:12, 20:4, 20:7, 21:2, 22:20, 24:12, 27:1, 29:21, 32:5, 32:21, 36:11, 36:16, 36:18, 36:24, 37:16, 38:24, 43:10, 46:24, 47:10, 47:18, 47:20, 47:22, 50:25, 52:14, 54:2, 54:10, 54:11, 55:11, 56:16, 56:25, 95:4, 95:5, 95:16, 96:1, 96:6, 97:2, 99:7, 99:11, 99:12, 103:5, 104:1, 105:2, 105:10, 106:17, 107:2, 107:4
**processed** [3] - 52:11, 52:20, 53:10
**produce** [1] - 60:16
**produced** [2] - 20:14, 84:20
**product** [1] - 45:3
**production** [2] - 15:12, 20:15
**profession** [1] - 86:21
**professional** [6] - 46:1, 49:13, 57:4, 92:20, 93:14, 97:23
**professionally** [1] - 38:8
**program** [10] - 31:14, 31:23, 34:5, 34:17, 37:20, 37:22, 54:25, 106:7, 106:14, 106:16

**programs** [1] - 37:17
**progress** [1] - 107:22
**progression** [1] - 51:1
**progressive** [1] - 102:24
**promotes** [1] - 26:18
**pronounce** [1] - 40:20
**pronouncing** [1] - 48:13
**proof** [1] - 60:17
**propensity** [1] - 97:12
**property** [1] - 79:10
**proprietary** [1] - 33:25
**protect** [1] - 34:1
**provide** [19] - 19:20, 20:1, 20:9, 26:17, 28:2, 32:13, 40:13, 40:17, 49:11, 94:17, 94:23, 95:5, 95:23, 95:24, 102:3, 103:6, 103:12, 110:3, 115:16
**provided** [18] - 13:1, 15:7, 19:4, 20:2, 20:19, 26:22, 37:15, 45:7, 45:23, 46:9, 47:14, 49:14, 55:12, 56:6, 75:21, 77:6, 92:11, 103:11
**provider** [1] - 106:20
**providers** [2] - 106:19, 107:2
**provides** [1] - 27:14
**providing** [2] - 16:2, 28:4
**psychological** [1] - 98:24
**PTSD** [18] - 24:6, 24:7, 57:14, 59:10, 59:25, 60:10, 86:4, 86:15, 87:3, 88:10, 89:4, 89:6, 90:10, 90:13, 90:14, 95:20, 98:21, 98:22
**PUBLIC** [2] - 114:23, 117:9
**Public** [4] - 1:14, 3:2, 3:10, 114:2
**Public/Attorney** [1] - 117:11
**publicly** [1] - 14:18
**publicly-owned** [1] - 14:18
**pulley** [16] - 68:8, 68:18, 68:22, 69:3, 69:8, 69:14, 69:16,

70:1, 70:6, 70:10, 70:14, 70:18, 71:8, 71:18, 71:22, 82:5
**purchase** [1] - 108:15
**purchases** [1] - 109:2
**purchasing** [2] - 108:14
**purpose** [2] - 26:4, 93:10
**purposes** [1] - 4:8
**put** [7] - 27:19, 27:20, 33:23, 90:17, 101:13, 102:23, 104:7
**putting** [3] - 60:25, 62:17, 89:2

**Q**

**qualified** [2] - 21:18, 22:14
**quantifiable** [1] - 50:13
**quarter** [2] - 12:15, 33:7
**questioned** [3] - 74:17, 74:18, 92:10
**questions** [8] - 5:12, 45:8, 45:9, 48:3, 63:4, 67:13, 81:12, 94:16
**quick** [6] - 90:25, 91:1, 91:5, 91:17, 91:22, 96:22
**quite** [1] - 54:23
**quitting** [1] - 39:11
**quote** [3] - 21:17, 60:6, 65:12

**R**

**raise** [3] - 101:5, 101:25, 105:5
**raised** [2] - 40:4, 74:10
**Rand** [6] - 1:21, 2:4, 2:24, 59:21, 115:7, 117:22
**RAND** [24] - 11:18, 11:21, 17:10, 35:16, 35:21, 43:5, 63:17, 63:25, 64:4, 64:7, 67:12, 67:16, 68:12, 75:24, 76:2, 76:6, 84:9, 84:12, 99:19, 101:7, 104:11, 112:16, 112:23, 113:11
**Rand's** [1] - 5:4

**range** [3] - 23:11, 46:19, 47:2
**rankings** [1] - 46:21
**raped** [1] - 86:7
**rate** [1] - 108:4
**rather** [2] - 48:3, 85:6
**ratio** [1] - 109:11
**Re** [1] - 115:11
**reached** [3] - 55:23, 72:22, 91:4
**reaction** [4] - 58:11, 59:8, 97:13, 98:8
**reactions** [1] - 98:2
**read** [8] - 21:8, 59:23, 84:25, 113:4, 113:14, 117:3, 117:8
**reading** [2] - 59:18, 117:7
**ready** [1] - 52:18
**realize** [1] - 94:2
**really** [4] - 71:2, 80:14, 100:4, 101:17
**Reason** [6] - 116:5, 116:9, 116:13, 116:17, 116:21, 116:25
**reason** [10] - 4:3, 4:7, 5:11, 53:13, 54:4, 85:19, 86:3, 86:11, 91:8, 98:24
**reasonable** [6] - 21:17, 22:6, 22:14, 30:19, 98:17, 106:22
**reasons** [7] - 22:20, 51:23, 52:4, 53:16, 54:12, 87:24, 117:4
**reassigning** [1] - 52:16
**recalled** [2] - 23:23, 81:20
**receive** [8] - 13:11, 21:1, 24:13, 27:2, 57:1, 107:17, 108:6, 108:8
**received** [7] - 7:24, 8:2, 8:9, 21:3, 62:22, 76:19, 113:4
**receiving** [1] - 92:3
**recently** [1] - 31:11
**recess** [3] - 41:23, 76:8, 112:20
**recognition** [1] - 92:18
**recognize** [2] - 61:23, 109:17
**recognizing** [1] - 94:4
**recollection** [11] - 13:6, 33:5, 34:7, 50:20, 56:3, 63:6,

64:18, 65:1, 70:17, 89:23, 91:21
**recommending** [1] - 106:18
**record** [18] - 3:16, 5:19, 5:24, 16:25, 17:6, 17:11, 17:12, 33:23, 39:16, 40:22, 52:3, 64:10, 76:6, 99:4, 111:19, 113:13, 114:12
**recorded** [1] - 16:23
**recording** [1] - 16:16
**records** [7] - 40:19, 60:15, 60:16, 75:18, 95:24, 96:1, 96:4
**recovery** [1] - 4:22
**recruiter** [9] - 18:20, 18:21, 19:4, 19:7, 43:25, 44:7, 46:18, 46:22, 47:21
**Recruiter** [3] - 2:12, 43:23, 47:17
**recruiters** [7] - 18:25, 19:12, 19:20, 20:1, 43:19, 47:4, 47:14
**recruiting** [3] - 18:24, 20:7, 46:17
**rectify** [1] - 99:8
**reduced** [1] - 114:10
**refer** [3] - 7:20, 59:20, 110:11
**reference** [12] - 7:16, 22:17, 26:15, 40:19, 63:21, 67:21, 71:15, 80:3, 84:19, 89:7, 90:3, 95:23
**referenced** [2] - 69:11, 82:13
**references** [1] - 38:8
**referencing** [1] - 79:25
**referring** [1] - 16:1
**reflect** [4] - 23:25, 39:16, 62:8, 75:6
**reflected** [1] - 53:23
**refresh** [5] - 56:3, 61:18, 63:6, 67:13, 77:11
**regard** [6] - 24:18, 86:21, 89:11, 89:12, 90:8, 105:8
**regarding** [12] - 13:2, 19:20, 19:21, 28:24, 37:24, 40:4, 55:4, 57:2, 62:3, 90:12, 111:6, 112:2
**regardless** [2] - 25:25, 96:25

**S**

**regularly** [1] - 8:12
**regulations** [1] - 6:25
**related** [1] - 29:19
**relation** [1] - 79:9
**relations** [1] - 111:14
**relative** [1] - 84:16
**relevant** [1] - 29:17
**remember** [5] - 17:4, 59:17, 61:5, 67:19, 91:8
**reminded** [1] - 76:13
**repeat** [6] - 15:18, 37:6, 57:24, 60:3, 74:21, 96:14
**rephrase** [1] - 5:14
**Report** [3] - 2:12, 43:23, 47:17
**report** [9] - 44:2, 44:17, 45:6, 46:18, 52:8, 75:25, 76:5, 111:11
**reported** [2] - 44:16, 114:10
**Reporter** [2] - 114:24, 117:24
**reporter** [1] - 76:11
**reporting** [4] - 52:25, 53:2, 72:12, 106:5
**REPORTING** [1] - 117:25
**reports** [3] - 32:25, 43:25, 44:7
**represent** [1] - 20:13
**representative** [1] - 3:22
**request** [7] - 31:7, 86:24, 87:2, 87:8, 95:25, 96:3, 105:24
**requested** [5] - 31:12, 35:20, 36:8, 85:23, 107:14
**requesting** [5] - 85:20, 86:14, 86:19, 86:20, 88:9
**requests** [3] - 30:5, 30:11, 74:3
**required** [3] - 54:2, 56:22, 60:17
**requirement** [4] - 32:9, 32:21, 33:13, 33:14
**requirements** [1] - 21:21
**requisite** [1] - 11:24
**resigned** [1] - 48:21
**resigning** [1] - 39:11
**resources** [4] - 7:3, 8:2, 8:10, 8:22
**respect** [9] - 8:6,

20:25, 40:1, 49:8, 54:11, 66:4, 75:5, 103:17, 104:20
**respective** [1] - 117:4
**responded** [1] - 82:14
**Response** [1] - 2:10
**response** [9] - 15:17, 15:19, 15:24, 47:25, 59:21, 94:21, 105:22, 106:12, 106:25
**responsibilities** [2] - 19:1, 19:2
**resulted** [2] - 42:19, 42:22
**results** [1] - 45:5
**resumed** [3] - 41:24, 76:9, 112:21
**retain** [1] - 115:17
**retroactively** [2] - 55:8, 101:5
**returned** [3] - 59:24, 60:9, 115:17
**returning** [1] - 93:6
**reveal** [1] - 102:5
**review** [4] - 56:15, 60:15, 75:18, 115:16
**reviewed** [3] - 15:7, 39:1, 42:15
**reviewing** [3] - 24:22, 47:9, 115:17
**Rights** [7] - 2:10, 15:16, 15:21, 47:25, 59:19, 59:22, 76:4
**rights** [1] - 89:8
**role** [10] - 8:5, 10:25, 20:5, 20:8, 53:12, 53:14, 54:2, 72:12, 79:5, 91:2
**roll** [1] - 80:11
**rolled** [1] - 80:1
**room** [8] - 5:20, 41:17, 78:2, 78:9, 78:14, 79:8, 79:9, 79:11
**rotary** [1] - 10:2
**rough** [1] - 40:17
**roughly** [3] - 33:20, 76:19, 84:6
**routine** [1] - 47:15
**routinely** [1] - 16:22
**rude** [1] - 50:2
**rules** [4] - 5:2, 5:4, 6:4, 101:3
**run** [3] - 32:14, 32:19, 54:24

**S**

**S-p-a-n-i-e-r** [1] - 10:6
**sales** [8] - 7:19, 18:16, 26:9, 26:13, 26:19, 27:3, 45:14, 107:13
**sat** [1] - 6:14
**save** [1] - 17:6
**saved** [1] - 21:6
**scenarios** [1] - 45:10
**scheduled** [2] - 91:9, 102:22
**schedules** [1] - 87:25
**school** [12] - 6:15, 6:19, 7:24, 8:1, 49:21, 62:17, 82:12, 82:22, 83:3, 83:23, 84:2, 88:22
**science** [3] - 6:12, 7:1, 7:2
**score** [4] - 46:23, 47:1, 47:5
**se** [1] - 25:23
**seal** [1] - 114:20
**seat** [3] - 86:24, 88:7
**second** [1] - 76:7
**secret** [1] - 67:17
**see** [19] - 21:22, 27:5, 46:1, 46:5, 46:14, 47:5, 51:4, 53:5, 54:3, 55:9, 63:19, 63:20, 63:21, 69:10, 81:20, 83:2, 94:2, 111:14, 111:17
**seek** [7] - 36:3, 43:19, 83:25, 99:23, 100:19, 103:5, 112:4
**seeking** [5] - 4:22, 29:18, 29:22, 44:21, 95:16
**seeks** [2] - 36:11, 96:1
**seem** [1] - 83:18
**segment** [1] - 9:16
**selecting** [1] - 108:13
**sell** [1] - 14:19
**send** [2] - 78:6, 78:16
**sense** [7] - 33:1, 33:8, 40:11, 62:11, 64:22, 79:12, 84:15
**sent** [3] - 12:25, 91:25, 112:25
**Sent** [1] - 117:21
**sentence** [2] - 21:22,

60:22
**separate** [3] - 14:10, 109:13, 115:14
**separated** [2] - 48:19, 79:13
**September** [23] - 49:1, 49:9, 51:12, 53:23, 53:25, 55:2, 55:19, 56:20, 59:24, 60:9, 62:6, 68:23, 68:25, 69:4, 71:14, 74:20, 76:15, 76:20, 84:5, 84:10, 98:25, 106:7, 112:25
**sequence** [3] - 75:19, 75:20, 87:17
**series** [2] - 45:8, 45:9
**serious** [1] - 94:11
**seriousness** [1] - 94:4
**serve** [1] - 8:6
**server** [1] - 17:7
**service** [13] - 7:19, 18:16, 26:9, 26:13, 26:17, 26:20, 27:3, 43:23, 43:25, 44:7, 45:15, 94:17, 94:24
**Service** [2] - 2:12, 47:17
**serving** [2] - 8:5, 34:22
**set** [5] - 16:9, 21:14, 26:8, 27:21, 105:25
**setting** [2] - 27:18, 83:11
**severe** [3] - 80:5, 86:4, 102:19
**sexual** [2] - 9:4, 9:7
**share** [3] - 33:24, 34:2, 83:1
**shared** [2] - 87:18, 90:11
**Shawn** [1] - 10:4
**sheet** [2] - 115:14, 115:17
**SHEET** [1] - 116:1
**shift** [2] - 16:6, 41:22
**shifts** [1] - 102:22
**short** [5] - 92:17, 104:22, 108:9, 108:19
**short-term** [2] - 108:9, 108:19
**shouldering** [1] - 50:9
**show** [5] - 13:15, 20:12, 43:16, 61:16, 61:21
**showing** [4] - 4:1, 51:9, 51:16, 53:8

**shown** [5] - 21:5, 29:15, 43:22, 109:23, 110:1
**shows** [1] - 54:22
**sick** [2] - 82:22, 83:23
**sign** [2] - 21:11, 113:15
**SIGNATURE** [1] - 117:1
**signature** [3] - 115:14, 115:16, 117:12
**Signature** [1] - 117:6
**signing** [2] - 38:25, 108:21
**similar** [7] - 8:17, 30:4, 42:18, 48:4, 54:10, 77:5, 93:23
**Sincerely** [1] - 115:21
**single** [3] - 42:16, 109:6
**sit** [12] - 30:6, 40:16, 54:15, 59:3, 59:11, 77:23, 85:25, 87:12, 87:14, 87:20, 88:3, 88:5
**sit-and-stand** [1] - 30:6
**sit/stand** [1] - 31:5
**site** [18] - 12:12, 12:14, 12:16, 12:17, 12:21, 31:8, 32:24, 32:25, 34:15, 34:18, 34:20, 34:22, 38:18, 39:2, 73:2, 77:1, 90:23, 91:2
**sites** [1] - 34:9
**sitting** [2] - 26:12, 50:2
**situation** [35] - 42:15, 58:7, 62:16, 64:25, 69:4, 69:10, 69:13, 70:8, 70:18, 70:21, 70:25, 71:7, 71:18, 71:22, 71:24, 72:22, 72:23, 73:9, 77:16, 78:1, 82:4, 82:7, 82:9, 83:10, 90:22, 91:24, 94:4, 101:15, 101:18, 101:24, 102:4, 102:10, 104:17, 105:23, 106:13
**situational** [1] - 41:16
**situations** [3] - 42:17, 62:18, 102:18
**six** [3] - 33:5, 33:15,

107:23
**Skill** [1] - 109:10
**skill** [8] - 44:10, 107:22, 107:25, 108:4, 108:6, 109:3
**slide** [5] - 109:23, 110:6, 111:13, 111:20
**slides** [1] - 110:1
**smell** [1] - 111:9
**Smith** [8] - 10:10, 10:16, 10:25, 11:5, 12:13, 12:16, 91:12, 91:14
**snap** [1] - 75:3
**snapped** [1] - 75:8
**so-called** [1] - 12:4
**solution** [1] - 107:6
**sometime** [3] - 10:19, 13:7, 71:14
**sometimes** [3] - 5:12, 52:24, 88:19
**somewhere** [3] - 21:11, 68:13, 107:11
**sorry** [5] - 19:21, 40:13, 78:12, 79:22, 108:11
**sort** [43] - 3:21, 4:6, 5:18, 9:12, 11:10, 16:7, 20:2, 25:3, 25:10, 26:5, 30:10, 30:23, 33:2, 37:9, 39:2, 41:22, 42:6, 42:11, 43:3, 43:16, 46:4, 47:9, 50:4, 50:6, 53:15, 55:8, 57:4, 58:18, 59:15, 62:9, 75:8, 79:24, 80:25, 81:20, 86:23, 86:25, 97:6, 97:12, 98:8, 102:24, 107:10, 111:1, 111:5
**sought** [1] - 35:24
**sound** [1] - 59:16
**sounds** [1] - 35:5
**source** [2] - 83:25, 90:14
**Spanier** [4] - 10:4, 10:7, 10:17, 10:22
**speaking** [1] - 64:18
**specific** [5] - 19:11, 27:10, 44:4, 61:6, 95:10
**specifically** [2] - 59:12, 95:8
**spectrum** [1] - 98:1
**speculate** [2] - 52:2, 52:10
**speculation** [1] - 52:3
**speed** [4] - 32:10,

32:12, 32:18
**spelling** [1] - 10:6
**spend** [1] - 41:1
**spoken** [3] - 55:3, 90:1, 90:7
**spot** [1] - 52:18
**SSC** [8] - 7:18, 8:13, 9:9, 26:1, 27:5, 51:1, 53:14, 54:23
**SSCs** [6] - 7:17, 8:20, 18:17, 18:19, 20:25, 51:15
**stand** [2] - 7:18, 30:6
**standard** [2] - 9:12, 107:24
**standards** [1] - 102:17
**standoffish** [1] - 50:7
**start** [5] - 5:7, 19:5, 22:12, 36:20, 103:5
**started** [3] - 28:7, 32:9, 93:23
**starting** [2] - 16:3, 69:20
**state** [9] - 3:16, 9:22, 11:4, 11:6, 11:17, 12:7, 14:10, 38:7, 60:23
**State** [1] - 114:3
**statement** [1] - 60:2
**STATES** [1] - 1:1
**States** [2] - 114:8, 117:17
**station** [2] - 30:6, 31:5
**stay** [1] - 54:19
**stenographically** [1] - 114:9
**step** [1] - 50:25
**stepped** [1] - 78:9
**steps** [2] - 54:2, 78:7
**stick** [1] - 19:6
**stigma** [1] - 105:18
**still** [15] - 10:11, 10:25, 28:21, 34:20, 34:25, 35:3, 35:4, 46:20, 48:5, 48:17, 53:11, 68:18, 78:19, 79:4, 100:12
**stock** [5] - 14:19, 109:1, 109:2
**stop** [1] - 94:19
**Street** [3] - 115:8, 117:20, 117:23
**street** [1] - 9:21
**stress** [3] - 24:4, 88:13, 101:17
**stronger** [1] - 61:19
**strongly** [1] - 65:18

**structure** [3] - 34:12, 52:8, 56:21
**stuff** [1] - 83:24
**subject** [1] - 48:24
**subscribe** [1] - 114:19
**subsequent** [1] - 67:8
**subset** [1] - 23:3
**substance** [1] - 117:4
**successful** [1] - 54:23
**successfully** [4] - 92:8, 95:2, 99:17, 100:15
**sue** [1] - 28:20
**sued** [2] - 4:25, 5:1
**sufficiently** [1] - 32:18
**suggest** [9] - 11:24, 35:14, 51:15, 60:14, 83:7, 94:3, 96:5, 107:11, 111:1
**suggested** [2] - 49:12, 107:8
**suggesting** [4] - 25:16, 59:6, 69:19, 102:6
**suggestions** [1] - 107:5
**suggests** [1] - 12:19
**summer** [3] - 10:14, 11:5, 19:7
**summer/fall** [1] - 28:7
**supervision** [1] - 20:10
**supervisor** [4] - 10:3, 10:7, 10:13, 90:20
**supplemental** [2] - 108:15, 108:16
**suppose** [1] - 100:5
**supposed** [3] - 38:24, 99:21, 110:18
**suspect** [1] - 110:16
**suspected** [2] - 110:19, 111:9
**suspend** [1] - 106:13
**swear** [1] - 104:13
**swearing** [5] - 63:21, 63:24, 64:15, 64:23, 103:23
**swore** [2] - 60:1, 60:11
**sworn** [2] - 3:12, 114:5
**symptoms** [1] - 88:18

**syndrome** [2] - 97:18, 97:19
**synonymous** [1] - 7:11
**system** [2] - 17:3, 52:25
**systems** [6] - 26:16, 26:17, 32:16, 32:19, 52:15, 53:3

## T

**Talent** [1] - 7:7
**talent** [28] - 7:9, 7:15, 10:23, 11:1, 11:16, 12:1, 17:14, 17:16, 17:17, 17:18, 22:5, 24:20, 24:25, 27:17, 29:2, 29:12, 30:1, 30:9, 33:10, 38:24, 39:1, 88:22, 90:21, 90:24, 103:4, 110:13, 111:4, 111:11
**task** [1] - 83:6
**taught** [1] - 12:24
**team** [13] - 8:12, 19:9, 19:11, 19:13, 34:7, 51:2, 51:3, 52:12, 52:23, 53:14, 56:19, 87:22, 88:2
**teams** [9] - 51:6, 51:7, 51:17, 51:25, 52:5, 53:6, 53:23, 54:4, 88:1
**tearful** [1] - 80:7
**telephone** [4] - 7:14, 26:16, 96:7
**tendencies** [1] - 45:22
**tenure** [10] - 18:8, 22:4, 32:9, 32:21, 33:9, 33:13, 33:14, 37:7, 39:3, 39:5
**term** [6] - 7:23, 59:16, 108:9, 108:19
**terminate** [14] - 38:15, 38:19, 38:22, 57:16, 62:13, 78:17, 89:14, 89:16, 92:1, 92:23, 93:16, 93:20, 96:25
**terminated** [8] - 40:24, 43:2, 43:11, 48:22, 57:9, 57:12, 92:6, 93:3
**terminating** [2] - 39:9, 58:3
**termination** [22] - 16:4, 16:10, 38:13,

39:4, 40:8, 42:8, 42:14, 42:19, 47:11, 47:18, 47:22, 48:3, 53:25, 58:8, 58:22, 59:14, 92:17, 94:7, 94:10, 94:13, 96:13
**terminations** [5] - 38:25, 39:6, 39:18, 40:4, 42:2
**terminology** [1] - 7:9
**terms** [2] - 38:25, 95:10
**test** [5] - 25:23, 32:10, 32:11, 32:12, 32:14
**testified** [2] - 55:18, 113:3
**testify** [1] - 114:5
**testimony** [4] - 95:14, 101:6, 114:12, 117:4
**Texas** [1] - 91:2
**Thad** [1] - 117:19
**therefore** [1] - 117:4
**they've** [2] - 99:9, 102:23
**thinking** [4] - 23:9, 23:14, 89:11, 89:12
**third** [4] - 22:1, 33:7, 60:5, 106:6
**Thoma** [10] - 48:13, 48:14, 56:8, 56:11, 56:12, 70:7, 70:14, 75:17, 81:12, 83:20
**THOMPSON** [3] - 1:24, 115:1, 117:25
**three** [9] - 12:11, 33:15, 71:12, 77:21, 78:6, 79:1, 107:23, 109:13, 112:16
**three-week** [1] - 71:12
**throughout** [6] - 9:12, 27:12, 29:3, 45:13, 91:11, 105:9
**throw** [1] - 104:14
**Thursday** [2] - 84:9, 112:25
**ticket** [6] - 27:19, 27:20, 29:15, 29:16, 52:15, 56:15
**tickets** [4] - 52:9, 52:10, 52:19, 53:9
**Title** [1] - 117:16
**title** [1] - 7:16
**TM** [2] - 110:11, 110:13
**TO** [2] - 117:2, 117:9
**today** [10] - 3:20, 13:17, 13:19, 15:6,

19:18, 26:12, 40:15, 40:16, 42:19, 61:19
**together** [3] - 50:3, 117:4
**tolerance** [3] - 41:18, 103:22, 104:2
**tolerated** [2] - 41:14, 41:17
**tone** [4] - 85:4, 85:12, 85:13, 93:22
**took** [2] - 58:15, 93:6
**tool** [8] - 44:16, 44:19, 44:21, 45:4, 45:13, 45:18, 45:21, 46:10
**tools** [1] - 26:7
**top** [2] - 40:14, 67:2
**topics** [8] - 4:10, 13:21, 13:24, 14:3, 14:24, 15:2, 41:22
**Torrey** [1] - 28:20
**total** [1] - 23:15
**touch** [2] - 29:24, 30:7
**Tourette's** [9] - 97:18, 97:21, 97:24, 98:4, 98:10, 98:12, 98:13, 98:16, 98:20
**toward** [2] - 49:13, 57:13
**towards** [1] - 80:24
**Trahan** [112] - 16:17, 24:2, 28:13, 35:14, 35:19, 35:24, 36:2, 36:7, 39:19, 40:7, 40:20, 43:1, 44:4, 46:13, 46:16, 48:2, 49:11, 49:13, 49:14, 51:5, 51:21, 51:24, 53:22, 55:4, 56:2, 56:5, 56:16, 56:22, 57:8, 57:11, 57:20, 58:3, 58:23, 59:2, 59:6, 59:15, 59:25, 60:10, 60:15, 60:19, 60:23, 61:2, 62:16, 63:7, 63:16, 66:5, 69:17, 69:19, 70:2, 70:10, 70:15, 70:17, 70:19, 71:18, 71:21, 71:24, 73:19, 73:21, 74:3, 74:10, 74:19, 74:24, 75:7, 78:17, 78:24, 79:7, 80:3, 81:23, 82:1, 82:11, 82:18, 83:9, 83:24, 84:22, 85:4, 85:18, 85:23, 86:14, 86:19, 87:2, 87:14, 88:5, 89:2, 89:6, 89:20,

90:1, 91:15, 91:18, 92:5, 92:7, 92:25, 93:2, 93:13, 94:1, 94:16, 95:15, 96:5, 96:15, 96:18, 99:6, 99:7, 100:6, 105:22, 106:13, 107:11, 112:1, 112:3, 112:8, 114:7, 115:11, 117:16
**TRAHAN** [1] - 1:5
**Trahan's** [22] - 5:3, 31:9, 45:24, 47:1, 47:10, 47:16, 53:25, 55:14, 59:24, 60:9, 61:24, 62:14, 69:12, 74:15, 79:17, 84:1, 85:2, 86:12, 90:2, 92:18, 96:10, 113:5
**trainees** [2] - 54:8, 105:3
**training** [34] - 7:25, 8:2, 8:10, 9:1, 9:15, 9:16, 12:16, 12:20, 12:21, 13:1, 13:4, 13:5, 13:12, 19:20, 20:1, 20:3, 24:17, 25:24, 26:2, 27:13, 28:3, 37:15, 53:19, 54:6, 54:9, 57:1, 62:22, 63:1, 73:8, 73:11, 86:18, 88:21, 104:24, 106:4
**trainings** [3] - 8:11, 9:3, 13:13
**Transcript** [1] - 117:18
**transcript** [7] - 23:24, 113:15, 115:13, 115:17, 115:19, 115:19, 117:7
**Transcription** [1] - 114:11
**transfer** [5] - 85:20, 85:23, 86:15, 87:3, 88:9
**transitioned** [1] - 93:24
**transpired** [2] - 63:7, 79:24
**travel** [1] - 12:9
**traveling** [1] - 91:3
**travels** [1] - 35:6
**treat** [2] - 75:5, 100:13
**treated** [3] - 71:6, 86:7, 86:8
**treating** [4] - 38:8, 57:22, 58:5, 66:4
**triggered** [4] - 57:14, 58:11, 58:25, 59:8

**triggering** [1] - 59:4
**triggers** [2] - 88:19, 88:20
**true** [3] - 61:8, 114:12, 117:12
**truth** [3] - 114:6
**truthfulness** [1] - 86:12
**try** [8] - 5:14, 5:16, 19:6, 99:1, 100:8, 100:11, 106:15, 107:9
**trying** [2] - 23:17, 81:25
**turn** [1] - 110:8
**two** [9] - 25:24, 51:17, 51:20, 52:4, 54:17, 66:15, 66:17, 71:11, 105:25
**two-week** [1] - 25:24
**type** [12] - 31:13, 35:20, 37:3, 41:19, 50:17, 83:9, 90:18, 92:10, 95:8, 97:4, 101:20, 101:22
**types** [3] - 9:5, 9:8, 30:23
**typewritten** [1] - 114:10
**typically** [5] - 7:16, 29:8, 73:1, 106:18, 106:23

## U

**uh-huhs** [1] - 5:18
**under** [12] - 4:16, 38:4, 64:24, 86:23, 87:1, 87:7, 88:16, 88:24, 89:8, 97:25, 103:18, 111:10
**underlying** [4] - 24:10, 43:3, 43:13, 112:9
**understood** [1] - 94:6
**undertake** [3] - 9:10, 72:11, 72:16
**undertaken** [1] - 44:12
**undue** [1] - 21:19
**United** [2] - 114:8, 117:17
**UNITED** [1] - 1:1
**University** [2] - 7:5, 9:23
**unknown** [1] - 88:20
**unless** [3] - 21:19, 22:22, 35:22
**unlike** [1] - 8:19

**unreasonable** [1] - 103:22
**unwieldy** [1] - 5:13
**up** [29] - 14:6, 24:25, 27:21, 29:19, 32:25, 34:3, 36:6, 36:7, 38:11, 43:17, 47:10, 47:18, 53:9, 55:5, 55:19, 57:6, 58:7, 59:13, 67:15, 81:11, 81:20, 90:12, 91:15, 91:18, 95:25, 103:6, 105:25, 106:23, 108:21
**upfront** [1] - 104:8
**upset** [3] - 71:2, 80:22, 80:25
**utilize** [1] - 110:6
**utilized** [2] - 45:13, 45:14
**utilizing** [1] - 35:10

## V

**value** [2] - 66:1, 109:3
**various** [2] - 61:23, 77:8
**vehicle** [2] - 4:17, 4:18
**verbalizations** [1] - 98:3
**verbalize** [1] - 5:23
**verify** [1] - 10:6
**version** [3] - 21:4, 21:5, 75:12
**versus** [2] - 82:1, 84:17
**veteran** [1] - 86:3
**via** [2] - 31:20, 112:11
**videotapes** [1] - 75:11
**violate** [1] - 104:18
**violated** [1] - 49:8
**violation** [3] - 49:16, 49:24, 66:2
**virtual** [7] - 32:22, 32:24, 32:25, 33:3, 34:10, 34:14
**vis-à-vis** [1] - 63:7
**vision** [2] - 108:9, 108:15
**visit** [1] - 12:14
**vocalized** [1] - 65:20
**voice** [3] - 85:4, 85:13, 93:22
**voicemail** [12] - 84:22, 85:2, 85:12,

85:17, 86:2, 86:6, 86:12, 87:3, 88:4, 88:11, 93:23, 113:5
**voluntarily** [1] - 48:21
**voluntary** [1] - 39:8
**voracity** [1] - 74:15
**vs** [4] - 1:7, 114:7, 115:11, 117:16

## W

**W000119** [1] - 46:3
**wage** [3] - 107:17, 107:20, 108:4
**walk** [1] - 77:23
**walked** [1] - 70:4
**walking** [2] - 83:19, 99:25
**warrant** [1] - 83:18
**Washington** [5] - 11:4, 11:6, 11:17, 12:5, 12:7
**WAYFAIR** [1] - 1:8
**Wayfair** [73] - 2:11, 3:23, 6:6, 6:19, 7:6, 7:12, 8:9, 9:4, 9:21, 11:13, 14:5, 14:7, 14:11, 14:14, 14:15, 14:16, 14:18, 14:22, 15:1, 15:19, 15:20, 16:22, 17:17, 17:19, 18:13, 18:25, 19:5, 19:25, 20:14, 20:20, 20:21, 21:17, 22:6, 26:18, 27:10, 28:16, 31:18, 37:17, 37:20, 38:3, 38:13, 39:3, 43:20, 44:23, 48:5, 49:3, 57:6, 57:7, 57:20, 58:4, 60:14, 60:16, 61:17, 62:24, 71:25, 86:1, 88:23, 89:2, 90:2, 98:16, 98:18, 101:16, 104:15, 106:8, 106:12, 107:5, 108:18, 114:7, 115:11, 117:16
**Wayfair's** [1] - 76:13
**ways** [2] - 40:21, 111:8
**week** [4] - 25:24, 28:5, 71:12, 106:6
**weeks** [4] - 12:11, 54:17, 71:11, 106:14
**well-being** [1] - 73:22
**western** [1] - 6:16

15

**Wharf** [2] - 115:8, 117:23
**whatsoever** [1] - 36:14
**WHEREOF** [1] - 114:19
**whole** [4] - 34:17, 75:9, 101:14, 114:6
**William** [2] - 90:25, 96:22
**willing** [1] - 60:19
**willingness** [1] - 83:7
**wish** [1] - 17:10
**within-named** [1] - 114:5
**WITNESS** [1] - 114:19
**witness** [1] - 114:13
**witnessed** [1] - 67:23
**WOM** [1] - 67:22
**woman's** [1] - 87:19
**women** [6] - 56:10, 80:1, 80:3, 80:23, 81:1, 81:4
**women's** [2] - 68:1, 68:3
**wondering** [1] - 103:15
**word** [7] - 8:24, 31:24, 53:16, 59:15, 82:13, 82:24, 104:12
**words** [3] - 5:15, 5:17, 57:25
**work-from-home** [6] - 31:14, 33:12, 34:5, 34:17, 35:8, 106:14
**workplace** [9] - 29:22, 38:6, 41:15, 86:16, 87:9, 95:1, 95:3, 104:10, 105:5
**works** [1] - 99:11
**world** [2] - 34:14, 61:17
**worthwhile** [1] - 29:6
**write** [1] - 111:21
**written** [2] - 13:11, 37:10
**wrote** [5] - 66:12, 66:14, 67:4, 67:5, 67:7
**Ws** [1] - 20:18
**www. donthompsonandassociates .com** [1] - 1:25

## Y

**year** [6] - 6:17, 10:8, 10:18, 28:2, 28:4, 61:4
**yelled** [1] - 69:8
**yourself** [3] - 17:15, 38:18, 76:15

## Z

**Zmistowski** [1] - 117:19
**zone** [1] - 11:10