UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KIRSTIE TRAHAN,           )
                          )
     Plaintiff            )
                          )
V.                        )   Docket No. 1:18-CV-00209-GZS
                          )
WAYFAIR MAINE, LLC,       )
                          )
          Defendant       )

DEPOSITION of KIRSTIE TRAHAN, taken pursuant to notice dated December 5, 2018, at the law offices of Lanham Blackwell & Baber, P.A. at 133 Broadway, Bangor, Maine, on January 7, 2019, commencing at 10:00 a.m., before Claudette G. Mason, RMR, CRR, a Notary Public in and for the State of Maine.

APPEARANCES:

For the Plaintiff:      BRETT D. BABER, ESQ.

For the Defendant:      KATHARINE I. RAND, ESQ.

Also Present:  Jonie Dunivan

Page 2

INDEX

Deponent:  KIRSTIE TRAHAN

Examination by:                                    Page

    Ms. Rand                                         3


                        EXHIBITS

Number          Description                        Page

1       Answers to Interrogatories                    7
2       4/29/15 Behavioral Health Notes              17
3       1/19/15 Behavioral Health Notes              20
4       6/17/15 Behavioral Health Notes              22
5       9/1/17 Attendance Report                     59
6       8/24/17 Attendance Report                    59
7       3/5/18 Response of K. Trahan                 65
8       8:25 a.m. FB Brynn Williams Chat            107
9       8:27 a.m. FB Toni Johnson Chat              113
10      8:23 a.m. FB Cougar Bunn Chat               118
11      9:49 a.m. Brandi Beale iMessage             120
12      8:40 p.m. Brianna Ireland FB Group Post     122
13      Darren Plante FB Screenshot                 124
14      Complaint of Discrimination                 127

Page 3

STIPULATION

It is hereby agreed by and between the parties that signature is waived.

                    - - - - -

KIRSTIE TRAHAN, having been duly sworn by the Notary Public, was examined and testified as follows:

                    EXAMINATION

BY MS. RAND:

Q.  So good morning.  I'm Katy Rand.

A.  Good morning.

Q.  And I represent Wayfair.

A.  Uh-huh.

Q.  We met really briefly before we went on the record.
    Could you state your full name for the record, please.

A.  Kirstie Lynn Trahan.

Q.  And what was your -- did you have a different last name before marriage?

A.  I did.

Q.  And what was that?

A.  Dawson.

Q.  Okay.  Have you ever been deposed before, had your deposition taken like this?

A.  In a car accident case, yeah.

Page 4

Q.  Okay.  The rules were probably exactly the same as they are here.  And you have probably already talked to your counsel about this; but just so we're clear, I'll go over some of the ground rules.
    This is really just an interview under oath. It's not a marathon.  You can take a break at any time you need to.  Just let me know.  If there is a question pending I would probably ask that you answer that question before you take a break. But we can take breaks whenever you need to.
    Because the Court reporter is taking down everything each of us says, this is a little bit different than a typical conversation where people sort of anticipate what the other person is asking or saying and talk over each other. It's important that you let me finish my question before you start answering, and I'll try really hard to let you finish your answer before I ask the next question.

A.  Uh-huh.

Q.  If you don't understand any of my questions, it's totally appropriate to ask me to say it again or say it another way.
    If you answer a question, I'm going to assume

Page 5

    that you understood it.

A.  Uh-huh.

Q.  I think that's about it.  Do you understand those basics?

A.  I do.

Q.  Okay.  Thanks.
    Where were you born?

A.  Lincoln, Maine.

Q.  And what's your birthday?

A.  3/30/91.

Q.  Did you go to high school in Lincoln?

A.  Nope.

Q.  Where did you go to high school?

A.  I went to school at Penobscot Valley High School in Howland.

Q.  And did you graduate from high school?

A.  I did.

Q.  Any education after high school?

A.  Yeah.  I went almost through college.

Q.  And is that a Bachelor's Degree --

A.  Yes.

Q.  -- that you're working towards?

A.  It is.

Q.  Where have you -- let me ask this.  When did you first attend college?

KIRSTIE TRAHAN - 01/07/2019                    Pages 6..9

Page 6

A.  I attended 2013 roughly, the University of Southern Maine.

Q.  Okay.  And in 2013 were you studying anything in particular?

A.  No.  It was just liberal studies.

Q.  How long did you go to college in 2013?

A.  I went about a year and a half.

Q.  And while you were in school, at that time were you also working?

A.  I worked at Olive Garden.

Q.  Is that at the Maine Mall?

A.  It is.

Q.  When you stopped college for a period of time, what was the reason?

A.  I had bills.

Q.  You needed to work more?

A.  Uh-huh.

Q.  Okay.  Oh, another ground rule that I didn't say is because the court reporter is taking everything down, another thing that's different from normal conversation is that I need you to say yes or no.  So sometimes I may prompt that.  Uh-huh makes sense, and I know what your answer is; but it doesn't always -- it's not always clear on the transcript.

Page 7

I want to walk through your employment history.  And I think the simplest way to do that might be to use the interrogatories that you provided.

MS. RAND:  So let's mark those.

(Deposition Exhibit No. 1 was marked.)

BY MS. RAND:

Q.  Okay.

MS. RAND:  You can use the actual exhibit, if you want.

MR. BABER:  Thanks.

Why don't we trade.

(Discussion off the record.)

BY MS. RAND:

Q.  All right.  So you have what the court reporter has marked Exhibit 1.  And are you looking at interrogatory answer No. 17?

A.  Yes.

Q.  On page 7?

A.  Yes.

Q.  Okay.  Do you recognize this document?

A.  I do.

Q.  Are these the interrogatories -- the responses to the interrogatories that you provided?

A.  Yes.

Page 8

Q.  And did you -- if you look on the last page or the second to last page, is that your signature?

A.  It is.

Q.  And you understood that you signed these under oath?

A.  I did.

Q.  Okay.  So going through this job history in response to interrogatory No. 17, your first job was at McDonald's in Lincoln, Maine?

A.  It was.

Q.  And is that the only job that you held before you went into the service?

A.  I baby-sat as a teen, but none of those families are around here anymore.

Q.  Okay.  The only job where you received a payroll check?

A.  A W-2, yes.

Q.  Okay.  And why did you leave that job?

A.  I went in the Army.

Q.  And you were in the Army from January to September 2010?

A.  I was.

Q.  Okay.  Your first job after the service was at Microdyne?

A.  It was.

Page 9

Q.  Where is Microdyne?

A.  Microdyne was over in Orono by the Black Bear Inn.

Q.  What kind of a company is it?

A.  It's a call center.

Q.  What's sold by that company?

A.  They have multiple contracts or they had.

Q.  What were the contracts for?

A.  Synapse is a magazine service company, Time Warner Cable, Open Table.  And I -- I only worked Synapse or Time Warner; so I don't know about the rest.

Q.  Okay.  A variety of things?

A.  Yes.

Q.  Was that your first job in a call center environment?

A.  Yes.

Q.  And you worked there from October 2010 until June 2012?

A.  Yes.

Q.  And why did you leave that job?

A.  I got a new job at Macy's.

Q.  At Microdyne were you ever subjected to any disciplinary action?

A.  Not that I can recall.

KIRSTIE TRAHAN - 01/07/2019          Pages 10..13

Page 10

Q.  Okay.  And when you left Microdyne, it was voluntarily?

A.  Yes.

Q.  So then you went to Macy's in Bangor?

A.  Yeah.

Q.  And you were there from June 2012 until September 2012?

A.  Yeah.

Q.  And looks like you left that position because you moved to Portland?

A.  Yes.

Q.  And why did you move to Portland?

A.  I moved to Portland to be with my boyfriend.

Q.  And when you moved to Portland, is that when you started at USM as well?

A.  Yes.

Q.  Okay.  Were you subjected to any disciplinary action when you were working at Macy's?

A.  Not to my knowledge, no.

Q.  And you left there voluntarily?

A.  Yes.

Q.  Okay.  Your next job, it looks like, was at Auto Europe?

A.  Yeah.

Q.  I worked at Auto Europe as a call center rep, so

Page 11

I know what that job involves.

A.  Yeah.

Q.  Do you still know all your airport codes?

A.  I do.

Q.  Yes.  So do I.
     So you were there from January 2013 to September 2013?

A.  I was.

Q.  And that's when you started school full time?

A.  Yes.

Q.  At Auto Europe were you subjected to any disciplinary action?

A.  Not to my knowledge.

Q.  And when you left there, it was voluntarily?

A.  It was.

Q.  All right.  You already mentioned Olive Garden.

A.  Yeah.

Q.  And you were there from September 2013 until March 2014?

A.  Yes.

Q.  Any disciplinary action at all at Olive Garden?

A.  I don't think so.

Q.  And you left there to go to AAA voluntarily?

A.  Yes.

Q.  AAA, is this in Portland?

Page 12

A.  It is.

Q.  Down on Marginal Way?

A.  Yes.

Q.  Okay.  And you were a call center rep there for about a year?

A.  I was.

Q.  Okay.  And you left there to move back to Bangor?

A.  Yes.

Q.  Okay.  Any disciplinary action at AAA?

A.  No.  I left of my own free will.

Q.  And any warnings or other performance improvement plans while you were there?

A.  No.

Q.  Okay.  At any of the jobs that we have gone through so far, did you request any reasonable accommodations?

A.  I did.  At Nexxlinx.

Q.  Okay.  So is that the next job that we're about to get to?

A.  Yeah.  That is -- used to be Microdyne.  I went back to work there.

Q.  Oh, okay.

A.  Yes.  Nexxlinx bought them.

Q.  So when you went back to Bangor, you went back to Microdyne, now called Nexxlinx?

Page 13

A.  Uh-huh.

Q.  Yes?

A.  Yes.  Sorry.

Q.  And tell me about the request for accommodation that you made while working for Nexxlinx?

A.  I went through a PTSD episode, and I left for a month.  And I went on medical leave during that month.

Q.  What is it -- when you say a PTSD episode, what is it that happened?

A.  Flashbacks.

Q.  And --

A.  Depression.

Q.  Did -- is that something that you underwent in the workplace?

A.  It was triggered by the workplace.

Q.  How so?

A.  Just the stress and the bills.  I had a lot of bills when I moved back.

Q.  Was there something that happened in the workplace that triggered you?

A.  No.  Just stress.

Q.  And how did that manifest itself in the workplace?

A.  It didn't -- just makes me very quiet, very -- I

KIRSTIE TRAHAN - 01/07/2019                Pages 14..17

Page 14

cross my arms a lot.

Q. And that --

A. I tend to withdraw. So --

Q. And that happened at Nexxlinx?

A. It did.

Q. Was that interfering with your ability to do your job?

A. No.

Q. What is it that caused you to take a medical leave?

A. I have very bad night terrors; and when I have them, I don't sleep. So I had been up at one point for over 72 hours. So at that point we made the call to take a leave of absence for a month so that I could get my sleeping meds under control.

Q. Okay. Was -- was the medical leave more for you to get yourself to a place where you were feeling better?

A. Yes.

Q. Did anyone -- to your knowledge did anyone in the workplace at Nexxlinx know that you were experiencing flashbacks?

A. HR department did.

Q. And how did they know that?

Page 15

A. I told them.

Q. Did you tell them when you requested medical leave?

A. I told -- I called -- I called and talked to them, yes.

Q. Was it in the context of requesting medical leave that you shared that with them?

A. It was in the context that I had to tell them.

Q. In order to get medical leave or for another reason?

A. I told them that I needed to take a month of leave for my PTSD.

Q. All right. When you worked at Nexxlinx, was there ever a time that you felt your PTSD was impacting your behavior in the workplace?

A. Like I said, I just tend to withdraw.

Q. Did anyone at Nexxlinx, a supervisor or HR or anyone else ever speak to you about your behavior in the workplace?

A. No.

Q. Any disciplinary actions at Nexxlinx?

A. Not that I can recall, no.

Q. Was there a time when you were working at Nexxlinx that you did not get a promotion that you expressed interest in or applied for?

Page 16

A. Not that I can remember.

Q. Were you subject to any sexual harassment at Nexxlinx?

A. There was an instance where somebody was too friendly, but -- I mean, I think that happens everywhere.

Q. Is that instance something that you complained about to your supervisor?

A. I believe I made a complaint about it.

Q. Was there ever a time that you believed that Nexxlinx was discriminating against you because of your disability?

A. No.

Q. Why did you leave Nexxlinx?

A. I became pregnant with my daughter.

Q. Do you recall when it was that you left Nexxlinx?

A. I believe around September, maybe -- yeah. Right around September, I think, is when I finally left.

Q. Of 2015?

A. I think so, yeah.

Q. I didn't ask you this at the outset, but I can tell that you're expecting a child?

A. I am.

Q. When are you due?

Page 17

A. February.

Q. Okay. And how many other children do you have?

A. I have two.

Q. And how old are they?

A. Almost three and almost two.

Q. And you're married?

A. I am.

Q. And what is your husband's name?

A. Seth Trahan.

Q. And are your two children children that you have had with Seth?

A. Yes.

Q. Okay.

(Deposition Exhibit No. 2 was marked.)

BY MS. RAND:

Q. So the court -- oh, here. I will hand you what the court reporter has marked Exhibit 2. And I'll represent to you that these are medical records from Acadia that we received from your lawyer in discovery.

A. Uh-huh.

Q. Have you reviewed these before?

A. They're my medical records. I haven't seen these before. I don't really ask for them.

Q. Okay. This -- it looks like this record was

KIRSTIE TRAHAN – 01/07/2019          Pages 18..21

Page 18

authored by Linda Colburn?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And who is Linda Colburn?

A. Linda Colburn was my -- my med management nurse.

Q. Medication management?

A. Yes.

Q. Do you still see --

A. Linda?

Q. -- Linda?

A. Linda left the clinic, and I got bounced to Caitlyn. And now, I'm with -- I have to see someone new; but I'm still on Sandra's team. I have always been on Sandra's team.

Q. Sandra's team, is that what you said?

A. Yeah.

Q. In this note Linda Colburn -- I'm looking about halfway down the page --

A. Uh-huh.

Q. -- fourth sentence, Linda writes, patient states she quit her job about a week ago and feels much less stress. She said she was dealing with sexual harassment at work and her supervisor would not do anything.

Page 19

A. Yes.

Q. First of all, do you recall saying that to Linda?

A. I do. I tell -- I told Linda everything.

Q. And is -- is she referring to Nexxlinx?

A. I believe so, yes.

Q. Was she referring to when you quit your job at Nexxlinx?

A. I had left my job. I hadn't quit yet. I had left.

Q. Is here it says, patient states she quit her job about a week ago. Do you think that's not accurate or that she may be referring to a different job?

A. She might be referring to a different job. I'm not 100 percent sure what she's referring to here.

Q. Did you work any other jobs when you worked at Nexxlinx?

A. I can't -- I don't really remember.

Q. Okay. When you read that paragraph, does it suggest to you that Linda is referring to Nexxlinx?

A. It suggests it.

Q. Okay. And the date of this document is April 29, 2015. Is it possible that you quit your job at

Page 20

Nexxlinx in April of 2015 and not September?

A. It's possible.

(Deposition Exhibit No. 3 was marked.)

BY MS. RAND:

Q. So the court reporter has handed you Exhibit 3. And always feel free to take your time to read the document when I hand it to you. And if I see you reading, I'm going to wait to ask a question. So just look up when you feel like you're oriented, please.

So Exhibit 3 is another medical record that we received from your counsel in response to our discovery request. And it -- this entry is dated January 28, 2015. Do you see that?

A. I see that it was dated 1/19/15.

Q. Oh, okay. I see that. You're looking up under the admit/discharge date at the top?

A. Yes.

Q. Okay. And who is Jennifer Hubler?

A. She is my therapist.

Q. Is Jennifer someone that you still see today?

A. She is.

Q. And in this entry Jennifer writes, client called to report she was having a difficult day. She reported that she did not receive a job promotion

Page 21

that she had anticipated and she believes it is due to her recent elevated mental health state.

At this point in time were you working anywhere other than Netflix?

A. Nexxlinx.

Q. Nexxlinx, sorry.

A. No. I don't believe so.

Q. Do you recall that -- tell me if you need to take a break.

A. Okay.

Q. Do you recall the circumstances surrounding this?

A. Honestly, I don't.

Q. Okay. The next -- well, then it says, she believes due to her recent elevated mental health state. Do you -- do you know what that's referring to?

A. No. Honestly, with my PTSD that was a very bad time for me; so I don't remember.

Q. Do you recall when the leave of absence was that you -- that you took?

A. It was right around that time.

Q. Okay. The next sentence says, client left work because she was so upset and did not know if she should hire a lawyer. Does that mean anything to you?

KIRSTIE TRAHAN - 01/07/2019          Pages 22..25

Page 22

A.  No.  I honestly -- when I'm going through a PTSD episode, I don't remember.

Q.  Do you remember anytime considering hiring a lawyer --

A.  No.

Q.  -- due to -- no?

A.  No.

Q.  Okay.

(Deposition Exhibit No. 4 was marked.)

BY MS. RAND:

Q.  So the court reporter has handed you Exhibit 4. And this is a medical record authored by Jennifer Hubler and dated June 17, 2015?

A.  Yeah.

Q.  And in -- just to be clear, Jennifer is somebody that you saw separately from the medication management nurse Linda.  Right?

A.  Correct.

Q.  Okay.  And on June 17, 2015, Jennifer Hubler writes, client states she has quit both her jobs and will be going back to school in the fall. She states that management was not supportive of her so she left.

Does that in any way refresh your recollection around whether you had another job

Page 23

at that time?

A.  I don't remember, no.

Q.  Do you have any recollection of feeling that management at Nexxlinx was not supportive of you?

A.  Management at Nexxlinx was choppy; but when I have PTSD episodes, I have a hard time differentiating between what was Army management and what was PTSD management -- I mean, Nexxlinx management.  So I honestly -- I don't remember a lot of '15.

Q.  Okay.

A.  I just don't.

Q.  When you say you have a difficult time distinguishing between what was, like, PTSD management and what was Nexxlinx management, does that mean that your -- when you're experiencing a PTSD episode, that your perception is off?

A.  When I experience a PTSD episode, I have really strong flashbacks.  And it takes me back to a point in time in my life I don't like to relive often.  And when I have to relive it, it does cloud what can be reality and what can be not.

Q.  I'm not going to ask you any questions about the incident that led to your diagnosis of PTSD other than ask you to confirm that it was as a result

Page 24

of a sexual assault in the military?

A.  Yeah.  It was.  And it was a couple other mixed things where I was pulled into a lot of meetings of three on one, two on one.  And I was mentally and verbally abused for about six months of my life that no one would love me and no one would ever take me seriously.  So when I do have a PTSD flashback, it's quite significant and very serious.

Q.  And what you just described, the meetings, that was when you were in the military?

A.  Yeah.

Q.  When were your two children born?  What are their birthdays?

A.  3/14/16 is my daughter Kennedy, and 3/22/17 is my son Kendrick.

Q.  Almost exactly -- they almost have the same birthdays.

A.  Almost.

Q.  Okay.  When you left Nexxlinx, did you work -- when did you next work?

A.  When I left Nexxlinx, I didn't go back to work until Wayfair, I believe.

Q.  And as you sit here today -- forget about the medical records that we just looked at; I'm just

Page 25

looking for what you remember -- were you pregnant when you left Nexxlinx?

A.  Yeah.  We miscarried between our daughter Kennedy and -- like, but right before then.

Q.  Before your daughter in March of 2016 you miscarried?

A.  Right.  I got pregnant with her in July.

Q.  Okay.  And between when you left Nexxlinx and when you started at Wayfair, were you just at home and then at home caring for children once you had children?

A.  I went to school online with the University of Southern Maine.

Q.  Okay.  When did you return to school online?

A.  September of '16.

Q.  Was it after your daughter was born?

A.  Yes.

Q.  Okay.  And did you continue to study just general liberal arts?

A.  Yes.  And once I built my GPA, I switched to human biology.

Q.  Was there something -- so you were working toward, like, a Bachelor in Science in human biology?

A.  Yes.

KIRSTIE TRAHAN - 01/07/2019          Pages 26..29

Page 26

Q. Was there something in particular that you were hoping to do with that degree for work?

A. I hadn't really decided at that point. I knew with my husband's guidance -- he had been through college before -- that I didn't just want a basic, like, psychology degree or something simple. He told me go with something that I could either do something with that degree or move on.

Q. Does your husband have some exposure to or experience in the medical field?

A. Yes. He's a doctor of physical therapy.

Q. There is a reference in -- I'll represent to you that there is a reference in one of the medical records to a job at Comfort Inn. Does that -- did you ever work at Comfort Inn that you recall?

A. I think I tried it out for, like, two days. And then I realized I was pregnant, and I didn't stick with it.

Q. Was that in Portland or Bangor?

A. Bangor. We lived in Bangor -- Brewer.

Q. Okay. Since leaving Wayfair, you had a hip surgery in November of 2017?

A. I did.

Q. What did that surgery entail?

Page 27

A. Disconnecting my joint capsule from the labrum.

Q. And was that an inpatient surgery? Were you admitted to the hospital?

A. No. It was outpatient.

Q. It was outpatient. Was there a period of time after your hip surgery when you were unable to work even if you had a job?

A. Yes. It would have been about two weeks. At that time I was still doing -- going through the emotions of the PTSD as well. So we --

Q. From your termination?

A. Yes.

Q. You have shared some of -- some of the symptoms of your PTSD, at least when you're being triggered; but I want to talk a little bit more about that. Does the PTSD cause you to feel at times that people are out to get you?

A. Yes.

Q. And is that sometimes not consistent with reality even if it feels very real to you?

A. It's situation dependent.

Q. What do you mean by that?

A. It would have to depend on the situation of how bad the flashback is how bad the PTSD episode is

Page 28

at that time.

Q. So sometimes -- sometimes it --

A. Sometimes I can pull myself out of it. Sometimes I can't.

Q. All right.

A. If it's a brand new trigger, I can't.

Q. Are there times --

MR. BABER: I'm going to put on the record, just for your safety, if you have any concerns about feeling like you're about to get triggered, just let us know. We'll take a break.

THE DEPONENT: All right.

MR. BABER: All right?

BY MS. RAND:

Q. I totally agree, for that reason or for any other reason.

MR. BABER: If you feel a contraction --

BY MS. RAND:

Q. Just speak up. We'll take a break. Absolutely. Are there times that because of PTSD you have -- it's been your feeling that people are out to get you, but you have later learned or understood that perhaps that was not real, but was caused by the PTSD?

Page 29

A. When I go through a PTSD episode, I try not to go back and relive the whole situation because then it triggers it all over again.

Q. Does that mean that after these situations, you try not to go back and examine how accurate your perception was?

A. I don't try to go back and examine really anything about the PTSD episode unless I absolutely have to.

Q. Okay. Does the PTSD also cause you to be more verbally reactive?

A. It's situation dependent.

Q. Are there situations in which you would describe yourself as verbally reactive?

MR. BABER: Object to form. You can answer.

A. Sometimes, sometimes not. I mean, it depends on the exact situation I'm put in.

Q. Okay. At any time have you been completely unable to work as a result of your PTSD?

A. After I was terminated from Nexxlinx and during that leave of absence -- I mean, after I was terminated from Wayfair and during that leave of absence at Nexxlinx.

Q. Any other time other than those two times?

KIRSTIE TRAHAN - 01/07/2019          Pages 30..33

Page 30

A. When I came home from the Army.

Q. When you came home from the Army, how long was it before you were able to work again?

A. About a month. I believe I started training at the end of October of 2010.

Q. Okay.

A. I came home September 22.

Q. And how long after your termination from Wayfair would you say you were just totally unable to work as a result of your disability?

A. I started to be willing to try to work again in about January, but the thought of what I lived through there still plays in my head a lot.

Q. Before -- during your employment before Wayfair, did you have any verbal conflicts with co-workers that you recall?

A. I can't remember.

Q. Do you not remember whether you had any or not or you --

A. I don't think I did. I don't usually try to pick fights with people. My PTSD is not a violent form. It's not my --

Q. Did you ever have verbal conflicts though, words -- harsh words exchanged with co-workers?

A. I don't think so. I don't really remember.

Page 31

Q. During the period of time that you were working at Wayfair, were you still enrolled in courses?

A. I was, yes.

Q. Have you been enrolled in courses -- is it online, first of all?

A. Mostly it's online. So I'm at the point now I have to take five classes.

Q. At the time that you were working for Wayfair, it was online?

A. Yes.

Q. And after you were terminated from Wayfair, you continued going to school?

A. I finished the semester. I dropped some classes, but I finished. It was very hard. And I took a lot of -- my professors extended a lot of extend dates for me.

Q. I mean, I asked you about requests for accommodation in the context of past jobs; but you also requested accommodation in connection with your education?

A. I do. I have a whole accommodation letter at the University of Maine.

Q. And I have seen that.

When did you -- first of all, did -- was that initiated because you requested accommodation?

Page 32

A. That was. I requested accommodations in January when I went back to live classes.

Q. Okay.

A. So Wayfair didn't -- really affected me in public situations, and I had to really rely on the disability department to get me through.

Q. Prior to January of 2018 did you require any accommodations in connection with your education?

A. I tested up here instead of driving all the way to Portland because U-Maine has testing sites all over the state. So I tested in Bangor.

Q. And is that something that you requested?

A. You can request it.

Q. And did you request -- request that because of your PTSD?

A. I requested it because driving with PTSD all the way to Portland can be a bit stressful.

Q. Other than requesting accommodation of being able to test in Bangor rather than Portland, did you require any accommodations in connection with education before January of 2018?

A. No. It was all online.

Q. When you take online courses, do you still undergo exams?

A. Depends on the class.

Page 33

Q. For some of them did you?

A. Yes.

Q. And were those timed?

A. Some of them were; but the math teacher I had two semesters back to back, we -- we talked a lot and built a connection. So me -- she allowed me to really take my time.

Q. Okay. So that math teacher gave you sort of an informal accommodation?

A. Right. And she would also meet with me if I needed anything.

Q. Okay. You applied for work at St. Joseph's in January of 2018; is that right?

A. I did.

Q. And so as of January 2018, you were able to return to work?

A. I reached -- I started to dabble in the work pool, yeah.

Q. What does that mean, dabble in the work pool?

A. I wanted to see if I could do it. Mentally I wasn't completely ready, but losing my job at Wayfair put a lot of financial stress on us. And we were on the verge of losing some things that we really needed. So I really needed to get a job.

KIRSTIE TRAHAN - 01/07/2019          Pages 34..37

Page 34

Q.  Okay.  Is St. Joseph's the only place where you applied for employment -- that you have applied for employment since leaving Wayfair?

A.  I applied to a few places, but it was schedule dependent.  Because of the financial stress we couldn't afford day-care.  So we have two under two, and day-care was around $400 a week.  We couldn't afford it, so I had to find something where I could work overnights and be up during the day.

Q.  Is that still -- well, first, you were hired at St. Joseph's?

A.  I was.

Q.  And you started working there in --

A.  March 26 is when I did my orientation.

Q.  Okay.  March 26, 2018?

A.  Yeah.

Q.  And were you hired to work overnights?

A.  I was.

Q.  Are you still working overnights?

A.  I am.

Q.  When do you sleep?

A.  I have a nanny.  We can afford a nanny.  We have started to climb out of our financial hole, and we can finally afford a nanny for Fridays.  My

Page 35

husband altered his whole schedule to make accommodations so that he could have Thursdays off; and Wednesday I'm up for 24 hours.

Q.  Okay.  I think it will be easier to do this through the interrogatory, which is back -- if you can dig out that first exhibit that we looked at.

    I want to ask you about interrogatory 12 which is on page 6.

    Okay.  Your hourly wage at St. Joseph's is 86 cents per hour less than it was at Wayfair?

A.  So my hourly wage that my HR letter states is 12.11 an hour.  However, I get shift differential pay.  So as long as I work my scheduled shift, I get so much more an hour.  You have to be there from your 7:00 to 7:00; and you get your extra -- your extra shift dif.  However, if you take vacation time or maternity leave or you violate any of those conditions, you lose it for those hours.

Q.  Okay.  So when you're physically working that overnight shift, you will get the shift differential?

A.  Right.  But if I have to work a day shift, then it goes to my minimum 12.11.

Page 36

Q.  Okay.  What is the shift differential when you're working those overnight hours?

A.  Depends on the hour time.  I think it's listed on my pay stub that we included.  It's like shift 3, shift 4, shift 6, just using those as examples.

Q.  What's the range, just so I have a ball park of how much additional per hour?

A.  It ranges, I think, between $1 and -- and this is an estimate -- $1 to -- depending on a weekend shift, it could be 3.50.  I only work on a Saturday morning, and I couldn't tell you weekend shift dif unless I worked it consistently.

Q.  Okay.  What was your hourly wage at Wayfair?

A.  It was 15 when I was hired, and 15.25 when I was fired.

Q.  So in response to interrogatory No. 12, when you write that you have a wage differential of 86 cents per hour, that's factoring the shift differential?

A.  It is factoring the shift differential, yes.

Q.  And it says in here that you work four fewer hours per week at St. Joseph's?

A.  I do.  I'm a 36 hour position.

Q.  Okay.  Has that been consistent since you joined

Page 37

St. Joseph's in March of 2018?

A.  Unless they call me in and I'm available to work or I pick up somebody's Saturday night, but most of the time it's my 36 hours.

Q.  Okay.  Will you be taking some time off from work when you deliver this baby?

A.  I will be, yes.

Q.  How much time do you intend to take?

A.  About 12 weeks.

Q.  Will any of that time be paid?

A.  I pay for short-term disability.  And then that's going to come into play after two weeks of earned time.  So after that two weeks of earned time, I'll make 12.11 an hour.

Q.  So for the first two weeks after you go out you'll use your earned time, which would be 12.11 an hour.  Right?

A.  Uh-huh.  Yes.

Q.  And then your STD benefits that you pay for will kick in?

A.  It should, yes.  Which is 60 percent of my earned income before shift differentials.  My shift differential does not come into play there, I believe.

Q.  You just answered my next two questions.

KIRSTIE TRAHAN - 01/07/2019          Pages 38..41

Page 38

Okay. Do you have an understanding about how much of that 12 weeks of leave the STD will cover?

A.    I'm a C-section. It's a very high-risk situation. So I think 10 weeks or so. And that would be including my two weeks of, like -- so I have 10 weeks of pay and then two weeks of earned time; so it will be about 12.

Q.    Okay. So you think that the 12 weeks will be mostly covered by your earned time and the STD benefit, which is reduced but --

A.    It should be.

Q.    Okay. Do you -- do you have any understanding of what Wayfair's benefits are around maternity leave?

A.    I believe maternity leave was paid. I can't remember.

Q.    When you were at Wayfair, did you have medical insurance through Wayfair?

A.    No. I had it through my husband. We determined that our plan with his was better PTSD coverage and mental health care than what was at Wayfair.

Q.    Did you take advantage of any other benefits that Wayfair offered, for example, short-term disability?

Page 39

A.    I think so, but I can't remember.

Q.    So when you were terminated from Wayfair, you did not have a loss of healthcare coverage; is that right?

A.    No.

Q.    Do you get any paid vacation at St. Joseph's?

A.    I do.

Q.    What -- what are you entitled to?

A.    I earn 8.62 hours per pay period.

Q.    Did you say 8.62?

A.    Yes.

Q.    Okay. And is a pay period every two weeks?

A.    Yes.

Q.    And did you -- were you earning vacation at Wayfair?

A.    Yes.

Q.    What were you --

A.    I don't remember.

Q.    What were you earning?

      Okay.

A.    I might have a pay stub at home that says it. I don't know. I don't think I do, but --

Q.    Are there other -- any other benefits or any benefits, as you sit here today, that were available to you at Wayfair but aren't available

Page 40

to you at St. Joseph's?

A.    I would have to look at them again. I -- I went through three pregnancies in three years. Things are -- my memory is not as good as it used to be.

Q.    Okay. Now, I'm going to go back in time to when you were applying to go to Wayfair. You had been a stay-at-home mom for a period of time. Right?

A.    Yes.

Q.    What was it that caused you to decide to return to the work force?

A.    I wanted to.

Q.    And at that time you had two small children at home?

A.    I did.

Q.    Did you -- what did you and your husband do for child care?

A.    My mom watched them, and my sister watched them.

Q.    Was Wayfair the only company that you applied to at that time?

A.    Yeah.

Q.    And do you remember how you applied?

A.    I applied online.

Q.    And did you undergo an interview?

A.    I underwent two interviews with them and some recruiter situation.

Page 41

Q.    Were any of them in person?

A.    Two of them were.

Q.    Were they right there at the call center?

A.    Yes.

Q.    Do you recall who they were with?

A.    No.

Q.    Do you recall undergoing sort of a personality or skills test --

A.    I remember taking an assessment.

Q.    What do you recall about it?

A.    Just a standard call center test.

Q.    Is that something that you had taken before at Nexxlinx?

A.    I took it for AAA. But it wasn't as in-depth as the one at -- it was just more of a job function test, not a personality test.

Q.    Wayfair was more in-depth?

A.    I think so.

Q.    What was your job title at Wayfair?

A.    I think just a customer service rep or service rep.

Q.    And just walk me through the -- what were the job duties?

A.    From what I can recall, I was taking phone calls and processing e-mails and training in chat to

KIRSTIE TRAHAN - 01/07/2019          Pages 42..45

Page 42

assist customers in their issues with Wayfair. Like where is my item, changing address, or, you know, fixing a payment or helping them shop, I think is what I remember it.

Q. The -- the customers that you would communicate with, were they all individual consumers like you and me as opposed to businesses?

A. Yes.  I didn't work business to business.

Q. Okay.  And how much of your communications with customers would come from you reaching out to them versus them calling into the call center?

A. All of it came from them reaching into the call center unless there was an issue where you had to call them back.  Like an e-mail, if you didn't understand what they were asking, you would call them.

Q. Okay.  You -- you underwent some kind of a training program after you were hired?

A. Yes.

Q. What did that entail?

A. I believe it was two weeks of in-classroom training, and then it was so many weeks of nesting.

Q. Starting with the classroom training, did someone or someones in particular run that training for

Page 43

Wayfair?

A. I believe it was Kirk Thompson was the one that ran it; but I'm not -- I'm pretty sure.

Q. And just describe the training for me at a high level?

A. Teaches you how to learn the system, teaches you -- just a bunch of slides and basically fake scenarios that you run through.

Q. Sort of what to do if you get this question from a customer or this issue?

A. Right.  I mean, it doesn't prep you for everything, but gives you a very general knowledge.

Q. And when you said two weeks, was that for the classroom training?  Not the classroom training and the nesting, but just the classroom training?

A. No.  It was just classroom, I believe.  But it's been awhile.

Q. Did you start training with a group of other people who were new to Wayfair, too?

A. Yeah.  We were all one training class.

Q. Okay.  Approximately how many people were in your training class?

A. 15 to 20 maybe.

Q. Okay.

Page 44

A. That's an estimate.

Q. Did you know anyone in your training class before you started at Wayfair?

A. Do you have a list of the people?

Q. I don't think I do, so your answer may be that you don't remember or you can't answer without a list but --

A. It would be better with a list, but I'm pretty sure I knew at least two of them.

Q. If you did know them, was it just knowing them in passing; or were you close with anyone?

A. I wasn't -- I knew Cougar pretty well; but once again, that was just a passing.  Like, we weren't friends outside.

Q. Okay.

A. We keep in touch once in awhile, but nothing -- he's not in my immediate circle.

Q. Okay.  During -- during the classroom training before nesting -- so you're still in the classroom -- did you have any difficulties with any of the members of your training class?

A. I don't -- I don't think so.

Q. Was there ever a time when you were in classroom training and you felt that other members of the training class were talking about you behind your

Page 45

back?

A. I felt it was a very tight-knit environment that I wasn't in.  But I was a stay-at-home mom for two years, so -- and I had PTSD.  So I tread lightly with people anyway.

Q. The -- the tight-knit environment, were there certain members of the training class that were a part of that; or was it everyone except you that you felt was a part of that?

A. No.  It was certain people.

Q. Who would you describe as being in that tight-knit environment?

A. I would say Ashley and Brianna and Will.

Q. Will, did you say?

A. Yes.  Will Hes -- I can't pronounce his last name.

Q. Hesketh or something?

A. Yeah.  Hesketh.

Q. Was there anyone else that you would put in being in that tight-knit environment?

A. There were a couple others, but without a list I couldn't really --

Q. During the training class piece, was there ever a time where you felt like this tight-knit group of people were disrespectful or in any way rude to

KIRSTIE TRAHAN - 01/07/2019          Pages 46..49

Page 46

you?

A.   I think that I remember feeling that I didn't fit in.

Q.   Do you recall anything that anyone in the training class did to make you feel that way?

A.   Once they formed their group of friends, I just didn't feel included.  They all ate lunch together.  They all did a lot of things together, and I just wasn't included.

Q.   Okay.

     MS. RAND:  Let's take five.

         (A short recess was taken.)

BY MS. RAND:

Q.   Okay.  Was there -- we were -- before we took a break we were talking about the training period at Wayfair.  And you shared that there was a tight-knit group that you felt excluded from.  Is that fair?

A.   Yes.

Q.   Is there anything else about this time in training that sticks out in your mind in terms of interactions with co-workers?

A.   It was very forced.

Q.   What do you mean forced?

A.   You meet so many new people all at once, it just

Page 47

feels forced.

Q.   Is that -- meeting lots of new people, is that something that's uncomfortable for you in particular because of the PTSD?

A.   It is.

Q.   During training was there ever a time that you exchanged, you know, unhappy or unpleasant words with anyone employed at Wayfair?

A.   I don't think so.

Q.   Or a time when you felt that people in the training class were somehow, like, targeting you?

A.   I felt that they weren't the nicest group of people.

Q.   And is that because they were excluding you or not including you, or is there another reason that you felt that?

A.   I just felt that they were kind of mean.

Q.   As you sit here today, can you think of any examples of what they did that made you feel they were mean?

A.   I feel they were very judgmental.  There was an instance where -- like, once they found out what my husband did and that we weren't just middle class or -- I think they thought I -- that I was better than them.

Page 48

Q.   So when you say that you weren't just middle class, do you mean that you think they thought you were upper class?

A.   I think they thought just because of what my husband did I thought that I was better than them.

Q.   Did anyone in the training class ever say anything to you that led you to believe that that's what they thought about you?

A.   They would make comments like it must be nice to be a stay-at-home mom for two-plus years or it must be nice to have a husband that pays all your bills.  So --

Q.   Okay.  Do you recall in particular who made that comment or those comments?

A.   Just a couple of the women in there.

Q.   Do you recall their names, as you sit here?

A.   I think two of them were Bri and Ashley.

Q.   And did -- this is just to keep the record clean.  Did you just say Bri?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   And is Bri a nickname for Brianna, whom you referred to earlier?

Page 49

A.   Yes.

Q.   Was there ever a time -- you mentioned Kirk --

A.   Yes.

Q.   -- Thompson, I believe, as being involved in the training?

A.   Yes.

Q.   Was there anyone else from Wayfair that you remember leading the training or being actively involved?

A.   People came in and out.  Kirk was the main trainer for us.  We met Thoma later, but it was mostly Kirk.

Q.   Was there ever a time during the classroom training that you reported to Kirk that your co-workers were making you unhappy or uncomfortable in any way?

A.   I didn't report it to Kirk because it really didn't become an issue until nesting.

Q.   Okay.  Let's move to nesting then.  Can you describe what you mean by nesting?

A.   Nesting was where we left classroom training and went into a live environment with live customers.  So instead of just doing fake scenarios, you're, like, running the real deal.  I do believe it's dialed down a little bit so you're not, like, a

KIRSTIE TRAHAN - 01/07/2019          Pages 50..53

Page 50

full rep on the floor, but pretty close.

Q. All right. And during this nesting period, you sat with -- in the same physical space as your training class; is that right?

A. Yeah. We had assigned seats.

Q. But you were sitting with the same group of people that you had done the classroom with?

A. Yes.

Q. Okay. And did you understand that after nesting was over, those people in that training class would be assigned to different teams?

A. Yes. And we would be moved to different areas of the floor.

Q. Okay. And during nesting, is there a Wayfair resource close by in case you run into trouble with a customer?

A. I think there were a couple floor walkers, and Thoma was around.

Q. Do you know what Thoma's job title was at the time?

A. I think she was just nesting coach. I'm not --

Q. Did your interactions with your co-workers change when you transitioned from the classroom training to nesting?

A. Yes.

Page 51

Q. How so?

A. They became worse.

Q. What specifically do you recall about that?

A. Their -- their group of friends got stronger, and their behaviorisms got worse.

Q. Can you recall any specific examples of bad behaviors by this group when in nesting?

A. They -- they all used to have this group chat going that was just a select few of them that they would all laugh out loud about. But the whole training class wasn't in it. We had one that was all training class, and then there was one that was just them.

Q. And just to make sure I'm clear when we are talking about them, this group, we're talking about Brianna, Ashley, Will, and maybe a couple of other people?

A. There's a couple other people. The way the desks were set up there was, like, a row of desks, a row of desks; and then across the floor there was another big row of desks where we were all spread out.

Q. Okay. But you -- the group was roughly five people large?

A. I never -- I briefly saw the chat once; and they

Page 52

minimized it out really quickly. Couldn't tell you how many people for sure was in it. I just know that there was quite a few of them.

Q. What -- tell me about the time that you saw the chat. What were the circumstances surrounding that?

A. They were making fun of people.

Q. Where were you when you saw it?

A. At my desk.

Q. And how did you see it?

A. I -- she had it open on her screen; and I happened to look over. Our screens weren't privacy screens.

Q. And who was she? Who was it that had it open?

A. Ashley.

Q. What do you recall seeing in the chat? Like, the content of it?

A. They were making fun of certain people.

Q. Do you recall who?

A. I think I was one of them, but I couldn't speculate on who else. It was minimized fairly quickly when she saw I saw it.

Q. What did you see that -- that led you to conclude that they were making fun of you?

A. Just different interactions that we had.

Page 53

Q. For now I'm sticking with the actual chat. That time that you looked over and saw the chat, I assume you saw your name in it?

A. Yeah. I think I did.

Q. Did you see any other words that were being used near your name?

A. I think I just saw my name. And after that I put my head down, and I tried to ignore the situation as best as possible.

Q. Did you say anything to Ashley about what you saw?

A. I did not, but I said something to Lexi Tracey. She was our -- one of our floor walkers at the time. And I said something to her. And she -- we had this -- this board we could put stickies on for things to come up at our nesting meeting. And she put a sticky on the board about it.

Q. What did -- do you remember what it said?

A. I can't remember the exact phrasing; but I do know that she -- it was something along the lines of the chat was used for, you know, talking about work-related issues, not -- not that.

Q. Okay. Was there a time that you reported something to Kirk about your co-workers' behavior during nesting?

KIRSTIE TRAHAN - 01/07/2019          Pages 54..57

Page 54

A. I didn't report it to Kirk. I reported it to Thoma. It was after the nesting meeting when the Post-it came up to play. I approached Harley Pont -- Ponte -- whatever. I can't pronounce the last name.

Q. P O N T E?

A. Yes.

Q. When you say after the Post-it came to play, is that the same -- the sticky that you were just talking about?

A. Yeah.

Q. Okay. What did you say to Thoma?

A. I talked about the chat, and I talked about how these co-workers were making me feel. And I said that it was a very much -- a clique environment and that I inquired when we were going to get our permanent desks out on the floor. And we talked in brief about how they made me feel.

Q. How -- how were they making you feel?

A. They made me feel very similar to how I felt when I was in the Army.

Q. Did you tell Thoma that?

A. I told her that they were affecting certain things to come out in my life that I really didn't want to come out.

Page 55

Q. Did you tell Thoma that you had PTSD?

A. I told her later -- not at that time; but I did tell her.

Q. When did you tell Thoma about your PTSD?

A. There was an incident with Matt Poolie where I asked for his help. And he was very overbearing and tone of voice. And at that time he touched my arm, and he made me very uncomfortable. And I told him that I needed to walk away and that I needed to just not be near him at that time and that we would cut back to it.

And I had a PTSD flashback in the bathroom. And I cried and I sat on the floor. And Thoma approached me underneath the stall door. And I told her that I was having a PTSD flashback and that I needed some time to compose and that I would come back, but at this point in time it would be best to leave me be.

Q. Did she leave you be?

A. She did.

Q. And were you ever, you know, punished or disciplined for walking away from Matt Poolie?

A. No, I was not.

Q. All right. We may go back to the Matt -- the Matt incident later.

Page 56

Q. Other than what you just described, that conversation with Thoma, was there any -- other than the two conversations that we just talked about, you said you reported to Thoma after the Post-it note about how it was making you feel; and then we just talked about the bathroom?

A. Uh-huh.

Q. Were there any other communications with Thoma about how your co-workers were treating you or making you feel?

A. She told me that she would handle it and that she would look into it. And I trusted her.

Q. Did she say that to you when you were talking after the group chat?

A. Yeah. It was right with -- Harley was there. She said that she would look into it and to not let them wear me down.

Q. Okay. I want to -- I just want to be real -- make sure I understand the things that the co-workers were doing that were making you feel this way when you talked to Thoma. And we talked about eating lunch -- you know, excluding you from lunch and this group chat where you saw your name and -- were there other behaviors that they were engaging in, this group of employees, that

Page 57

were directed toward you during nesting?

A. They just formed this really strong group of friends. And they made it very clear, made you feel a very certain way if you were on the outside.

Q. Most of your training class was on the outside?

A. A group of us were.

Q. Are there people that you remember, as you sit here today, that were on the outside with you?

A. I can't speak for their friendships, but I did form a good friendship with Toni and Harley and Brynn and Courtney.

Q. So Toni, Harley, Brynn, and Courtney?

A. And Ron. Ron was another one that wasn't really a traditional employee of the call center.

Q. Did you talk to any of those individuals -- just so we're clear, I'm talking about before the incident that led to your termination now. So we'll leave that -- just put that whole thing to the side. We'll get there.

Before that incident, did you talk to Toni, Harley, Brynn, Courtney, or Ron about this group of employees and how they were making you feel?

A. Me and Harley talked about it quite a bit.

Q. And what did you talk about it? What did you

Page 58

talk about?

A.  We talked about the group chat, and we talked about how they were making me feel.  And we talked about why I avoided the best I could.

Q.  Avoided talking to this group?

A.  Yeah.  I just withdrew.

Q.  Did Harley -- first of all, is Harley a female?

A.  Um.

Q.  Yes?

A.  Oh, yes.  Sorry.  Yes.

Q.  I knew what you meant.
    Did Harley say anything to you about how this group was making Harley feel?

A.  We talked mostly about me.

Q.  Do you know whether any other Wayfair employees were bothered by the closeness of this tight-knit group of employees?

A.  I don't know.

Q.  Are there any other behaviors or negative interactions that you had with this group of employees that you reported to anyone at Wayfair?

A.  The day of the incident I reached out to my new manager for a different desk.

Q.  Okay.  We'll go -- I'll ask you about that in just a minute.  Before the incident, were there

Page 59

any reports to anyone in management other than ones you have already told me about about this group of coworkers?

A.  No.  I came in, I did my job, I went home, and I talked to my husband about it.

Q.  Okay.  Did you lose somebody in your family or a friend at -- during these early days at Wayfair?

A.  I did.

Q.  And was that your grandmother?

A.  It was.

Q.  And did you take some time off?

A.  I did.

Q.  Do you remember how much time?

A.  I took three days after she died.  I worked the whole time she was dying.

Q.  Did you tell anyone -- any manager that your grandmother was dying?

A.  I did.  And I took a day to go see her in the hospital.  And I was written up for it.

Q.  Do you -- do you recall when your grandmother passed away?

A.  September 6, 2017.
    (Deposition Exhibit Nos. 5, 6 were marked.)
BY MS. RAND:

Q.  So we're going to take these out of order, and

Page 60

Q.  I'm going to ask you first about Exhibit 6 --

A.  Sure.

Q.  -- which is the one that was handed to you.
    And do you recognize this document?

A.  I do.

Q.  Is that your signature on the second page?

A.  It is.

Q.  Is this an attendance coaching?

A.  It is.

Q.  Okay.  And it was for an absence on August 21?

A.  It was.

Q.  Was this the absence that you took to be with your grandmother?

A.  It was.

Q.  And what did you understand Wayfair's attendance policy to be?

A.  You have so many points.  And once you go over the points, you're up for review for termination.

Q.  Do you recall it being fairly rigid during the first 60 days of employment?

A.  I recall that, yeah.

Q.  Okay.  Now, I'm turning to the other -- to the Exhibit 5 --

A.  Yeah.

Q.  -- which is in front of you.

Page 61

A.  Yeah.

Q.  Is this another coaching document?

A.  It is.

Q.  And that's your signature on the second page?

A.  It is.

Q.  And this one relates to a late arrival; is that right?

A.  Right.

Q.  On August 28?

A.  Yeah.

Q.  Do you recall what caused you to arrive late on August 28?

A.  Yeah.  It was my night to walk to my grandmother and give her her morphine.
    MR. BABER:  Do you need a break?
BY MS. RAND:

Q.  I was just going to say; speak up if you need to take even three.  We'll do whatever you want to do.  Okay?
    Are you okay to continue?

A.  Yeah.

Q.  Okay.  Did you share -- first of all, who issued this Exhibit 5 -- Exhibit 5 to you?

A.  Darren.

Q.  Did he issue the Exhibit 6 document?

KIRSTIE TRAHAN - 01/07/2019          Pages 62..65

Page 62

A. Yeah, he did.

Q. What did you tell Darren about your grandmother's situation?

A. I told him what was going on.

Q. And did you do that before the first of these coachings was issued?

A. I did it when the first coaching was issued.

Q. What was his response?

A. He said that this was basically something that needed to be done. Just because you're put up for review doesn't mean it's an automatic termination, that it's all situation dependent and that everyone understood what I was going through. And we talked a bit about it.

Q. Do you -- do you recall when you transitioned from training to nesting?

A. I don't.

Q. Like, do you recall whether one or both of these coachings were issued to you when you were still in the classroom training portion?

A. I think -- no. These were both when I was in nesting, I do believe.

Q. Did you understand that if you missed too much work, you might be terminated, but would have an opportunity to go through the training program

Page 63

again?

A. Yes.

Q. Okay. The three days that you took after your grandmother passed away --

A. Yes.

Q. -- did you receive any kind of disciplinary action for those?

A. No. But I did call and I told them it was bereavement.

Q. Okay. Do you know what Wayfair's policy was around bereavement leave?

A. I did. And I checked with Thoma.

Q. And what did Thoma tell you?

A. They said it was three days.

Q. Backing up a little bit to the incident that you described with Matt Poolie --

A. Yeah.

Q. -- Matt was a floor walker?

A. Yeah.

Q. And does that mean somebody who just sort of walks the floor looking for trainees who need assistance?

A. Yeah.

Q. Okay. Do you recall -- well, did you ask for Matt's assistance on that day?

Page 64

A. I raised my hand. Whoever walks over walks over.

Q. Okay. Before this incident with Matt, had you ever had any negative interaction with Matt at all?

A. No.

Q. Do you recall what issue you were asking for help with?

A. It was an e-mail related issue. It was a situation where you could do multiple things. I tend to think outside the box, so I think it was in reference to that.

Q. Do you recall what -- what he directed you to do, if anything?

A. He directed, I think, to run -- run some sort of wizard again. And he was just very -- and when I tried to talk to him about it, like work through as like a team, like bounce ideas, he cut me off and was very demanding of what I could do and what I couldn't do.

Q. And that interaction with him triggered your PTSD?

A. It did.

Q. Do you think you said something to him like I can't even deal with you anymore?

A. I walked away; and I said, I need a minute.

Page 65

Please stop. I said, I can't.

Q. Did you have any -- again, before -- before the incident that culminated in your termination, did you have any other interactions with co-workers at Wayfair that triggered your PTSD?

A. Not that I recall.

Q. Okay. So you just recall the incident with Matt and then what happened right before your termination?

A. Yeah.

Q. Did you have any incidents with customers?

A. No. I don't think so.

Q. Since this lawsuit has started, have you become aware that a sales representative in another office complained about your demeanor on the phone with her?

A. When I read through the documents, yeah, I became aware.

Q. When you saw that, did it trigger any recollection of an interaction that wasn't ideal?

A. No.

Q. Were you surprised to see that?

A. Yeah.

(Deposition Exhibit No. 7 was marked.)

Page 66

BY MS. RAND:

Q. All right. So the court reporter has handed you Exhibit 7.

A. Yeah.

Q. You can take time now to read through it, if you want, or you can stop and read paragraphs as I ask you about them.

A. Okay.

Q. Just let me know if you want to take a minute to read through.

A. I'll just read paragraphs as you ask questions.

Q. Okay. First of all, this Exhibit 7, do you recognize this?

A. I do.

Q. And is this something that you prepared?

A. It is.

Q. And you prepared it in response to Wayfair's submission to the Maine Human Rights Commission?

A. It is.

Q. It's dated March 5 at the top. Did you write this in one sitting?

A. Nope.

Q. Just talk to me about your process of composing this.

A. It took me about -- I think I had a month to do

Page 67

it. I wrote a little bit at a time. I took the whole month.

Q. And when you wrote it, it was approximately six months after your termination from Wayfair?

A. Yeah.

Q. Did you -- when these events were unfolding in September of 2017, did you take any notes?

A. No. I talked to my husband a lot though in between meetings.

Q. So when you composed this in, I guess, February and March, 2018 --

A. Yeah.

Q. -- were you going from your memory?

A. Yes.

Q. So in the first paragraph you write that on September 20, 2017, I started my workday at 11:30 which usually ends at 8 p.m. I came in to work and the systems were down. We were told for two hours to cherry-pick e-mails, which means you pick out the junk e-mails, avoid customer e-mails, and delete them. I listened to Brianna Ireland loudly joke and make fun of customer e-mails that she accidently pulled and put back in the queue.

Brianna Ireland, is that the same Brianna

Page 68

that we have been talking about today?

A. It is.

Q. What do you recall about Brianna's behavior at this point in time?

A. So she would pull -- she liked to pull e-mails and read through them and make fun of what customers were writing in. She would do the same when she put them on hold on the phone. She would make fun of them really loudly and obnoxiously and degrading.

Q. Is that something that you reported to anyone at Wayfair?

A. A bunch of us heard it around. I don't know if anybody reported it. But I tend to -- I tend to pick my battles with people.

Q. It says, the systems came back on around 1:45 or 2 o'clock p.m.

A. Yeah.

Q. At that point in the day, 1:45 or 2 clock p.m., were you pretty annoyed with Brianna Ireland?

MR. BABER: Object to form.

A. I let it go.

Q. Did you say you let it go?

A. Yeah. I let it go. I wasn't really annoyed with her.

Page 69

Q. Okay. And so it was right around when the computer systems came back up that you said to Ashley MacDonald, it would be nice if there were a number for Fed-Ex in Canada?

A. Yeah.

Q. And you wrote here that while you were dialing Fed-Ex for the United States, you and Ashley were talking?

A. Yeah.

Q. And that Brianna then said, they do have a contact number?

A. Yeah.

Q. Was there something inappropriate about Brianna telling you they do have a contact number?

A. It was her tone of voice and the way she just talked over our whole thing. Because we were talking about how we had to be transferred from the U.S. UPS to Canada or Canada Fed-Ex. It all depended on, really, what side of the border the package was on with how you could deal with it.

Q. Okay. Did you learn in the course of this interaction that there was, in fact, a contact number for Canada available to you?

A. Yeah. I mean, I wasn't aware of it. And she -- she made it very loudly clear.

KIRSTIE TRAHAN - 01/07/2019          Pages 70..73

Page 70

Q. It -- did -- if Ashley was aware of it, she didn't give it to you when you asked?

A. I don't even think Ashley was aware of it, but I can't speculate about what she does and doesn't know.

Q. Okay. And -- you said it was her tone. What -- describe Brianna's tone at this point when she said they do have a contact number?

A. Sharp and very I know something you don't know and very demeaning.

Q. Okay. And your response to her was, I was not talking to you. Please do not overstep my conversation?

A. Yeah. I said, please stop overtalking our conversation.

Q. Now, six months later when you were writing this, do you remember that those were the words you used word for word; or were you sort of characterizing what your response was?

A. I believe that's what I said.

Q. And then you write, I asked her to stop and that I'd look it up as I did not know that. She then proceeded to say, well, if you had listened to me the first time, then you would have known.

A. Yeah.

Page 71

Q. That's how you remember it?

A. Yeah.

Q. And you remained seated this entire time?

A. I did.

Q. And you then said, well, you don't have to be ignorant?

A. Yeah.

Q. And she started to say something else, but Ashley cut her off and said, that's enough guys. We all disagree on things.

A. Yeah.

Q. In this paragraph you don't mention the word bitch as being used. Do you agree with me?

A. I agree.

Q. Did you use the word bitches?

A. I vaguely remember possibly using it. I don't think I 100 percent did.

Q. Okay. At what point -- if there is even a point. There may not be. But is there a point during this interaction where -- where you start to feel triggered?

A. Yeah.

Q. Is there a particular point, or is it just --

A. Right when she started overtalking and it became a two on one situation.

Page 72

Q. Did you feel that Ashley was ganging up on you?

A. I feel that Ashley played a role with her tone of voice.

Q. Was it the tone that she used when she said, that's enough guys. We all disagree on things?

A. It was her tone the whole time.

Q. What else did Ashley say during this interaction that isn't in this paragraph?

A. It was just her -- she was just annoyed.

Q. Annoyed with you?

A. She -- I believe she was annoyed with me.

Q. What made you believe that?

A. I -- just the way she responded.

Q. Is there anything else that you remember Ashley saying that doesn't appear in your statement?

A. It wasn't anything she said. It was body language and just tone of voice.

Q. But it is true that when she -- when she said that's enough, guys, we all disagree on things, she was directing that to both of you?

A. I think so. And she raised her voice, and it was very irritated.

Q. In the next paragraph you write that during this time, I started to sweat, this much commotion between people's tones and voices and talking

Page 73

over each other is a lot for me to handle. I started to black out when the flashback came across.

A. Yes.

Q. Was it after Ashley sort of said, that's enough, guys, we all disagree, that you started to black out?

A. It started coming across when Brianna just kept insisting on being part of the conversation.

Q. And what -- when you black out --

A. Yeah.

Q. -- does that word mean what it suggests to me, which is that there's a blackout; you don't remember anything?

A. Basically what happens is is that a flashback happens; and it's very hard to -- it's like a movie. So it replays, but you're physically feeling it.

Q. And when you say it's like a movie, do you mean the trauma that you experienced in the past is replaying?

A. Yeah.

Q. Okay. I'm not going to ask you to replay that. Are you -- while that's replaying, are you aware of what's happening around you?

KIRSTIE TRAHAN - 01/07/2019          Pages 74..77

Page 74

A.   No.

Q.   Okay.  I'm skipping now to the next paragraph, which is the last paragraph --

A.   Yeah.

Q.   -- on the bottom of page 1.  It says, this flashback lasted around 10 minutes.

A.   Right.  Yeah.

Q.   Does that mean -- I'm not trying to put words in your mouth.  I want to understand what this means.
     Does that mean that for 10 minutes you don't have a recollection of what happened in the call center?

A.   It means that the flashback was playing for about 10 minutes.  I remember some of that 10 minutes, but some of the 10 minutes I don't.

Q.   What do you remember during that 10 minutes?

A.   I remember just sitting there frozen and living it.

Q.   Okay.  Do you remember there being any more words exchanged between you and either Brianna or Ashley?

A.   No.

Q.   But it's possible that more words were exchanged, and you don't remember that part?

Page 75

A.   I usually don't talk during my flashback.  I try to slow my breathing as much as possible, and I try to live it.  And it is what it is.

Q.   Just kind of ride it out?

A.   Yeah.  But I don't talk.  I'm not violent.

Q.   How -- when you -- how do you put a 10-minute mark on roughly how long it lasted?

A.   How do I put that mark?

Q.   Yes.

A.   Is that what you're asking?

Q.   Yes.

A.   That's how long he raped me the first time.

Q.   And is that typically how long your flashbacks last?

A.   No.

Q.   Do you put that period of time on this one because of what was replaying in your head during the flashback?

A.   Yeah.  I replayed the whole first rape.

Q.   What does it feel like when you're coming out the other end?
     How do you know you're coming out the other end; let me ask it that way?

A.   I'm drenched in sweat, and I'm shaky for the rest of the day.  And I just have a very hard time.  I

Page 76

usually hide.

Q.   But when this 10 minutes was up, do you just start to kind of have a more in-tuned awareness of what's around you?  Is that how you know you're coming out of it?

A.   Yeah.  And the vision stops.

Q.   Is the next thing that you remember doing reaching out to Joseline --

A.   Yeah.

Q.   -- Belanger?

A.   That's the last thing I remember.

Q.   And what do you remember writing to her?

A.   I remember writing when we were going to move to our permanent desk and that I would prefer to be moved away as soon as possible.  And that if I needed to talk about it, we could talk about it.

Q.   Is that all you remember putting in that message?

A.   I think so.

Q.   At any time between the beginning of the interaction with Brianna and when you wrote to Joseline do you know whether you left your desk?

A.   I don't believe I left my desk at all.

Q.   What was different about this flashback and the flashback that you experienced with Matt Poolie when you -- when you sort of fled and needed to

Page 77

get away from the situation?

A.   This is the first time I have ever been triggered in a situation with two on one.

Q.   So was it, like, more immobilizing?

A.   It was more of a trigger I have never experienced.

Q.   Okay.  Is the next thing that you remember after reaching out to -- well, first of all, do you recall one way or another whether there were any managers on the floor when this was all unfolding?

A.   I knew they were all in a meeting.  They all left the floor for a meeting.  I knew this before this whole incident took place.

Q.   And is that why you sent a message to Joseline instead of just going and tracking her down?

A.   Right.

Q.   Okay.  Is the next thing that you remember Kristie Foster coming up and asking to speak with you?

A.   Yeah.  She came up, I think, on my left side.  And it really was unnerving.  I don't like being approached from behind.  It's -- I just don't like it.

Q.   Do you know or do you remember one way or another

Page 78

whether she touched you?

A.   Not this interaction, I don't believe so.

Q.   Okay.  Was she by herself when she approached you from behind?

A.   I think so.

Q.   And what did she say?

A.   That they needed to speak with me.

Q.   Did she tell you who the other person was, or did you understand who the other person was?

A.   No.

Q.   Did you have an understanding or at least a suspicion of what it was they wanted to speak to you about?

A.   I was very unsure of that situation.  I was just coming out of that flashback, so I was very unsure of what was even going on.

Q.   Okay.  And so then just you and Kristie went into a conference room?

A.   No.  There was someone else in there.

Q.   So somebody else was already in the conference room that you and Kristie walked into?

A.   Right.  Yeah.  It was a two on one situation.

Q.   Do you know who that other person was that was in the conference room?

A.   I know she was and I think another manager.  I

Page 79

think she was the manager of the other team.

Q.   Okay.

A.   I can't remember her name.  I could point her out, but --

Q.   Was it Hayley Manion maybe?

A.   Yeah.

Q.   Does that sound familiar?

A.   That sounds familiar.

Q.   In -- in your written statement -- now, I'm still on that first page about halfway through the last paragraph --

A.   Yeah.

Q.   -- you say, I walked into a conference room into a situation where once again it was two people on one.  The one being me.

A.   Yeah.

Q.   I find those situations very intimidating and this situation then triggered a panic attack for me which I tried my best to control while I was in the meeting.

A.   I did.

Q.   Is the -- experiencing a panic attack is different from experiencing a flashback?

A.   It is.

Q.   And are panic attacks something that you have

Page 80

experienced periodically since you returned from the military?

A.   They are.  Usually if I cross my arms and really -- it looks really defensive on the outside; but, really, it's more of like the straight jacket feeling, like if you --

    MR. BABER:  Would you like a short break now?

BY MS. RAND:

Q.   Yes.  Do you want to take a breather?

    (Discussion off the record.)

    (A short recess was taken.)

BY MS. RAND:

Q.   Before the break we were talking about panic attacks; and you were describing how you crossed -- I think you were -- you either said or you were going to say that you cross your arms when you're experiencing a panic attack, that that helps you come out of it?

A.   It helps control it.

Q.   Okay.  What -- what feelings are you experiencing during a panic attack?

A.   I sweat really bad, and I get really shaky.  And I can't really communicate very well.

Q.   You didn't tell Kristie or Hayley that you were

Page 81

experiencing a panic attack?

A.   It's very hard to communicate when you're living it.

Q.   When you're experiencing a panic attack, does that have any impact on, like, your memory of what's happening when you're experiencing that?

A.   It has more of an impact on how I respond to certain situations if I feel threatened or if I -- fight or flight comes into play.

Q.   Did you have that feeling --

A.   Yeah.

Q.   -- when you were meeting with them?

A.   I did.

Q.   And how do you recall reacting?

A.   I reacted very similar to how I reacted in the Army is I will tend to -- I'm very easy to agree with or very easy to tell them what I think they want to hear so that I can be done so that I can -- I can fly from the situation.

Q.   Okay.  So when you say tell them what you think they want to hear, do you think you're quick to agree with them?

A.   Yes.

Q.   Okay.

A.   I'm quick to submit.

KIRSTIE TRAHAN - 01/07/2019          Pages 82..85

Page 82

Q. You write here that panic attacks also cause flashbacks for me?

A. They can, yes.

Q. Did -- did this one that you were experiencing during this meeting cause a flashback?

A. It did.

Q. And did that happen in the course of the meeting?

A. No. It happened in my car with my husband on the phone.

Q. Okay.

A. As soon as the meeting was over, I grabbed my keys and my phone; and I went outside.

Q. Okay. What do you recall about this meeting with Kristie and Hayley?

A. I recall it was very tense, very -- made to believe that it was all my fault and that their minds were already made up and that they were -- they were just -- I could tell by the way they looked at me that -- with my body language that they were making assumptions that weren't necessarily true.

Q. Do you remember any words that came out of their mouths -- either of their mouths?

A. Vaguely.

Q. What do you vaguely recall?

Page 83

A. It was about the situation. And they asked a couple questions; and then they just went into what they thought they knew and what they -- what was said in the -- I think in the meeting before me.

Q. Do you remember whether they told you that they had met with someone before you?

A. I think they said that someone else had claimed that this was said on the floor.

Q. Do you remember what they said this person claimed was said on the floor?

A. That I swore a bunch or that I dropped the F word.

Q. And in your written statement on the top of page 2 you write, I vaguely remember saying I thought I may have said bitches on the floor, but that I never said the F word.

A. Hold on. My papers are stuck together.
Yeah. I believe I said that to them that I vaguely remember that I may have said -- said that.

Q. Do you -- this is kind of a fine distinction; but do you -- when you were writing this, were you vaguely remembering telling them that you said "may have said bitches", or did you tell them

Page 84

that you vaguely remembering saying it on the floor?
Do you understand what I'm asking?

A. I remember vaguely saying to them I -- I felt in that meeting with my PTSD and my anxiety and everything was so out of control that if I just vaguely agreed to remember saying something, that -- that it would end.

Q. Okay. As you sit here today, do you no longer believe that you said the word bitches on the floor?

A. I'm going to say that I might have said it. I'm not going to say I didn't say it because I -- I vaguely remember maybe saying it.

Q. But you don't have any vague recollection of using the F word?

A. No.
MR. BABER: Objection to form.

Q. Okay. In the next sentence -- the next paragraph --

A. Yeah.

Q. -- that starts with "during nesting" --

A. Yeah.

Q. -- the second sentence you write, during this meeting with Kristie and Joseline, I told them

Page 85

that this wasn't the first incident with Brianna and Ashley.
Do you recall it being Joseline and not Hayley who was in this meeting with you?

A. I think that I made a typo on the paper.

Q. Okay.

A. It was Hayley, I believe. I don't believe Joseline came into play until the second meeting.

Q. Okay. You write, I told them that I had reported Ashley and Brianna for what appeared to be a conversation of them making fun of me and other coworkers in a Skype group.

A. Yeah.

Q. You told Kristie and Hayley that?

A. I believe so, yes.

Q. And just Harley was present when you went to Thoma --

A. Yeah.

Q. -- to talk about the --

A. This was a separate -- this was during a different incident.

Q. But it's the incident that we talked about already with the Post-it note?

A. Right. Yes.

Q. How did this meeting with Kristie and Hayley end?

KIRSTIE TRAHAN - 01/07/2019                 Pages 86..89

Page 86

A. I think it ended with that they had no other questions. And I just -- I asked if we were done; and they said yes. And I got up and I walked out.

Q. And is that when you went out to your car?

A. It was.

Q. Do you -- as a Wayfair employee, did you need to clock in and out for breaks or that kind of thing?

A. I think if it was just a 10 minute or 15, they were paid; you didn't have to clock out. If it's a 30, I think you do.

Q. Okay. Before you went out to the car to call your husband, you did not clock out?

A. No. I just took a quick 15.

Q. What do you recall about your conversation with your husband at this time?

MR. BABER: Can I speak with my client on a matter of privilege?

MS. RAND: Yes.

(Discussion off the record.)

MR. BABER: Marital privilege comes into play, but we're going to waive the privilege.

MS. RAND: Okay.

MR. BABER: Feel free to --

Page 87

A. I talked to him about the situation that just unfolded, and I talked to him about the flashback. And when I talked to him, I had another one. And I hyperventilated and cried. So most of the conversation was a flashback. It wasn't really of use.

And he told me to go in and pack my stuff up and take a day and recoup and go from there. We had a baby-sitter all day; so if there was an issue where I needed to go to a meeting or I needed to call somebody, I could.

Q. Did you understand why he told you to pack up your stuff before taking the day?

A. Like, my bag. Like, my purse.

Q. Okay.

A. No. I carry my life in my purse.

Q. Okay. You didn't understand him to mean pack up all the stuff on your desk?

A. No.

Q. Okay.

A. No. He just meant my wallet, my keys, lock my desk, just -- I have to be kind of babied through flashbacks and told, you know, lock my desk, grab your wallet, take your keys, because if not, I'll fight or flight and just walk out.

Page 88

Q. Okay. After your phone call with your husband, did you intend to, you know, grab your purse and head out for the day?

A. I did.

Q. Were you going to talk to somebody before you did that?

A. I was going to stop and talk to Thoma and tell her why I needed to go. And essentially I needed to go home and take my meds. And some of them are sedatives.

Q. We haven't talked about medications yet, but are there some medications that you take every day regardless of whether you're having a good day or a bad day?

A. Yes.

Q. And others that you only take as needed?

A. Correct.

Q. And what -- what is the medication or are the medications that you take as needed?

A. At this time of this year was -- my as needed was Clonidine.

Q. What was the word you used, your --

A. Clonidine.

Q. Before that though. Your what was Clonidine?

A. As needed.

Page 89

Q. As needed. I just didn't hear that.

Okay. When you took Clonidine, was it something that you could take and then work on?

A. It was something I can take and function, but I needed to sleep. So sometimes the easiest way to get through a flashback is I take my max dose of Trazodone, and I will sleep.

Q. Is that your as-needed medication today?

A. No. That's my every night sleep med.

Q. Okay.

A. It has been since I came home.

Q. Okay. So your intent was to go home and take some medication and sleep?

A. Yes.

Q. And you did not actually talk to Thoma when you went back in the building?

A. No. I sat down at my desk because I was going to grab my wallet first. I don't like to really leave my stuff unattended. My kids' social security cards and stuff are in there. So I went to grab that and my purse and sign out of everything. So I went to clock out and stuff. And then I was approached again.

Q. And who approached you this time?

A. Kristie.

KIRSTIE TRAHAN - 01/07/2019          Pages 90..93

Page 90

Q. Okay. And you write in your statement -- I'm in the middle paragraph -- once I entered the building, I sat down at my desk and was once again approached by Kristie Foster who placed her hand on my shoulder approaching me from behind which is also a huge trigger for me.

A. Yeah.

Q. What -- what did Kristie touching you trigger?

A. Started to trigger a flashback.

Q. When you say started, is that it started and then subsided; or did --

A. It startled me enough to trigger it. It had been one that I had processed before. So I was able to kind of, like, keep it on the minimum of, like, an anxiety attack and still function with what's going around -- on around me. But it still triggered it. It was probably, like, a mild one.

Q. Okay. And then you write, I was walked out to the front of the building in front of everyone where I was greeted yet again by a meeting. Do you recall what Kristie said to you?

A. She said that she needed to speak with me again. And I was walked out to the front of the building.

Page 91

Q. Okay. And when you say the front of the building, do you mean, like, that lobby area when you walk in?

A. Yeah. There is a lobby area where you have to badge in to get past, and it goes to the floor.

Q. Okay.

A. So I was walked off from the floor.

Q. And where did this second meeting take place? Was it out in the lobby or in the conference room?

A. It was one of the conference rooms right off the lobby.

Q. And who was present?

A. Jonie was and Joseline and Kristie.

Q. Okay. Is this the first time that you recall Jonie or Joseline getting involved in this situation?

A. Yes.

Q. During this meeting do you recall Joseline saying anything?

A. I don't recall.

Q. Do you recall Kristie saying anything?

A. I honestly think that was Jonie's meeting.

Q. And what do you recall Jonie saying?

A. I recall her asking about the situation, and I

Page 92

recall her being a little bit harsh.

Q. When you say asking about the situation, did she ask you what had happened on the floor?

A. I think she already knew. I think she was just explaining to me that I was going to be suspended until Friday, and then they were going to interview everybody and find out what they wanted to do.

Q. Okay. When you say harsh, is that a tone of voice?

A. Yes.

Q. And you write in this exhibit, I felt very attacked in this meeting, not like they were unbiased but that they hated me.

A. That is exactly how I felt.

Q. What -- is there something objective that you can point to that -- behavior that was being directed towards you that caused you to feel that way?

A. So when I have anxiety attacks and when I have PTSD attacks, I ask a lot of questions. And it's not to mean to be a -- an attack from me. It's more meant to help me understand and process for later. And the more questions I asked, the more snappy and snarky she got.

Q. What does the word snappy mean to you?

Page 93

A. She cut me off. She wouldn't let me finish my questions.

Q. What questions do you remember asking?

A. I remember asking them if I was the only one that was going to get, you know, in trouble for this or if I was in trouble or what was going to happen. And, you know, I was very upset about it because I don't like feeling vulnerable like that in public. I don't like having flashbacks in public. I don't -- what I had to live through in that day and then process, it's just I panicked. And that's not me. So --

Q. And was it Jonie that asked you if you needed anything from your desk?

A. I -- either -- it was either her or Kristie asked me if I needed anything.

Q. And you said that you wanted all of it?

A. I did. I panicked.

Q. What were -- when you said you wanted all of it, was it because you didn't think you were going to be returning?

A. No. I tend to -- so part of PTSD is you surround yourself with belongings of -- like, if by chance there is a situation that upsets you, like, if you have certain pictures and you have certain

KIRSTIE TRAHAN - 01/07/2019                    Pages 94..97

Page 94

belongings, it can help ground you. And one of those belongings -- it's kind of cold in there; so I have this blanket I take everywhere. So, like, in the hospital or anywhere, I take it everywhere. And it smells like home. So if I -- I didn't want that to have a chance to be left because I knew I would need it for later. So I just said everything out of -- because I have pictures of my kids and stuff. So --

Q. Did somebody go pack that stuff up for you?

A. Somebody did, yeah.

Q. Did you just wait in the conference room while they did that?

A. I waited out in the lobby.

Q. Okay. In the next paragraph you write, I was escorted to the front door of the building.

A. Yeah. They walked me right from that -- because it's, like, all one lobby. I don't know if you have ever been there, but --

Q. I have.

A. -- it's all one lobby. So, like, you can -- they walked me right to the front door.

Q. From that little conference room --

A. Yeah.

Q. -- at the back of the lobby?

Page 95

A. Yeah.

Q. And they made sure they took my badge?

A. Yeah.

Q. Do you remember who took your badge?

A. I -- I think Kristie did. But it was made a point to be very loudly discussed that they took my badge.

Q. Were there other people in the area?

A. I don't recall. Maybe the secretary was sitting at the desk.

Q. But you don't recall one way or another if she was there?

A. Sometimes she's there. Sometimes she's not. She could have been sitting there.

Q. Okay. And then you left and called your husband again. Right?

A. Yeah. I did.

Q. Right from the parking lot?

A. I did. I sat in the truck and I called him.

Q. And he told you to come see him at work?

A. He did.

Q. Where was he working at the time?

A. He works in -- at his PT office.

Q. Did you go there?

A. I did. I drove up there. It's about an hour

Page 96

drive. And I talked and cried with him on the car ride because it was the aftermath of the PTSD flashback. So --

Q. And then you write that he stood there with -- he stood there with me while I called Jonie before 5:30 and declared my disability.

A. Yes.

Q. At any time before the phone call to Jonie did you tell any of these individuals that you were meeting with anything about PTSD or anxiety?

A. No. Because when I live through a flashback and I live through my anxiety, I get very ashamed. And how they made me feel that day, they made me feel very ashamed. And they made me feel like I was lesser of a human. And when I feel that way, I shut down completely; and I don't tell anybody anything.

Q. Do you have any reason to believe that Jonie or Kristie or Joseline or Hayley were aware that you had a disability before you reached out and called Jonie?

A. I can't speak for them. I do know that once I declared it that Wednesday night, it was questioned very harshly the next day.

Q. But you don't have any reason to believe -- you

Page 97

don't have any evidence or information that --

A. I would.

Q. -- they knew before?

A. No. I like to completely calm down from a situation, especially when flashbacks are playing, to really declare that because I really don't want to expose my flashbacks because -- you know.

Q. When you called Jonie, you left a voicemail. Right?

A. I did.

Q. Have you heard that voicemail since?

A. I have.

Q. Okay. We won't play it today.

A. Okay.

Q. Was what -- when you heard it, is it what you remembered about the voicemail about what you said?

A. It is, yeah.

Q. Why did you want Jonie to know about your PTSD?

A. Because I thought I could come in and talk; and we could come up with, like, a resolution, kind of. Like, maybe move me from co-workers or maybe -- you know, I understood I was suspended, but maybe keep me suspended until work at home

KIRSTIE TRAHAN - 01/07/2019          Pages 98..101

Page 98

rolled out just to -- you know, I thought we could really sit down; and I could pull in some of my med management and therapists to really talk about it and give them more of an understanding of why my behavior was the way it was.

Q. Okay. At the point that you called Jonie and declared your disability, did you need any accommodation to do your job well?

A. I didn't need accommodations to do my Wayfair job, no. I just needed to be moved away from the -- you know, the people that were triggering it. I just wanted a chance to be with different people on the floor.

Q. Okay. Were you concerned that if you weren't moved away from the people who were triggering it, that there would be another confrontation?

A. That they would trigger it again, yes.

Q. Okay. So that voicemail was left on Wednesday, late afternoon --

A. Correct.

Q. -- right?
   And you heard back from Jonie the following evening?

A. Correct. It was, like, afternoon, evening.

Page 99

Q. Okay. And during your voicemail to Jonie the night before, you offered to provide medical records?

A. I offered to provide a letter from my therapist, and I could provide some medical records. Some of them I don't like out there.

Q. Is that what you recall saying on the voicemail to Jonie?

A. No. I said I could provide a letter from my therapist.

Q. Okay. What do you -- tell me what you recall about the phone call with Jonie on Thursday evening.

A. I recall -- I recall it being very hostile; and I recall her demanding access to all my medical doctors and my medical staff and all of my records.

Q. Do you -- when you say recall her demanding access, as you sit here can you recall the words she used?

A. I recall her saying that she needed complete access to all my medical professionals and all my medical records.

Q. And did you understand her to be asking for access to medical records that had nothing to do

Page 100

with PTSD?

A. I assumed it was my PTSD ones, but I wasn't 100 percent sure what exactly PTSD records she wanted because they range from '11 to now.

Q. What else do you recall from this phone call with Jonie?

A. I recall -- I recall stating I would not supply my whole medical file from Acadia because it's boxes upon boxes. I'm not naive to that.

Q. What does that mean, I'm not naive to that?

A. It would have put a lot of paperwork to go through. I was willing to give her access to my therapist who I see the most. I see her weekly. I see her biweekly. I see her the most out of everybody, so she would be the best person to talk to to get a good understanding of it.

Q. And that's Jennifer Hubler?

A. It is.

Q. Do you recall Jonie sharing anything with you about what she had learned about anything that had happened the day before?

A. I asked her if she had talked to a few of the other people; and she stated to me that she was still doing the fact-finding, and that a lot of it she couldn't discuss with me, and that -- and

Page 101

I asked, I said, are we looking at termination or being fired? She said, that's -- that's to the extreme of the situation; and I'm not sure we're there yet.
    She also stated she didn't believe that their tones of voice would have any impact on my flashbacks.

Q. Did she tell you that what happened was very serious and would not be tolerated?

A. She did. And at that point in time I asked for the accommodation to be moved away from them, which would be the second request on that.

Q. Now, being moved away from Brianna and Ashley would presumably prevent you from being triggered by them. Right?

A. Correct.

Q. But you had been triggered by other people in the workplace at Wayfair. Right?

A. I was triggered by Matt; but after we got out of nesting, it's mostly you are on your own. You have your team manager. If you don't want to have interactions with people, you don't necessarily have to.

Q. What was your basis for the understanding of that?

KIRSTIE TRAHAN - 01/07/2019        Pages 102..105

Page 102

A. When we sat with people on the floor, some of them were very quiet and didn't really -- they did their job; and they went home. And they were good at their job. And some people are social butterflies.

Q. Did you understand though that as a call center employee, interacting with other call center employees or other Wayfair employees, even in another location, was an essential piece of the job?

MR. BABER: Objection, form.

A. There's a difference between interacting and forced to be in a small environment and being friends with them.

Q. Did you feel that you were forced to interact with Matt Poolie and be friends with him?

A. I did.

Q. Friends with -- in what way did you feel that you were forced to be friends with Matt Poolie?

A. I felt like I had to be -- because he was a floor walker, that I had to communicate with him. I had to, you know -- I had to include him in my daily tasks because he would walk around. And sometimes he would be from behind, because our desks faced out and our seats faced out, that he

Page 103

would just look over and just interject him into what you were doing. And when you're out of training and nesting and on the floor, it's not like that.

Q. You mentioned earlier that one of the reasons -- one of the things you hoped for in talking with Jonie about your PTSD was that you would be permitted to work from home?

A. That that could be an option on the table.

Q. Why would you need to work from home if you -- if you were separated from Brianna and Ashley on the floor?

A. I just presented it as a second option that if they didn't trust me around co-workers, that they could put me work from home. I would be in my own environment with my own things.

Q. When you say you presented it, do you mean you presented it to Jonie?

A. I asked about it.

Q. When did you do that?

A. I think I asked about it in that phone call. It might have been --

Q. Did you agree that the write-up here that we're looking at doesn't mention anything about asking to move or asking to work from home?

Page 104

MR. BABER: Let me make sure. You mean Exhibit 7?

MS. RAND: Yes. I'm sorry.

A. It's not in the write-up, but I do believe it's in the recorded phone call.

Q. And you believe the phone call was recorded because Jonie told you the next day that those calls were recorded?

A. Correct. And all outbound phone calls are recorded from that call center because they have the voice mail message as well. We have that recording.
And I asked her on the 22nd if all the phone calls outgoing are recorded. And she said yes.

Q. Won't a voice message be an inbound call?

A. It's kind of like with your Skype business records, they all get recorded and sent to your inbox. A lot of employees aren't aware of that that's what happens.

Q. Do you have any reason for believing that Wayfair records outbound phone conversations other than the fact that you say Jonie told you on the 5th that they're recorded?

A. Most call centers do.

Q. Record outbound phone calls?

Page 105

A. Yes. Because you do make outbound phone calls to customers that are recorded, and you have to say that all calls are being recorded.

Q. How about -- do you have any reason to believe that outbound phone calls not from a customer sales representative are recorded at Wayfair?

A. I don't think that they can cherry-pick the system of what's recorded as an outbound customer call and what's recorded as a regular phone call.

Q. Why? What's the basis for that belief?

A. I mean, it could be a system thing. I don't know for sure, but I don't think that they can decide until they listen to it and pull it was this a customer phone call or was this an interaction.

Q. Okay. All right. Is the next -- leaving to one side communications that you had with coworkers over text or Facebook and stuff, which we'll look at in a minute, did you have any other communications with Wayfair HR or management between this call with Jonie on Thursday night and the call that you got the next day terminating your employment?

A. No.

Q. Okay. On Friday, September 22, you received a call from Jonie?

Page 106

A.   Jonie and Chris Gagnon.

Q.   Who is that?

A.   Chris Gagnon, G A G N O N.

Q.   Do you know what that person -- Chris's role is?

A.   I think he's upper management, I think.  I had never met him until this -- until I verbally talked to him.

Q.   Okay.  And who did the talking during that phone call?

A.   I believe it was Jonie.

Q.   And what do you recall Jonie saying?

A.   That they had made the decision to terminate me.

Q.   Do you recall her saying anything else?

A.   I asked if -- she said that I would receive an e-mail with my official termination letter in it; and I would receive an e-mail explaining what benefits I had left, and then if I had any questions.  And I said, yes, at that time.  I said, are all outgoing calls recorded?

Q.   And she said yes?

A.   Yes.

     MS. RAND:  I think we should stop for lunch.  I don't have -- let's break.

     (Discussion off the record.)

     (A recess was taken from 12:38 p.m. to

Page 107

1:35 p.m.)

BY MS. RAND:

Q.   Before the break we were going through Exhibit 7 and talking about the events that led to your termination from Wayfair.  I think right before the break we were talking about the call during which you were terminated.  Is there anything about that call other than what you have shared with me and what's in your statement that you haven't testified to today?

A.   No, I don't think so.

Q.   Okay.  Between when you were placed out on leave or suspended, I guess, and your termination, you reached out to some co-workers in the workplace?

A.   I did.

Q.   And was that over Facebook or --

A.   Uh-huh.

Q.   -- text message?

     Facebook?

A.   Uh-huh.

Q.   Okay.  I want to look at some of those together.

     (Deposition Exhibit No. 8 was marked.)

BY MS. RAND:

Q.   So this -- the court reporter has just handed you Exhibit 8.

Page 108

A.   Uh-huh.

Q.   And do you recognize this?

A.   Yeah.  It's Facebook.

Q.   This is an exchange between you and Brynn Williams on Facebook?

A.   Uh-huh.

Q.   And who is Brynn Williams?

A.   She was one of the girls that were there that day.

Q.   A Wayfair employee?

A.   Yeah.

Q.   Was she in your training class?

A.   Yeah.

Q.   Before this text -- or this Facebook exchange with Brynn Williams, had you ever spoken to Brynn about Brianna or Ashley?

A.   We might have talked briefly about it, but I don't think so.

Q.   Okay.  Starting with the first message, this darker colored block --

A.   Yeah.

Q.   -- on the right, that's you?

A.   Yeah.

Q.   And then the left is Brynn?

A.   Yeah.

Page 109

Q.   And so you wrote to her, Joseline Ashley just pulled her aside?

A.   Yeah, I did.

Q.   Did that mean Ashley just pulled Joseline aside?

A.   I think so.

Q.   Okay.

A.   I don't --

Q.   Were you still at work when you sent this?

A.   Briefly, yeah.  I think I was at work another -- like, not even.  I don't know.

Q.   Was this -- was that message that you said -- sent sent on September 20?

A.   I think so.  Maybe.  I don't --

Q.   Can you --

A.   I don't remember a lot of the 20th.  But, yeah, it looks like I did.

Q.   Okay.  And Brynn wrote back, oh Ashley pulled Joseline aside?  I was going to say it might be her coaching meeting because some of us have those today.

     You wrote maybe.  IDK.

     Does that mean I don't know?

A.   Yeah.

Q.   It would make sense if she is in there running her mouth.

KIRSTIE TRAHAN - 01/07/2019        Pages 110..113

Page 110

A.  It would, yes.

Q.  And at 2:57 you messaged her, so I got pulled into a meeting about the whole Bri thing?

A.  I did, yes.

Q.  And that means Brianna?

A.  Yeah.  We have established that.

Q.  And underneath she writes, I figured that's what it was about.  What happened?
    And you wrote, I'm pretty sure I'm going to get shafted because of this whole thing.

A.  Yeah.

Q.  Why did you -- first of all, what does that mean, shafted?

A.  It means I'm really bad at explaining my PTSD, and I don't like to talk about it.  It's not something I prefer to talk about.  And I always feel like whenever it does come to a head, I always get shafted, always.

Q.  But shafted, you mean, like, the raw deal?

A.  I always get blamed.
    Yeah.  I always get blamed.  And PTSD has a really bad stigma, and it's just a very unknown disease.  And I just --

Q.  At this point in time you hadn't shared with the managers that you had PTSD yet.  Right?

Page 111

A.  No.  I think it was about an hour later I called in and I said about it because I had talked to my husband and finally calmed down.

Q.  So at this time when you said you were pretty sure you were going to get shafted, was that because you knew you were going to disclose you had PTSD or because of your --

A.  Yeah.

Q.  -- behavior that day?

A.  Because I hate disclosing it.

Q.  Okay.

A.  It's not a very comfortable thing to disclose.

Q.  On the next page you wrote to Brynn, I'm probably going to get in trouble for the whole snapping back at her.

A.  Yeah.  As I remember it, I said to Bri, you don't have to be ignorant.  That's what I thought I was going to get in trouble for.

Q.  Okay.

A.  Not what I don't remember from the flashback.

Q.  But it was the ignorant comment and not the -- not the bitch comment that you thought you were going to get in trouble for?

A.  Right.  I thought where I said to her, please stop overstepping my conversation, and I -- I was

Page 112

very, you know, about it.

Q.  Okay.  And then Brynn writes back, she was snappy too, though.  What did they say to you?
    And you replied, oh that I dropped F bombs.  I did call her a little bitch.  But I don't think I said fuck.

A.  Right.

Q.  And Brynn replies, I didn't hear any F bombs LOL -- that means laugh out loud?

A.  I think so.

Q.  I didn't even hear you call her a little bitch.  Right?

A.  Right.  I -- I haven't denied that I said the B word; I just said I vaguely remember saying it.

Q.  Yes.  But Brynn didn't hear that?

A.  Apparently not, no.

Q.  Okay.  On -- in the bottom right-hand corner there are little numbers that we call Bates numbers, and I'm on the one numbered 422 right now.

A.  Okay.

Q.  Which is several pages beyond where we just were.

A.  Okay.

Q.  And Brynn -- in the middle of the page Brynn writes to you, no but I thought I only heard you

Page 113

say goddamn so I didn't hear you swear either.
    Do you recall saying goddamn?

A.  No, I don't.

Q.  Do you think Brynn is wrong?

A.  I don't -- I can't speculate what she heard or what she didn't hear.  I don't remember saying that.

Q.  Okay.  That's it for those.
    (Deposition Exhibit No. 9 was marked.)

BY MS. RAND:

Q.  Before we look at the Exhibit 9 that you have just been handed, did you have any other written communications with Brynn about Wayfair other than what's in the Exhibit 8 that we just looked at?

A.  I don't think so.  I'm not sure though.

Q.  Did you -- did you search your Facebook communications and provide your counsel with anything -- any communications with --

A.  I provided --

Q.  -- co-workers?

A.  -- what I had for communications.

Q.  And you didn't see any others that related to Brynn?

A.  I don't think so, no.

KIRSTIE TRAHAN - 01/07/2019        Pages 114..117

Page 114

Q. Have you spoken to Brynn Williams on the phone about Wayfair since your termination from Wayfair?

A. No. We talk through Facebook about other things, but not about Wayfair.

Q. Okay. Okay. This is Exhibit 9.

A. Yeah.

Q. And this is a Facebook exchange with Toni Johnson.

A. Yes.

Q. Is Toni Johnson another Wayfair employee?

A. Yes.

Q. And was she in your training class as well?

A. Yes.

Q. Okay. Did Toni sit close to you in nesting?

A. Yeah. She was diagonal from me. She was at the end desk.

Q. Do you recall her being present during the interaction with Brianna on the 20th?

A. I do.

Q. And it looks like from the top of the stream that this exchange started on September 21 at 5:52 p.m.?

A. Yeah.

Q. Toward the end of the first page you write to

Page 115

Toni, would you agree that I'm the target of them most of the time?

And what were you referring to there? In what way did you believe that you were the target?

A. That they singled me out a lot, that I feel like they constantly -- like, I was the -- the center of their conversation and jokes.

Q. Have you -- have you already testified to all of the ways in which they did that?

A. Yes.

Q. Okay. And Toni responds, I don't know.

A. That's what it says, yes.

Q. But I think Bri has a big mouth?

A. That's what she said.

Q. And then you wrote on the next page, yeah. Well, I'm probably going to lose my job.

A. Yeah. Because that was after the phone call.

Q. Which phone call?

A. The phone call with Jonie.

Q. Where you talked about -- where you disclosed PTSD?

A. No. Where she called me back. This would be Thursday, the 21st.

Q. Right. So where you --

Page 116

A. Right.

Q. You left a voicemail, and then she called you back?

A. Right. This was after -- the time stamp on this is 5:52. She called me back around 2:00 in the afternoon.

Q. So at the end of that phone call with Jonie, you understood you were probably going to be terminated?

A. I didn't understand that, but I felt Jonie was making accusations about my PTSD that she really didn't have a place to make.

Q. What -- what accusations did you feel like Jonie was making?

A. That the interaction couldn't possibly have triggered PTSD for me and that tone of voices wouldn't do that.

Q. Anything else?

A. And that unless she had all of my medical records, that she couldn't make that decision.

Q. What decision did you understand her to be referring to?

A. On whether or not this affected my PTSD. And I felt as though that was an unfair judgment because someone can't really decide what would

Page 117

trigger me and what would not because even I don't know that all the time.

Q. Did -- did you ever discuss with any of your medical providers or your counselor Jennifer Hubler whether there were accommodations that Wayfair or any other employer could make that would minimize the triggers for you?

A. I think Jen and I talked briefly about it.

Q. Was -- do you recall that being in relation to Wayfair or more generally?

A. More under Wayfair.

Q. While you were still employed there?

A. I took a -- I think I had a visit with her along this timeline; and I think we talked about it.

Q. Okay.

A. Or I called her. Usually if I call and say it's an emergency, she calls me back.

Q. Okay. On the second page of this Exhibit 9 --

A. 426?

Q. Yes, exactly. The stamp 426.

A. Yeah.

Q. Toni writes to you, no, you said friggin bitches. And you wrote back, yeah. And they were quite rude and ignorant. And Toni writes back and said, they both said bitching too. And you wrote

KIRSTIE TRAHAN - 01/07/2019       Pages 118..121

Page 118

back, yeah.

Do you recall either Ashley or Brianna saying bitching?

A.   I recall swearing happened on the floor with a lot of different employees.  They -- they may have swore in that situation; but if they did, I lived through so much that day I couldn't say for sure.

Q.   Okay.  So you don't specifically recall them swearing, but you also don't know that it didn't happen; is that right?

A.   I recall them not having the best vocabulary.

Q.   But don't recall specific words?

A.   No.

Q.   Okay.

(Deposition Exhibit No. 10 was marked.)

BY MS. RAND:

Q.   Exhibit 10 looks like a Facebook exchange between you and someone named Cougar Bunn?

A.   Uh-huh.

Q.   Is Cougar -- at the time was Cougar a Wayfair employee?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Page 119

Q.   Was Cougar in your training program?

A.   Yes.

Q.   And did Cougar sit near you during nesting?

A.   Cougar was -- sat off to the side.

Q.   To your knowledge did Cougar witness the interaction?

A.   Cougar did not, no.

Q.   Okay.  Did you ask Cougar whether she -- is it a she?

A.   He.

Q.   Did you ask him whether he witnessed the interaction?

A.   No.

(Discussion off the record.)

BY MS. RAND:

Q.   Did -- at the bottom of this page after Cougar tells you that he hears swearing on the floor every day, you write, yeah.  Jonie said that swearing doesn't happen on the floor and I was a liar.

A.   Yeah.

Q.   Did Jonie call you a liar?

A.   She insinuated it, yeah.  That swearing doesn't happen on the floor at all.

Q.   When did that exchange happen?  When did you and

Page 120

Jonie --

A.   He believe it happened on Thursday.

Q.   When you spoke in more -- when she called you back after your voicemail?

A.   Right.

Q.   Okay.  Have you had any communication with Cougar about Wayfair or about your claims in this lawsuit since this text -- Facebook exchange in October?

A.   No.

Q.   And was this in October of 2017?

A.   I believe so.

Q.   Closer in time to when you were terminated as opposed to a few months ago?

A.   Right.  It wasn't a few months ago.

Q.   Okay.

(Deposition Exhibit No. 11 was marked.)

BY MS. RAND:

Q.   Okay.  The court reporter has handed you Exhibit 11.  And this is a -- is this a Facebook exchange with somebody?

A.   No.  That's a iMessage.

Q.   Okay.  This is an iMessage with someone named Brandi?

A.   Yeah.

Page 121

Q.   And what's Brandi's last name?

A.   Beale.

Q.   And are you -- do you know what date this iMessage exchange was?

A.   The date is on the next page.  Friday, July 20, would be when I iMessaged her there; but me and Brandi talk just about every other day.  So --

Q.   And have you had more communications with Brandi other than what's in this exhibit about Wayfair or your lawsuit?

A.   No.  We -- not -- this is the only time I ever really talked about it, I think, in text messages.

Q.   At the top of this exhibit Brandi asks you how is the process going?

A.   Yeah.

Q.   And you said, good.  I can't talk a lot about it but good.

A.   Yeah.

Q.   How did you know what she was referring to when she said how is the process going?

A.   She knew about the -- she's one of the people I confided in about my PTSD.

Q.   Was there any discussion before Brandi's message to you, how is the process going, about Wayfair

KIRSTIE TRAHAN - 01/07/2019        Pages 122..125

Page 122

or about your -- the litigation?

A.  We talked in person.  She asked why I wasn't with Wayfair anymore.  I said I was fired.  And we talked about the situation, but nothing specific.

Q.  Okay.  But nothing in writing though --

A.  No.

Q.  -- before what's in here?

A.  No.

(Deposition Exhibit No. 12 was marked.)

BY MS. RAND:

Q.  So Exhibit 12 is something that your counsel produced to us in discovery?

A.  Yes.

Q.  And I assume that's because you provided it to him to produce?

A.  Yeah.

Q.  What is this?

A.  That is a Facebook group shared by Brianna Ireland.

Q.  And what does that mean, a Facebook group?
    Oh, that she shared something?

A.  Right.  She shared and posted exactly within the same -- around the same day of when I had my public PTSD attack.

Q.  You were friends with Brianna Ireland on

Page 123

Facebook?

A.  No.  Her profile is public.

Q.  Okay.  And so it was a public share or a group share?

A.  It was a share on her Facebook page.

Q.  Okay.

A.  I was friend with her at some point in time, but I think I removed her and a bunch of other Wayfair people.

Q.  When did you -- is this a screenshot, first of all --

A.  It is.

Q.  -- from your phone?
    When did you take that screenshot?

A.  Right around October.

Q.  Around October 15, 2017?

A.  I think so, yeah.

Q.  Okay.  Have you checked her Facebook page since to see whether this is still out there?

A.  No.  I only -- I don't really go on Facebook anymore.

Q.  Did you ever share with Brianna that you experienced anxiety attacks?

A.  I may have at some point, but I'm not 100 percent sure if I did.

Page 124

Q.  Did you -- do you have any other information about this post other than the fact that it appeared on October 15?

A.  I felt that it was weird that it appeared very soon after this whole incident took place.  And I feel like it describes a lot of what she would have witnessed that day.

Q.  Yes.  Was it just out of nowhere on her Facebook page; or was there any context sort of before or after, if you recall?

A.  It was just on there from what I remember.  I think they're all blocked on my Facebook.

Q.  Okay.  But she wasn't blocked on October 15, 2017?

A.  No.  It's just -- I just did a housekeeping thing maybe around September of last year.

Q.  Okay.

(Deposition Exhibit No. 13 was marked.)

BY MS. RAND:

Q.  This Exhibit 12 -- this Exhibit 13 looks like it's a photograph of a computer monitor showing Darren Plante's Facebook page?

A.  Yeah.  It's just a screenshot to prove we're friends outside of Wayfair.

Q.  Okay.

Page 125

A.  And also -- sorry.  Go ahead.

Q.  No.  You can finish.

A.  It just shows that we're friends.

Q.  When you say friends, do you mean, like, connected on Facebook --

A.  Yeah.

Q.  -- or do you mean you're actually friends outside of work?

A.  I would imply that Facebook, when you make connections with people to stay in touch with them.

Q.  Okay.  So when was this connection made?  Can you tell?

A.  Yeah, I can.  It was made 9/5 or 9/6/2017.

Q.  Okay.  So a few weeks or a couple weeks before your termination?

A.  Correct.

Q.  Do you recall which of you sent this friend invitation?

A.  I don't.  One of us did.  I don't -- I don't remember.

Q.  And when did you take this screenshot?

A.  Right around the same time as the previous one.

Q.  In October of 2017?

A.  Right.

KIRSTIE TRAHAN - 01/07/2019        Pages 126..129

Page 126

Q. What prompted you to take a screenshot of this page a month after you were terminated?

A. I just wanted to establish that I had other connections with people on -- from Wayfair outside of the horrible things that were being said about me.

Q. Do you have any information about whether Darren had any role in the decision making about your termination?

A. No. He was just my first manager; and we -- we got fairly close.

Q. You had a good relationship with Darren?

A. I did.

Q. Did you ever tell Darren that you had PTSD?

A. There was never a need to.

Q. Does that mean, no, that you didn't?

A. No.

Q. Okay. We can look at it if we have to, but I'll represent that something very similar was produced for Matt Poolie.

A. Yes. Uh-huh.

Q. Was that also a screenshot that you took shortly after your termination to show that you were connected to Matt on Facebook?

A. Yes. And Matt -- Matt also did personal

Page 127

training; and I consulted him about that, too.

Q. Personal training like --

A. Physical.

Q. Okay.

(Deposition Exhibit No. 14 was marked.)

BY MS. RAND:

Q. So this is Exhibit 14. Can you confirm that this is a copy of the charge that you filed with the Maine Human Rights Commission?

A. It is.

Q. In -- in the second sentence you write, on September 20, 2017, I was at work when some co-workers were treating me rudely, then jumped on me. What did you mean by jumped on me?

A. Like, verbally.

Q. Okay.

A. Just, like, an attack two on one, three on one.

Q. And are you referring to what you have already testified to about --

A. Yes.

Q. -- Brianna offering the phone number?

A. Yes.

Q. All right. I want to -- a couple things about your claim that I want to understand. Is it your position that you were terminated because of your

Page 128

diagnosis of PTSD?

A. Can you rephrase that?

Q. Yes. Do you have any reason to believe that you were not, in fact, terminated because Wayfair concluded that you swore at co-worker -- at a co-worker on the floor?

MR. BABER: Object to form.

A. I believe I was terminated for my PTSD attack on the floor.

Q. Okay. Is it your position that Wayfair violated the law by not providing you with accommodation?

A. Can you ask me that again.

Q. Yes. Is this a -- do you contend that Wayfair was required to provide you with a reasonable accommodation for your disability rather than terminate you?

A. I think that we should have tried accommodations, yes.

Q. And have we already -- we have talked about two possible accommodations that I can recall, moving away from Brianna and Ashley --

A. Yeah.

Q. -- and also possibly working from home?

A. Correct.

Q. Are there any other accommodations that you have

Page 129

conceived of that might have been effective?

A. I think that moving me away from the situation or work from home would have been effective.

Q. Is there anything else that -- that you would have required?

A. No. I didn't -- I like to be realistic with my accommodations.

Q. What information do you have about Wayfair's work from home program?

A. They talked briefly about it when we came in to orientation and that they were getting ready to roll it out.

MR. BABER: Can you speak up just a little bit.

A. They were getting ready to roll it out. And basically it was what you did at the office, but you got to do it from home.

Q. Do you know when that -- when that was rolled out?

A. I think it was rolled out maybe a month after I left. My friend Brandi did it for a while.

Q. So at the time that you were terminated from Wayfair, to your knowledge there were no employees -- customer service employees working from home?

KIRSTIE TRAHAN - 01/07/2019          Pages 130..133

Page 130

A.  No.  But it had made the option that they were getting ready to open it up because they wanted to expand.  So --

Q.  Did you have any understanding around whether you had to be employed at Wayfair for any particular period of time before you would be eligible to work from home?

A.  From my knowledge it was -- you have got to apply for it.  And depending on stats and how well you did your job would be whether or not you qualified for it.

Q.  Did you request any accommodation from anyone at Wayfair before September 20, 2017?

A.  No.  Because there wasn't -- I talked about when -- when we were going to get moved to our new permanent desk; and I just was trying to wait and to see if that lessened the situation.  Because I had asked about it a few times, like, when were we going to get moved?  When were our teams going to get separated?

Q.  But not if connection to any particular medical need that you had?

A.  No.

MS. RAND:  Let's take, like, five minutes; and I may have a few more.

Page 131

MR. BABER:  Sure.

MS. RAND:  But I'm pretty much done.

(A short recess was taken.)

BY MS. RAND:

Q.  I don't know what -- how clearly or if I asked this question clearly at all earlier, but other than at Wayfair, have you ever experienced either a flashback or a panic attack at work?

A.  At work, no.  But public, yes.

Q.  How often would you say you experience flashbacks?

A.  Do you want to narrow that down to, like, a time frame?

Q.  Yes.  In -- in 2017 were you experiencing them with any regularity?

A.  I get them from time to time.  But after the whole incident, I got them a lot.

Q.  Okay.

A.  I still get them quite frequently.

Q.  Before you were terminated from Wayfair, you know, is that something that would happen to you once a month, less frequently than that, more frequently?

A.  It depends on the triggers.  If I have seen it before, a mild trigger I can try to contain.  But

Page 132

if I haven't, then it's bad.  And then once I usually have a bad one, it takes -- I get them a lot more frequently after that.

Q.  From the same trigger?

A.  Yeah.  Well, the same trigger and then reliving the situation.  It kind of almost creates more of a breeding ground kind of deal because I'll overanalyze the situation, and then it brings it out again.

Q.  Some of the triggers that we have talked about included being approached from behind --

A.  Uh-huh.

Q.  -- right?
    And being touched --

A.  Yeah.

Q.  -- right?
    And being -- feeling ganged up on, having more than one person talking at you?

A.  Yeah.

Q.  And tones and people talking over each other?

A.  Yeah.

Q.  Are there other things that are relatively common triggers?

A.  Yeah.  I don't -- if someplace is very, very, very crowded, I can't do it.

Page 133

Q.  Okay.

A.  Since this incident, I have been really worried about running into Wayfair people in Bangor, because Bangor is small.  So I tend to order my groceries.  I don't go out.  I order everything off-line.  I don't -- I just don't want to run into them.  Or I'll send my husband.  He does all the pickups.  He does everything.
    I go to work.  I go home.

Q.  When you say Wayfair people, do you mean the people who were involved in and know about the reason for your termination or anybody?

A.  Mostly the people that were involved in the situation; but if someone openly talks about working at Wayfair, it makes me very uncomfortable.  So I usually just will remove myself from that situation.

Q.  Okay.  Do you recall -- did you have more than one supervisor when you worked at Nexxlinx?

A.  I don't remember.

Q.  Do you remember any supervisor's name that supervised you?

A.  Ashley Brown was my supervisor for the longest time.

Q.  Okay.  Do you remember the name of the human

KIRSTIE TRAHAN - 01/07/2019      Pages 134..135

Page 134

resources representative that you spoke with at Nexxlinx?

A.  I don't.

Q.  Was it male or a female?

A.  It was a male.

Q.  Does the name Haneel Basu sound familiar?

A.  No.

Q.  That's all I have.

MR. BABER:  Thank you.  We have no questions for today.

I do want to state on the record that I want to thank you for your professionalism and courtesy and --

MS. RAND:  Thanks.

MR. BABER:  -- your ability to get through a lot of very serious material very adroitly.  So thank you.

MS. RAND:  You're welcome.

(The deposition was concluded at 2:21 p.m.)

-  -  -  -  -  -  -

Page 135

CERTIFICATE

I, Claudette G. Mason, a Notary Public in and for the State of Maine, hereby certify that the within-named deponent was sworn to testify the truth, the whole truth and nothing but the truth, in the aforementioned cause of action.

I further certify that this deposition was stenographically reported by me and later reduced to print through Computer-Aided Transcription, and the foregoing is a full and true record of the testimony given by the deponent.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

IN WITNESS WHEREOF I subscribe my hand this 14th day of January, 2019.

Dated at Falmouth, Maine.

Claudette G. Mason, RMR, CRR
Notary Public

My Commission Expires June 9, 2019.

KIRSTIE TRAHAN - 01/07/2019                    i1

**$**

**$1**
36:9,10

**$400**
34:7

**1**

**1**
7:6,16 74:5

**1/19/15**
20:15

**10**
38:5,7 74:6,11,15,16,17
76:2 86:10 118:16,18

**10-minute**
75:6

**100**
19:15 71:17 100:2
123:24

**11**
100:4 120:17,20

**11:30**
67:17

**12**
35:8 36:17 37:9 38:2,8,9
122:9,11 124:20

**12.11**
35:13,25 37:14,16

**12:38**
106:25

**13**
124:18,20

**14**
127:5,7

**15**
23:10 36:15 43:24 86:10,
15 123:16 124:3,13

**15.25**
36:15

**16**
25:15

**17**
7:17 8:8 22:13,19

**1:35**
107:1

**1:45**
68:16,19

**2**

**2**
17:14,17 68:17,19 83:15

**20**
43:24 67:16 109:12
121:5 127:12 130:13

**2010**
8:21 9:18 30:5

**2012**
9:19 10:6,7

**2013**
6:1,3,6 11:6,7,18

**2014**
11:19

**2015**
16:20 19:25 20:1,14
22:13,19

**2016**
25:5

**2017**
26:23 59:22 67:7,16
120:11 123:16 124:14
125:24 127:12 130:13
131:14

**2018**
32:7,21 33:13,15 34:16
37:1 67:11

**20th**
109:15 114:19

**21**
60:10 114:22

**21st**
115:24

**22**
30:7 105:24

**22nd**
104:13

**24**
35:3

**26**
34:15,16

**28**
20:14 61:9,12

**29**
19:24

**2:00**
116:5

**2:21**
134:19

**2:57**
110:2

**3**

**3**
20:3,5,11 36:5

**3.50**
36:11

**3/14/16**
24:15

**3/22/17**
24:15

**3/30/91**
5:10

**30**
86:12

**36**
36:24 37:4

**4**

**4**
22:9,11 36:5

**422**
112:19

**426**
117:19,20

**5**

**5**
59:23 60:23 61:23 66:20

**5:30**
96:6

**5:52**
114:22 116:5

**5th**
104:22

**6**

**6**
35:9 36:5 59:22,23 60:1
61:25

**60**
37:21 60:20

**7**

**7**
7:19 65:25 66:3,12 104:2
107:3

**72**
14:13

**7:00**
35:16

**8**

**8**
67:17 107:22,25 113:14

**8.62**
39:9,10

**86**
35:10 36:18

**9**

**9**
113:9,11 114:6 117:18

**9/5**
125:14

**9/6/2017**
125:14

**A**

**AAA**
11:23,25 12:9 41:14

**ability**
14:6 134:15

KIRSTIE TRAHAN - 01/07/2019                    i2

**able**
30:3 32:18 33:15 90:13

**absence**
14:14 21:19 29:22,24
60:10,12

**absolutely**
28:20 29:9

**abused**
24:5

**Acadia**
17:19 100:8

**access**
99:15,19,22,25 100:12

**accident**
3:25

**accidently**
67:23

**accommodation**
13:4 31:18,19,21,25
32:18 33:9 98:9 101:11
128:11,15 130:12

**accommodations**
12:16 32:1,8,20 35:2
98:10 117:5 128:17,20,
25 129:7

**accurate**
19:12 29:5

**accusations**
116:11,13

**action**
9:24 10:18 11:12,21 12:9
63:7

**actions**
15:21

**actively**
49:8

**actual**
7:9 53:1

**additional**
36:8

**address**
42:2

**admit/discharge**
20:17

**admitted**

**27:3**

**adroitly**
134:17

**advantage**
38:23

**afford**
34:6,8,23,25

**aftermath**
96:2

**afternoon**
98:20,25 116:6

**ago**
18:22 19:11 120:14,15

**agree**
28:16 71:13,14 81:16,22
103:23 115:1

**agreed**
3:2 84:7

**ahead**
125:1

**airport**
11:3

**allowed**
33:6

**altered**
35:1

**annoyed**
68:20,24 72:9,10,11

**answer**
4:10,19,25 6:23 7:17
29:16 44:5,6

**answered**
37:25

**answering**
4:18

**anticipate**
4:15

**anticipated**
21:1

**anxiety**
84:5 90:15 92:19 96:10,
12 123:23

**anybody**
68:14 96:16 133:12

**anymore**
8:14 64:24 122:3 123:21

**anytime**
22:3

**anyway**
45:5

**Apparently**
112:16

**appear**
72:15

**appeared**
85:10 124:3,4

**applied**
15:25 33:12 34:2,4
40:18,21,22

**apply**
130:8

**applying**
40:6

**approached**
54:3 55:14 77:23 78:3
89:23,24 90:4 132:11

**approaching**
90:5

**appropriate**
4:23

**approximately**
43:22 67:3

**April**
19:24 20:1

**area**
91:2,4 95:8

**areas**
50:12

**aren't**
39:25 104:18

**arm**
55:8

**arms**
14:1 80:3,17

**Army**
8:19,20 23:7 30:1,2
54:21 81:16

**arrival**
61:6

**arrive**
61:11

**arts**
25:19

**as-needed**
89:8

**ashamed**
96:12,14

**Ashley**
45:13 48:18 51:16 52:15
53:10 69:3,7 70:1,3 71:8
72:1,2,7,14 73:5 74:22
85:2,10 101:13 103:11
108:16 109:1,4,17 118:2
128:21 133:23

**aside**
109:2,4,18

**asked**
31:17 55:6 70:2,21 83:1
86:2 92:23 93:13,15
100:22 101:1,10 103:19,
21 104:13 106:14 122:2
130:18 131:5

**asking**
4:16 42:15 64:6 75:10
77:19 84:3 91:25 92:2
93:3,4 99:24 103:24,25

**asks**
121:14

**assault**
24:1

**assessment**
41:9

**assigned**
50:5,11

**assist**
42:1

**assistance**
63:22,25

**assume**
4:25 53:3 122:14

**assumed**
100:2

**assumptions**
82:20

**ate**

46:7

**attack**
79:18,22 80:18,22 81:1,4
90:15 92:21 122:24
127:17 128:8 131:8

**attacked**
92:13

**attacks**
79:25 80:15 82:1 92:19,
20 123:23

**attend**
5:25

**attendance**
60:8,15

**attended**
6:1

**August**
60:10 61:9,12

**authored**
18:1 22:12

**Auto**
10:22,25 11:11

**automatic**
62:11

**available**
37:2 39:25 69:23

**avoid**
67:20

**avoided**
58:4,5

**aware**
65:14,18 69:24 70:1,3
73:25 96:19 104:18

**awareness**
76:3

**awhile**
43:18 44:16

---

**B**

---

**BABER**
7:11 28:8,14,18 29:15
61:15 68:21 80:7 84:18
86:18,22,25 102:11
104:1 128:7 129:13
131:1 134:9,15

**babied**
87:22

**baby**
37:6

**baby-sat**
8:13

**baby-sitter**
87:9

**Bachelor**
25:23

**Bachelor's**
5:20

**back**
12:7,21,24 13:19 22:21
23:19 24:22 29:2,5,7
32:2 33:5 35:5 40:5
42:14 45:1 55:11,17,24
67:23 68:16 69:2 89:16
94:25 98:23 109:17
111:15 112:2 115:23
116:3,5 117:17,23,24
118:1 120:4

**Backing**
63:15

**bad**
14:11 21:17 27:25 51:6
80:23 88:14 110:14,22
132:1,2

**badge**
91:5 95:2,4,7

**bag**
87:14

**ball**
36:7

**Bangor**
10:4 12:7,24 26:20,21
32:11,19 133:3,4

**basic**
26:6

**basically**
43:7 62:9 73:15 129:16

**basics**
5:4

**basis**
101:24 105:10

**Basu**

134:6

**Bates**
112:18

**bathroom**
55:12 56:6

**battles**
68:15

**Beale**
121:2

**Bear**
9:2

**beginning**
76:19

**behavior**
15:15,18 53:24 68:3
92:17 98:5 111:9

**behaviorisms**
51:5

**behaviors**
51:7 56:24 58:19

**Belanger**
76:10

**belief**
105:10

**believe**
16:9,17 19:5 21:7 24:23
30:4 37:24 38:16 42:21
43:2,17 48:8 49:4,24
62:22 70:20 72:11,12
76:22 78:2 82:16 83:19
84:10 85:7,15 96:18,25
101:5 104:4,6 105:4
106:10 115:4 120:2,12
128:3,8

**believed**
16:10

**believes**
21:1,14

**believing**
104:20

**belongings**
93:23 94:1,2

**benefit**
38:11

**benefits**
37:19 38:14,23 39:23,24

106:17

**bereavement**
63:9,11

**best**
53:9 55:18 58:4 79:19
100:15 118:12

**better**
14:19 38:21 44:8 47:25
48:5

**beyond**
112:22

**big**
51:21 115:14

**bills**
6:15 13:18,19 48:13

**biology**
25:21,24

**birthday**
5:9

**birthdays**
24:14,18

**bit**
4:13 27:15 32:17 49:25
57:24 62:14 63:15 67:1
92:1 129:14

**bitch**
71:13 111:22 112:5,11

**bitches**
71:15 83:16,25 84:10
117:22

**bitching**
117:25 118:3

**biweekly**
100:14

**black**
9:2 73:2,6,10

**blackout**
73:13

**blamed**
110:20,21

**blanket**
94:3

**block**
108:20

KIRSTIE TRAHAN - 01/07/2019                     i4

**blocked**
124:12,13

**board**
53:15,17

**body**
72:16 82:19

**bombs**
112:4,8

**border**
69:19

**born**
5:7 24:13 25:16

**bothered**
58:16

**bottom**
74:5 112:17 119:16

**bought**
12:23

**bounce**
64:17

**bounced**
18:12

**box**
64:10

**boxes**
100:9

**boyfriend**
10:13

**brand**
28:6

**Brandi**
120:24 121:7,8,14
129:21

**Brandi's**
121:1,24

**break**
4:7,10 21:9 28:12,20
46:15 61:15 80:7,14
106:23 107:3,6

**breaks**
4:11 86:8

**breather**
80:10

**breathing**
75:2

**breeding**
132:7

**Brewer**
26:21

**Bri**
48:18,20,24 110:3
111:16 115:14

**Brianna**
45:13 48:24 51:16 67:21,
25 68:20 69:10,13 73:8
74:21 76:20 85:1,10
101:13 103:11 108:16
110:5 114:19 118:2
122:18,25 123:22 127:21
128:21

**Brianna's**
68:3 70:7

**brief**
54:18

**briefly**
3:13 51:25 108:17 109:9
117:8 129:10

**brings**
132:8

**Brown**
133:23

**Brynn**
57:12,13,22 108:4,7,15,
24 109:17 111:13 112:2,
8,15,24 113:4,13,24
114:1

**building**
89:16 90:3,20,25 91:2
94:16

**built**
25:20 33:6

**bunch**
43:7 68:13 83:12 123:8

**Bunn**
118:19

**business**
42:8 104:16

**businesses**
42:7

**butterflies**
102:5

**C**

**C-SECTION**
38:4

**Cable**
9:10

**Caitlyn**
18:13

**call**
9:5,15 10:25 12:4 14:14
37:2 41:3,11 42:11,12,
14,15 57:15 63:8 74:12
86:13 87:11 88:1 96:8
99:12 100:5 102:6,7
103:21 104:5,6,10,15,24
105:9,14,20,21,25 106:9
107:6,8 112:5,11,18
115:18,19,20 116:7
117:16 119:22

**called**
12:25 15:4 20:23 95:15,
19 96:5,21 97:9 98:7
111:1 115:23 116:2,5
117:16 120:3

**calling**
42:11

**calls**
41:24 104:8,9,14,25
105:1,3,5 106:19 117:17

**calm**
97:4

**calmed**
111:3

**can't**
19:19 28:4,6 30:17 38:16
39:1 44:6 45:15 53:19
54:4 57:10 64:24 65:1
70:4 79:3 80:24 96:22
113:5 116:25 121:17
132:25

**Canada**
69:4,18,23

**capsule**
27:1

**car**
3:25 82:8 86:5,13 96:2

**cards**

89:20

**care**
38:22 40:16

**caring**
25:10

**carry**
87:16

**case**
3:25 50:15

**cause**
27:17 29:10 82:1,5

**caused**
14:9 28:25 40:9 61:11
92:18

**center**
9:5,15 10:25 12:4 41:3,
11 42:11,13 57:15 74:13
102:6,7 104:10 115:7

**centers**
104:24

**cents**
35:11 36:19

**certain**
45:7,10 52:18 54:23 57:4
81:8 93:25

**chance**
93:23 94:6 98:13

**change**
50:22

**changing**
42:2

**characterizing**
70:19

**charge**
127:8

**chat**
41:25 51:8,25 52:5,16
53:1,2,21 54:13 56:14,23
58:2

**check**
8:16

**checked**
63:12 123:18

**cherry-pick**
67:19 105:7

KIRSTIE TRAHAN - 01/07/2019                    i5

**child**
16:23 40:16

**children**
17:2,10 24:13 25:10,11
40:12

**choppy**
23:5

**Chris**
106:1,3

**Chris's**
106:4

**circle**
44:17

**circumstances**
21:11 52:5

**claim**
127:24

**claimed**
83:8,11

**claims**
120:7

**class**
32:25 43:21,23 44:2,21,
25 45:7,23 46:5 47:11,24
48:2,3,7 50:4,10 51:11,
12 57:6 108:12 114:13

**classes**
31:7,13 32:2

**classroom**
42:24 43:15,16,17 44:18,
20,23 49:13,21 50:7,23
62:20

**clean**
48:19

**clear**
4:4 6:25 22:15 51:14
57:3,17 69:25

**clearly**
131:5,6

**client**
20:23 21:22 22:20 86:18

**climb**
34:24

**clinic**
18:12

**clique**
54:15

**clock**
68:19 86:8,11,14 89:22

**Clonidine**
88:21,23,24 89:2

**close**
44:11 50:1,15 114:15
126:11

**closeness**
58:16

**Closer**
120:13

**cloud**
23:22

**co-worker**
128:5,6

**co-workers**
30:15,24 46:22 49:15
50:22 54:14 56:9,20 65:4
97:23 103:14 107:14
113:21 127:13

**co-workers'**
53:24

**coach**
50:21

**coaching**
60:8 61:2 62:7 109:19

**coachings**
62:6,19

**codes**
11:3

**Colburn**
18:1,5,6,18

**cold**
94:2

**college**
5:19,25 6:6,13 26:5

**colored**
108:20

**come**
37:12,23 42:10 53:16
54:24,25 55:17 80:19
95:20 97:21,22 110:17

**comes**

81:9 86:22

**Comfort**
26:15,16

**comfortable**
111:12

**coming**
73:8 75:20,22 76:5 77:19
78:15

**comment**
48:15 111:21,22

**comments**
48:10,15

**Commission**
66:18 127:9

**common**
132:22

**commotion**
72:24

**communicate**
42:5 80:24 81:2 102:21

**communication**
120:6

**communications**
42:9 56:8 105:16,19
113:13,18,19,22 121:8

**company**
9:4,6,9 40:18

**complained**
16:7 65:15

**complaint**
16:9

**complete**
99:21

**completely**
29:19 33:21 96:16 97:4

**compose**
55:16

**composed**
67:10

**composing**
66:23

**computer**
69:2 124:21

**conceived**

129:1

**concerned**
98:15

**concerns**
28:10

**conclude**
52:23

**concluded**
128:5 134:19

**conditions**
35:19

**conference**
78:18,20,24 79:13 91:9,
11 94:12,23

**confided**
121:23

**confirm**
23:25 127:7

**conflicts**
30:15,23

**confrontation**
98:17

**connected**
125:5 126:24

**connection**
31:19 32:8,20 33:6
125:12 130:21

**connections**
125:10 126:4

**considering**
22:3

**consistent**
27:20 36:25

**consistently**
36:13

**constantly**
115:7

**consulted**
127:1

**consumers**
42:6

**contact**
69:11,14,22 70:8

**contain**

KIRSTIE TRAHAN - 01/07/2019                    i6

131:25

**contend**
128:13

**content**
52:17

**context**
15:6,8 31:18 124:9

**continue**
25:18 61:20

**continued**
31:12

**contraction**
28:18

**contracts**
9:7,8

**control**
14:16 79:19 80:20 84:6

**conversation**
4:14 6:21 56:2 70:13,15
73:9 85:11 86:16 87:5
111:25 115:8

**conversations**
56:3 104:21

**copy**
127:8

**corner**
112:17

**Correct**
22:18 88:17 98:21,25
101:16 104:9 125:17
128:24

**Cougar**
44:12 118:19,21 119:1,3,
4,5,7,8,16 120:6

**couldn't**
34:6,8 36:12 45:22 52:1,
20 64:19 100:25 116:15,
20 118:7

**counsel**
4:3 20:12 113:18 122:11

**counselor**
117:4

**couple**
24:2 45:21 48:16 50:17
51:16,18 83:2 125:15
127:23

**course**
69:21 82:7

**courses**
31:2,4 32:23

**court**
4:12 6:19 7:15 17:16,17
20:5 22:11 66:2 107:24
120:19

**courtesy**
134:13

**Courtney**
57:12,13,22

**cover**
38:3

**coverage**
38:21 39:3

**covered**
38:10

**coworkers**
59:3 85:12 105:16

**creates**
132:6

**cried**
55:13 87:4 96:1

**cross**
14:1 80:3,17

**crossed**
80:16

**crowded**
132:25

**culminated**
65:3

**customer**
41:20 43:10 50:16 67:20,
22 105:5,8,14 129:24

**customers**
42:1,5,10 49:22 65:11
68:7 105:2

**cut**
55:11 64:17 71:9 93:1

---

**D**

**dabble**
33:17,19

**daily**
102:23

**darker**
108:20

**Darren**
61:24 62:2 124:22 126:7,
12,14

**date**
19:24 20:17 121:3,5

**dated**
20:13,15 22:13 66:20

**dates**
31:16

**daughter**
16:15 24:15 25:3,5,16

**Dawson**
3:22

**day**
20:24 34:10 35:24 58:22
59:18 63:25 68:19 75:25
87:8,9,13 88:3,12,13,14
93:11 96:13,24 100:21
104:7 105:21 108:9
111:9 118:7 119:18
121:7 122:23 124:7

**day-care**
34:6,7

**days**
26:17 59:7,14 60:20
63:3,14

**deal**
49:24 64:24 69:20
110:19 132:7

**dealing**
18:23

**decide**
40:9 105:12 116:25

**decided**
26:3

**decision**
106:12 116:20,21 126:8

**declare**
97:6

**declared**
96:6,23 98:8

**defensive**
80:4

**degrading**
68:10

**degree**
5:20 26:2,6,8

**delete**
67:21

**deliver**
37:6

**demanding**
64:18 99:15,18

**demeaning**
70:10

**demeanor**
65:15

**denied**
112:13

**department**
14:24 32:6

**depend**
27:24

**depended**
69:19

**dependent**
27:22 29:12 34:5 62:12

**depending**
36:10 130:9

**depends**
29:17 32:25 36:3 131:24

**DEPONENT**
28:13

**deposed**
3:23

**deposition**
3:24 7:6 17:14 20:3 22:9
59:23 65:25 107:22
113:9 118:16 120:17
122:9 124:18 127:5
134:19

**Depression**
13:13

**describe**
29:13 43:4 45:11 49:20
70:7

KIRSTIE TRAHAN - 01/07/2019                          i7

**described**
24:10 56:1 63:16

**describes**
124:6

**describing**
80:15

**desk**
52:9 58:23 76:14,21,22
87:18,22,23 89:17 90:3
93:14 95:10 114:17
130:16

**desks**
51:18,19,20,21 54:17
102:25

**determined**
38:20

**diagnosis**
23:24 128:1

**diagonal**
114:16

**dialed**
49:25

**dialing**
69:6

**didn't**
6:18 13:25 16:22 24:22
26:5,18 32:4 42:8,14
46:2,7 49:17,18 54:1,25
70:2 80:25 84:13 86:11
87:17 89:1 93:20 94:6
98:10 101:5 102:2
103:14 112:8,11,15
113:1,6,23 116:10,12
118:10 126:16 129:6

**died**
59:14

**dif**
35:17 36:13

**difference**
102:12

**different**
3:18 4:14 6:20 19:13,14
50:11,12 52:25 58:23
76:23 79:23 85:21 98:13
118:5

**differential**
35:13,23 36:1,18,20,21

37:23

**differentials**
37:22

**differentiating**
23:7

**difficult**
20:24 23:13

**difficulties**
44:20

**dig**
35:6

**directed**
57:1 64:12,14 92:17

**directing**
72:20

**disability**
16:12 30:10 32:6 37:11
38:25 96:6,20 98:8
128:15

**disagree**
71:10 72:5,19 73:6

**disciplinary**
9:24 10:17 11:12,21 12:9
15:21 63:6

**disciplined**
55:22

**disclose**
111:6,12

**disclosed**
115:21

**disclosing**
111:10

**Disconnecting**
27:1

**discovery**
17:20 20:13 122:12

**discriminating**
16:11

**discuss**
100:25 117:3

**discussed**
95:6

**discussion**
7:13 80:11 86:21 106:24
119:14 121:24

**disease**
110:23

**disrespectful**
45:25

**distinction**
83:22

**distinguishing**
23:14

**doctor**
26:12

**doctors**
99:16

**document**
7:21 19:24 20:7 60:4
61:2,25

**documents**
65:17

**doesn't**
6:24 43:11 62:11 70:4
72:15 103:24 119:19,23

**doing**
27:9 49:23 56:20 76:7
100:24 103:2

**don't**
4:22 7:12 9:11 11:22
14:12 17:24 19:19 21:7,
12,18 22:2 23:2,9,12,20
29:7 30:20,25 39:18,22
44:5,6,22 47:9 58:18
62:17 65:12 68:13 70:3,9
71:5,12,16 73:13 74:11,
16,25 75:1,5 76:22
77:22,23 78:2 84:15 85:7
89:18 91:21 93:8,9,10
94:18 95:9,11 96:16,25
97:1,7 99:6 101:21,22
105:7,11,12 106:23
107:11 108:18 109:7,10,
13,15,22 110:15 111:16,
20 112:5 113:3,5,6,16,25
115:12 117:2 118:9,10,
13 123:20 125:20 131:5
132:24 133:5,6,20 134:3

**door**
55:14 94:16,22

**dose**
89:6

**drenched**
75:24

**drive**
96:1

**driving**
32:9,16

**dropped**
31:13 83:12 112:4

**drove**
95:25

**due**
16:25 21:2,14 22:6

**duly**
3:5

**duties**
41:23

**dying**
59:15,17

---

**E**

**e-mail**
42:14 64:8 106:15,16

**e-mails**
41:25 67:19,20,21,23
68:5

**earlier**
48:25 103:5 131:6

**early**
59:7

**earn**
39:9

**earned**
37:12,13,16,21 38:7,10

**earning**
39:14,19

**easier**
35:4

**easiest**
89:5

**easy**
81:16,17

**eating**
56:22

**education**
5:18 31:20 32:8,21

**effective**
129:1,3

**either**
26:8 74:21 80:16 82:23
93:15 113:1 118:2 131:7

**elevated**
21:2,14

**eligible**
130:6

**emergency**
117:17

**emotions**
27:10

**employed**
47:8 117:12 130:5

**employee**
57:15 86:7 102:7 108:10
114:11 118:22

**employees**
56:25 57:23 58:15,17,21
102:8 104:18 118:5
129:24

**employer**
117:6

**employment**
7:1 30:14 34:2,3 60:20
105:22

**ended**
86:1

**ends**
67:17

**engaging**
56:25

**enrolled**
31:2,4

**entail**
26:25 42:20

**entered**
90:2

**entire**
71:3

**entitled**
39:8

**entry**
20:13,23

**environment**
9:16 45:2,6,12,20 49:22
54:15 102:13 103:16

**episode**
13:6,9 22:2 23:17,18
27:25 29:1,8

**episodes**
23:6

**escorted**
94:16

**especially**
97:5

**essential**
102:9

**essentially**
88:8

**establish**
126:3

**established**
110:6

**estimate**
36:10 44:1

**Europe**
10:23,25 11:11

**evening**
98:24,25 99:13

**events**
67:6 107:4

**everybody**
92:7 100:15

**evidence**
97:1

**exact**
29:18 53:19

**exactly**
4:1 24:17 92:15 100:3
117:20 122:22

**EXAMINATION**
3:7

**examine**
29:5,7

**examined**
3:6

**example**
38:24

**examples**
36:6 47:19 51:6

**exams**
32:24

**exchange**
108:4,14 114:8,22
118:18 119:25 120:8,21
121:4

**exchanged**
30:24 47:7 74:21,24

**excluded**
46:17

**excluding**
47:14 56:22

**exhibit**
7:6,10,16 17:14,17 20:3,
5,11 22:9,11 35:6 59:23
60:1,23 61:23,25 65:25
66:3,12 92:12 104:2
107:3,22,25 113:9,11,14
114:6 117:18 118:16,18
120:17,20 121:9,14
122:9,11 124:18,20
127:5,7

**expand**
130:3

**expecting**
16:23

**experience**
23:18 26:11 131:10

**experienced**
73:20 76:24 77:6 80:1
123:23 131:7

**experiencing**
14:23 23:16 79:22,23
80:18,21 81:1,4,6 82:4
131:14

**explaining**
92:5 106:16 110:14

**expose**
97:7

**exposure**
26:10

**expressed**
15:25

**extend**
31:15

**extended**
31:15

**extra**
35:16,17

**extreme**
101:3

---

**F**

---

**Facebook**
105:17 107:16,19 108:3,
5,14 113:17 114:4,8
118:18 120:8,20 122:18,
20 123:1,5,18,20 124:8,
12,22 125:5,9 126:24

**faced**
102:25

**fact**
69:22 104:22 124:2
128:4

**fact-finding**
100:24

**factoring**
36:19,21

**fair**
46:18

**fairly**
52:21 60:19 126:11

**fake**
43:7 49:23

**fall**
22:21

**familiar**
79:7,8 134:6

**families**
8:13

**family**
59:6

**far**
12:15

**fault**
82:16

**February**
17:1 67:10

**Fed-ex**
69:4,7,18

KIRSTIE TRAHAN - 01/07/2019                                    i9

**feel**
20:6,9 27:17 28:18 46:5, 7 47:19,21 54:14,18,19, 20 56:5,10,20 57:4,23 58:3,13 71:20 72:1,2 75:20 81:8 86:25 92:18 96:13,14,15 102:15,18 110:17 115:6 116:13 124:6

**feeling**
14:18 23:3 28:10,22 46:2 73:18 80:6 81:10 93:8 132:17

**feelings**
80:21

**feels**
18:22 27:21 47:1

**felt**
15:14 44:24 45:2,9,24 46:17 47:10,12,16,17 54:20 84:4 92:12,15 102:20 116:10,24 124:4

**female**
58:7 134:4

**fewer**
36:22

**field**
26:11

**fight**
81:9 87:25

**fights**
30:21

**figured**
110:7

**file**
100:8

**filed**
127:8

**finally**
16:18 34:25 111:3

**financial**
33:22 34:5,24

**find**
34:8 79:17 92:7

**fine**
83:22

**finish**
4:17,19 93:1 125:2

**finished**
31:13,14

**fired**
36:16 101:2 122:3

**first**
5:25 8:8,23 9:15 19:2 31:5,24 34:11 35:6 37:15 58:7 60:1,20 61:22 62:5, 7 66:12 67:15 70:24 75:12,19 77:2,8 79:10 85:1 89:18 91:15 108:19 110:12 114:25 123:10 126:10

**fit**
46:2

**five**
31:7 46:11 51:23 130:24

**fixing**
42:3

**flashback**
24:8 27:25 55:12,15 73:2,15 74:6,14 75:1,18 76:23,24 78:15 79:23 82:5 87:3,5 89:6 90:9 96:3,11 111:20 131:8

**flashbacks**
13:11 14:23 23:19 75:13 82:2 87:23 93:9 97:5,7 101:7 131:11

**fled**
76:25

**flight**
81:9 87:25

**floor**
50:1,13,17 51:20 53:13 54:17 55:13 63:18,21 77:10,13 83:9,11,16 84:2,11 91:5,7 92:3 98:14 102:1,20 103:3,12 118:4 119:17,19,24 128:6,9

**fly**
81:19

**following**
98:23

**follows**

3:6

**force**
40:10

**forced**
46:23,24 47:1 102:13,15, 19

**forget**
24:24

**form**
29:15 30:22 57:11 68:21 84:18 102:11 128:7

**formed**
46:6 57:2

**Foster**
77:19 90:4

**found**
47:22

**four**
36:22

**fourth**
18:21

**frame**
131:13

**free**
12:10 20:6 86:25

**frequently**
131:19,22,23 132:3

**Friday**
92:6 105:24 121:5

**Fridays**
34:25

**friend**
59:7 123:7 125:18 129:21

**friendly**
16:5

**friends**
44:14 46:6 51:4 57:3 102:14,16,18,19 122:25 124:24 125:3,4,7

**friendship**
57:11

**friendships**
57:10

**friggin**
117:22

**front**
60:25 90:20,24 91:1 94:16,22

**frozen**
74:18

**fuck**
112:6

**full**
3:15 11:9 50:1

**fun**
52:7,18,24 67:22 68:6,9 85:11

**function**
41:15 89:4 90:15

---

**G**

---

**Gagnon**
106:1,3

**ganged**
132:17

**ganging**
72:1

**Garden**
6:10 11:16,21

**general**
25:18 43:12

**generally**
117:10

**getting**
91:16 129:11,15 130:2

**girls**
108:8

**give**
61:14 70:2 98:4 100:12

**gives**
43:12

**go**
4:4 5:11,13 6:6 11:23 24:22 26:7 29:1,5,7 37:15 40:5,6 55:24 58:24 59:18 60:17 62:25 68:22, 23,24 87:7,8,10 88:8,9 89:12 94:10 95:24

KIRSTIE TRAHAN - 01/07/2019                    i10

**goddamn**
100:11 123:20 125:1
133:5,9

**goddamn**
113:1,2

**goes**
35:25 91:5

**going**
4:25 8:7 20:8 22:1,21
23:23 27:9 28:8 31:12
37:12 40:5 51:9 54:16
59:25 60:1 61:17 62:4,13
67:13 73:23 76:13 77:16
78:16 80:17 84:12,13
86:23 88:5,7 89:17 90:16
92:5,6 93:5,6,20 107:3
109:18 110:9 111:5,6,14,
18,23 115:17 116:8
121:15,21,25 130:15,19,
20

**good**
3:9,10 40:4 57:11 88:13
100:16 102:4 121:17,18
126:12

**GPA**
25:20

**grab**
87:23 88:2 89:18,21

**grabbed**
82:11

**graduate**
5:16

**grandmother**
59:9,17,20 60:13 61:13
63:4

**grandmother's**
62:2

**greeted**
90:21

**groceries**
133:5

**ground**
4:4 6:18 94:1 132:7

**group**
43:19 45:24 46:6,17
47:12 50:6 51:4,7,8,15,
23 56:14,23,25 57:2,7,22
58:2,5,13,17,20 59:3
85:12 122:18,20 123:3

**guess**
67:10 107:13

**guidance**
26:4

**guys**
71:9 72:5,19 73:6

---

**H**

---

**hadn't**
19:8 26:3 110:24

**half**
6:7

**halfway**
18:19 79:10

**hand**
17:16 20:7 64:1 90:5

**handed**
20:5 22:11 60:3 66:2
107:24 113:12 120:19

**handle**
56:11 73:1

**Haneel**
134:6

**happen**
82:7 93:7 118:11 119:19,
24,25 131:21

**happened**
13:10,20 14:4 52:12 65:8
74:12 82:8 92:3 100:21
101:8 110:8 118:4 120:2

**happening**
73:25 81:6

**happens**
16:5 73:15,16 104:19

**harassment**
16:2 18:24

**hard**
4:19 23:6 31:14 73:16
75:25 81:2

**Harley**
54:3 56:15 57:11,13,22,
24 58:7,12,13 85:16

**harsh**
30:24 92:1,9

**harshly**
96:24

**hate**
111:10

**hated**
92:14

**haven't**
17:23 88:11 107:10
112:13 132:1

**Hayley**
79:5 80:25 82:14 85:4,7,
14,25 96:19

**he's**
26:12 44:17 106:5

**head**
30:13 53:8 75:17 88:3
110:17

**health**
21:2,14 38:22

**healthcare**
39:3

**hear**
81:18,21 89:1 112:8,11,
15 113:1,6

**heard**
68:13 97:12,16 98:23
112:25 113:5

**hears**
119:17

**held**
8:11

**help**
55:6 64:6 92:22 94:1

**helping**
42:3

**helps**
80:19,20

**Hes**
45:15

**Hesketh**
45:17,18

**hide**
76:1

**high**
5:11,13,14,16,18 43:4

**high-risk**
38:4

**hip**
26:22 27:6

**hire**
21:24

**hired**
34:11,18 36:15 42:18

**hiring**
22:3

**history**
7:2 8:7

**hold**
68:8 83:18

**hole**
34:24

**home**
25:10 30:1,2,7 39:21
40:13 59:4 88:9 89:11,12
94:5 97:25 102:3 103:8,
10,15,25 128:23 129:3,9,
17,25 130:7 133:9

**honestly**
21:12,17 22:1 23:9 91:23

**hoped**
103:6

**hoping**
26:2

**horrible**
126:5

**hospital**
27:3 59:19 94:4

**hostile**
99:14

**hour**
35:11,13,15 36:3,8,19,24
37:14,17 95:25 111:1

**hourly**
35:10,12 36:14

**hours**
14:13 35:3,20 36:2,23
37:4 39:9 67:19

**housekeeping**
124:15

**Howland**

5:15

**HR**
14:24 15:17 35:12
105:19

**Hubler**
20:19 22:13,19 100:17
117:5

**huge**
90:6

**human**
25:21,23 66:18 96:15
127:9 133:25

**husband**
26:10 35:1 38:20 40:15
47:23 48:5,12 59:5 67:8
82:8 86:14,17 88:1 95:15
111:3 133:7

**husband's**
17:8 26:4

**hyperventilated**
87:4

---

**I**

---

**I'D**
70:22

**I'LL**
4:4,18 17:18 26:13 37:14
58:24 66:11 87:24
126:18 132:7 133:7

**I'M**
3:9 4:25 18:13,14,18
19:14 20:8 22:1 23:23
24:25 28:8 29:18 31:6
35:3 36:24 37:2 38:4
40:5 43:3 44:8 50:21
51:14 53:1 57:17 60:1,22
73:23 74:2,8 75:5,24
79:9 81:16,25 84:3,12
90:1 100:9,10 101:3
104:3 110:9,14 111:13
112:19 113:16 115:1,17
123:24 131:2

**ideal**
65:21

**ideas**
64:17

**IDK**

109:21

**ignorant**
71:6 111:17,21 117:24

**ignore**
53:8

**imessage**
120:22,23 121:4

**imessaged**
121:6

**immediate**
44:17

**immobilizing**
77:4

**impact**
81:5,7 101:6

**impacting**
15:15

**imply**
125:9

**important**
4:17

**improvement**
12:11

**in-classroom**
42:21

**in-depth**
41:14,17

**in-tuned**
76:3

**inappropriate**
69:13

**inbound**
104:15

**inbox**
104:18

**incident**
23:24 55:5,25 57:18,21
58:22,25 63:15 64:2
65:3,7 77:14 85:1,21,22
124:5 131:17 133:2

**incidents**
65:11

**include**
102:22

**included**
36:4 46:7,9 132:11

**including**
38:6 47:15

**income**
37:22

**individual**
42:6

**individuals**
57:16 96:9

**informal**
33:9

**information**
97:1 124:1 126:7 129:8

**initiated**
31:25

**Inn**
9:3 26:15,16

**inpatient**
27:2

**inquired**
54:16

**insinuated**
119:23

**insisting**
73:9

**instance**
16:4,7 47:22

**insurance**
38:19

**intend**
37:8 88:2

**intent**
89:12

**interact**
102:15

**interacting**
102:7,12

**interaction**
64:3,20 65:20 69:22
71:20 72:7 76:20 78:2
105:14 114:19 116:15
119:6,12

**interactions**
46:22 50:22 52:25 58:20

65:4 101:22

**interest**
15:25

**interfering**
14:6

**interject**
103:1

**interrogatories**
7:3,23,24

**interrogatory**
7:17 8:8 35:5,8 36:17

**interview**
4:6 40:23 92:7

**interviews**
40:24

**intimidating**
79:17

**invitation**
125:19

**involved**
49:4,9 91:16 133:11,13

**involves**
11:1

**Ireland**
67:22,25 68:20 122:19,
25

**irritated**
72:22

**isn't**
72:8

**issue**
42:13 43:10 49:18 61:25
64:6,8 87:10

**issued**
61:22 62:6,7,19

**issues**
42:1 53:22

**it's**
4:7,17,22 6:24 9:5 20:2
24:8 27:22 28:6,22 29:12
30:22 31:6 36:3,4 37:4
38:4 43:17 49:24 62:11,
12 66:20 73:16,19 74:24
77:23 80:5 81:2 85:22
86:11 92:20,21 93:11
94:2,18,21 95:25 100:8

101:20 103:3 104:4,16
108:3 110:15,22 111:12
117:16 124:15,21,23
132:1

**item**
42:2

---

**J**

---

**jacket**
80:6

**January**
8:20 11:6 20:14 30:12
32:1,7,21 33:13,15

**Jen**
117:8

**Jennifer**
20:19,21,23 22:12,15,19
100:17 117:4

**job**
8:7,8,11,15,18,23 9:15,
21,22 10:22 11:1 12:18
14:7 18:22 19:6,8,10,13,
14,25 20:25 22:25 26:15
27:7 33:21,25 41:15,19,
22 50:19 59:4 98:9,11
102:3,4,10 115:17
130:10

**jobs**
12:14 19:17 22:20 31:18

**Johnson**
114:9,11

**joined**
36:25

**joint**
27:1

**joke**
67:22

**jokes**
115:8

**Jonie**
91:14,16,24 93:13 96:5,
8,18,21 97:9,20 98:7,23
99:1,8,12 100:6,19
103:7,18 104:7,22
105:20,25 106:1,10,11
115:20 116:7,10,13
119:18,22 120:1

**Jonie's**
91:23

**Joseline**
76:8,21 77:15 84:25
85:3,8 91:14,16,19 96:19
109:1,4,18

**Joseph's**
33:12 34:1,12 35:10
36:23 37:1 39:6 40:1

**judgment**
116:24

**judgmental**
47:21

**July**
25:7 121:5

**jumped**
127:13,14

**June**
9:18 10:6 22:13,19

**junk**
67:20

---

**K**

---

**Katy**
3:9

**keep**
44:16 48:19 90:14 97:25

**Kendrick**
24:16

**Kennedy**
24:15 25:3

**kept**
73:8

**keys**
82:12 87:21,24

**kick**
37:20

**kids**
94:9

**kids'**
89:19

**kind**
9:4 42:17 47:17 63:6
75:4 76:3 83:22 86:8
87:22 90:14 94:2 97:22

104:16 132:6,7

**Kirk**
43:2 49:2,10,12,14,17
53:24 54:1

**Kirstie**
3:5,17

**knew**
26:3 44:9,12 58:11
77:12,13 83:3 92:4 94:7
97:3 111:6 121:22

**know**
4:8 6:23 9:11 11:1,3
14:22,25 21:15,23 28:11
39:22 42:3 44:2,10 47:7
50:19 52:3 53:20,21
55:21 56:22 58:15,18
63:10 66:9 68:13 70:5,9,
22 75:22 76:4,21 77:25
78:23,25 87:23 88:2
93:5,7 94:18 96:22 97:8,
20,24 98:1,12 102:22
105:11 106:4 109:10,22
112:1 115:12 117:2
118:10 121:3,20 129:18
131:5,21 133:11

**knowing**
44:10

**knowledge**
10:19 11:13 14:21 43:13
119:5 129:23 130:8

**known**
70:24

**Kristie**
77:19 78:17,21 80:25
82:14 84:25 85:14,25
89:25 90:4,8,22 91:14,22
93:15 95:5 96:19

---

**L**

---

**labrum**
27:1

**language**
72:17 82:19

**large**
51:24

**lasted**
74:6 75:7

**late**
61:6,11 98:20

**laugh**
51:10 112:9

**law**
128:11

**lawsuit**
65:13 120:8 121:10

**lawyer**
17:20 21:24 22:4

**leading**
49:8

**learn**
43:6 69:21

**learned**
28:23 100:20

**leave**
8:18 9:21 13:7 14:10,14,
17 15:3,6,9,12 16:14
21:19 29:22,23 35:18
38:2,15,16 55:18,19
57:19 63:11 89:19
107:12

**leaving**
26:22 34:3 105:15

**led**
23:24 48:8 52:23 57:18
107:4

**left**
10:1,9,20 11:14,23 12:7,
10 13:6 16:16,19 18:12
19:8,9 21:22 22:23
24:20,22 25:2,8 49:21
76:21,22 77:12,21 94:6
95:15 97:9 98:19 106:17
108:24 116:2 129:21

**lessened**
130:17

**lesser**
96:15

**let's**
7:5 46:11 49:19 106:23
130:24

**letter**
31:21 35:12 99:4,9
106:15

KIRSTIE TRAHAN - 01/07/2019                              i13

**level**
43:5

**Lexi**
53:12

**liar**
119:20,22

**liberal**
6:5 25:19

**life**
23:20 24:6 54:24 87:16

**lightly**
45:5

**liked**
68:5

**Lincoln**
5:8,11 8:9

**Linda**
18:1,5,6,10,11,12,18,21
19:2,3,21 22:17

**lines**
53:20

**list**
44:4,7,8 45:21

**listed**
36:3

**listen**
105:13

**listened**
67:21 70:23

**litigation**
122:1

**little**
4:13 27:15 49:25 63:15
67:1 92:1 94:23 112:5,
11,18 129:14

**live**
32:2 49:22 75:3 93:10
96:11,12

**lived**
26:21 30:12 118:7

**living**
74:18 81:2

**lobby**
91:2,4,9,12 94:14,18,21,
25

**location**
102:9

**lock**
87:21,23

**LOL**
112:9

**long**
6:6 30:2,8 35:14 75:7,12,
13

**longer**
84:9

**longest**
133:23

**look**
8:1 20:9 40:2 52:12
56:12,16 70:22 103:1
105:17 107:21 113:11
126:18

**looked**
24:25 35:6 53:2 82:19
113:14

**looking**
7:16 18:18 20:16 25:1
63:21 101:1 103:24

**looks**
10:9,22 17:25 80:4
109:16 114:21 118:18
124:20

**lose**
35:19 59:6 115:17

**losing**
33:21,23

**loss**
39:3

**lot**
13:18 14:1 23:10 24:3
30:13 31:15 33:5,22 46:8
67:8 73:1 92:20 95:18
100:11,24 104:18 109:15
115:6 118:5 121:17
124:6 131:17 132:3
134:16

**lots**
47:2

**loud**
51:10 112:9

**loudly**
67:22 68:9 69:25 95:6

**love**
24:6

**lunch**
46:7 56:22,23 106:23

**Lynn**
3:17

―――――――――――

**M**

―――――――――――

**Macdonald**
69:3

**Macy's**
9:22 10:4,18

**magazine**
9:9

**mail**
104:11

**main**
49:10

**Maine**
5:8 6:2,11 8:9 25:13
31:22 66:18 127:9

**making**
49:15 52:7,18,24 54:14,
19 56:5,10,20 57:23
58:3,13 82:20 85:11
116:11,14 126:8

**male**
134:4,5

**Mall**
6:11

**management**
18:6,7 22:17,22 23:4,5,7,
8,9,15 59:1 98:3 105:19
106:5

**manager**
58:23 59:16 78:25 79:1
101:21 126:10

**managers**
77:10 110:25

**manifest**
13:23

**Manion**
79:5

**marathon**
4:7

**March**
11:19 25:5 34:15,16 37:1
66:20 67:11

**Marginal**
12:2

**Marital**
86:22

**mark**
7:5 75:7,8

**marked**
7:6,16 17:14,17 20:3
22:9 59:23 65:25 107:22
113:9 118:16 120:17
122:9 124:18 127:5

**marriage**
3:19

**married**
17:6

**material**
134:16

**maternity**
35:18 38:14,16

**math**
33:4,8

**Matt**
55:5,22,24,25 63:16,18
64:2,3 65:7 76:24 101:19
102:16,19 126:20,24,25

**Matt's**
63:25

**matter**
86:19

**max**
89:6

**Mcdonald's**
8:9

**mean**
16:5 21:24 23:8,16 27:23
29:4,17,22 31:17 33:19
43:11 46:24 47:17,20
48:2 49:20 62:11 63:20
69:24 73:12,19 74:8,11
87:17 91:2 92:21,25
100:10 103:17 104:1
105:11 109:4,22 110:12,

KIRSTIE TRAHAN - 01/07/2019                               i14

19 122:20 125:4,7
126:16 127:14 133:10

**means**
67:19 74:10,14 110:5,14
112:9

**meant**
58:11 87:21 92:22

**med**
18:6 89:9 98:3

**medical**
13:7 14:9,17 15:2,6,9
17:18,23 20:11 22:12
24:25 26:11,14 38:18
99:2,5,15,16,22,23,25
100:8 116:19 117:4
130:21

**medication**
18:7 22:16 88:18 89:8,13

**medications**
88:11,12,19

**meds**
14:15 88:9

**meet**
33:10 46:25

**meeting**
47:2 53:16 54:2 77:12,13
79:20 81:12 82:5,7,11,13
83:4 84:5,25 85:4,8,25
87:10 90:21 91:8,19,23
92:13 96:10 109:19
110:3

**meetings**
24:3,10 67:9

**members**
44:21,24 45:7

**memory**
40:4 67:13 81:5

**mental**
21:2,14 38:22

**mentally**
24:4 33:20

**mention**
71:12 103:24

**mentioned**
11:16 49:2 103:5

**message**

76:17 77:15 104:11,15
107:18 108:19 109:11
121:24

**messaged**
110:2

**messages**
121:13

**met**
3:13 49:11 83:7 106:6

**Microdyne**
8:24 9:1,2,23 10:1 12:20,
25

**middle**
47:23 48:1 90:2 112:24

**mild**
90:18 131:25

**military**
24:1,11 80:2

**mind**
46:21

**minds**
82:17

**minimize**
117:7

**minimized**
52:1,21

**minimum**
35:25 90:14

**minute**
58:25 64:25 66:9 86:10
105:18

**minutes**
74:6,11,15,16,17 76:2
130:25

**miscarried**
25:3,6

**missed**
62:23

**mixed**
24:2

**mom**
40:7,17 45:3 48:11

**monitor**
124:21

**month**
13:7,8 14:15 15:11 30:4
66:25 67:2 126:2 129:20
131:22

**months**
24:5 67:4 70:16 120:14,
15

**morning**
3:9,10 36:12

**morphine**
61:14

**mouth**
74:9 109:25 115:14

**mouths**
82:23

**move**
10:12 12:7 26:9 49:19
76:13 97:23 103:25

**moved**
10:10,13,14 13:19 50:12
76:15 98:11,16 101:11,
13 130:15,19

**movie**
73:17,19

**moving**
128:20 129:2

**multiple**
9:7 64:9

_____

**N**
_____

**naive**
100:9,10

**name**
3:15,19 17:8 45:16 53:3,
6,7 54:5 56:24 79:3
121:1 133:21,25 134:6

**named**
118:19 120:23

**names**
48:17

**nanny**
34:23,25

**narrow**
131:12

**near**

53:6 55:10 119:3

**necessarily**
82:21 101:23

**need**
4:8,11 6:21 21:8 61:15,
17 63:21 64:25 86:7 94:7
98:8,10 103:10 126:15
130:22

**needed**
6:16 15:11 33:11,24
55:9,10,16 62:10 76:16,
25 78:7 87:10,11 88:8,
16,19,20,25 89:1,5 90:23
93:13,16 98:11 99:21

**negative**
58:19 64:3

**nesting**
42:23 43:16 44:19 49:18,
19,20,21 50:2,9,14,21,24
51:7 53:16,25 54:2 57:1
62:16,22 84:22 101:20
103:3 114:15 119:3

**Netflix**
21:4

**never**
51:25 77:5 83:17 106:6
126:15

**new**
9:22 18:14 28:6 43:20
46:25 47:2 58:22 130:16

**Nexxlinx**
12:17,23,25 13:5 14:4,22
15:13,17,21,24 16:3,11,
14,16 19:4,7,18,22 20:1
21:5,6 23:4,5,8,15 24:20,
22 25:2,8 29:21,24 41:13
133:19 134:2

**nice**
48:10,12 69:3

**nicest**
47:12

**nickname**
48:24

**night**
14:11 37:3 61:13 89:9
96:23 99:2 105:20

**Nope**
5:12 66:22

KIRSTIE TRAHAN - 01/07/2019                    i15

**normal**
6:21

**Nos**
59:23

**Notary**
3:5

**note**
18:18 56:5 85:23

**notes**
67:7

**November**
26:23

**number**
69:4,11,14,23 70:8
127:21

**numbered**
112:19

**numbers**
112:18,19

**nurse**
18:6 22:17

**O**

**o'clock**
68:17

**oath**
4:6 8:5

**Object**
29:15 68:21 128:7

**Objection**
84:18 102:11

**objective**
92:16

**obnoxiously**
68:10

**October**
9:18 30:5 120:9,11
123:15,16 124:3,13
125:24

**off-line**
133:6

**offered**
38:24 99:2,4

**offering**

127:21

**office**
65:15 95:23 129:16

**official**
106:15

**oh**
6:18 12:22 17:16 20:16
58:10 109:17 112:4
122:21

**okay**
3:23 4:1 5:6 6:3,18 7:8,
21 8:7,15,18,23 9:13
10:1,17,22 12:4,7,9,14,
18,22 14:17 17:2,13,25
19:20,24 20:16,19 21:10,
13,22 22:8,19 23:11
24:20 25:8,14,18 26:22
29:10,19 30:6 32:3 33:8,
12 34:1,16 35:4,10,21
36:1,14,25 37:5 38:1,9,
13 39:12,20 40:5 42:9,17
43:22,25 44:15,18 46:10,
14 48:14 49:19 50:9,14
51:23 53:23 54:12 56:18
58:24 59:6 60:10,22
61:19,20,22 63:3,10,24
64:2 65:7 66:8,12 69:1,
21 70:6,11 71:18 73:23
74:2,20 77:7,18 78:3,17
79:2 80:21 81:20,24
82:10,13 84:9,19 85:6,9
86:13,24 87:15,17,20
88:1 89:2,10,12 90:1,19
91:1,6,15 92:9 94:15
95:15 97:14,15 98:7,15,
19 99:1,11 105:15,24
106:8 107:12,21 108:19
109:6,17 111:11,19
112:2,17,21,23 113:8
114:6,15 115:12 117:15,
18 118:9,15 119:8 120:6,
16,19,23 122:5 123:3,6,
18 124:13,17,25 125:12,
15 126:18 127:4,16
128:10 131:18 133:1,18,
25

**old**
17:4

**Olive**
6:10 11:16,21

**once**
25:10,20 44:12,16 46:6,

25 47:22 51:25 60:17
79:14 90:2,3 96:22
131:22 132:1

**ones**
59:2 100:2

**online**
25:12,14 31:5,6,9 32:22,
23 40:22

**open**
9:10 52:11,14 130:2

**openly**
133:14

**opportunity**
62:25

**opposed**
42:7 120:14

**option**
103:9,13 130:1

**order**
15:9 59:25 133:4,5

**orientation**
34:15 129:11

**oriented**
20:10

**Orono**
9:2

**outbound**
104:9,21,25 105:1,5,8

**outgoing**
104:14 106:19

**outpatient**
27:4,5

**outset**
16:22

**outside**
44:14 57:5,6,9 64:10
80:5 82:12 124:24 125:7
126:5

**overanalyze**
132:8

**overbearing**
55:6

**overnight**
35:22 36:2

**overnights**
34:9,18,20

**overstep**
70:12

**overstepping**
111:25

**overtalking**
70:14 71:24

**P**

**p.m.**
67:17 68:17,19 106:25
107:1 114:23 134:19

**pack**
87:7,12,17 94:10

**package**
69:20

**page**
7:19 8:1,2 18:19 35:9
60:6 61:4 74:5 79:10
83:15 111:13 112:24
114:25 115:16 117:18
119:16 121:5 123:5,18
124:9,22 126:2

**pages**
112:22

**paid**
37:10 38:16 39:6 86:11

**panic**
79:18,22,25 80:14,18,22
81:1,4 82:1 131:8

**panicked**
93:11,18

**paper**
85:5

**papers**
83:18

**paperwork**
100:11

**paragraph**
19:20 67:15 71:12 72:8,
23 74:2,3 79:11 84:20
90:2 94:15

**paragraphs**
66:6,11

KIRSTIE TRAHAN - 01/07/2019                    i16

**park**
36:7

**parking**
95:18

**part**
45:8,9 73:9 74:25 93:22

**particular**
6:4 26:1 42:25 47:4
48:14 71:23 130:5,21

**parties**
3:2

**passed**
59:21 63:4

**passing**
44:11,13

**patient**
18:21 19:10

**pay**
35:14 36:4 37:11,19 38:7
39:9,12,21

**payment**
42:3

**payroll**
8:15

**pays**
48:12

**pending**
4:9

**Penobscot**
5:14

**people**
4:15 27:18 28:22 30:21
43:20,22 44:4 45:5,10,25
46:25 47:2,10,13 49:10
50:7,10 51:17,18,24
52:2,7,18 57:8 68:15
79:14 95:8 98:12,14,16
100:23 101:17,22 102:1,
4 121:22 123:9 125:10
126:4 132:20 133:3,10,
11,13

**people's**
72:25

**percent**
19:15 37:21 71:17 100:3
123:24

**perception**
23:17 29:6

**performance**
12:11

**period**
6:13 27:5 31:1 39:9,12
40:7 46:15 50:2 75:16
130:6

**periodically**
80:1

**permanent**
54:17 76:14 130:16

**permitted**
103:8

**person**
4:15 41:1 78:8,9,23
83:10 100:15 106:4
122:2 132:18

**personal**
126:25 127:2

**personality**
41:7,16

**phone**
41:24 65:16 68:8 82:9,12
88:1 96:8 99:12 100:5
103:21 104:5,6,9,13,21,
25 105:1,5,9,14 106:8
114:1 115:18,19,20
116:7 123:13 127:21

**photograph**
124:21

**phrasing**
53:19

**physical**
26:12 50:3 127:3

**physically**
35:21 73:17

**pick**
30:20 37:3 67:20 68:15

**pickups**
133:8

**pictures**
93:25 94:9

**piece**
45:23 102:9

**place**
14:18 34:1 77:14 91:8
116:12 124:5

**placed**
90:4 107:12

**places**
34:4

**plan**
38:21

**plans**
12:12

**Plante's**
124:22

**play**
37:12,23 54:3,8 81:9
85:8 86:23 97:14

**played**
72:2

**playing**
74:14 97:6

**plays**
30:13

**please**
3:16 20:10 65:1 70:12,14
111:24

**point**
14:13 21:3 23:20 26:3
31:6 55:17 68:4,19 70:7
71:18,19,23 79:3 92:17
95:6 98:7 101:10 110:24
123:7,24

**points**
60:17,18

**policy**
60:16 63:10

**Pont**
54:4

**Ponte**
54:4

**pool**
33:18,19

**Poolie**
55:5,22 63:16 76:24
102:16,19 126:20

**portion**
62:20

**Portland**
10:10,12,13,14 11:25
26:20 32:10,17,19

**position**
10:9 36:24 127:25
128:10

**possible**
19:25 20:2 53:9 74:24
75:2 76:15 128:20

**possibly**
71:16 116:15 128:23

**post**
124:2

**Post-it**
54:3,8 56:5 85:23

**posted**
122:22

**prefer**
76:14 110:16

**pregnancies**
40:3

**pregnant**
16:15 25:2,7 26:18

**prep**
43:11

**prepared**
66:15,17

**present**
85:16 91:13 114:18

**presented**
103:13,17,18

**presumably**
101:14

**pretty**
43:3 44:8,12 50:1 68:20
110:9 111:4 131:2

**prevent**
101:14

**previous**
125:23

**Prior**
32:7

**privacy**
52:13

KIRSTIE TRAHAN - 01/07/2019                    i17

**privilege**
86:19,22,23

**probably**
4:1,2,9 90:17 111:13
115:17 116:8

**proceeded**
70:23

**process**
66:23 92:22 93:11
121:15,21,25

**processed**
90:13

**processing**
41:25

**produce**
122:15

**produced**
122:12 126:20

**professionalism**
134:12

**professionals**
99:22

**professors**
31:15

**profile**
123:2

**program**
42:18 62:25 119:1 129:9

**promotion**
15:24 20:25

**prompt**
6:22

**prompted**
126:1

**pronounce**
45:15 54:4

**prove**
124:23

**provide**
99:2,4,5,9 113:18 128:14

**provided**
7:4,24 113:20 122:14

**providers**
117:4

**providing**
128:11

**psychology**
26:6

**PT**
95:23

**PTSD**
13:6,9 15:12,14 21:17
22:1 23:6,8,14,17,18,24
24:7 27:10,14,17,25
28:21,25 29:1,8,10,20
30:21 32:15,16 38:21
45:4 47:4 55:1,4,12,15
64:21 65:5 84:5 92:20
93:22 96:2,10 97:20
100:1,2,3 103:7 110:14,
21,25 111:7 115:22
116:11,16,23 121:23
122:24 126:14 128:1,8

**public**
3:6 32:4 93:9,10 122:24
123:2,3 131:9

**pull**
28:3 68:5 98:2 105:13

**pulled**
24:3 67:23 109:2,4,17
110:2

**punished**
55:21

**purse**
87:14,16 88:2 89:21

**put**
28:8 29:18 33:22 45:19
53:7,15,17 57:19 62:10
67:23 68:8 74:8 75:6,8,
16 100:11 103:15

**putting**
76:17

---

**Q**

---

**qualified**
130:11

**question**
4:9,10,17,20,25 20:8
43:9 131:6

**questioned**
96:24

**questions**
4:22 23:23 37:25 66:11
83:2 86:2 92:20,23 93:2,
3 106:18 134:10

**queue**
67:24

**quick**
81:21,25 86:15

**quickly**
52:1,22

**quiet**
13:25 102:2

**quit**
18:22 19:6,8,10,25 22:20

**quite**
24:8 52:3 57:24 117:23
131:19

---

**R**

---

**raised**
64:1 72:21

**ran**
43:3

**Rand**
3:8,9 7:5,7,9,14 17:15
20:4 22:10 28:15,19
46:11,13 59:24 61:16
66:1 80:9,13 86:20,24
104:3 106:22 107:2,23
113:10 118:17 119:15
120:18 122:10 124:19
127:6 130:24 131:2,4
134:14,18

**range**
36:7 100:4

**ranges**
36:9

**rape**
75:19

**raped**
75:12

**raw**
110:19

**reached**
33:17 58:22 96:20
107:14

**reaching**
42:10,12 76:8 77:8

**reacted**
81:15

**reacting**
81:14

**reactive**
29:11,14

**read**
19:20 20:6 65:17 66:5,6,
10,11 68:6

**reading**
20:8

**ready**
33:21 129:11,15 130:2

**real**
27:21 28:24 49:24 56:18

**realistic**
129:6

**reality**
23:22 27:20

**realized**
26:18

**really**
3:13 4:6,18 17:24 19:19
23:18 26:3 29:7 30:25
32:4,5 33:7,24 45:22
49:17 52:1 54:24 57:2,14
68:9,24 69:19 77:22
80:4,5,23,24 87:6 89:18
97:6 98:2,3 102:2
110:14,22 116:11,25
121:12 123:20 133:2

**reason**
6:14 15:10 28:16,17
47:15 96:18,25 104:20
105:4 128:3 133:12

**reasonable**
12:15 128:14

**reasons**
103:5

**recall**
9:25 15:22 16:16 19:2
21:8,11,19 26:16 30:16
41:5,7,10,24 46:4 48:14,
17 51:3,6 52:16,19 59:20
60:19,21 61:11 62:15,18

63:24 64:6,12 65:6,7
68:3 77:9 81:14 82:13,
15,25 85:3 86:16 90:22
91:15,19,21,22,24,25
92:1 95:9,11 99:7,11,14,
15,18,19,21 100:5,7,19
106:11,13 113:2 114:18
117:9 118:2,4,9,12,13
124:10 125:18 128:20
133:18

**receive**
20:25 63:6 106:14,16

**received**
8:15 17:19 20:12 105:24

**recess**
46:12 80:12 106:25
131:3

**recognize**
7:21 60:4 66:13 108:2

**recollection**
22:25 23:3 65:20 74:12
84:15

**record**
3:14,16 7:13 17:25 20:11
22:12 28:9 48:19 80:11
86:21 104:25 106:24
119:14 134:11

**recorded**
104:5,6,8,10,14,17,23
105:2,3,6,8,9 106:19

**recording**
104:12

**records**
17:19,23 24:25 26:15
99:3,5,17,23,25 100:3
104:17,21 116:20

**recoup**
87:8

**recruiter**
40:25

**reduced**
38:11

**reference**
26:13,14 64:11

**referred**
48:25

**referring**

19:4,6,12,14,15,21 21:16
115:3 116:22 121:20
127:18

**refresh**
22:24

**regardless**
88:13

**regular**
105:9

**regularity**
131:15

**related**
64:8 113:23

**relates**
61:6

**relation**
117:9

**relationship**
126:12

**relatively**
132:22

**relive**
23:20,21 29:2

**reliving**
132:5

**rely**
32:5

**remained**
71:3

**remember**
16:1 19:19 21:18 22:2,3
23:2,9 25:1 30:17,18,25
38:17 39:1,18 40:21 41:9
42:4 44:6 46:2 49:8
53:18,19 57:8 59:13
70:17 71:1,16 72:14
73:14 74:15,17,18,20,25
76:7,11,12,13,17 77:7,
18,25 79:3 82:22 83:6,
10,15,20 84:4,7,14 93:3,
4 95:4 109:15 111:16,20
112:14 113:6 124:11
125:21 133:20,21,25

**remembered**
97:17

**remembering**
83:24 84:1

**remove**
133:16

**removed**
123:8

**rep**
10:25 12:4 41:20,21 50:1

**rephrase**
128:2

**replay**
73:23

**replayed**
75:19

**replaying**
73:21,24 75:17

**replays**
73:17

**replied**
112:4

**replies**
112:8

**report**
20:24 49:17 54:1

**reported**
20:25 49:14 53:23 54:1
56:4 58:21 68:11,14 85:9

**reporter**
4:12 6:19 7:15 17:17
20:5 22:11 66:2 107:24
120:19

**reports**
59:1

**represent**
3:11 17:18 26:13 126:19

**representative**
65:14 105:6 134:1

**request**
12:15 13:4 20:13 32:13,
14 101:12 130:12

**requested**
15:2 31:19,25 32:1,12,16

**requesting**
15:6 32:18

**requests**
31:17

**require**
32:7,20

**required**
128:14 129:5

**resolution**
97:22

**resource**
50:15

**resources**
134:1

**respond**
81:7

**responded**
72:13

**responds**
115:12

**response**
8:8 20:12 36:17 62:8
66:17 70:11,19

**responses**
7:23

**rest**
9:12 75:24

**result**
23:25 29:20 30:10

**return**
25:14 33:16 40:9

**returned**
80:1

**returning**
93:21

**review**
60:18 62:11

**reviewed**
17:22

**ride**
75:4 96:2

**right**
7:15 11:16 15:13 16:17
21:21 22:17 25:4,7 28:5,
13,14 33:10,13 35:24
37:17 39:4 40:7 41:3
43:11 50:2,4 55:24 56:15
61:7,8 65:8 66:2 69:1
71:24 74:7 77:17 78:22
85:24 91:11 94:17,22

KIRSTIE TRAHAN - 01/07/2019                    i19

95:16,18 97:10 98:22
101:15,18 105:15 107:5
108:22 110:25 111:24
112:7,12,13,19 115:25
116:1,4 118:11 120:5,15
122:22 123:15 125:23,25
127:23 132:13,16

**right-hand**
112:17

**Rights**
66:18 127:9

**rigid**
60:19

**role**
72:2 106:4 126:8

**roll**
129:12,15

**rolled**
98:1 129:18,20

**Ron**
57:14,22

**room**
78:18,21,24 79:13 91:10
94:12,23

**rooms**
91:11

**roughly**
6:1 51:23 75:7

**row**
51:19,20,21

**rude**
45:25 117:24

**rudely**
127:13

**rule**
6:18

**rules**
4:1,5

**run**
42:25 43:8 50:15 64:14
133:6

**running**
49:24 109:24 133:3

---
**S**
---

**safety**
28:9

**sales**
65:14 105:6

**Sandra's**
18:14,15,16

**sat**
50:3 55:13 89:17 90:3
95:19 102:1 119:4

**Saturday**
36:12 37:3

**saw**
22:16 51:25 52:4,8,22
53:2,3,7,11 56:23 65:19

**saying**
4:16 19:2 72:15 83:15
84:1,4,7,14 91:19,22,24
99:7,21 106:11,13
112:14 113:2,6 118:2

**says**
4:13 19:10 21:13,22
36:22 39:21 68:16 74:5
115:13

**scenarios**
43:8 49:23

**schedule**
34:4 35:1

**scheduled**
35:14

**school**
5:11,13,14,16,18 6:8
11:9 22:21 25:12,14
31:12

**Science**
25:23

**screen**
52:11

**screens**
52:12,13

**screenshot**
123:10,14 124:23 125:22
126:1,22

**search**
113:17

**seated**
71:3

**seats**
50:5 102:25

**second**
8:2 60:6 61:4 84:24 85:8
91:8 101:12 103:13
117:18 127:11

**secretary**
95:9

**security**
89:20

**sedatives**
88:10

**see**
18:9,13 20:7,14,15,16,21
33:20 52:10,23 53:5
59:18 65:23 95:20
100:13,14 113:23 123:19
130:17

**seeing**
52:16

**seen**
17:23 31:23 131:24

**select**
51:9

**semester**
31:13

**semesters**
33:5

**send**
133:7

**sense**
6:23 109:24

**sent**
77:15 104:17 109:8,12
125:18

**sentence**
18:21 21:22 84:19,24
127:11

**separate**
85:20

**separated**
103:11 130:20

**separately**
22:16

**September**
8:21 10:7 11:7,18 16:17,
18 20:1 25:15 30:7 59:22
67:7,16 105:24 109:12
114:22 124:16 127:12
130:13

**serious**
24:9 101:9 134:16

**seriously**
24:7

**service**
8:12,23 9:9 41:20 129:24

**set**
51:19

**Seth**
17:9,11

**sexual**
16:2 18:24 24:1

**shafted**
110:10,13,18,19 111:5

**shaky**
75:24 80:23

**share**
61:22 123:3,4,5,22

**shared**
15:7 27:13 46:16 107:8
110:24 122:18,21,22

**sharing**
100:19

**Sharp**
70:9

**she's**
19:15 95:13 121:22

**shift**
35:13,14,17,22,24 36:1,
5,11,13,19,21 37:22

**shop**
42:3

**short**
46:12 80:7,12 131:3

**short-term**
37:11 38:24

**shortly**
126:22

**shoulder**

KIRSTIE TRAHAN - 01/07/2019                    i20

show
126:23

showing
124:21

shows
125:3

shut
96:16

side
57:20 69:19 77:21
105:16 119:4

sign
89:21

signature
3:3 8:2 60:6 61:4

signed
8:4

significant
24:8

similar
54:20 81:15 126:19

simple
26:7

simplest
7:2

singled
115:6

sister
40:17

sit
24:24 39:24 47:18 48:17
57:8 84:9 98:2 99:19
114:15 119:3

sites
32:10

sitting
50:6 66:21 74:18 95:9,14

situation
27:22,24 29:2,12,18 38:5
40:25 53:8 62:3,12 64:9
71:25 77:1,3 78:14,22
79:14,18 81:19 83:1 87:1
91:17,25 92:2 93:24 97:5
101:3 118:6 122:4 129:2
130:17 132:6,8 133:14,

17

situations
29:4,13 32:5 79:17 81:8

six
24:5 67:3 70:16

skills
41:8

skipping
74:2

Skype
85:12 104:16

sleep
14:12 34:22 89:5,7,9,13

sleeping
14:15

slides
43:7

slow
75:2

small
40:12 102:13 133:4

smells
94:5

snapping
111:14

snappy
92:24,25 112:2

snarky
92:24

social
89:19 102:4

sold
9:6

somebody
16:4 22:15 59:6 63:20
78:20 87:11 88:5 94:10,
11 120:21

somebody's
37:3

someones
42:25

someplace
132:24

son

24:16

soon
76:15 82:11 124:5

sorry
13:3 21:6 58:10 104:3
125:1

sort
4:15 33:8 41:7 43:9
63:20 64:14 70:18 73:5
76:25 124:9

sound
79:7 134:6

sounds
79:8

Southern
6:2 25:13

space
50:3

speak
15:18 28:20 57:10 61:17
77:19 78:7,12 86:18
90:23 96:22 129:13

specific
51:6 118:13 122:4

specifically
51:3 118:9

speculate
52:21 70:4 113:5

spoke
120:3 134:1

spoken
108:15 114:1

spread
51:21

St
33:12 34:1,12 35:10
36:23 37:1 39:6 40:1

staff
99:16

stall
55:14

stamp
116:4 117:20

standard
41:11

start
4:18 43:19 71:20 76:3

started
10:15 11:9 25:9 30:4,11
33:17 34:14,24 44:3
65:13 67:16 71:8,24
72:24 73:2,6,8 90:9,10
114:22

Starting
42:24 108:19

startled
90:12

starts
84:22

state
3:15 21:2,15 32:11
134:11

stated
100:23 101:5

statement
72:15 79:9 83:14 90:1
107:9

states
18:21 19:10 22:20,22
35:12 69:7

stating
100:7

stats
130:9

stay
125:10

stay-at-home
40:7 45:3 48:11

STD
37:19 38:2,10

stick
26:19

stickies
53:15

sticking
53:1

sticks
46:21

sticky
53:17 54:9

**stigma**
110:22

**STIPULATION**
3:1

**stood**
96:4,5

**stop**
65:1 66:6 70:14,21 88:7
106:22 111:25

**stopped**
6:13

**stops**
76:6

**straight**
80:6

**stream**
114:21

**stress**
13:18,22 18:23 33:22
34:5

**stressful**
32:17

**strong**
23:19 57:2

**stronger**
51:4

**stub**
36:4 39:21

**stuck**
83:18

**studies**
6:5

**study**
25:18

**studying**
6:3

**stuff**
87:7,13,18 89:19,20,22
94:9,10 105:17

**subject**
16:2

**subjected**
9:23 10:17 11:11

**submission**
66:18

**submit**
81:25

**subsided**
90:11

**suggest**
19:21

**suggests**
19:23 73:12

**supervised**
133:22

**supervisor**
15:17 16:8 18:24 133:19,
23

**supervisor's**
133:21

**supply**
100:7

**supportive**
22:22 23:4

**sure**
19:15 43:3 44:9 51:14
52:2 56:19 60:2 95:2
100:3 101:3 104:1
105:12 110:9 111:5
113:16 118:8 123:25
131:1

**surgery**
26:23,25 27:2,6

**surprised**
65:23

**surround**
93:22

**surrounding**
21:11 52:5

**suspended**
92:5 97:24,25 107:13

**suspicion**
78:12

**swear**
113:1

**swearing**
118:4,10 119:17,19,23

**sweat**
72:24 75:24 80:23

**switched**

25:20

**swore**
83:12 118:6 128:5

**sworn**
3:5

**symptoms**
27:13

**Synapse**
9:9,11

**system**
43:6 105:8,11

**systems**
67:18 68:16 69:2

---

**T**

---

**table**
9:10 103:9

**take**
4:7,10,11 14:9,14 15:11
20:6 21:8 24:7 28:11,20
31:7 32:23 33:7 35:17
37:8 38:23 46:11 59:11,
25 61:18 66:5,9 67:7
80:10 87:8,24 88:9,12,
16,19 89:3,4,6,12 91:8
94:3,4 123:14 125:22
126:1 130:24

**taken**
3:24 41:12 46:12 80:12
106:25 131:3

**takes**
23:19 132:2

**talk**
4:16 27:15 57:16,21,25
58:1 64:16 66:23 75:1,5
76:16 85:19 88:5,7 89:15
97:21 98:4 100:16
110:15,16 114:4 121:7,
17

**talked**
4:3 15:4 33:5 54:13,17
56:3,6,21 57:24 58:2,4,
14 59:5 62:14 67:8 69:16
85:22 87:1,2,3 88:11
96:1 100:22 106:7
108:17 111:2 115:21
117:8,14 121:12 122:2,4
128:19 129:10 130:14

132:10

**talking**
44:25 46:15 51:15 53:21
54:10 56:13 57:17 58:5
68:1 69:8,17 70:12 72:25
80:14 103:6 106:8 107:4,
6 132:18,20

**talks**
133:14

**target**
115:1,5

**targeting**
47:11

**tasks**
102:23

**teacher**
33:4,8

**teaches**
43:6

**team**
18:14,15,16 64:17 79:1
101:21

**teams**
50:11 130:20

**teen**
8:13

**tell**
13:4 15:2,8 16:23 19:3
21:8 36:12 52:1,4 54:22
55:1,3,4 59:16 62:2
63:13 78:8 80:25 81:17,
20 82:18 83:25 88:7
96:9,16 99:11 101:8
125:13 126:14

**telling**
69:14 83:24

**tells**
119:17

**tend**
14:3 15:16 64:10 68:14
81:16 93:22 133:4

**tense**
82:15

**terminate**
106:12 128:16

**terminated**

KIRSTIE TRAHAN - 01/07/2019                          i22

29:21,23 31:11 39:2
62:24 107:7 116:9
120:13 126:2 127:25
128:4,8 129:22 131:20

**terminating**
105:22

**termination**
27:11 30:8 57:18 60:18
62:12 65:3,9 67:4 101:1
106:15 107:5,13 114:2
125:16 126:9,23 133:12

**terms**
46:21

**terrors**
14:11

**test**
32:19 41:8,11,16

**tested**
32:9,11

**testified**
3:6 107:10 115:9 127:19

**testing**
32:10

**text**
105:17 107:18 108:14
120:8 121:12

**thank**
134:9,12,17

**Thanks**
5:6 7:11 134:14

**therapist**
20:20 99:4,10 100:13

**therapists**
98:3

**therapy**
26:12

**there's**
51:18 73:13 102:12

**they're**
17:23 104:23 124:12

**thing**
6:20 57:19 69:16 76:7,11
77:7,18 86:9 105:11
110:3,10 111:12 124:15

**things**
9:13 24:3 33:23 40:3

46:8 53:16 54:24 56:19
64:9 71:10 72:5,19
103:6,16 114:4 126:5
127:23 132:22

**think**
5:3 7:2 11:22 16:5,18,21
19:11 26:17 30:20,25
35:4 36:3,9 38:5,9 39:1,
22 41:18,20 42:4 44:5,22
46:2 47:9,18,24 48:2,4,
18 50:17,21 52:20 53:4,7
62:21 64:10,14,23 65:12
66:25 70:3 71:17 72:21
76:18 77:21 78:5,25 79:1
80:16 81:17,20,21 83:4,8
85:5 86:1,10,12 91:23
92:4 93:20 95:5 103:21
105:7,12 106:5,22 107:5,
11 108:18 109:5,9,13
111:1 112:5,10 113:4,16,
25 115:14 117:8,13,14
121:12 123:8,17 124:12
128:17 129:2,20

**Thoma**
49:11 50:18 54:2,12,22
55:1,4,13 56:2,4,8,21
63:12,13 85:17 88:7
89:15

**Thoma's**
50:19

**Thompson**
43:2 49:4

**thought**
30:12 47:24 48:2,4,5,9
83:3,16 97:21 98:1
111:17,22,24 112:25

**threatened**
81:8

**three**
17:5 24:4 40:3 59:14
61:18 63:3,14 127:17

**Thursday**
99:12 105:20 115:24
120:2

**Thursdays**
35:2

**tight-knit**
45:2,6,12,20,24 46:17
58:16

**time**
4:8 6:8,13 9:9,11 11:9
15:14,23 16:10 20:6
21:3,18,21 23:1,6,13,20
27:5,9 28:1 29:19,25
31:1,8 33:7 35:18 36:3
37:4,5,8,10,13,16 38:8,
10 40:5,7,12,19 44:23
45:24 46:20 47:6,10
49:2,13 50:20 52:4 53:2,
14,23 55:2,7,10,16,17
59:11,13,15 66:5 67:1
68:4 70:24 71:3 72:6,24
75:12,16,25 76:19 77:2
86:17 88:20 89:24 91:15
95:22 96:8 101:10
106:18 110:24 111:4
115:2 116:4 117:2
118:21 120:13 121:11
123:7 125:23 129:22
130:6 131:12,16 133:24

**timed**
33:3

**timeline**
117:14

**times**
27:17 28:7,21 29:25
130:18

**title**
41:19 50:19

**today**
20:21 24:24 39:24 47:18
57:9 68:1 84:9 89:8
97:14 107:10 109:20
134:10

**told**
15:1,4,11 19:3 26:7
54:23 55:2,9,15 56:11
59:2 62:4 63:8 67:18
83:6 84:25 85:9,14 87:7,
12,23 95:20 104:7,22

**tolerated**
101:9

**tone**
55:7 69:15 70:6,7 72:2,4,
6,17 92:9 116:16

**tones**
72:25 101:6 132:20

**Toni**
57:11,13,21 114:8,11,15

115:1,12 117:22,24

**top**
20:17 66:20 83:14
114:21 121:14

**totally**
4:23 28:16 30:9

**touch**
44:16 125:10

**touched**
55:7 78:1 132:14

**touching**
90:8

**Tracey**
53:12

**tracking**
77:16

**trade**
7:12

**traditional**
57:15

**Trahan**
3:5,17 17:9

**trainees**
63:21

**trainer**
49:11

**training**
30:4 41:25 42:18,22,24,
25 43:4,15,16,19,21,23
44:2,18,21,24,25 45:7,23
46:5,15,21 47:6,11 48:7
49:5,8,14,21 50:4,10,23
51:11,12 57:6 62:16,20,
25 103:3 108:12 114:13
119:1 127:1,2

**transcript**
6:25

**transferred**
69:17

**transitioned**
50:23 62:15

**trauma**
73:20

**Trazodone**
89:7

tread
45:4

treating
56:9 127:13

tried
26:17 53:8 64:16 79:19
128:17

trigger
28:6 65:19 77:5 90:6,8,9,
12 98:18 117:1 131:25
132:4,5

triggered
13:16,21 27:15 28:11
64:20 65:5 71:21 77:2
79:18 90:17 101:14,17,
19 116:16

triggering
98:12,16

triggers
29:3 117:7 131:24
132:10,23

trouble
50:15 93:5,6 111:14,18,
23

truck
95:19

true
72:18 82:21

trust
103:14

trusted
56:12

try
4:18 29:1,5,7 30:11,20
75:1,3 131:25

trying
74:8 130:16

turning
60:22

two
17:3,5,10 24:4,13 26:17
27:8 29:25 33:4 34:6,7
37:12,13,15,25 38:6,7
39:12 40:12,24 41:2
42:21 43:14 44:9 45:4
48:18 56:3 67:19 71:25
77:3 78:22 79:14 127:17

128:19

two-plus
48:11

typical
4:14

typically
75:13

typo
85:5

_____

**U**

_____

U-MAINE
32:10

U.S.
69:18

Uh-huh
3:12 4:21 5:2 6:17,23
13:1 17:21 18:2,20 37:18
48:21 56:7 107:17,20
108:1,6 118:20,23
126:21 132:12

Um
58:8

unable
27:6 29:20 30:9

unattended
89:19

unbiased
92:14

uncomfortable
47:3 49:16 55:8 133:16

undergo
32:24 40:23

undergoing
41:7

underneath
55:14 110:7

understand
4:22 5:3 42:15 50:9
56:19 60:15 62:23 74:9
78:9 84:3 87:12,17 92:22
99:24 102:6 116:10,21
127:24

understanding
38:1,13 78:11 98:5

100:16 101:24 130:4

understood
5:1 8:4 28:24 62:13
97:24 116:8

underwent
13:14 40:24 42:17

unfair
116:24

unfolded
87:2

unfolding
67:6 77:11

unhappy
47:7 49:15

United
69:7

University
6:1 25:12 31:22

unknown
110:22

unnerving
77:22

unpleasant
47:7

unsure
78:14,16

upper
48:3 106:5

UPS
69:18

upset
21:23 93:7

upsets
93:24

use
7:3,9 37:16 71:15 87:6

USM
10:15

usually
30:20 67:17 75:1 76:1
80:3 117:16 132:2
133:16

_____

**V**

_____

vacation
35:18 39:6,14

vague
84:15

vaguely
71:16 82:24,25 83:15,20,
24 84:1,4,7,14 112:14

Valley
5:14

variety
9:13

verbal
30:15,23

verbally
24:5 29:11,14 106:6
127:15

verge
33:23

versus
42:11

violate
35:18

violated
128:10

violent
30:21 75:5

vision
76:6

visit
117:13

vocabulary
118:12

voice
55:7 69:15 72:3,17,21
92:10 101:6 104:11,15

voicemail
97:9,12,17 98:19 99:1,7
116:2 120:4

voices
72:25 116:16

voluntarily
10:2,20 11:14,23

KIRSTIE TRAHAN - 01/07/2019                    i24

**vulnerable**
93:8

---

**W**

**W-2**
8:17

**wage**
35:10,12 36:14,18

**wait**
20:8 94:12 130:16

**waited**
94:14

**waive**
86:23

**waived**
3:3

**walk**
7:1 41:22 55:9 61:13
87:25 91:3 102:23

**walked**
64:25 78:21 79:13 86:4
90:19,24 91:7 94:17,22

**walker**
63:18 102:21

**walkers**
50:17 53:13

**walking**
55:22

**walks**
63:21 64:1

**wallet**
87:21,24 89:18

**want**
7:1,10 26:5 27:15 35:8
54:25 56:18 61:18 66:6,9
74:9 80:10 81:18,21 94:6
97:7,20 101:21 107:21
127:23,24 131:12 133:6
134:11,12

**wanted**
33:20 40:11 78:12 92:7
93:17,19 98:13 100:3
126:3 130:2

**Warner**
9:10,11

**warnings**
12:11

**wasn't**
33:21 41:14 44:12 45:3
46:9 51:11 57:14 65:20
68:24 69:24 72:16 85:1
87:6 100:2 120:15 122:2
124:13 130:14

**watched**
40:17

**way**
4:24 7:2 12:2 22:24 32:9,
17 45:25 46:5 49:16
51:18 56:21 57:4 69:15
72:13 75:23 77:9,25
82:18 89:5 92:18 95:11
96:15 98:5 102:18 115:4

**Wayfair**
3:11 24:23 25:9 26:22
29:23 30:8,14 31:2,8,11
32:4 33:22 34:3 35:11
36:14 38:18,19,22,24
39:2,15,25 40:6,18
41:17,19 42:1 43:1,20
44:3 46:16 47:8 49:7
50:14 58:15,21 59:7 65:5
67:4 68:12 86:7 98:10
101:18 102:8 104:20
105:6,19 107:5 108:10
113:13 114:2,3,5,11
117:6,10,11 118:21
120:7 121:9,25 122:3
123:9 124:24 126:4
128:4,10,13 129:23
130:5,13 131:7,20 133:3,
10,15

**Wayfair's**
38:14 60:15 63:10 66:17
129:8

**ways**
115:10

**we'll**
28:11,20 57:19,20 58:24
61:18 105:17

**we're**
4:4 12:18 51:15 57:17
59:25 86:23 101:3
103:23 124:23 125:3

**wear**
56:17

**Wednesday**
35:3 96:23 98:19

**week**
18:22 19:11 34:7 36:23

**weekend**
36:10,12

**weekly**
100:13

**weeks**
27:8 37:9,12,13,15 38:2,
5,6,7,9 39:12 42:21,22
43:14 125:15

**weird**
124:4

**welcome**
134:18

**went**
3:13 5:14,19 6:7 8:12,19
10:4 12:20,24 13:6,7
25:12 32:2 40:2 49:22
59:4 78:17 82:12 83:2
85:16 86:5,13 89:16,20,
22 102:3

**weren't**
44:13 47:12,23 48:1
52:12 82:20 98:15

**what's**
5:9 9:6 36:7 73:25 76:4
81:6 90:16 105:8,9,10
107:9 113:14 121:1,9
122:7

**Williams**
108:5,7,15 114:1

**willing**
30:11 100:12

**withdraw**
14:3 15:16

**withdrew**
58:6

**witness**
119:5

**witnessed**
119:11 124:7

**wizard**
64:15

**women**

48:16

**won't**
97:14 104:15

**word**
70:18 71:12,15 73:12
83:13,17 84:10,16 88:22
92:25 112:14

**words**
30:24 47:7 53:5 70:17
74:8,20,24 82:22 99:19
118:13

**work**
6:16 12:21 18:24 19:17
21:22 24:20,21,22 26:2,
16 27:7 29:20 30:3,10,11
33:12,16,17,19 34:9,18
35:14,24 36:11,22 37:2,5
40:10 42:8 62:24 64:16
67:18 89:3 95:20 97:25
103:8,10,15,25 109:8,9
125:8 127:12 129:3,8
130:7 131:8,9 133:9

**work-related**
53:22

**workday**
67:16

**worked**
6:10 9:10,18 10:25 15:13
19:17 36:13 59:14
133:19

**working**
5:22 6:9 10:18 13:5
15:23 21:3 25:22 31:1,8
34:14,20 35:21 36:2
95:22 128:23 129:24
133:15

**workplace**
13:15,16,21,24 14:22
15:15,19 101:18 107:14

**works**
95:23

**worried**
133:2

**worse**
51:2,5

**wouldn't**
93:1 116:17

**write**

36:18 66:20 67:15 70:21 72:23 82:1 83:15 84:24 85:9 90:1,19 92:12 94:15 96:4 114:25 119:18 127:11

**write-up**
103:23 104:4

**writes**
18:21 20:23 22:20 110:7 112:2,25 117:22,24

**writing**
68:7 70:16 76:12,13 83:23 122:5

**written**
59:19 79:9 83:14 113:12

**wrong**
113:4

**wrote**
67:1,3 69:6 76:20 109:1, 17,21 110:9 111:13 115:16 117:23,25

---

**Y**

---

**yeah**
3:25 5:19 10:5,8,24 11:2, 17 12:20 16:17,21 18:17 22:14 24:2,12 25:3 33:18 34:17 40:20 43:21 45:18 50:5 53:4 54:11 56:15 58:6 60:21,24 61:1,10, 13,21 62:1 63:17,19,23 65:10,17,24 66:4 67:5,12 68:18,24 69:5,9,12,24 70:14,25 71:2,7,11,22 73:11,22 74:4,7 75:5,19 76:6,9 77:21 78:22 79:6, 12,16 81:11 83:19 84:21, 23 85:13,18 90:7 91:4 94:11,17,24 95:1,3,17 97:19 108:3,11,13,21,23, 25 109:3,9,15,23 110:6, 11,21 111:8,16 114:7,16, 24 115:16,18 117:21,23 118:1 119:18,21,23 120:25 121:16,19 122:16 123:17 124:23 125:6,14 128:22 132:5,15,19,21, 24

**year**
6:7 12:5 88:20 124:16

**years**
40:3 45:4 48:11

**you'll**
37:16

**you're**
5:22 16:23 17:6 20:9,16 23:16 27:14 28:10 35:21 36:1 44:19 49:23,25 60:18 62:10 73:17 75:10, 20,22 76:5 80:18 81:2,4, 6,21 88:13 103:2 125:7 134:18