UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

KIRSTIE TRAHAN,

Plaintiff,

v.

WAYFAIR MAINE, LLC

Defendant.

CIVIL ACTION

Docket No:  1:18-cv-00209-LEW

**DECLARATION OF JONIE DUNIVAN**

1.       My name is Jonie Dunivan.  I hold the position of Manager, Talent Management at Wayfair, for which I have worked since 08/08/2016.   I am over eighteen years old, reside in Penobscot County, Maine, and made this declaration on the basis of personal knowledge.

2.       Wayfair hired Kirstie Trahan to be a Sales and Service Consultant (SSC) on 08/07/2017.  SSCs at Wayfair undergo two (2) weeks of classroom training, before they move the floor for "nesting," during which they take live calls from customers with the support of more experienced employees, including a "nesting coach" and "floorwalkers."  The nesting coach is not a supervisor and does not have the authority to hire, terminate, or discipline employees.  A floorwalker is an individual with experience working as an SSC.  As the title implies, floorwalkers walk the floor and support SSC during their nesting period, by assisting them as necessary.

3.       Ms. Trahan did not disclose any disability or request any accommodations for a disability upon her hire at Wayfair.  I did not know Ms. Trahan had post-traumatic stress disorder until I listened to a voicemail that she left me on September 21, 2017, as described below.  To my knowledge, Ms. Trahan did not disclose her diagnosis to anyone else at Wayfair at any time.

{W7282666.1}

4.        Until late afternoon on September 20, 2017, I was working from home on an on-line training.  When I arrived at the call center on the afternoon of September 20, either then Site Manager Peter Boudreaux or Manager Kristy Foster told me that there had been an incident on the floor during which Ms. Trahan had directed profanity toward a peer.  Ms. Foster had spoken with Ms. Trahan, two coworkers involved in the incident (Ashely and Brianna), another colleague who had a concerning interaction with Ms. Trahan (Matthew Pulley), nesting coach Thoma Noddin, and Manager Darren Plante.  Ms. Foster shared with me the substance of those interviews at a high level.

5.        Mr. Boudreaux and I consulted and agreed that Ms. Trahan should be sent home pending further investigation.  I met with Ms. Trahan in the presence of Ms. Foster and Joseline Belanger, who was Ms. Trahan's manager.   I observed Ms. Trahan to be defensive and abrupt and to lack accountability.  She referred to her coworkers as "bitches" and rolled her eyes as I spoke to her.  My perception was that she was very annoyed.  Ms. Trahan said that one of her coworkers answered a question that she had directed to another coworker, which apparently offended her.  She asked me whether her coworkers were being sent home, and I told her that I could not share information about other employees.  During the course of this meeting, Ms. Trahan did not mention PTSD or any mental health conditions.

6.        After we sent Ms. Trahan home, I spoke further with Ms. Foster about what she had learned during her investigatory interviews.  Ms. Foster shared with me all of the details that she later committed to writing in the email to me that is attached as Exhibit B to her Declaration.

7.        I also spoke with Thoma Noddin and asked whether Ms. Trahan had ever complained to her about her coworkers, as Ms. Trahan claimed to have done so when she met with Ms. Foster.  Ms. Noddin told me that she recalled an occasion when they were leaving a

training class and Ms. Trahan commented that it was so "high school." Ms. Noddin may have said that Ms. Trahan also used the word "cliques." Ms. Noddin reportedly responded, "we're all here to a get a job done . . ." Ms. Noddin told me that she did not perceive Ms. Trahan to be lodging a complaint, so much as making an offhand remark about her coworkers.

8.      At the end of the workday on September 20, 2017, after speaking with Ms. Noddin, I spoke to Mr. Boudreaux about how to proceed. We agreed that, based on Ms. Trahan's own description of events and, in particular, her admission that she called her coworkers a "bunch of bitches" on the floor, she would be terminated for violating Wayfair's Rules of Conduct. In supporting termination, I was mindful of the other information Ms. Foster had gathered, including about Ms. Trahan's interaction with Matt Pulley and a Texas nesting coach's complaint that Ms. Trahan had been rude. There appeared to be a pattern of unprofessionalism and rudeness that Ms. Trahan not only did not acknowledge, but perpetuated in the course of her meetings with management on September 20, 2017.

9.      Wayfair's Rules of Conduct, which are attached hereto as Exhibit A, require employees to "treat everyone in a professional manner—that is, with respect, integrity, courtesy, and a cooperative attitude." Ms. Trahan's admitted and observed behavior on September 20, 2017 did not live up to these requirements. Wayfair takes these Rules of Conduct seriously. I am unaware of any employee who has directed profanity at a coworker on the floor and suffered some consequence short of termination. I am aware of employees Wayfair has terminated, with my support, for unprofessional interactions with colleagues and without prior disciplinary action. The decision to terminate Ms. Trahan's employment was consistent with how Wayfair has handled similar situations in the past.

{W7282666.1}

10.    Mr. Boudreaux and I agreed that I would speak with Ms. Trahan to terminate her employment the following day, and I left for the day at approximately 5 p.m.

11.    The next morning, I came in to a voicemail that Ms. Trahan had apparently left for me the day before, after I left.  In it, Ms. Trahan stated that she was a veteran with PTSD and that her coworkers triggered her.  Ms. Trahan offered to provide documentation of her PTSD.  I called Ms. Trahan back later that day, as she asked me to do.  I did not terminate Ms. Trahan on this call, even though the decision to terminate had already been made, because I wanted to give Ms. Trahan an opportunity to tell me whatever she wanted to tell me and because I felt it was important to consult with my manager before proceeding, in light of the new information Ms. Trahan had provided about her mental health diagnosis.

12.    After speaking with Ms. Trahan, I contacted my manager, Candice Smith, and confirmed I had her support to proceed with the termination.  The next day, on September 22, 2017, I called Ms. Trahan and terminated her employment.

13.    I understand Ms. Trahan contends that, when we spoke on September 21, she asked if she might work from home.  In September 2017, no Bangor SSCs worked from home and Wayfair did not yet have the technical capability to permit Bangor SSCs to do their jobs from home.  It literally would not have been possible for Ms. Trahan to do her job from home in September 2017 because, as an SSC, Ms. Trahan required access to the network and Wayfair's phone system.

I declare under the penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: June 12, 2019                                    /s/ Jonie Dunivan
                                                      Jonie Dunivan