UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| KIRSTIE TRAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-cv-00209-LEW |
| | ) | |
| WAYFAIR MAINE, LLC, | ) | |
| | ) | |
| Defendant | ) | |

# ORDER ON DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT

Kirstie Trahan alleges her former employer, Wayfair Maine, LLC, engaged in disability discrimination in violation of the Maine Human Rights Act and the Americans with Disabilities Act, when it failed to accommodate her disability and subsequently terminated her. Compl. ¶ 16 (ECF No. 1). The matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 14).

For the reasons discussed herein, Defendant's motion is granted.

## SUMMARY JUDGMENT FACTS

Kirstie Trahan began working for Wayfair Maine, LLC, on August 7, 2017, and served as a sales and service consultant in Wayfair's Bangor call center. The call center has an open floor plan and consultants sit close to one another. Consultants frequently interact in the work place and rely on each other for best practices, tips, and information. Consultants are also organized into teams for group coaching and training.

Trahan is a veteran with post-traumatic stress disorder. When "triggered," Trahan experiences flashbacks that return her to a traumatic experience and shift her perception of what is happening around her. Her flashbacks produce emotional dysregulation and make her feel that people are out to get her. When she started work with Wayfair, Trahan did not disclose to Wayfair that she has PTSD or how it might affect her employment.

During her employment with Wayfair, Trahan was part of a training team and three members of the team were "tight" with each other but excluded Trahan from their social activities. On one occasion, Trahan observed a chat session and recognized her name. She believed the others were making fun of her. She reported to her nesting coach, Thoma Noddin, that she felt the three trainees were a clique and stated that "they were affecting certain things to come out in my life that I really didn't want to come out." Trahan Dep. 54:23-25. She inquired when the trainee nesting period would end so she could part ways with them and join a different team.

After approximately a month at work, Trahan sought assistance from a trainer named Matt. Trahan perceived Matt's tone as overbearing and felt uncomfortable when he touched her arm. Trahan expressed her frustration with Matt and left for the bathroom, where she processed a flashback triggered by her interaction with Matt. When Noddin entered the bathroom to check on her, Trahan explained that she had a PTSD flashback and needed time to process through it. The record does not indicate what, if anything, Noddin may have done with this information.

On a later date, Trahan had an unpleasant exchange with a coworker named Brianna, one of the three clique members, who chimed in to answer an inquiry Trahan directed at a

different coworker named Ashley, another member of the clique. Although Brianna supplied useful information to Trahan, Brianna used a tone Trahan regarded as demeaning. This annoyed Trahan and Trahan's reaction ("I was not talking to you, mind your own business") drew a further response ("I was only trying to help"). This interaction ended with Trahan calling her coworkers bitches, throwing her headset, and slamming down her cell phone before walking off.[1] Def.'s Stmt. ¶ 29. (Plaintiff denies pounding her fists on her desk and storming off, but admits throwing the headset, slamming down her phone, and walking off. Pl.'s Stmt. ¶¶ 29, 108.) After this episode of emotional dysregulation,[2] Trahan reached out via Skype to Joselin Belanger, her manager, to inquire when she would move to a different desk and team because she would prefer to move away from certain coworkers.

Meanwhile, when managers learned of a conduct issue on the floor, site manager Peter Boudreaux instructed Kristie Foster, another manager, to investigate. The investigation included a sit-down talk with Trahan, attended by Foster and Belanger. Trahan acknowledged that she called her coworkers bitches, but stated that one of them had snapped at her. Trahan stated that she was sick of the clique the others had, that they were always talking about her, and that they were a "bunch of bitches." Trahan asked to be moved to a different location through a team change and told Foster and Belanger she had previously reported to Noddin that she had trouble with these coworkers. During the

---

[1] There is evidence that Trahan also dropped the "F-bomb." I have credited Trahan's denial, though Trahan also says she blacked out during the incident. Def.'s Stmt. ¶ 29; Pl.'s Stmt. ¶¶ 29, 106, 118.

[2] Wayfair describes the incident as escalating into a flashback. This description is consistent with Trahan's deposition testimony. Trahan Dep. 71 – 73.

meeting, Trahan sat with her arms crossed and rolled her eyes repeatedly, which Foster considered very rude and unprofessional. Trahan maintains her conduct was the product of a panic attack triggered by the confrontational meeting. Trahan did not suggest to either Foster or Belanger that she was experiencing a psychiatric event at the time.

After speaking with the other workers involved in the incident, and with Matt about his interaction with Trahan, Foster brought the matter to Jonie Dunivan, Wayfair's local talent (HR) manager. Dunivan conferred with site manager Peter Boudreaux. Dunivan and Boudreaux agreed that Trahan should be sent home for the day and Dunivan, Belanger, and Foster met with Trahan to send her home. When she retrieved Trahan, Foster placed a hand on her shoulder, "a huge trigger for Ms. Trahan." Pl.'s Stmt. ¶ 121. Also, this meeting was stressful for Trahan because it was a "three-on-one." *Id.* ¶ 122. Like Foster, Dunivan was not impressed with Trahan's comportment, as Trahan rolled her eyes, once more referred to her coworkers as bitches, and did not offer any words of personal accountability. After the meeting, Foster took Trahan's badge, packed up Trahan's possessions at Trahan's request, and escorted Trahan to the exit. Later that afternoon, Boudreaux and Dunivan conferred and agreed that Trahan would be terminated for violating Wayfair's rules of conduct, which require that employees interact with respect, integrity, courtesy and a cooperative attitude. They also agreed that Dunivan would inform Trahan of their decision in the morning.

> Later that evening, Trahan called and left Dunivan the following voicemail:
>
> Hi Jonie, this is Kirstie Trahan and my extension was 1141199. And I forgot to tell you today that the reason I did ask for that transfer of pod and out of that situation is because I am a veteran with severe PTSD and how those girls

4

were treating me was causing triggers to come out in me. Umm, and I do have documentation of that and I can provide any further documentation you need like a DD-214 or records from my therapist at Acadia. So if you could call me back that would be great. My number is [555-5555].

Dunivan listened to the voicemail the following morning. That was the first time Dunivan was aware that Trahan attributed her behavior to a mental health disorder.

When Dunivan spoke with Trahan by phone later that day, she expressed skepticism that the incidents at the workplace would have triggered PTSD symptoms, stated she would have to see medical records that support Trahan's representations, and informed Trahan that the behavior Trahan exhibited would not be tolerated but they had not yet decided what to do. Trahan asked if she could be moved away from the coworkers she disliked so they would not trigger her, and she also asked if it would be possible to work from home. Trahan expressed willingness to substantiate her claim of disability and Dunivan understood that Trahan was reporting the existence of a disability, but she did not consider Trahan's statements to be a request for accommodation. After speaking with Trahan, Dunivan consulted with Wayfair's talent director, Candice Smith, to confirm that she had the go-ahead to terminate Trahan. The next day, September 22, 2017, Dunivan called Trahan and informed her she was terminated.

Trahan admits that she was not the only employee at the Bangor call center terminated for unprofessional interactions with coworkers, and that no employee has received discipline short of termination due to an emotional outburst or fit of anger in the work area.

Trahan had no incidents involving Wayfair customers. At the time of her

termination, she would have been eligible to move on from the nested training environment. Approximately one month after Trahan's termination, Wayfair began to offer Bangor employees the ability to work from home. Approximately 170 employees in Bangor worked in this capacity during the first year of the work-from-home program.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com*, *Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in her favor. *Triangle Trading Co. v. Robroy Indus.*, *Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).

Plaintiff brings disability discrimination claims pursuant to the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. Compl. ¶ 16. Specifically, she alleges Defendant failed to accommodate her PTSD and terminated her based on her PTSD. *Id.*

I. **FAILURE TO ACCOMMODATE**

To overcome the summary judgment motion on her failure to accommodate claim,

Trahan must produce sufficient evidence to establish that (1) she is a disabled person within the meaning of the applicable statute; (2) she is nonetheless qualified to perform the essential functions of the job (with or without reasonable accommodation); and (3) the employer knew of the disability and rejected a request for reasonable accommodation. *Sepúlveda-Vargas v. Caribbean Rest., LLC*, 888 F.3d 549, 553 (1st Cir. 2018); *see also Carnicella v. Mercy Hosp.*, 168 A.3d 768 (Me. 2017) (applying the same standard for a failure to accommodate claim arising under the MHRA).

A requested accommodation is considered reasonable if it would enable the employee to perform the essential functions of her job and, "at least on the face of things, . . . is feasible for the employer under the circumstances." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001). When making a request of the employer, the employee does not need to cite the governing law or use any magic word such as "accommodation," but she must "provide sufficient information to put the employer on notice of the need for accommodation" and "explain how the accommodation is linked to [the] plaintiff's disability." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012).

Through her voicemail to Jonie Dunivan and subsequent phone conversations with Dunivan, Plaintiff provided Wayfair with sufficient information for Wayfair to understand that Plaintiff attributed her misbehavior to a mental health condition. Plaintiff also requested that she not have to continue working with specific individuals with whom she had been in conflict or did not trust. What she did not articulate is how changing the coworkers she worked near would make her any more capable of performing her work, to the extent her work would require her to interact with and rely on coworkers or to act

7

appropriately in team activities or group coaching and training sessions. [3] Nor would it be apparent to the fact finder how an "accommodation" is at work here, as in a modification that would make Plaintiff more capable of engaging in the coworker-interactive requirements associated with Wayfair's workplace. While Plaintiff has suggested that telework from home would enable her to avoid unwelcome interactions, she has not demonstrated that the ability to telework relieves Wayfair consultants of coworker interaction, obviates the need to interact professionally with coworkers regardless of the perception of social cliques, slights and similar challenges, or minimizes the significance of past violations of Wayfair's rules of conduct.

Plaintiff's communication with Dunivan concerning Plaintiff's PTSD was, in short, an excuse for her past transgression of Wayfair's rules of conduct. "When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 262 n.9 (1st Cir. 2001)). So it is here. [4]

Plaintiff's failure to accommodate claim is similar to the claim presented in *Dorr v. Woodlands Senior Living of Brewer*, *LLC*, No. 1:15-cv-92-GZS, in which matter the Court

---

[3] Plaintiff's actual work with customers was not at issue.

[4] Citing *Calero-Cerezo v. United States Department of Justice*, 355 F.3d 6 (1st Cir. 2004), Plaintiff argues it is incumbent on an employer to engage in an interactive process to develop an accommodation whenever an employer receives information that workplace misconduct is associated with a disability. I do not understand *Calero-Cerezo* to so hold and *Jones v. Nationwide* is a contrary authority on that issue. Every case must be assessed on its own facts and the facts of *Calero-Cerezo* bear little resemblance to the facts of this case.

8

determined "that an employer's obligation to accommodate a disability is designed to apply prospectively rather than retroactively in the form of leniency or forgiveness of prior performance issues." 2016 WL 3566202, at *9 (D. Me. June 27, 2016), report and recommendation adopted, 2016 WL 4250254 (Aug. 10, 2016) (citing and discussing *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999), and *Davila v. Qwest Corp., Inc.*, 113 F. App'x 849 (10th Cir. 2004)). The plaintiff, Ms. Dorr, departed the workplace without providing her employer notice in advance, and later explained she suffered a panic attack that compelled her sudden departure. As in this case, Ms. Dorr first made a disability disclosure after being placed on notice that serious disciplinary action was contemplated. The Court granted summary judgment to the employer on Ms. Dorr's failure to accommodate claim.

Plaintiff's claim is also reminiscent of the claim presented in *Reed*. In *Reed*, the plaintiff informed her employer of a mental health impairment and sought permission to walk away from conflictual interactions with supervisors, but she made her request only after engaging in a "belligerent, vituperative attack" against a supervisor, an approach the First Circuit deemed "too little, too late." 244 F.3d at 262 & n.9. The Court observed that nothing would have prevented Ms. Reed from utilizing her proposed accommodation at the time, instead of engaging in a verbal attack on her supervisor. Trahan presents the same sort of claim. Trahan's conduct in calling her coworkers bitches, throwing her headset, and slamming her phone down was the culmination of what began with her subjective experience of annoyance following a "demeaning" response to her own question. Subsequently, in her words, "she started to sweat because the amount of commotion

9

between people's tones and voices and talking over each other is a lot for her to handle," and then she "started to black out." Def.'s Stmt. ¶ 106. Trahan has not demonstrated that she could not have exercised her proposed accommodation by not engaging or by disengaging at the first experience of annoyance.

Plaintiff's communications with Ms. Dunivan was designed to excuse unacceptable behavior and dodge coworkers she did not care for, not a request for a workplace accommodation. Defendant's decision to sanction Plaintiff's conduct was not a failure to accommodate.

## II. UNLAWFUL TERMINATION

Both the ADA and the MHRA prohibit discrimination in employment based on an employee's disability. 42 U.S.C. § 12112(a); 5 M.R.S. § 4572(1)(A). Disparate treatment of the disabled in connection with adverse employment actions is a form of prohibited discrimination. *Adamson v. Walgreens Co.*, 750 F.3d 73, 81 (1st Cir. 2014) ("An employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." (quoting *Velez v. Thermo King de Puerto Rico, Inc*., 585 F.3d 441, 451 (1st Cir. 2009)).

To substantiate a claim of discriminatory termination, a plaintiff must produce evidence to support a finding that the employer terminated her based in whole or in part on her disability. *Freadman v. Metro. Prop. & Cas. Ins. Co*., 484 F.3d 91, 99 n.7 (1st Cir. 2007); *Tobin v. Libery Mut. Ins. Co*., 433 F.3d 100, 104 (1st Cir. 2005). In other words, the inquiry turns on the presence or absence of evidence that the disability negatively influenced the decision-making process, such that the finder of fact can infer that it was the

employer's intent to discriminate based on the perception that the employee is disabled. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). The inquiry, in other words, is directed at uncovering whether the employer treated the disabled, but capable worker, less favorably than it would have treated a similarly situated, non-disabled but capable worker.

At oral argument, Plaintiff argued that because her PTSD produced her behavior, Defendant's decision to terminate her based on her behavior is direct evidence of disability discrimination, citing *EEOC v. Amego*, *Inc.*, 110 F.3d 135 (1st Cir. 1997). This is faulty logic and *Amego* does not support the proposition. *Id*. at 145 (rejecting a similar argument and observing that where discriminatory intent or pretext are not suggested by the record "there should be special sensitivity to the danger of the court becoming a super-employment committee"). An employer can sanction disability-related misbehavior, but cannot sanction it more harshly than it would sanction the same behavior in non-disabled employees.

The record reflects that Defendant informed Plaintiff of her termination after Plaintiff disclosed that she suffers from PTSD, so there is evidence Defendant was aware of a condition that could qualify as a disability before it actually terminated Plaintiff's employment. However, it is undisputed that Dunivan and Boudreaux agreed that Trahan would be fired based on her conduct in the workplace, and that they came to this agreement before Trahan informed Dunivan that her conduct was triggered by PTSD.[5] It also is

---

[5] Plaintiff argues the finder of fact might infer that Dunivan already knew based on statements Plaintiff made to Noddin. However, Plaintiff admitted that the first time Dunivan became aware that Trahan has PTSD was when she listened to Trahan's voicemail. Def.'s Stmt. ¶ 64.

undisputed that Trahan was not the only employee at the Bangor call center terminated for unprofessional interactions with coworkers, and that no employee has received discipline short of termination due to an emotional outburst or fit of anger in the work area. Given the undisputed evidence, Plaintiff has failed to raise a genuine issue of intent to discriminate based on disability status.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (ECF No. 14) is GRANTED.

**SO ORDERED.**

Dated this 6th day of September, 2019

                                              /s/ Lance E. Walker
                                              U.S. DISTRICT JUDGE